William Reynolds, individually; as Spouse of Sylwia Pawlak Reynolds; and as Next Friend of their minor children, AMR, WR, and AR

Plaintiff

vs.

Case No. 25-CV-754-LMP-JFD

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED UNDER FED. R. CIV. P. 38(b)**

Nancy Sanders Harper, MD; Hennepin County; Fairview Health Services; The Board of Regents of the University of Minnesota; Hennepin Healthcare System, Inc., d/b/a Hennepin County Medical Center; Otto Bremer Trust; The University of Minnesota Physicians d/b/a U of M Physicians; the University of Minnesota Foundation d/b/a U of M Foundation; Britta Nicholson; Sarah Elizabeth Lucken, MD; Seth Cheng Silbert, MD; Mohamed Tahsin A. Jouhari, MD,

Defendants.

FOR HIS AMENDED COMPLAINT AND JURY DEMAND, William Reynolds, individually; as spouse of Sylwia Pawlak Reynolds; and as Next Friend of their minor children, AMR, WR, and AR, ("William,") by and through counsel, the Law Offices of J.M. Reinan, PC,

states and alleges against Nancy Sanders Harper, MD; Hennepin County; Fairview Health Services; The Board of Regents of the University of Minnesota; Hennepin Healthcare System, Inc., d/b/a Hennepin County Medical Center; The Otto Bremer Trust; University of Minnesota Physicians d/b/a UMP; University of Minnesota Foundation d/b/a U of M Foundation; Britta Nicholson; Sarah Elizabeth Lucken, MD; Seth Cheng Silbert, MD; Mohamed Tahsin A. Jouhari, MD, as follows:

## **INTRODUCTION**

1.      This suit is brought to redress the unconstitutional, unlawful, fraudulent and secret policies, procedures, customs and practices of persons involved in the Hennepin County child protection system.

2.      Those unconstitutional, unlawful, fraudulent and secret policies, procedures, customs and practices resulted in the destruction of Plaintiff's family and continue to cause incalculable harm to many other Hennepin County families who become unwittingly ensnared in Defendants' unlawfully constructed child protection net.

3.      On February 2, 2018, Sylwia Pawlak Reynolds was charged with two counts of Murder–2nd Degree related to the death of 11- month-old GC.

4.       Sylwia didn't murder or hurt GC in any way. Defendants know that.

5.      Despite knowing that Sylwia had nothing to do with GC's injuries or death, Defendant' unconstitutional, unlawful, fraudulent and secret policies, procedures, customs and practices were implemented to make it appear as if Sylwia murdered GC by shaking him to death.

6.      Defendants were able to fabricate, destroy and omit medical evidence in GC's case because of private policies, customs and practices created and implemented by Defendants to ensure that no physician or staff member at any University of Minnesota staffed hospital will

contradict or disagree with a diagnosis of child abuse made by a member of the University of Minnesota's child abuse pediatric team, including, in this case, Defendant Nancy Harper, MD.

7.     These secret policies, customs and practices promoting the fabrication, destruction and omission of medical evidence tending to exonerate accused child abusers were created in order to compensate for the fact that one of the premiere child abuse diagnoses, shaken baby syndrome, "SBS," which is now referred to as abusive head trauma, "AHT," has now been widely discredited by medical science, even though the public at large is generally insulated from this fact.

8.     Because SBS/AHT generates considerable money for Defendants – through grants and public monies – Defendants have made the decision to engage in systematic fraud in order to identify and falsely prosecute accused child abusers.

9.     This fraud involves not only manipulation of medical evidence and testimony, but also includes academic fraud by and through the creation of falsified medical data and studies that Defendants use to secure false child abuse prosecutions and convictions.

10.     Defendants' decisions to favor their own personal, academic and institutional wellbeing over those of sick babies, parents, families and caregivers of sick children has resulted in a situation where parents and caregivers who bring sick or injured children to a Hennepin County or University of Minnesota-staffed emergency department run the real risk of becoming targets of Defendants' unscrupulous monetization of child abuse reporting and prosecution.

11.     Defendants' contempt for the medical profession, the courts and the child protection system has also resulted in the destruction of Plaintiff's family.

12.     The fabricated civil and criminal prosecution of Sylwia – and the system that created and tolerated her fabricated prosecution – has forced Sylwia to remain in her native home

Poland, where she has resided for over seven years, raising the Reynolds' six-year-old son by herself, while William raises the two other children without their mother.

13.     In the small town where she lives, Sylwia has been labeled a "baby killer" because the public perception is that neither doctors nor the institutions they report to would ever falsely accuse a person of such a horrific act. Defendants in fact thrive on that public perception.

14.     The seven years of abject fear created by Defendants' continuing course of wrongful conduct has prevented Sylwia from being able to directly participate in this lawsuit.

15.     The system has not only failed Sylwia and her family -- it has abused them, and it continues to do so to this day.  Plaintiff's remaining remedy is to seek this Court's intervention to not only compensate the family for its continuing injuries and losses, but to force Defendants and ultimately Hennepin County to protect families, children and caregivers rather than treat them as financial, academic and political pawns.

## JURISDICTION

16.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution; 42 U.S.C. § 1983; 42 U.S.C. § 1988; and 18 U.S.C. § 1961 *et seq.*  The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202.

17.     This case is instituted in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

18.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367, because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

## PARTIES AND VENUE

19.    Plaintiff William Reynolds ("William") is the spouse of Sylwia Pawlak Reynolds ("Sylwia"). William and Sylwia have three minor children: AMR, who is now 16 years old; WR, who is now 13 years old; and AR, who is now 6 years old.

20.    William brings this suit individually; as Sylwia's spouse; and as Next Friend of AMR, WR and AR, all of whom are minor children lacking legal standing to bring this suit on their own.

21.    Defendants have prevented Sylwia from participating in this lawsuit, for the reasons described in greater detail below.

22.    Defendant Nancy Sanders Harper, MD ("Harper") is a pediatrician with a sub certificate in child abuse pediatrics.

23.    Harper is a resident of Minnesota and citizen of the United States of America acting within the scope and course of her employment and under color of state law.

24.    Harper is the Child Abuse Pediatrics Fellowship Program Director and a Professor of Pediatric Emergency Medicine within the Department of Pediatrics at the University of Minnesota, which is owned and operated by the Defendant Board of Regents of the University of Minnesota.

25.    Defendant Board of Regents of the University of Minnesota is the University's governing body and "body corporate . . . with the right as such, of suing and being sued." Minn. Laws 1851, cl. 3, § 7; *see also Miller v. Chou*, 257 N.W.2d 277, 278 (Minn. 1977). The Board of Regents consists of twelve members elected pursuant to Minn. Stat. § 137.0246. The Board is sued pursuant to *Ex parte Young*, 209 U.S. 123 (1908), for acting under color of state law. For the purposes of this lawsuit, the Defendant Board of Regents of the University of Minnesota will be

referred to as "U of M".

26.     U of M is a proper entity to be sued under 42 U.S.C. § 1983 for its deliberately indifferent policies, practices, habits, customs, procedures, and training with respect to its Child Abuse Pediatrics Fellowship Program, the diagnosis of child abuse in pediatric populations presenting to HH and Children's, which resides on the U of M campus, and other entities supervised and overseen by physicians employed by the U of M, UMP, as well as its forensic services and participation/oversight of persons accused of child abuse.

27.     Harper is also the Medical Director of the Otto Bremer Trust Center for Safe & Healthy Children ("The Center"), a sub department of the U of M Department of Pediatrics. The Center was created by, is managed by and is funded by Defendant Otto Bremer Trust, "Bremer." The Center is operated, medically staffed and supervised by UMP.

28.     Bremer created and funded Harper's position within the Hennepin County child abuse protection system and is responsible for placing Harper in her ultimate position of unsupervised authority, as described further below, and for tolerating and ratifying her continuing unlawful conduct.

29.     Bremer also effectively monetizes the prosecution of alleged child abusers by and through its numbers-based grants and donations to various U of M entities.

30.     Harper is co-employed by Defendant University of Minnesota Physicians "UMP." UMP employs, trains and supervises some or all of the members of the medical staff at several major acute care hospitals in Hennepin County, including Hennepin Healthcare, f/k/a Hennepin County Medical Center, herein "HH;" and M Health Fairview Masonic Children's Hospital, herein "M Health."

31.     UMP also directs and supervises clinical care at HH and M Health and is part of

Hennepin County's child protection program.

32.     UMP provides HH and M Health with policies, procedures, protocols and customs at HH and M Health.

33.     M Health is co-owned by Defendant Fairview Health Services, "Fairview," a nonprofit corporation.

34.     UMP and U of M contract with Defendant Hennepin County to provide child abuse services at HH and M Health. Upon entering into formal and informal agreements to provide diagnostic services, oversight and forensic services to Hennepin County, M Health and HH, Defendants U of M and UMP assumed public and county functions, acted under color of state law, and are legally responsible to comply with all requirements of the United States Constitution.

35.     Harper is an agent of and/or co-employee of Hennepin County, where she acts as an agent and/or consultant for the Hennepin County Attorney's Office, "HCAO," and as an agent of the Hennepin County Department of Human Services, Division of Child and Family Services.

36.     In these roles, Harper:

> a.     Generates and supervises medical evidence used in child abuse prosecutions in Hennepin County;
>
> b.     Edits medical evidence generated by physicians assigned to diagnose and treat suspected victims of child abuse;
>
> c.     Supervises and directs Hennepin County child protection employees;
>
> d.     Supervises and directs law enforcement officials and investigators; and

e. Supervises and directs employees of the Hennepin County Attorney's Office, "HCAO."

37. Harper has privileges to practice medicine at HH and M Health.

38. Hennepin County employs, funds and supervises all child protection workers, social workers and the investigators and attorneys of the HCAO, including specifically Defendant Britta Nicholson, an attorney employed by the HCAO to bring civil child protection suits in family court. Nicholson is a resident of Minnesota and citizen of the United States of America acting under color of state law and at times within the scope of her employment with the HCAO.

39. Defendant U of M Foundation is a 501(c)(3) nonprofit corporation owned, operated and/or a subsidiary agency of the U of M. U of M Foundation receives grants and donations from Bremer on behalf of The Center and distributes those monies to its various subsidiary business entities, including UMP, and, ultimately, Defendant Harper. In this role the U of M Foundation participates in, ratifies and directs child abuse identification and prosecution policies within those institutions.

40. At times relevant, Defendant Sarah Elizabeth Lucken, MD ("Lucken") was a staff pediatrician at HH, on-call representative of The Center, and member of the Child Maltreatment Physician Consult Team (CMPCT) at HH. Lucken is a resident of Minnesota and citizen of the United States of America at times acting within the scope and course of her employment and under color of state law.

41. At times relevant, Defendant Seth Cheng Silbert, MD ("Silbert") was an ophthalmologist with privileges to practice at HH. Silbert is a resident of Minnesota and citizen of the United States of America at times acting within the scope and course of his employment and under color of state law.

42.     At times relevant, Defendant Mohamed Tahsin A. Jouhari, MD ("Jouhari") was a staff Pediatric Emergency Medicine physician with privileges to practice at HH and was a faculty member of the U of M Medical School. Jouhari is a citizen of the United States of America at times acting within the scope and course of his employment and under color of state law.

43.     Under Minnesota law, Hennepin County is vicariously liable for the acts and omissions of its agents and employees, including Harper, Nicholson and agents of the HCAO. UMP is vicariously liable for the acts and omissions of its agents and employees, including Harper, Silbert and Jouhari. U of M is vicariously liable for the acts and omissions of its agents and employees, including Harper and Jouhari. HH is vicariously liable for the acts and omissions of its agents and employees, including Harper and Jouhari.

## I.     FACTUAL BACKGROUND

### Development of "Shaken Baby Syndrome"

44.     Shaken Baby Syndrome ("SBS/AHT") is not and has never been a scientifically proven medical diagnosis. In SBS/AHT cases involving children ages 0 to 5 years of age, child abuse physicians ("CAP") testifying on behalf of state prosecutors dogmatically rely on a "triad" of symptoms – subdural hematomas, retinal hemorrhages, and encephalopathy – as proof-positive of inflicted traumatic brain injury ("TBI") regardless of whether a child presents with or without external injuries.

45.     The underlying hypothesis of SBS/AHT was first suggested by British neurosurgeon Norman Guthkelch in 1971. Dr. Guthkelch studied thirteen cases of infants with subdural hematomas and found that five of those cases demonstrated no external injuries. Dr. Guthkelch theorized that the intracranial findings in those infants could have been caused by shaking. He cited to an observation study of Dr. Ayub K. Ommaya in which monkeys were

subjected to sudden accelerative/decelerative forces. Dr. Ommaya's paper on monkeys was the only source of experimental data upon the which the original hypothesis was based.

46.    In 1984, Ludwig and Warman published a paper titled, *Shaken Baby Syndrome: A Review of 20 Cases.* In this review, the authors examined twenty cases of children who were reported as victims of child abuse. Of 1,250 children referred to Child Protective Services, "CPS," 20 met the criteria for SBS/AHT. 14 were boys and 6 were girls, ranging in age from one to 15 months.

47.    Of the 20 cases reviewed by Ludwig and Warman, 16 children had their head circumferences measured. Nine children were identified with head circumference, "HC" measurements greater than the 90th percentile, and eleven children had a full or bulging anterior fontanelle (soft spot on an infant's head that closes between 4 and 26 months of age.)

48.    15 children were subject to funduscopic examinations. 12 were positive for retinal hemorrhages (3/15 unilateral, 12/15 bilateral.) All 20 children were subject to computed cranial tomography ("CT") scans. Ten children were identified with subdural hemorrhages, eight with cerebral contusions, and five with subarachnoid hemorrhages.

49.    Of the 20 cases reviewed, 3 children died, and 10 children had significant morbidity including blindness, visual impairment, motor impairment, seizures, and developmental delay.

50.    Ludwig and Warman concluded from the analysis of this data that HC measurements in the 90+ percentiles were an early indicator of SBS/AHT caused by behavioral corrective efforts by parents and caregivers over time that produced cumulative morbidity and potentially death.

51.    In other words, these researchers concluded that shaking a baby's head, over time,

would result in excessive head growth, "macrocephaly," and ultimately sickness or death.

52.     In 1993, the American Academy of Pediatrics ("AAP") published its first official statement on the SBS/AHT "triad" of injuries.

53.     The AAP instructed physicians to assume SBS/AHT had occurred notwithstanding the absence of external injuries or caregiver reports of accidental events and/or natural disease process.

54.     The AAP also recommended that teams of specialists be formed for the specific task of working with children suspected to be victims of SBS/AHT. These teams were to be comprised of pediatric radiologists, neurologists, neurosurgeons, ophthalmologists, and pediatricians specializing in child abuse. In that moment, the modern incarnation of Child Assault Prevention, "CAP," was born.

55.     In its 1993 statement, the AAP instructed that SBS/AHT symptoms may not be immediately identifiable. Supporting Ludwig and Warman's view that SBS/AHT was often the result of repeated shaking over time – and demonstrated by head circumferences above the 90th percentile -- the AAP characterized SBS/AHT as equally likely to present with gradual or subtle symptoms such as poor feeding, vomiting, lethargy and irritability over days and weeks.

56.     Around this same time, a three-year nationwide campaign was launched to raise public awareness about "Shaken Baby Syndrome."

57.     After the AAP statement and media blitz, criminal allegations and prosecutions of SBS/AHT soared.

58.     Prior to 1990, only fifteen cases of alleged SBS/AHT reached the appellate courts. Between 1990 and 2000, over two hundred SBS/AHT cases reached the appellate courts, and between 2000 and 2010, there were over eight hundred such SBS/AHT cases.

59.     Although Dr. Guthkelch originally theorized the shaking mechanism within the context of medical care, SBS/AHT had been commandeered by state and local prosecutors for the purpose of criminal prosecution.

60.     In 2001, the AAP published a paper that gave rise to the most current SBS/AHT theory that governs the testimony of CAPs nationwide. Contrary to its position in 1993, the AAP then proclaimed that the clinical signs of SBS/AHT "…are immediate and identifiable as problematic even to parents who are not medically knowledgeable."

61.     This new position also effectively scrapped the previous medical studies demonstrating that SBS/AHT usually involved a prolonged process of shaking that manifested itself through abnormal enlargement of the baby's head.

62.     In 2009, the AAP released yet another policy statement, this acknowledging the problems inherent to the term "shaken baby syndrome." In this statement, AAP recommended the use of the term "abusive head trauma" as an alternative. At that moment, SBS/AHT was born.

63.     In the Consensus Statement on Abusive Head Trauma in Infants and Young Children (2018), the term AHT is used as a synonym for all forms of child abuse, for SBS/AHT and as an umbrella term containing all mechanisms of physical abuse to the head including SBS/AHT.

64.     Despite the fact that the SBS/AHT hypothesis was never proven to be a reliable medical diagnosis through peer reviewed testing and biomechanical analysis, it was rapidly adopted as a standard for prosecuting infant brain injuries in the absence of obvious external traumatic findings for a number of reasons – many of which have little or nothing to do with child protection or the prosecution of actual child abusers.

65.     Rather, the SBS/AHT hypothesis became popular because it became an easy route

for securing child abuse convictions. Development and use of the SBS/AHT hypothesis also became politically important, given the overwhelming public distaste over child abuse injuries and deaths, especially after the early 1990s media campaign.

66. SBS/AHT is popular with prosecutors because it provides them with a rare "magic bullet."

67. Testimony from a single pediatric abuse expert can prove all elements of the crime of child abuse resulting in death or serious injury, including the manner of death, the identity of the assailant or killer, and the perpetrator's intent. Thus, if a baby or young child presents to the hospital with the triad of injuries – and nothing else – all that remains for the prosecution to do is identify the last person with the baby prior to the onset of the severe symptoms of traumatic brain injury, and that person will almost invariably go to prison.

68. The SBS/AHT hypothesis is also attractive to prosecutors because it effectively lowers the state's burden of proof.

69. SBS/AHT cases are often tried initially in juvenile/family court, where a preponderance of evidence standard applies. Thus, when a person is accused of causing injury through SBS/AHT, prosecutors can strategically opt to bring a juvenile/family court proceeding first. The juvenile/family court typically does not assign defense counsel or experts, and as a result, the criminal prosecutor is able to essentially develop the state's case without much pushback from the underfunded juvenile/family court defendant. Often, defendants and their family resources are exhausted on juvenile/family matters, leaving no money for criminal defense and, more importantly, defense medical experts when charges are finally levied.

70. SBS/AHT prosecutions are also wildly successful because of the development of what amounts to an SBS/AHT enterprise.

71.    Over the years, lobbying and publicity efforts by SBS/AHT proponents – including child abuse pediatricians, prosecutors and child welfare caseworkers – has resulted in significant public funding and what amounts to a financial, political and medical machine built on identifying and prosecuting SBS/AHT.

72.    Medical schools at colleges and universities across the county have created departments that teach and validate SBS/AHT. State legislation has prescribed the mandatory formation of multidisciplinary teams ("MDT") tasked with finding and prosecuting SBS/AHT. Massive marketing campaigns have taught the public about the scourge of SBS/AHT.

73.    Thus, even if an SBS/AHT defendant has money, she faces a well-organized public-private partnership of highly credentialed child abuse pediatricians who are actually by design partnered with the prosecution and backed by massive public funding and a longstanding public relations campaign – and who use this power to convince juries that SBS/AHT is a real and well-accepted medical diagnosis based in evidence.

74.    Moreover, the SBS/AHT enterprise has made child abuse pediatricians so intertwined within the prosecution process that they are often the ones exercising *de facto* prosecutorial discretion – as is the case in Hennepin County.

75.    While SBS/AHT prosecution teams have what amounts to unlimited resources, the overwhelming majority of SBS/AHT defendants do not have the money or resources necessary to rebut the power, politics, money and reputation of the SBS/AHT enterprise.

76.    The parents and caregivers subjected to SBS/AHT prosecutions are disproportionately blue collar, low income or minority persons who lack the resources to combat SBS/AHT prosecutions spearheaded by well-credentialed university pediatric experts.

77.    Upon information and belief, as high as 80% of SBS/AHT allegations are made

against parents and caregivers at or below 100% of the poverty line while 98% are made against parents and caregivers at or below 399% of the poverty line, as established in the US Census Bureau report *Health Insurance Coverage in the United States: 2022.*

78.     In fact, Defendant Harper and others recently published a multicenter study titled, *Variation in Use of Neuroimaging in the Care of Infants Undergoing Subspecialty Evaluations for Abuse: A Multicenter Study,* October 28, 2024. The study self-reports that of the 1,114 infants in the study population, 72% were publicly insured (Medicaid funded Medical Assistance or partially Medicaid/State funded public health insurance) or uninsured. Upon information and belief, of the 26% studied who had private or military insurance, most of this population was also at or below 399% of the poverty line.

79.     Thus, while SBS/AHT physicians and their related child advocacy centers regularly testify and publicly profess that SBS/AHT spans across all social and economic levels, races, religions, and cultures, the statistics suggest a predatory interest in blue collar, low-income and minority families.

80.     Because SBS/AHT diagnoses are partially validated by legal determinations, SBS/AHT physicians seek out low-income caregivers that lack the financial wherewithal to significantly challenge the criminal charges and the underlying diagnoses. There is too much to lose from wealthy defendants and their legal teams deeply examining the medical records.

81.     Finally, the SBS/AHT enterprise has become what amounts to a self-perpetuating industry. Because the funding and maintenance of university departments, endowed chairs, case workers, and prosecution teams depends on ever increasing numbers of successful SBS/AHT prosecutions, SBS/AHT pediatricians are pressured to continually "find" victims of SBS/AHT in order to maintain and grow the SBS/AHT enterprise – just like for-profit corporation CEOs are

continually pressured to increase sales.

**The Medical Community Attacks the Medical Validity of the SBS/AHT Enterprise**

82.    Starting around 2000, a number of medical researchers began to question the validity of the SBS/AHT hypothesis, prompted in large part by its excessive use and abuse by the well-funded SBS/AHT prosecution enterprise.

83.    Up to that point, many SBS/AHT prosecution teams were able to secure convictions based on the existence of a baby's presentation with the SBS/AHT triad alone. In other words, babies would present to an emergency room with a brain bleed, retinal bleed and brain swelling – with absolutely no outward signs of injury or abuse – yet their parents or caregivers would be successfully prosecuted because of the sophistication and organization of the SBS/AHT enterprise and the lack of studies questioning the evidentiary basis for the prosecution's medical expert testimony.

84.    Around this time, several medical researchers became concerned that SBS/AHT was being overdiagnosed, and that the SBS/AHT hypothesis was resulting in a number of known false prosecutions and convictions. These false prosecutions were particularly troubling because they usually involved prosecution of the baby's parents or caregivers.

85.    These medical researchers began to publish papers questioning the validity of the SBS/AHT hypothesis.

86.    For example, a 2002 paper by forensic pathologist John Plunkett demonstrated, through video evidence, that a short fall from playground equipment could cause the triad of SBS/AHT symptoms and death after a short period of lucidity. This conclusion flew directly in the face of the SBS/AHT hypothesis, which was built on the idea that the triad of injuries was basically conclusive of SBS/AHT even if the infant had suffered falls or other medical injuries.

87.     Other medical studies confirmed that short falls could produce the triad of symptoms as could many non-traumatic medical conditions, including genetic disorders, metabolic disorders, blood disorders, clotting disorders, infections, toxins, poisons, nutritional disorders, and surgical complications.

88.     In 2003, a prominent biomechanical study by Michael Prange showed that the amount of shaking force necessary to cause an SBS/AHT-type brain injury to an infant would also necessarily result in catastrophic neck injury. Prange's conclusion was that the triad of SBS/AHT symptoms could not be caused by shaking unless the baby also had significant damage to his neck and ligaments.

89.     In 2006, the National Association of Medical Examiners withdrew its endorsement of the SBS/AHT hypothesis, calling the triad "not scientifically valid" and "mythical."

90.     In 2009, the American Academy of Pediatrics revisited its position on SBS/AHT and found, due to advances in medical understanding, that "there is no single or simple test to determine the accuracy of the [SBS/AHT] diagnosis."

91.     In 2010, a major study was published demonstrating that the mere presence of retinal bleeding is not diagnostic of SBS/AHT. *Retinal and Optic Nerve Sheath Hemorrhages Are Not Pathognomonic of Abusive Head Injury,* American Academy of Forensic Sciences (2010).

92.     In 2011, separate studies by Lantz/Couture and Barnes demonstrated that both subdural and retinal bleeding – 2/3 of the SBS/AHT triad – could be caused by short falls, further dissembling the medical and evidentiary foundation of SBS/AHT. *See Lantz et al, Evidence Based Case Report: Perimaculer Folds From Childhood Head Trauma,* 328 Br. Med. J. 754 (2004); Patrick D. Barnes, *Imaging of Nonaccidental Injury and the Mimics Issues and*

*Controversies in the Era of Evidence-Based Medicine*, 49 Radial. Clin. N. Am .205, 212 (2011).

93.     Barnes further noted that there is, "no evidentiary basis for reliably distinguishing between nonaccidental and accidental injury or the medical 'mimics.'" As a result, he concluded that, "the triad of signs and symptoms that would lead to a Shaken Baby Syndrome diagnosis were and are no longer considered medically sound."

94.     In 2012, the very person who coined the term "Shaken Baby Syndrome," Dr. Guthkelch, expressed remorse for creating what he considered to be a runaway prosecution train:

> While society is rightly shocked by any assault on its weakest members and demands retribution, there seem to have been instances in which both medical science and the law have gone too far in hypothesizing and criminalizing alleged acts of violence in which the only evidence has been the presence of the classic triad or even just one or two of its elements. Often, there seems to have been inadequate inquiry into the possibility that the picture resulted from natural causes. In reviewing cases where the alleged assailant has continued to proclaim his/her innocence, I have been struck by the high proportion of those in which there was a significant history of previous illness or of abnormalities of structure and function of the nervous system, suggesting that the problem was natural or congenital, rather than abusive. Yet these matters were hardly, if at all, considered in the medical reports.

95.     In 2017, a large study conducted by Lynøe *et al* in Sweden concluded that there is insufficient medical evidence supporting the conclusion that SBS is causative of the so-called triad of injuries.

96.     In 2018, Randy Papetti published a paper describing how unreliable the SBS/AHT diagnosis had become. *Papetti, The Forensic Unreliability of Shaken Baby Syndrome.*

97.     As a result of these and other studies as well as the recognition that the SBS/AHT enterprise had resulted in a number of false convictions and painful family separations, various medical organizations began to distance themselves from the SBS/AHT hypothesis based on the clear and emerging medical evidence against it.

98.     Even more recently, former supporters of the SBS/AHT hypothesis have begun to

actively back efforts to vacate criminal convictions based on earlier, flawed opinions that the presence of the triad is indicative of abuse. Among them was Dr. Guthkelch.

99. The crumbling medical community support for SBS/AHT resulted in some courts revisiting prior convictions that were premised on flawed and medically unsupported expert testimony by those intimately involved in the SBS/AHT enterprise.

100. For example, in *Roark v. Texas,* No. WR-56, 380-03, October 9, 2024, the Texas Court of Criminal Appeals vacated Andrew Roark's March of 2000 SBS/AHT conviction in a case involving his care of his girlfriend's 13-month-old child, BD. The child did not die but sustained permanent brain damage. Andrew Roark was sentenced to 35 years in prison. This ruling cites to a prior habeas finding:

> The habeas court found there was evidence presented by the State at Applicant's trial that shaking alone could cause the injury suffered by the child and that this injury is caused by shaking a child with extreme vigor that creates force similar to a high-speed motor vehicle accident or a fall from the second story of a building, as referenced in the previous section. The habeas court further found that there is no scientific validation to the claim that shaking alone can cause the injuries to B.D. The current science indicates there must be an impact. The evidence the court used to formulate this finding is based on changing testimony by State's witnesses in other trials and medical professionals who testified or provided affidavits.

The Texas Court of Criminal Appeals found, as did the habeas court, that medical science had evolved since the time of Roark's conviction. The Court took notice of the testimonies of State SBS/AHT experts as operating with an assumed certainty that is not commensurate with the past twenty years of scientific advancement and the uncertainty now inherent to medical evidence once solely attributed to SBS/AHT:

> But the jury would still hear experts on both sides arguing their position. B.D.'s injuries were consistent with abusive head trauma. An expert could still attest to the "consistent with" argument. Importantly, there would likely be no statements that it is "almost certainly" or "classically aligns with" a particular mechanism. This leaves the jury with little help. B.D.'s injuries were consistent with abusive head trauma, consistent with an acute-on-chronic rebleed from an accidental fall, and consistent with a spontaneous

rebleed that had reached the tipping point where there was no more room in her skull to hold the fluid. The mechanism of injury is the primary evidence in the case and the jury is left with criminal and non-criminal alternatives that are all consistent with the evidence.

101.    In *People of the State of Michigan v. Milton Lee Lemons*, Docket No. 163939, the Michigan Supreme Court overturned the 2005 conviction Milton Lemons on July 25, 2024. In its opinion, the Court addressed the double standard applied to SBS/AHT physicians opining on reliable testing and models versus that provided by representatives of government commissioned agencies pertaining to automobile and consumer product safety:

We fail to understand why there is no "analytical gap" between expert opinion testimony and biofidelic and computer models in cases involving car crashes or product liability, but when those same models are relied on by experts in cases involving SBS/AHT, there is an insurmountable analytical gap between the models and the experts' testimony.

102.    Similarly, the Wisconsin Court of Appeals reversed the conviction of Audrey Edmunds in *Wisconsin v. Edmunds,* finding that "there has been a shift in mainstream medical opinion" regarding the SBS/AHT hypothesis since Ms. Edmunds's 1997 conviction.

103.    In *Del Prete v. Thompson,* 10 F.Supp. 3d 907 (N.D. Ill. 2014), a court similarly overturned the conviction of a caregiver accused of murdering a baby through shaking, noting that the medical support for that theory had evolved considerably since the time of her conviction.

104.    *People v. Bailey,* 144 A.D. 3d 1562 reached substantially the same result, as did *In re Pers. Restraint of Fero*, 367 P.3d 588 (Wash. App. 2015).

105.    Crumbling medical and legal support for the SBS/AHT hypothesis in recent years has threatened the lucrative and prestigious enterprise created and funded based on the SBS/AHT hypothesis.

### Child Abuse Pediatricians Respond with the "Helfer Playbook"

106.    In response to the attacks on the validity of the SBS/AHT triad as a diagnostic tool -- and thus the SBS/AHT enterprise as a whole – a group of the most active child abuse

pediatricians, including Defendant Harper, created what amounts to a playbook they use to counteract the existential crisis caused by this new medical evidence.

107.    Upon information and belief, the tenets and methods of this Playbook were developed at least in part by Harper and certain other SBS/AHT pediatricians by and through their organization known as the Ray E. Helfer Society ("Helfer Society").

108.    The Helfer Society is a nonprofit organization based in Illinois. Its stated goal is to support physicians specializing in the subspecialty of child abuse pediatrics.

109.    Although much of what the Helfer Society does is legitimate, Harper and some of her associated SBS/AHT pediatricians have used it as tool for the exchange of fraudulent medical studies, fraudulent medical data, prosecutorial strategies and expert testimony strategies in order to keep the SBS/AHT enterprise afloat in the face of multiple evidentiary attacks from the medical and legal communities.

110.    Those fringe members of the Helfer Society include Harper, who is the Helfer Society President, as well as SBS/AHT pediatricians Debra Esernio-Jenssen, MD ("Esernio-Jenssen") and Barbara Knox, MD ("Knox"), who are active Helfer Society members.

111.    As described in further detail below, working with and through one another and through the Helfer Society, Esernio-Jenssen, Knox, Harper and others have developed what will be described here as the "Helfer Playbook."

112.    Upon information and belief, some of the data, materials and ideas used by Harper and others to create, adopt and carry out the Helfer Playbook are stored at, were exchanged through, or otherwise electronically reside at the Helfer Society's headquarters in Illinois and thus were transmitted through interstate wires.

113.    The Helfer Playbook begins with a set of child abuse hospital and medical

policies, protocols and customs. These policies, protocols and customs include:

a.    A requirement that babies with certain types of injuries, e.g. a brain bleed, be automatically referred to the hospital or county's child abuse team;

b.    A requirement that once a baby's case is referred to the child abuse team, the child abuse team leads the baby's care, even though the child abuse team is typically comprised of non-clinical, forensic practitioners;

c.    A requirement that once a baby's case is referred to the child abuse team, no clinician is permitted to enter notes or reports in the medical record that conflict with the child abuse team's diagnoses;

d.    A requirement that, whenever possible, once a baby's case is referred to the child abuse team, the baby is moved from the hospitalist service to the surgical or trauma service so as to avoid the possibility of conflicting diagnostic information or opinions from specially trained hospitalists;

e.    A requirement that once a baby's case is referred to the child abuse team, hospitalists and other clinicians are prohibited from providing family members with medical information or diagnostic impressions; and

f.    A requirement that the child abuse pediatrician be permitted to edit the notes and reports of other physicians to ensure that those notes and reports supported the child abuse diagnosis.

114.    These policies, procedures, protocols and customs ensure that the baby's medical record omits any medical opinions that might conflict with a child abuse diagnosis. This in turn permits the testifying child abuse pediatrician to later testify that the hospital's entire medical staff was in agreement with the child abuse diagnosis, even if that was not actually the case.

115.    These policies, procedures, protocols and customs also ensure that the information provided to the baby's family consists only of a child abuse diagnosis and not any competing diagnoses or differential diagnoses that the family could later use to defend themselves in subsequent child abuse prosecutions.

116.    These policies, procedures, protocols and customs also ensure that law enforcement and prosecutors will be shielded from any medical evidence or information that may otherwise cause them to forbear from prosecuting the alleged abuser identified by the child abuse team.

117.    Once the alleged abuser identified by the child abuse team is charged with a child abuse-related crime, the child abuse pediatrician shepherds law enforcement and the prosecutors through the criminal proceeding.

118.    If the person accused of abuse is later convicted or pleads guilty to a lesser included offense, the child abuse pediatrician uses this data in subsequent medical studies as confirmation that the abuse diagnoses was confirmed.

119.    Because there are many situations in which trained medical professionals refuse to omit, shade, fabricate or conceal their medical opinions from the baby's parents, law enforcement and the medical record, the Helfer Playbook also depends in part on acts of extortion, bullying, threats against and retaliation against noncompliant physicians, hospital staff and child protection workers.

120.    In order to describe and delineate the Helfer Playbook developed and honed by Harper and other Helfer Society members, Plaintiff will identify facts describing how that Playbook has been used by each of these Helfer Society members in other prosecutions and child protection matters, as these form the pattern of racketeering crimes necessary to prove Plaintiff's

civil rights, RICO, RICO conspiracy and civil conspiracy claims.

**Harper developed and implemented these fraudulent and unlawful policies, procedures and customs in Hennepin County for the purpose of manipulating medical data to support the SBS/AHT enterprise; enrich the Defendants; and assist the HCAO in separating babies from their families and caregivers**

121.    In 2015, the Minnesota Legislature passed sweeping legislation intended to improve and fortify the state's child protection system. The new child protection laws came into effect on July 1, 2015.

122.    On July 21, 2015, the new child protection laws created a $23.35 million Child Protection Grant to be annually distributed by the Minnesota Department of Human Services ("DHS") to county-level DHS agencies to fund expanded child protection staffing and services.

123.    DHS allocated the funds to each county according to the following criteria:

- Child population. Fifty percent of the funds must be distributed to county agencies based on the child population residing in the county.
- Screened-in reports. Twenty-five percent of the funds must be distributed based on the number of screened-in reports of child maltreatment in the county.
- Open child protection case management. Twenty-five percent of the funds must be distributed based on the number of open child protection cases in the county.

124.    The Child Protection Grant was fixed at $23.35 million and has not increased or decreased since its implementation. In order for any county to receive more funds from this grant, it would need to demonstrate increases in child population, screened-in reports and/or open child protection management.

125.    Because the Child Protection Fund is fixed, increased funding to one county requires a decrease in funding to one, some, or all other Minnesota Counties.

126.    With Minnesota's passage of its massive bill funding the identification and

prosecution of child abuse, including SBS/AHT, the SBS/AHT and child abuse stakeholders in the metropolitan Twin Cities, including the U of M, Bremer, Hennepin County, HCAO, HH, M Health and UMP were under significant pressure to alter their existing programs for diagnosing and prosecuting SBS/AHT and child abuse in order to take advantage of the new funding sources.

127.     These SBS/AHT and child abuse stakeholders chose Harper to run the new program.

128.     When Harper arrived in 2014, SBS/AHT stakeholders tasked her with expanding the child abuse program at the U of M and rebuilding the programs at HH and M Health.

129.     Bremer also directly monetized SBS/AHT diagnoses in child fatality cases by offering substantial financial bonuses for the identification and prosecution of child abuse.

130.     In order to accomplish the goal of monetizing SBS/AHT diagnoses, Harper used her knowledge of and association with the Helfer Society to create the child abuse policies, procedures, customs and practices outlined above.

131.     Harper caused those child abuse policies, procedures, customs and practices to be implemented throughout U of M, UMP, Hennepin County, HH and M Health.

132.     Harper's involvement in and leadership over Hennepin County's child abuse prosecution and civil child protection programs brought immediate and positive financial, prosecutorial and political results to Hennepin County's child abuse stakeholders.

133.     From 2008 to 2015, an average of 1,739 children in Hennepin County were reported as alleged victims of physical abuse.

134.     In 2016—after Harper arrived and her "find something, get something" policies and procedures were put into place – 5,709 children in Hennepin County were reported as alleged victims of physical abuse, an increase of 228% over the previous eight-year average. In one

calendar year, physical abuse cases in Hennepin County rose by 223%.

135.    By contrast, in 2016 the eight other metro counties – Anoka, Carver, Dakota, Ramsey, Scott, Sherburne, Washington and Wright – collectively reported only 3,804 alleged victims of physical child abuse.

136.    To put this in perspective, during this time the other eight metro counties had a collective child population of 504,807. Hennepin County's child population was only 271,399. The non-Hennepin metro counties thus reported 8 victims of alleged physical abuse per 1000 children, while Hennepin County under Harper's leadership reported 21 victims of alleged physical abuse per 1000 children. Harper thus helped Hennepin County exceed the other eight metro counties in alleged victims of physical abuse per 1000 children by 163%

137.    By 2016, the State of Minnesota and Bremer had put in place funding incentives that were tied to the number of children that could be identified as victims of physical abuse. In the case of Bremer, these incentives were tied to child fatalities.

138.    This in turn resulted in entire medical and social work departments funded on the expectation that the number of physical abuse victims would continue to increase over time.

139.    The flow of money tied to physical abuse findings also spilled over into the HCAO, which had fortified its child abuse prosecution team after the 2016 explosion in physical abuse cases.

140.    In 2014, the HCAO total budget was $45,107,676. Of this number, $24,303,473 was allocated to criminal prosecution and $20,804,203 to civil matters including for family court matters involving children in need of protective services ("CHIPS") and Termination of Parental Rights ("TPR") cases.

141.    In 2018, the HCAO total budget was increased to $57,166,723. The total budget

increase over 2014 numbers was 27%. Of this number, $28,498,433 was allocated to criminal prosecution and $28,668,290 to civil matters including CHIPS and TPR cases. The budget for CHIPS and TPR cases rose by 38% and, for the only time in a 10-year period, exceeded the criminal budget.

142.    Moreover, upon information and belief, the policies, procedures and protocols put into place by Harper resulted in bonus payments by Bremer to Defendants based on the number of prosecutions of persons accused of child abuse related deaths.

143.    In short, the financial and structural existence of Hennepin County's child protection program, which is part of a multidisciplinary team including healthcare workers, CPS workers, medical examiners, forensic interviewers, law enforcement, government case workers, guardians *ad litem*, HCAO civil attorneys and HCAO prosecutors, depends on Harper and her continuing financial, political and prosecutorial success.

144.    Harper in turn has created, fostered and maintained her own success and the purported financial and prosecutorial success of Hennepin County's child abuse prosecution system through a combination of dictatorial power, fraud, extortion, bullying, evidence manipulation and perjured testimony, consistent with the tenets of the Helfer Playbook.

145.    Among other things, Harper has caused the widespread falsification and manipulation of child abuse medical evidence and data in order to secure child abuse prosecutions, civil family separations and child abuse convictions while generating false medical data to support the SBS/AHT enterprise and thus her dictatorial role over Hennepin County's child protection system.

146.    Consistent with the Helfer Playbook, one way Harper and these co-defendants cause false child abuse prosecutions and civil actions and thereby collect falsified and

manipulated medical evidence is through specific policies, procedures or customs that Harper has caused UMP, the U of M, HH and M Health to implement.

147.    These policies, procedures and customs as created by Harper and the Helfer Society and adopted by UMP, U of M and M Health include:

>a. A policy or custom that requires that suspected victims of child abuse to be admitted (or transferred) to the hospital's trauma/surgery service instead of the hospitalist service so that care will be initially directed by child abuse pediatricians and not specialized hospitalists. Harper and UMP/U of M/M Health/HH/Fairview management have determined that admitting victims of child abuse to the hospitalist service results in consults from highly trained subspecialists who are more likely to determine or realize that a baby's injuries were caused by a condition or disease process unrelated to physical abuse;

>b. A policy or custom of deliberately denying a sick baby access to specialized clinical care if the baby is identified as a potential victim of child abuse;

>c. A policy or custom that forbids UMP hospitalists from making entries in the medical record that conflict with a child abuse related diagnosis such as SBS/AHT;

>d. A policy or custom that forbids UMP hospitalists from communicating with families of a child that is a suspected victim of child abuse, thereby concealing the baby's true medical condition and medical needs from the family;

e. A policy that uses false allegations of child abuse to cover up acts of medical malpractice;

f. A policy that forbids UMP hospitalists that are not part of the child abuse service from communicating with police or child protection workers; and

g. A policy that requires UMP hospitalists to develop a cohesive approach to diagnosing a child that is a suspected victim of child abuse, e.g, that the physician must not use his independent professional medical judgment to arrive at a medical conclusion different from physicians on the child abuse service.

148. The false medical data generated by these policies, procedures and customs are used by Harper and other members of the Helfer Society to create false and fictitious medical studies, data compilations and testimony that Harper and other members of the Helfer Society use to falsely charge, prosecute and imprison innocent parents and caregivers such as Sylwia.

149. The false medical data and evidence generated by these policies, procedures and customs is also used by the HCAO to bring civil actions to separate children from their families, terminate parenthood, and prosecute persons accused of child abuse.

150. Because the policies, procedures and customs described above are fraudulent, unlawful, immoral, unethical, repugnant and contrary to all reasonable medical and scientific principles, those policies, procedures and customs are by necessity concealed from public disclosure and in fact are concealed from most of the UMP hospitalists who work at HH and M Health.

151. Defendants have many specific reasons for concealing these policies, procedures and customs, including:

a.    the policies, procedures and customs are contrary to medical and scientific methods;

b.    the policies, procedures and customs are evidence of fraud, unlawful conduct, conspiracy and racketeering;

c.    disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of concealing, fabricating, manipulating and omitting important medical evidence from the record of a suspected child abuse victim would have profound effects on Hennepin County's child protection and child abuse system as a whole, since evidence manipulation fraudulently taints the entire law enforcement and judicial process.

d.    disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy or custom of concealing their denial of important or sometimes lifesaving clinical care to sick babies who are tagged with a suspected child abuse diagnosis would create a legal, financial, political and public relations nightmare for those hospitals;

e.    disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of preventing sick babies who are tagged with a suspected (but medically unfounded) child abuse diagnosis from accessing the clinical care their parents sought by bringing the baby to the hospital would create a legal, financial, political and public relations nightmare for those hospitals;

f.    disclosure of the fact that two of Hennepin County's primary pediatric hospitals have a policy of using sick babies who are tagged with a

suspected (but medically unfounded) child abuse diagnosis as forensic evidence instead of patients would create a legal, financial, political and public relations nightmare for those hospitals;

g.     disclosure of the fact that false allegations of child abuse are lodged to cover up medical malpractice would create a legal, financial, political and public relations nightmare for those hospitals; and

h.     disclosure of the fact that sick babies who are tagged with a suspected (but medically unfounded) child abuse diagnosis remain in the hospital for forensic evidence collection would subject HH, M Health/Fairview to potential Medicaid/insurance fraud investigations since, upon information and belief, HH, M Health/Fairview bill Medicaid or insurance companies for clinical care that is not actually provided in the forensic evidence gathering environment the babies are kept in.

152.     Defendants' intentional and active concealment of the above policies, procedures and customs prevented Plaintiff and Sylwia from discovering much of Defendants' wrongful and illegal conduct and methods until just recently.

153.     Upon information and belief, Nicholson and other employees of the HCAO are aware of these concealed policies, procedures, customs and practices and are aware how these concealed policies, procedures, customs and practices unconstitutionally and unlawfully taint child abuse investigations, civil child protection suits and criminal prosecutions in Hennepin County.

154.     Upon information and belief, Nicholson and other employees of the HCAO actively assist and conspire among themselves and others in the child protection system to

conceal these policies, procedures, customs and practices from child abuse defendants, defense counsel, courts, juries and opposing experts because they know and understand that if these unconstitutional and unlawful policies, procedures, customs and practices were publicly disclosed, it would result in their inability to effectively prosecute civil and criminal child abuse cases and may result in the reversal of previous child abuse convictions or parenting determinations.

155.    Plaintiff in fact only discovered Defendants' secret and concealed policies, procedures and customs outlined above because of a March 24, 2025 meeting with a former UMP/U of M/M Health pediatrician, Bazak Sharon, MD.

156.    Dr. Sharon is a well-respected and well-qualified pediatrician specializing in pediatric infectious disease and immunology.

157.    Dr. Sharon was on the U of M faculty and was a UMP physician practicing at M Health for approximately 17 years.

158.    During the March 24, 2025 meeting, Dr. Sharon revealed the following information about his experiences with Harper and Defendants' secret child abuse policies, procedures and customs outlined above.

159.    In early January, 2022, Dr. Sharon was asked to attend the care of Baby H, who had been admitted to M Health with feeding difficulties.

160.    Although Baby H was born with a head circumference in the 30th percentile, his head circumference had grown to over the 90th percentile by the time he was admitted to M Health. Baby H had no bruising, soft tissue injuries or any medical indicia of abuse.

161.    As part of the diagnostic workup, Baby H underwent an MRI, which revealed a non-acute (older) fluid collection.

162.     Dr. Sharon and Baby H's assigned neurologist, UMP and U of M physician Matthias Zinn, MD, both medically concluded and opined that the fluid collection was caused by a longstanding Vitamin K deficiency that made Baby H more susceptible to bleeding.

163.     Dr. Zinn concluded, that as a result, "from a neurologic perspective, the most likely etiology is spontaneous bleeding."

164.     These non-abuse diagnoses were further confirmed by Baby H's abnormally large head circumference, which the physicians determined was a reaction to the fluid collection, and not the result of repeated abuse.

165.     As part of his usual habit, routine, practice and training as a physician, Dr. Sharon documented these opinions and differential diagnoses in Baby H's electronic health record.

166.     As part of his usual habit, routine, practice and training as a physician, and as Baby H's attending physician, Dr. Sharon met with Baby H's parents and informed them of these differential diagnoses and medical opinions.

167.     At the time, Dr. Sharon was not aware of UMP/M Health/Fairview/U of M and Harper's secret and concealed policies regarding child abuse documentation outlined above.

168.      Because the presence of fluid on Baby H's brain automatically alerted the hospital's child abuse team, one of Harper's close associates, Dr. Carolyn George, was assigned to take over Baby H's care.

169.     As a direct result of the policies and customs implemented by Harper and carried out by UMP/M Health/Fairview/U of M, Dr. George immediately and without medical basis diagnosed Baby H with SBS/AHT even though there was no credible medical or factual basis for that diagnosis.

170.     As a result of this false and medically unsupported diagnosis, Baby H and his two

year old brother were both separated from their parents and temporarily held at the hospital under guard.

171. Because Dr. Sharon was Baby H's attending physician and because he knew that it was highly unlikely that Baby H's condition was caused by abuse, he attempted to intervene on his patient's behalf, which was his duty as a physician.

172. Among other things, Dr. Sharon attempted to contact the Hennepin County caseworker assigned to Baby H's case, Melvina Harrell, to inform her that it was very unlikely that Baby H was a victim of abuse and that the separation of the boys from their parents would cause the children to suffer irreparable harm.

173. Ms. Harrell did not return Dr. Sharon's phone calls.

174. Instead, upon information and belief, Ms. Harrell contacted Harper to complain about Dr. Sharon's interference with the child abuse prosecution of Baby H's parents and to prevent Dr. Sharon from continuing to provide the parents with medical information they could use to defend themselves in the child abuse prosecution.

175. Harper in turn contacted UMP/M Health/Fairview's Chief Medical Officer, Dr. Sameer Gupta. Upon information and belief, Harper instructed and/or pressured Dr. Gupta to remove Baby H from Dr. Sharon's care; to retaliatorily and coercively discipline Dr. Sharon for documenting opinions in the medical record that conflicted with the SBS/AHT diagnosis; and to retaliatorily and coercively discipline Dr. Sharon for telling Baby H's parents that Baby H's fluid collection was from something other than intentional abuse.

176. By that time, UMP/M Health/Fairview management had made a decision, based on pressure from Harper, to treat Baby H forensically, e.g., as a piece of prosecution evidence, as opposed to a pediatric clinical patient, by having him transferred from the hospitalist service to

the trauma/surgery service, where Harper and George would receive no interference from actual clinicians.

177. On January 18, 2022, Jordan Marmet, MD, M Health Hospitalist Division Director and a manager of UMP, removed Dr. Sharon from Baby H's care team and instructed him to cease all contacts with Baby H's family. Marmet told Dr. Sharon that he didn't know the reasons for the removal.

178. On January 20, CMO Gupta emailed Dr. Sharon and informed him that he would be required to attend a Zoom meeting on January 21. When asked about the subject of the meeting and whether Dr. Zinn would be attending, CMO Gupta replied that the meeting would focus on M Health's child abuse protocols.

179. CMO Gupta informed Dr. Sharon that he would not be permitted to invite any other attendees.

180. On that same day, Dr. George's opinion that Baby H was a victim of SBS/AHT caused the HCAO to seek an expedited proceeding to remove Baby H and his brother from their parents. The babies were both thereafter placed in unfamiliar foster environments. Baby H's brother suffered from profound emotional distress as a result of the forced removal from his home and continues to have nightmares to this day.

181. On January 21, 2022, Dr. Sharon attended the Zoom hearing as required by CMO Gupta. Other attendees included Harper, Dr. Marmet, Dr. Gupta, Dr. Joseph Neglia, Chief of Pediatrics, and Angela Nelson, an attorney for UMP.

182. The Zoom was led by Attorney Nelson, who asked Dr. Sharon whether he had legal counsel, confirming that the meeting was adversarial, disciplinary and in retaliation for Dr. Sharon's patient advocacy, and not related to quality assurance.

183.    Since Attorney Nelson announced that the proceeding was adversarial, and that Dr. Sharon may need his own attorney, she did not act as Dr. Sharon's attorney, nor did she provide him with any legal advice.

184.    CMO Gupta confirmed that the meeting was not for the purpose of quality assurance by instructing Dr. Sharon that Baby H's clinical care would not be discussed.

185.    Dr. Sharon was informed by the other Zoom participants, including Attorney Nelson and CMO Gupta that he had violated several as yet undisclosed (to Dr. Sharon) UMP and hospital policies and procedures, particularly the policy and procedure that prohibited him from documenting his clinical opinions about the causes of Baby H's brain fluid in Baby H's medical record, unless his opinions matched those of George, Harper and the child abuse team.

186.    Dr. Sharon was also instructed that once the child abuse team was involved, the policy required the baby to be transferred out of the hospitalist service and into the surgery/trauma service and assigned exclusively to the child abuse team so that hospitalist specialties would no longer be involved in the baby's care.

187.    Dr. Sharon was informed that the purpose of these secret and concealed policies was to ensure that there was a cohesive approach to the diagnosis of child abuse so that law enforcement and prosecutors will not be "confused" by the possibility the child's injuries may have been accidental or caused by a medical condition other than the abuse diagnosed by Harper's child abuse team.

188.    Dr. Sharon found the meeting troubling for a number of reasons, including:

    a.    The fact that his employers' previously concealed policy, stated through its attorney and its CMO, was to ensure that any child marked with a diagnosis of suspected child abuse by Harper's team would stop receiving

competent medical assessment and treatment by M Health and UMP's specially trained pediatric hospitalist staff and would instead become a forensic patient of Harper's child abuse team, with little or no access to care provided by specialty physicians with an ability to diagnose or treat a condition other than child abuse; and

b.  the fact that his employers' previously concealed policy, stated through its attorney and its CMO was to ignore, omit and/or conceal important medical opinions and findings so that child abuse suspects could be more easily and efficiently prosecuted civilly and criminally.

189.   Dr. Sharon recognized his employers' stated policies as being fraudulent, destructive to children and families, contrary to medical ethics and dangerous to patients systemwide.

190.   As a result of his grave concerns, on January 24, 2022, Dr. Sharon wrote a letter of complaint to hospital management and handed it directly to Dr. Neglia.  He received no response to his concerns.

191.   On February 2, Dr. Sharon was contacted by the attorney for Baby H's parents. Dr. Sharon provided the attorney with a summary of his truthful opinions based on his assessment of Baby H.

192.   Shortly after, Dr. Sharon was compelled to attend yet another Zoom conference on February 15, 2022.

193.   Because Dr. Sharon understood that this Zoom conference would be another retaliatory, coercive and adversarial disciplinary conference and not a quality assurance meeting, Dr. Sharon recorded the Zoom conference on his phone.

194. The other participants on the Zoom conference included Attorney Nelson, Harper, Dr. Marmet, Dr. Gupta, Dr. Neglia and Dr. George.

195. The purpose of the Zoom conference was indeed not quality assurance, but was rather for the purpose of intimidating Dr. Sharon and warning him that continuing to have medical opinions that conflicted with those of Drs. George and Harper was a violation of UMP, U of M, M Health and Fairview policy.

196. Among other things, Dr. Sharon was informed by UMP/U of M/M Health/Fairview clinical executives and legal counsel:

    a.    That Dr. Sharon's chart note and discussions with law enforcement had caused "confusion" and "moral distress" on the part of law enforcement that Dr. George was forced to "correct."

    b.    That Dr. Sharon's act of sharing his medical opinions with Baby H's parents had caused them to become "confused" over whether they had abused their baby, which was ridiculous in light of the fact that the parents already knew that they had not abused their baby.

    c.    That UMP, U of M, Fairview and M Health's policy was to admit babies with suspected abuse to the trauma unit instead of the hospitalist unit so that they would only be seen by the child abuse pediatricians. CMO Gupta commented that the policy was to avoid continuing to clinically treat babies on the hospitalist unit because that resulted in the baby receiving assessments from different specialties that could raise the likelihood of medical diagnoses that conflicted with those reached by the child abuse team, which is something that UMP and the hospital had a policy of avoiding, even though that policy sacrificed clinical care in favor

of forensic evidence gathering.

d. That if abuse was suspected, providing clinical care for the baby's presenting problem would interfere with the child abuse team's mission. If clinical care was necessary, the child abuse team would only involve involvement from what were apparently hand-picked "general pediatricians" instead of clinical specialists so as to avoid obtaining clinical workups that conflicted with the child abuse diagnosis.

e. That the UMP/U of M/Fairview/M Health policy was for the child abuse pediatricians – who were forensic doctors that did not provide clinical care – to "work backward" from the child abuse diagnosis to attempt to treat the baby's actual medical problem if that was required.

f. That all of the baby's diagnoses in the medical record have to "line up" with the primary child abuse diagnosis to as to avoid making the case difficult for law enforcement and the prosecutors;

g. That persons who are not medical providers (e.g., jurors) will not understand why there are differing opinions in the medical record;

h. That there has to be only one story, (e.g., diagnosis) in the medical record in order to avoid legal issues; and

i. That the child abuse pediatrician, e.g. Harper, "drives the ship."

197. On March 2, Dr. Sharon was summoned to a meeting with Dr. Neglia and Dr. Marmet. Dr. Sharon was warned against continuing to cooperate with Baby H's defense attorney. In the event he chose to do so, Dr. Sharon was instructed to forward all such communications to UMP's attorneys. Upon information and belief, UMP's attorneys would then share this information with the HCAO to assist it in the civil and criminal proceedings.

198. In May, 2023, Dr. Sharon was assigned to attend the care of Baby C.

199. Baby C's mother, a pediatric nurse, had enrolled Baby C in a study conducted by the U of M. As part of that study, Baby C underwent a head MRI.

200. The head MRI revealed the presence of a small, older brain bleed.

201. As a result of the above policies, procedures and customs created by Harper and instituted by the institutional Defendants, Baby C's brain bleed was reported to the child protection team.

202. Baby C was thereafter brought to M Health. Dr. Sharon was the pediatrician on call, and was requested to consult on Baby C.

203. After conducting a thorough assessment, including assessing for signs and symptoms of abuse, Dr. Sharon entered a note in Baby C's medical record stating that Baby C's brain bleed was not likely the result of abuse.

204. Shortly after making that note, Dr. Sharon was fired from UMP and the U of M by his supervisor, Dr. Marmet.

205. Dr. Marmet relayed to Dr. Sharon that he was being terminated for violating the previously disclosed policy that prohibited him from making entries into the medical record that conflicted with the child abuse pediatrician's diagnosis of child abuse. Dr. Marmet stated that the termination order was directed by Harper, even though Harper was not Dr. Sharon's supervisor or otherwise in the chain of command.

206. Apart from the policies, procedures, customs and coercive bullying tactics described above, Harper also supports and propagates her false SBS/AHT narrative by and through the creation of false data that she uses to generate "medical studies" supporting the SBS/AHT enterprise.

207.     As set forth above, by creating and implementing hospital policies, procedures and customs that virtually ensure that Harper and her team will be given exclusive medical control over babies admitted to the hospital with brain bleeds or similar conditions, Harper is able to singlehandedly decide, without medical or legal interference, which parents or caregivers will be charged and prosecuted for child abuse.

208.     By wielding this unchecked medical and legal power, Harper is able to ensure that if she decides that someone abused a baby, that person will lose custody of the baby and any other children in his or her household, and will either go to prison or plead guilty to a lesser offense related to child abuse.

209.     Either way, each family court determination, conviction or guilty plea creates a data point for Harper and other Helfer Society members to use to convince juries that their medical opinions are substantiated.

210.     Juries are told by Harper that the fact that most or all of the people accused of child abuse by Harper have either been convicted or have pled guilty substantiates the medical evidence supporting the SBS/AHT diagnosis.

211.     These fraudulent data points are particularly important to Harper and members of the Helfer Society since the true medical studies – the ones that are peer reviewed and based on non-fraudulent data – demonstrate that the SBS/AHT diagnosis is not legitimate.

212.     Apart from the fact that Harper's academic fraud is created from the lives of those falsely accused of heinous crimes, what also makes Harper's academic fraud particularly egregious is the fact that it is sponsored by and made possible by these esteemed institutional defendants, who have chosen money and funding over truth and the protection of babies and families.

213.     Another way Harper implements the Helfer Playbook throughout the Hennepin County medical community is by editing and modifying the reports of other physicians to promote and support diagnoses of SBS/AHT and other forms of child abuse.

214.     In the case of *Kallie Raye Budin and Michael Jeffrey Budin*, Harper specifically admitted under oath that as a matter of policy and practice she edits and modifies reports and medical records of other physicians who have provided care to patients Harper consults on.

215.     Harper makes these edits and modifications to other physician reports without clearly identifying her edits and/or contributions. The purpose of the policy and practice of giving Harper the ability to "ghost edit" other physician reports is so Harper can craft precise medical evidence that makes it easier to prosecute intended child abuse defendants.

216.     When she is finished with the edits, Harper gives the reports back to the physicians for them to sign and file them using their own names, in order to make it appear as if the physicians created the reports on their own and without assistance.

217.     Consistent with the Helfer Playbook, Harper's editing and modification of other physician's assessments and reports necessarily requires the agreement and participation of the physicians whose reports are being edited.

218.     Harper is able to extract this agreement and participation – even though it is wrongful and unethical – precisely because Harper wields enormous power over the other physicians' professional futures and livelihoods, consistent with the way other child abuse pediatricians implement the Helfer Playbook, as described below.

219.     To demonstrate the level of cooperation Harper is able to extract from her colleagues, Plaintiff will describe a case Harper was involved in in 2023.

220.     In that case, a baby presented to the hospital with bruising and fragile bones. The

baby's mother had a known genetic condition that caused her to have similar problems as a child.

221.    Despite knowing that the baby likely had a genetic predisposition to the bleeding and bone disorder, Harper created a false child abuse narrative to the exclusion of all else. She then caused the HCAO to bring an expedited proceeding in which the baby was immediately taken from her parents and placed in the foster home of one of Harper's pediatrician colleagues.

222.    To ensure that the family court was adequately convinced of Harper's fraudulent child abuse narrative, Harper manipulated child welfare reports and referrals to create the false narrative that the baby was inconsolable when in the presence of his parents.

223.    In truth, the baby was not inconsolable.  The foster parent-pediatrician had chosen to surreptitiously to dump out the mother's milk that had been so fastidiously provided to her by the parents and switch the baby to formula – resulting in the baby becoming fussy when the mother tried to breast feed during visits.

224.    Harper then arranged for another colleague to convince the court that this observation of the fussy baby constituted scientific proof that the baby was abused by his parents.

225.    Harper's fraudulent, unlawful and unconstitutional scheme would have likely succeeded were it not for the honesty and integrity of the court's visit supervisor.

226.    The visit supervisor provided her notes and an affidavit to the child's parents. In those materials, she documented her observation that the baby was actually happy to see his parents.

227.    After the visit supervisor's affidavit was provided to the family court, Harper and/or hospital records custodians caused the destruction of the medical notes and records Harper generated that falsely opined that the baby's fussy presentation was a result of abuse by the parents in order to cover up Harper's wrongdoing.

228.     Another Helfer Playbook tactic Harper regularly uses is to shade or actually fabricate her testimonial history in order to make it appear to criminal juries that she is unbiased and provides expert services to both the defense and prosecution, which is not the case.

229.     Upon information and belief, Harper has testified exclusively on behalf of state prosecutors in cases involving physical child abuse for over 24 years. During this time, Harper has averaged 6 to 12 court appearances as an expert witness per year, or well over 200 trial testimonies. On many of those occasions, Harper has been asked about her testimonial history.

230.     As part of her implementation of the Helfer Playbook, Harper has learned how to avoid being pinned down on her history of giving expert testimony on behalf of defendants criminally charged with SBS/AHT or any other form of physical abuse of children. She does this through a combination of evading the question; answering a different question than the one asked; refusing to give actual case names; and by giving false testimony about her testimonial history.

231.     In *Minnesota v. McMorris,* for example, Harper testified under oath on December 20, 2017, that she had never testified on behalf of a defendant in a child abuse case.

232.     On July 17, 2019, Harper contrarily testified in *Minnesota v. Laurie Ann Gregor* that she gave expert testimony on behalf of a child abuse defendant while she was medical director of Driscoll Children's Hospital in Corpus Christie, Texas – which was prior to the *McMorris* testimony.

233.     On November 11, 2021, Harper testified in *Wisconsin v. Kathryn Campbell* that she had testified on behalf of child abuse defendants "probably about a half dozen or a dozen times," which is false.

234.     On January 9, 2023, Harper testified in *Minnesota v. Jordan William Carter* that she had appeared in court on behalf of child abuse defendants twice: once involving child

pornography and once involving sexual assault in Pennsylvania.

235.    On December 15, 2023, Harper testified in State of *Wisconsin v. Joanna Ford* that she had only testified once for a criminal defendant, and that had been in Pennsylvania, though she was uncertain of the date.

236.    Harper and her co-employer, UMP, also arrange for Harper's expert witness fees to be paid to UMP so that Harper can falsely imply to the jury that she receives no compensation or benefit for giving her expert testimony.

237.    Harper also implements the Helfer Playbook by misrepresenting accepted medical science as it pertains to accidental TBI caused by short falls and stairway falls.

238.    For example, in *State of Minnesota vs. Jordan William Carter*, 69DU-CR-20-3788, Harper testified for the prosecution that children who experience short falls and stairway falls "…have very few injuries and minor injuries."

239.    Harper knew, when she gave this testimony, that it is well established, including by and through a study by the Journal of Safety Research, that "Falls are the leading cause of nonfatal emergency department (ED) visits among children aged birth to 14 years, accounting for 2.4 million visits annually, and the leading cause of traumatic brain injury (TBI) visits for children in the 0-4 year age group… children 4 years and younger are more likely to sustain head injuries, be hospitalized, or die from falls… Studies examining injury circumstances and location in younger children, report almost twice as many children are hospitalized due to falls from furniture than from stairs, but those children who fell from stairs are more likely to sustain head injuries."

240.    In the *Carter* case, the child Jordan Carter allegedly shook fell down a flight of basement stairs to a cement floor covered by thin linoleum. The boy exhibited symptoms of

traumatic brain injury shortly thereafter, which included loss of appetite, vomiting, lethargy, and unusual sleep patterns. The next day at approximately 5:35 pm, the child lost consciousness and stopped breathing. Two days later, the boy died.

241.   Through her use of the Helfer Playbook, Harper was able to convince a jury that the baby's death was caused by Carter's shaking, and not by falling down a flight of stairs.

242.   Harper also implements the Helfer Playbook by intentionally omitting exculpatory/exonerating medical information from her consultative reports.

243.   For example, upon information and belief, Harper regularly omits from her reports and testimony head circumference measurements, which she knows are diagnostic of conditions that would exclude SBS/AHT as a cause of injury or death.

244.   Instead, Harper follows the Helfer Playbook by reporting normocephalic head circumference measurements to create the impression with juries that she has performed an exhaustive and thorough investigation of injuries deemed pathogenic of abuse.

245.   Harper has taught and continues to teach fellows of the Child Abuse Pediatrics Fellowship Program at the Center and prosecutors how to identify and omit exculpatory medical information from consultative reports and criminal complaints.

246.   For example, upon information and belief, Jada Ingalls, DO, a June, 2020 graduate of Harper's fellowship program, omitted head circumference measurement diagnostic of macrocephaly from her consultive report in *State of Minnesota vs Michelle Marie Kleindl*, 06-CR-22-196.

247.   In another example, the HCAO, working closely with Harper, omitted from its criminal complaint against Sylwia the contents of the ambulance patient care report, the fall-related injury on the back of GC's head that was captured by Minnesota Police Department's

body-worn camera video, the original ophthalmology report that did not attribute GC's ocular findings to SBS/AHT, the reports from GC's family of behavior symptomatic of TBI, Sylwia's reports of behavior symptomatic of TBI, and the certified manner of death as "cannot be determined."

248.    On information and belief, Harper also implements the Helfer Playbook by specifically targeting SBS/AHT diagnoses toward blue collar, low income and minority caregivers because they lack the financial resources to effectively expose her false and fraudulent methodology.

### Debra Esernio-Jenssen, MD

249.    Esernio-Jenssen is another one of the co-conspirators and Helfer Society members who helped develop the Helfer Playbook used in turn to develop and implement the child abuse diagnosis and prosecution policies, practices and standards used by Harper, U of M, M Health/Fairview, UMP, Bremer, HH, Hennepin County and the HCAO.

250.    Esernio-Jenssen is a close colleague and associate of Harper. Esernio-Jenssen wrote a nomination letter for a Helfer Society Outstanding Teaching award given to Harper in 2022. Esernio-Jenssen and Harper have also presented together at numerous seminars and have shared research and publications.

251.    In order to support, further and maintain the SBS/AHT enterprise for herself and her co-conspirators, Esernio-Jenssen has employed the Helfer Playbook through a long and well-documented pattern of falsifying and shading medical documents, falsifying medical diagnoses, and rendering false testimony in order to obtain or attempt to obtain child abuse convictions.

252.    Esernio-Jenssen's overzealous, unprofessional and fraudulent work in obtaining child abuse convictions has earned her significant expert witness fees and has rewarded her with a

number of prestigious academic, political and teaching hospital appointments over the years.

253. Esernio-Jenssen was an SBS/AHT pediatrician in New York in the early 2000s. During that time, she found and caused the prosecution of numerous innocent caregivers and parents of children who were injured by accidents or underlying medical conditions.

254. By the mid-2000s, New York courts began finding, with regularity, that Esernio-Jenssen was not an objective physician but was instead an advocate for the prosecution who was willing to falsify testimony in order to support SBS/AHT prosecutions.

255. For example, on August 31, 2005, Judge Friedman of the Queens County Family Court found that Esernio-Jenssen's opinions in a case seemed to be racially and culturally motivated, noting, "Dr. Jenssen's emphasis on ethnic and religious issues often distasteful." Judge Friedman found, "Dr. Jenssen is a pediatrician, not a psychiatrist or qualified social worker," and therefore, "[i]t [wa]s not clear to what extent her views on the relationship between the parents and their presentation should be counted as expert." Id.

256. Judge Friedman also found that Ersenio-Jenssen's testimony was not credible; that Ersenio-Jenssen lacked objectivity; and that there was no evidence of abuse, notwithstanding Ersenio-Jenssen's insistence that there was.

257. Judge Friedman found it concerning that Dr. Jenssen so rigidly rejected any alternative to her chosen scenario despite advice from her own child abuse team, "Given these movings back and forth, the Court gained the impression that Dr. Jenssen had formed an intuitive judgment, and that she would make almost any argument to back it up."

258. In December 2005, another New York family court judge, the Honorable Edwina G. Richardson, found that Esernio-Jenssen was "clearly mistaken in her diagnosis that the child suffered from subarachnoid bleeding" when in fact the child's "CAT scan was negative for

subarachnoid bleeding." Judge Richardson noted that Esernio-Jenssen "made her finding of Shaken Baby Syndrome despite the fact that the child had no skull fracture, no bruises, no broken bones, no retinal hemorrhages, no other signs of abuse, neglect or trauma typically associated with Shaken Baby Syndrome, and no other suspicious conditions."

259.    Similar to Judge Friedman's observations, Judge Richardson stated, "It appears to this court that Dr. Jenssen [sic] came to an initial conclusion, then worked very hard to justify and defend it. She appeared unusually invested in defending her Shaken Baby Syndrome diagnosis."

260.    Remarking further on Esernio-Jenssen's lack of credibility, Judge Richardson stated, "The court had a number of serious concerns worth noting regarding the testimony presented by Dr. Jenssen [sic] in this case. Not only does the court question and discredit her medical findings in light of the highly competent and credible testimony of [another physician], but the court questions her testimony for other reasons as well."

261.    According to Judge Richardson, "at a minimum, Dr. Jenssen [sic] was being unreasonably judgmental and, at worst, culturally insensitive." The court further observed "Dr. Jenssen [sic] was unusually defensive, argumentative, and condescending to counsel who questioned her appropriately. She was also confrontational and combative in providing what should have been professional expert testimony. One would expect such a high level of emotion from a party to the proceeding or a lay witness but never from one who has testified in as many cases as Dr. Jenssen has."

262.    Judge Richardson concluded that "the child's injuries were caused by natural conditions and were not caused by violent shaking" and went so far as to proclaim that the Court could "confidently find that there was no violent shaking of the child here. That is, there was no neglect and no abuse. The parents and child are clearly part of a loving, intact family. The court

finds that the parents did nothing accidentally or deliberately to hurt their baby. They did not individually or jointly hurt this baby and then try to cover up his injuries."

263.    Judge Richardson went on, "The court is saddened by what has happened here as a result of an insufficiently substantiated accusation of Shaken Baby Syndrome. Dr. Jenssen's [sic] failure to identify and adequately rule out the various potential causes of bilateral subdural hematomas in this child, and her misdiagnosis of the child as suffering from subarachnoid bleeding, caused her to jump to many conclusions including the conclusion that the child's injuries were caused by violent shaking. There are far too many abused children in our society. This court's role is to try to ensure, to the extent possible, that children are protected from abusive and neglectful parents. It is tragic that a medical misdiagnosis and an inappropriate rush to judgment has resulted in these loving, caring, dedicated parents being separated from their sickly child." (emphasis added). *In the Matter of V.L.*, Docket No. NA- 20759/03, Decision and Order (Queens Cty. Fam. Ct. Dec. 21, 2005).

264.    Another New York Family Court, determined, in a written opinion dated May 19, 2009, that Esernio-Jenssen falsely diagnosed "non-accidental abuse head trauma" ("NAHT") despite clear medical evidence that the child was suffering from a brain infection (meningitis) and opinions of multiple other physicians that the child was suffering from meningitis – and not child abuse. *In the Matter of A.*, Docket No. NA-17916/08, Decision (Kings Cty. Fam. Ct. May 19, 2009).

265.    Like the other family court judges, Judge Ruiz found Esernio-Jenssen lacked credibility, "Dr. Jenssen's testimony that the child suffer[ed] from an episode of NAHT preceding his first hospital admission casts serious doubt on the reliability of her entire expert testimony." The court further found, "Three of the four medical experts who testified as to the child's

diagnosis and treatment agreed, to varying degrees, the child had either viral or bacterial meningitis during his first hospitalization. Only Dr. Jenssen, Petitioner's expert during their case in chief, opined the child suffered from NAHT during this first hospitalization."

266. Esernio-Jenssen was also named as a Defendant in no less than three federal lawsuits brought in the United States District Court for the Eastern District of New York on the basis of misdiagnosing child abuse, falsely accusing parents of child abuse, and causing the unnecessary removal of children into protective custody. Those lawsuits *are Estiverne et al v. Goodwine et al.*, C.A. No. 06-06617- NG-RLM (E.D.N.Y.); *V.S. et al v. Muhammad et al.*, C.A. 07-00213-CBA-JO (E.D.N.Y.), and *Denes Q. et al v. Caesar et al.*, C.A. 07-cv-01281-CBA-JO (E.D.N.Y.).

267. The *V.S.* and *Denes Q.* cases were both assigned to the Honorable Dora L. Irizarry, who issued a joint decision on September 30, 2008. In that decision, Judge Irizarry found, "In both complaints, medical defendant Dr. Esernio-Jenssen is accused of reporting incorrect diagnoses of the infant's injuries that she knew or should have known to be false, or reported in reckless disregard for the truth. This accusation is supported in the V.S. matter by the additional fact that full-body X-rays she ordered for the infant T.S. did not appear to reveal any skull fracture or brain hemorrhage despite her report to the contrary. The apparent contradiction between the outcome of the X-ray and her report raises plausible inference of bad faith that could overcome the good faith presumption."

268. In 2010, while some of the above actions were pending, Esernio-Jenssen resigned her positions in New York and moved to Gainesville, Florida. There, she assumed the position of Medical Director of the Gainesville Service Center of the Florida Department of Children and Families ("DCF Center"). Medical services were provided to the DCF Center by the University of

Florida ("UF"). Esernio-Jenssen was an employee of UF and the medical director of its child protection team ("UF CPT").

269. While in Florida, Esernio-Jenssen was the subject of numerous complaints, concerning, inter alia, her findings of alleged child abuse. See, e.g., https://www.wfmz.com/news/area/lehighvalley/a-look-at-the-history-of-dr-jenssen-the-pediatrician-accused-of-overdiagnosing-medical-child/article_f7566996-438d-11ee-8ce5-6ba6e636e457.html

270. In January 2014, a Florida mother ("Florida Mother") brought her then 5-year old son to the DCF Center, not as a victim of abuse himself, but as a supporting witness. She was told it was a witness interview. Esernio-Jenssen interviewed the boy while the Florida Mother remained in the lobby. Separating children from parents is typical of "interviews" conducted by Esernio-Jenssen.

271. During his interview, the boy became the victim of abuse by Esernio-Jenssen.

272. Jenssen outrageously ordered the child to strip naked, spread eagle, and photographed his entire body, including his genitals. When the child returned to his mother after the interview, he was crying, visibly shaken, and traumatized.

273. As a result of Esernio-Jenssen's extreme and outrageous conduct against her son, the Florida Mother notified UF, Governor Rick Scott, and also filed a formal complaint against Esernio-Jenssen and other agents of the Florida Department of Health. It was the Governor who insisted the complaint be investigated by the Office of Inspector General ("OIG").

274. In connection with its investigation, the Florida OIG provided a Preliminary Inquiry Memorandum ("PIM"), detailing the Florida Mother's complaint and the OIG's findings. The PIM focused on the conduct of state employees and does not identify Esernio-Jenssen as a

subject of the complaint in the heading, but Esernio-Jenssen's conduct is discussed throughout the PIM.

275.    Specifically, the OIG notes in the PIM that Esernio-Jenssen had been the subject of a prior complaint in January 2014 for her clinical practices – more particularly, for false allegations of child abuse related to a child who had suffered a ruptured spleen.

276.    UF thereafter reassigned Esernio-Jenssen to a non-CPT position.  Given that the entire reason for Esernio-Jenssen's presence at UF was for the identification and prosecution of child abuse, her removal from CPT was the equivalent of losing her job.

277.    Shortly after her reassignment to a non-CPT role, Esernio-Jenssen left UF and Florida entirely.

278.    In August 2014, Esernio-Jenssen moved back to the Northeast, taking a position as the director of the Lehigh Valley Health Network's ("LVHN") John Van Brakle Child Advocacy Center in Pennsylvania.

279.    Esernio-Jenssen's tenure at LVHN was marked by continuing misconduct aimed at promoting the SBS/AHT enterprise as she had done in her previous positions.

280.    The child protection caseworkers who worked with Esernio-Jenssen at LVHN described a toxic work environment and described Esernio-Jenssen as a bully. They characterized the atmosphere as "a frenzy" with Esernio-Jenssen verbally attacking and humiliating caseworkers who disagreed with her about her identification and diagnosis of child abuse.

281.    One caseworker recalled being forced to accuse a mother of Munchausen Syndrome by Proxy after being grilled for over an hour by Esernio-Jenssen on the speaker phone – with a Case Manager, Supervisor, others present in the room – until the caseworker finally relented and said "fine." One caseworker remarked that Esernio-Jenssen "thought she was

everybody-the lawyer, the cops, she was everybody."

282.    While at LVHN, Esernio-Jenssen regularly exceeded the scope of her practice by writing the recommendations of how child abuse prosecutions should be handled, such as removing children from their parents.

283.    On another occasion, when a caseworker disagreed with Esernio-Jenssen, Esernio-Jenssen locked herself and a child in a medical examination room and refused to come out until the caseworker agreed to file for custody.

284.    According to a series of later lawsuits filed against Esernio-Jenssen, including multiple parents, patients, and co-workers complained about Defendant Esernio-Jenssen's false accusations, false and unqualified diagnoses, her bullying and autocratic behavior, and her racial insensitivity.

285.    In these later lawsuits filed against Esernio-Jenssen, including from approximately 2020 to 2022, Esernio-Jenssen was placed on an internal improvement plan by LVHN because of repeated false accusations of child abuse and Munchausen Syndrome by Proxy.

286.    Esernio-Jenssen's continuing misconduct eventually rose to such a level that it garnered the attention of Lehigh and Northampton County officials as well as local and national news media beginning in the summer of 2023.

287.    On August 23, 2023, the Lehigh County Controller Mark Pinsley released a 99-page report entitled, "The Cost of Misdiagnosis" ("Report"), which claimed that there is a "potential systemic overdiagnosis" of medical child abuse (also known as Munchausen Syndrome by Proxy) in the Lehigh Valley. Report at 6. More specifically, the Report stated:

> An analysis uncovered alarming statistics that the Northeast region of Pennsylvania diagnoses 40% of the state's Munchausen syndrome by proxy cases ("MSBP") (used to signify medical child abuse (MCA), despite having just 11 % of the under-18 population. This disproportionate rate points to potential systemic overdiagnosis of this rare disorder.

288.    The Report also recognized a pattern in the false diagnosis of not only MSBP, but other forms of child abuse:

> This audit initially began as an investigation into the costs associated with the potential misdiagnosis of Munchausen Syndrome by Proxy. However, it quickly became apparent that the inquiry needed to include other areas, such as shaken baby syndrome, various forms of head trauma, and other rare diseases frequently misclassified as child abuse. Moreover, the reader must understand that our investigation did not reveal a few anomalies attributable to human error. Instead, our analysis showed statistical anomalies suggesting a pattern that requires further investigation.

289.    Not coincidentally, this uptick in false child abuse diagnoses coincided with Esernio-Jenssen's tenure at LHVN during which she introduced a screening protocol called "Every child, every time."

290.    Initially, Esernio-Jenssen's "Every child, every time" protocol was implemented to screen all trauma patients under 15 years of age, but within 9 months, it was "extended to all patients admitted to the children's hospital."

291.    Troublingly, this protocol appears to have been implemented regardless of any signs of child abuse in the admitted patients and without regard to the upheaval to families caused by baseless child abuse inquiries and investigations resulting from its overzealous screening tactics.

292.    News agencies quickly noticed the correlation between the overdiagnoses at LVHN and Esernio-Jenssen and her policies, and began reporting on it, as well as reporting on the heartbreaking stories of Lehigh Valley residents who were falsely accused of abuse by Esernio-Jenssen.

293.    As a result of the numerous complaints and lawsuits against Esernio- Jenssen, she was removed from her position at the advocacy center.

294.    Esernio- Jenssen is still active in the Ray Helfer Society and continues to maintain

and further the SBS/AHT enterprise through her work as an expert witness.

## Barbara Knox, MD

295. Knox is another co-conspirator and Ray Helfer Society member who has helped Harper Esernio-Jenssen and others develop the Helfer Playbook used to create and implement the child abuse diagnosis and prosecution policies, practices and standards used by Harper, U of M, UMP, Bremer, HH, M Health/Fairview Hennepin County and the HCAO.

296. Knox is also a close associate of Defendant Harper.

297. Knox was previously a professor of pediatrics at the University of Wisconsin ("UW"). In that role, and similar to the way Esernio-Jenssen operated, Knox maintained, furthered and participated in the SBS/AHT enterprise by finding supposed victims of SBS/AHT and making knowingly false reports of SBS/AHT against the alleged victims' caregivers and parents.

298. Using the Helfer Playbook that she, Harper and Esernio-Jenssen helped to develop, Knox engaged in a pattern of fraudulent and extortive conduct in order to support and maintain the enterprise, including, but not limited to falsifying medical records in order to support an SBS/AHT hypothesis and resulting prosecution; bullying other physicians and colleagues into falsifying or shading medical records or diagnoses in order to support an SBS/AHT hypothesis and resulting prosecution; and retaliating against other physicians and colleagues who refused to falsify or shade medical records in order to support an SBS/AHT hypothesis and resulting prosecution.

299. Knox's fraudulent and extortive conduct resulted in a pattern of false accusations of child abuse against the parents and caregivers of infants under her jurisdiction in Wisconsin.

300.    Soon after arriving at the UW in 2006, Knox caused the prosecution of Jennifer Hancock, a Verona day care provider who was convicted of killing an infant in her care.

301.    Knox caused the prosecution by in part pressuring a colleague, Dr. Michael Stier, to falsely conclude that the child was abused, which in turn falsely shaded his testimony at Hancock's 2009 trial.

302.    During Hancock's post-conviction motion hearing, Stier said he felt "peer pressure" to falsely conclude that the baby suffered a skull fracture and that it was caused by abuse.

303.    Stier said he has witnessed brain bleeding similar to the child in other people who died from natural causes, accidents or drug overdoses. The baby also had a heart virus that may have contributed, Stier said.

304.    Stier was certain that the infant had no skull fracture, yet the pressure exerted on him by Knox and her other proponents of the SBS/AHT enterprise caused him to falsely testify otherwise – consistent with the Helfer Playbook engineered in part by Knox, Esernio-Jenssen and Harper.

305.    Knox also attempted to cause a false child abuse prosecution of Greg Shebesta, the father of Henry, an infant.

306.    There was no medical basis for Knox's false accusation of child abuse. She made the false accusation because Henry presented to the hospital with a brain bleed, but no other evidence of abuse.

307.    Knox knew that Henry suffered from a blood clotting disorder that was known to cause brain bleeds like the one with which Henry was admitted.

308.    Despite this fact, Knox attempted to promote the SBS/AHT enterprise through

this false accusation.

309.     Knox also attempted to cause a false child abuse prosecution of the Siebold family.

310.     Leo Siebold was born with several medical conditions that required close monitoring, including heterotaxy syndrome, in which the internal organs are abnormally arranged. Leo's parents were told to bring Leo to the hospital if he developed a fever over 100 degrees.

311.     Leo's mother, Brenna – a third grade teacher – followed that advice and brought Leo to a Wisconsin hospital when his fever spiked.

312.     In the process of attempting to place an IV and a catheter, Leo thrashed, causing him to suffer bruises and cuts.  Leo also had older scars from previous medical treatments at the hospital.

313.     The following day Knox, who was again attempting to "find" victims of abuse in order to support the SBS/AHT enterprise and her own financial and reputational wellbeing, falsely accused Brenna and her husband of abusing Leo.

314.     In the process of doing so, Knox falsely represented herself as a "blood specialist" to Leo's parents, arousing suspicion in Breanna, who had talked to Leo's actual hematologist at the hospital earlier that day.

315.     Knox overcame Brenna's reservations and was allowed to take additional, unnecessary blood tests from Leo.

316.     Leo's parents were interviewed by the police, who instantly dismissed the allegations, concluding that Leo's bruises and other physical injuries were caused by medical staff when they attempted to place the IV and catheter.

317.     Brenna told reporters afterwards that she was haunted by her family's run-in with

Knox's team and wondered how less-educated parents, parents in poverty, parents who did not speak English, and parents without such strong community ties and family support could weather such accusations.

318.     Knox also attempted to cause a false child abuse prosecution of Alfonzo Clayborne in support of the SBS/AHT enterprise.

319.     On June 8, 2016, Alfonzo Clayborne found his 3-month-old son unresponsive in his crib. He called the baby's mother. She came home from work, and together they called 9-1-1. An ambulance took her and the baby to the hospital. Clayborne followed in his car. But once he arrived, the staff barred him from joining his family.

320.     The hospital's child protection team told authorities the baby had brain bleeding and a left leg fracture. A physician assistant told police other injuries were possible but not yet confirmed, according to the criminal complaint.

321.     Then-medical director Knox had examined and diagnosed the baby. Her physician assistant, Amanda Palm, relayed Knox's diagnosis to police and told them the child's injuries were caused by intentionally inflicted trauma.

322.     Authorities thereafter focused on Clayborne. A police officer and child protective services worker interviewed him. The child protective services worker was the first to tell him news of his son's condition.

323.     A pediatric orthopedist later determined Clayborne's son never had a fracture, but "a normal variant of the distal femur," according to a court document.

324.     The baby left the hospital with a cast on his leg for a break that he never had.

325.     Clayborne was charged with first-degree reckless injury. These chargers were later dropped after independent experts reached radically different conclusions than Knox.

326. Knox also attempted to cause a false child abuse prosecution of a Lake Mills childcare provider who fell down the stairs while holding a 4-month-old.

327. The baby sustained a blow to the head, which briefly knocked him unconscious, while the caregiver suffered minor injuries. After scans showed the child had bleeding on his brain and hemorrhaging in his eyes, Knox declared it abusive head trauma, and the woman was charged with recklessly causing the baby harm.

328. The court dismissed the charges during trial, finding Knox's theory unsustainable.

329. In addition to engaging in the fraudulent and unprofessional conduct described above, and in order to further facilitate her participation in the SBS/AHT enterprise, Knox provided false and fraudulent testimony in criminal prosecutions in order to assist in obtaining wrongful convictions against parents and caregivers accused of SBS/AHT.

330. Knox's participation in and furtherance of the SBS/AHT enterprise resulted in considerable fees for expert testimony as well as the maintenance of her national reputation and position with UW.

331. By 2019, the UW discovered that Knox had engaged in fraudulent and unprofessional conduct in furtherance of the SBS/AHT enterprise.

332. UW placed Knox on administrative leave on July 5, 2019, finding that Knox had engaged in "unprofessional acts that may constitute retaliation against and/or intimidation of internal and external colleagues."

333. Knox resigned in response to the investigation.

334. Meanwhile, a group of Wisconsin investigative journalists determined that Knox had misdiagnosed child abuse in twelve different prosecutions and child welfare cases.

335. Knox thereafter moved to Alaska and took on the role as the Medical Director at

the child advocacy center, Alaska CARES, in November, 2019.

336.    During Knox's first year at Alaska CARES, abusive head trauma / physical abuse cases increased by 173 – 220%

337.    While in Alaska, Knox implemented the same Helfer Society-derived SBS/AHT Playbook she had used in Wisconsin, which included bullying, extortion and retaliation against colleagues in order to manufacture child abuse diagnoses as well as misdiagnosing child abuse herself.

338.    As a result of Knox's abusive and fraudulent conduct, most of the workers and professionals in the Alaska CARES child abuse program resigned their positions.

339.    Knox was placed on leave in November of 2021 during an investigation of workplace toxicity and allegations against Knox's medical judgement.

340.    Knox was forced to find a new position at the University of Florida, a position she obtained through the recommendation of Helfer Society members Lynn Sheets, MD and Esernio-Jenssen.

341.    Knox became a Clinical Professor at UF Jacksonville, assigned to the Child Protection and Pediatric Forensics division, where she teamed up with Randall Alexander, MD ("Alexander").

342.    Alexander and Tom Fallon, former Dane County Assistant DA and lead prosecutor in *State of Wisconsin vs Jennifer Hancock*, presented together at the National Center on Shaken Baby Syndrome's 16th annual conference in Orlando, Florida in 2018.

343.    Alexander and Harper co-authored Medical Response to Child Sexual Abuse in 2019.

344.    In over 18 years of work as a child abuse physician, Knox has been directly

involved in at least 12 cases of diagnosed abusive head trauma that were either dismissed by prosecution, dismissed by judges, adjudicated and defendants found not guilty, or defendants were convicted under dubious circumstances and the cases are now under appeal.

### Reynolds Family Background.

345.  Sylwia was born in Poland. She graduated from the University of Bydgoszcz with a degree in environmental engineering with a specialization in water treatment.

346.  Sylwia moved from Poland to Minneapolis in 2002. She and William met in 2003, began to date in 2004 and were married in 2006.

347.  Sylwia obtained her United States Permanent Resident card in 2008. Their first child, AMR, was also born in 2008.

348.  WR was born in 2011.

349.  In 2015, Sylwia obtained a license to operate a home daycare in the Reynolds' home in Minneapolis.

350.  One of Sylwia's first clients was KC, the sister of GC.

351.  Between 2015 and July 12, 2017, Sylwia operated the daycare center on a full-time basis, with William proving support and assistance as needed.

352.  The daycare center provided an important part of the family's then present and future financial welfare.

### Defendants' use of the Helfer Playbook to falsely accuse Sylwia of murdering GC

353.  GC was born with a head circumference above the 85th percentile on the World Health Organization ("WHO") Head Circumference-for-age boys. GC's medical records demonstrate that as he grew, his head grew rapidly.

354.  By his 10-month wellness visit, GC's head circumference measured four

deviations above the mean, and two full deviations above the 97th percentile.

355.   GC's condition was diagnostic of macrocephaly, or an abnormally large head. This was likely caused by any number of underlying conditions such as enlargement of the extra-axial space, the ventricular system or brain parenchyma, hydrocephaly, or water on the brain; high cerebral blood volume (CBV); high levels of cerebrospinal fluid (CSF); intracranial hemorrhages; or a similar condition that caused GC to develop increased intracranial pressure, "ICP," also known as increased pressure inside of the skull.

356.   GC fell at home on or about July 6, 2017, causing him to sustain an injury on his forehead. Family reports changed over time as to whether GC fell from a bed or a couch and whether he fell onto a hard wood floor or an area rug.

357.   According to GC's mother, GC also fell on or about Monday, July 10, 2017, and struck the back of his head.

358.   GC became Sylwia's daycare client July 10, 2017 after these multiple falls. GC was 11 months old.

359.   At approximately 8:15 am on July 10, 2017, GC's father dropped GC off at Sylwia's daycare. GC was approximately 45 minutes late. Historically, GC's parents had punctually dropped off and picked up their children from Sylwia's daycare.

360.   When Sylwia observed an injury on GC's forehead during drop-off on July 10, 2017, GC's father explained that the boy had fallen off a bed.

361.   After GC's father left, Sylwia applied a bandage to the injury.

362.   GC was fussy and inconsolable during his July 10 and July 11 stays at Sylwia's daycare. On these days, he did not eat or drink, and he did not nap.

363.   GC's parents reported abnormal sleep patterns beginning after his fall on July 10.

In the early morning hours of both July 11 and July 12, GC woke up at 2:00 am and remained up until 4:30 am and 3:30 am respectively.

364.    Conversely, prior to his fall on July 10, 2017, GC averaged 13 – 14 hours of sleep per 24-hour period, including naps.

365.    On or about 10:57 am on July 12, 2017, GC collapsed without warning at Sylwia's daycare.

366.    At no time did Sylwia hit, shake, drop or otherwise assault or abuse GC.

367.    Sylwia called 911 and immediately began to administer CPR.

368.    Several police officers, paramedics and firefighters rushed to Sylwia's daycare to emergently continue resuscitative efforts.

369.    Paramedic Donald Wolfe led resuscitative efforts at the scene.

370.    Minneapolis Fire Department motor operator, Anthony Wilson, and firefighter Elizabeth Kadlec observed a large bump and bruises on the back of GC's head. Their observations were captured by the body camera worn by Minneapolis Police Department officer Dante Dean.

371.    Paramedic Wolfe subsequently wrote a patient care report, "PCR," documenting a contusion on the back of the GC's head.

372.    In the narrative portion of the first page of the PCR, Wolfe reported, "Mom recalls pt did fall 2 days ago, striking the back of his head."

373.    Upon GC's arrival to HH, Paramedic Wolfe told the HH emergency department staff – Dr. Brian Clarkowski, resident Dr. Elan Lindebaum, G3 Resident Dr. Mariah Kirsch, RN Shawntal James, and RN Randine Peterson – that GC's mother reported a fall on or about July 10.

374.    A copy of Paramedic Wolfe's PCR was left with the ED staff and was later faxed

to HH's health information management department.

375.    Wolfe's PCR documenting GC's fall and head injury was scanned into EPIC, the hospital's electronic health record, "EHR" system, and made available for viewing to all physicians on the EPIC platform that same day.

376.    Upon information and belief, all entries made into EPIC, including Wolfe's PCR, resulted in its transmission through interstate wires, since EPIC's cloud-based servers are located in and around Verona, Wisconsin.

377.    Upon GC's admission to HH, resident pediatric intensive care unit physician Dr. Ornina Bachour noted two falls in GC's original history of present illness ("HPI") that was part of his admission History and Physical ("H&P"): one fall on or around July 6, 2017, and a second fall within forty-eight to seventy-two hours of hospitalization.   This information was entered into EPIC and transmitted through interstate wires.

378.    Bachour cited GC's mother and Wolfe's report as her sources of this prehospital history.

379.    Bachour, resident Dr. Erin Dodd, and resident Dr. Alice Lehman all reported to GC's attending care provider, Defendant Jouhari.

380.    CT studies of GC's head completed less than 45 minutes after his admission to HH demonstrated the presence of scalp swelling in the region of the posterior vertex.

381.    Blood clots blocked the flow of oxygen-depleted blood from GC's brain back to his heart to be re-oxygenated. This caused a brain injury and increased intracranial pressure ("ICP").

382.    Blood clots were observed in the superior sagittal, on or around the region of the posterior vertex where GC had observable scalp swelling and contusions. Blood clots were also

observed in the right transverse and right sigmoid sinuses and in the torcula, the point of confluence where his superior sagittal, straight, occipital and transverse sinuses converge.

383. The blood clots comprised a condition medically known as cerebral venous sinus thrombosis ("CVST"). CVST, in the absence of prompt medical attention, can lead to a stroke.

384. An intracranial brain bleed observed in the region of the posterior vertex accompanied by external contusions and scalp swelling suggested that GC had a possible skull fracture from the fall documented in Wolfe's report and noted by Bachour in her HPI.

385. Apart from the concern about the possible skull fracture, the treatments ordered by GC's HH doctors reflected their concern that GC had elevated ICP.

386. This was demonstrated by the fact that GC's doctors ordered that the height of GC's bed be raised to 30°. GC was also administered 5% hypertonic saline and moved into surgery for an emergency ventriculostomy. An extra-ventricular drain ("EVD") catheter was inserted to measure and reduce GC's ICP by drawing away cerebral spinal fluid from the brain.

387. GC's ICP was initially recorded at 16–20 mmHg. Normal ICP values for an infant of GC's age are 5–10 mmHg. Values above 20 mmHg generally require immediate medical attention.

388. After surgery, GC was moved to the pediatric intensive care unit ("PICU"). At 2:08 pm, a second CT study, a venogram, was ordered to confirm placement of the EVD catheter that was placed in GC's brain to measure and relieve ICP.

389. Thirty minutes later, Bachour ordered an ophthalmology consult, citing a "Subdural with sigmoid sinus thrombosis."

390. Soon after, Bachour placed an order for a magnetic resonance venogram ("MRV"), to better visualize the venous system of GC's brain. Bachour noted prehospital history

provided by "Family or Guardian Comment – EMS."

391.    Consistent with the imaging and reported prehospital history, U of M resident physician Dr. Alice Lehman ordered a series of tests to confirm the presence of a cerebral venous sinus thrombosis ("CVST").

392.    A blood test confirmed that GC was heterozygous positive for the Factor V Leiden mutation, meaning that GC had a genetic blood clotting disorder. This disorder made GC 8 times more likely to develop CVST than a person without the mutation.

393.    At approximately 2:30 pm, Defendant Lucken, an HH staff pediatrician and member of the Child Maltreatment Physician Consult Team ("CMPCT"), and the on-call physician representing the Center, was paged by HH licensed independent clinical social worker Rosemary Froehle ("Froehle").

394.    Lucken performed a physical examination, reviewed GC's CT studies, reviewed medical records on EPIC, and spoke with Minnesota Police Department officers Seidl, Dean and Anderson.

395.    After assessing and evaluating GC, Lucken concluded that GC's brain injury was caused by an impact that resulted in a skull fracture and an occipital hematoma, and she informed Froehle of that opinion.

396.    At 3:17, the results of the CT venogram were returned. The CT venogram demonstrated that the EVD catheter had migrated out of the ventricular system and would need to be surgically re-inserted to correct placement. Without this procedure, the EVD catheter could not measure ICP.

397.    Around 4:00 pm, Lehman ordered two infusions of tranexamic acid, an agent that increases blood clotting – and which is contraindicated in the presence of CVST and in a patient

that already suffered from extensive blood clots like GC did.

398.    At around this same time, an unknown and inadequately documented emergent situation necessitated a massive infusion of blood product and fresh frozen plasma into GC.

399.    Upon information and belief, the emergent situation was not properly documented because it was caused by acts or omissions of HH staff, and documenting those acts and omissions may have revealed HH's liability for causing the emergent situation.

400.    At or around this same time, 4:00 pm, Lucken provided Froehle a report on GC's condition and progress. The report was provided either orally or in writing.

401.    After receiving this report, Froehle called CPS and reported child abuse.

402.    Primary CPS worker Mailee Lor ("Lor") documented she received Froehle's call at 4:13 pm.

403.    In her intake report, Lor documented that Froehle reported that GC had a "skull fracture" and "occipital hematoma."

404.    The original report Froehle received from Lucken diagnosing GC with a "skull fracture" and "occipital hematoma," was destroyed, modified and/or erased from HH, EPIC and/or child abuse investigatory records.

405.    At 4:51 pm, Lehman ordered three sodium chloride to treat GC's increased ICP.

406.    At 5:00 pm, GC's ICP abruptly shot up to 85 mmHg, a reading 8.5 to 17 times the normal range of 5–10 mmHg. An ICP reading of 40 mmHg is considered terminal.

407.    At 6:57 pm, Bachour ordered a CMPCT consult to "r/o [rule out] child abuse."

408.    At 7:17 pm, RN Randine Peterson input her ED nursing note into the EPIC EHR.

409.    In this note, Peterson falsely paraphrased Wolfe's PCR by stating that "11 mos old boy arrives per EMS from home of day care provider. His mother also arrives in the

68

ambulance. Initial report from EMS: [GC] had been outside in back yard when he was seen falling backward and striking his head and eyes rolled back…While pt at CT, MPD officer came from scene of cardiac arrest with updated information about prehospital events. Day care provider described events as follows: Pt was playing in day care back yard with other children. Provider was watching the kids from her window. She did NOT see pt fall today and fall was NOT reported to her by other kids." Peterson added emphasis to the word "Not."

410.    On or around 9:36 pm, Lucken filed a brief consultative report. She cited to Bachour's "Consult to CMPCT" order. Lucken made no mention in this report that Froehle had contacted her as the on-call attending physician for The Center.

411.    In her report, Lucken claimed that she interviewed GC's parents at 5:20 pm.

412.    Lucken also documented that she examined GC at or about 6:00 pm, even though she had actually assessed and examined GC prior to providing her report and opinion to Froehle, who herself called in a child abuse report at 4:13 pm.

413.    Lucken concluded this report with one sentence, "More comprehensive note to follow."

414.    As part of the HH, U of M and UMP child abuse policies, procedures and protocols put in place by Harper, Lucken was required to forward her draft child maltreatment report to Harper for editing, modification and approval prior to inputting the report into EPIC's permanent and audited medical records system.

415.    This policy, procedure and protocol adopted and ratified by Defendants assured that the edits and changes made by Harper would not be picked up or tracked by EPIC and thus would not generate metadata or audit trails that could be discovered in later court proceedings.

416.    At or about 9:48 pm, Dr. Anne Abel, an ophthalmologist, performed an

ophthalmology consult, and cited to Bachour's "Consult to Ophthalmology" order. Abel noted the presence of a subdural hemorrhage and "…possible venous sinus thrombosis."

417. Abel did not attribute the injuries to acceleration–deceleration injury, abusive head trauma or SBS/AHT.

418. Abel planned to perform a repeat eye exam on July 13.

419. On July 13, 2017, at 8:25 am, Lucken faxed Harper a copy of the original report she had provided to Froehle.

420. The fax was five pages long, including the cover sheet.

421. The original faxed report, which was later destroyed, modified and/or erased, pursuant to the policies, procedures and customs outlined above, contained medical evidence proving that GC's then existing medical condition was the result of a combination of his fall(s) at home and his genetic blood disorder, not SBS/AHT.

422. Among other things, the original faxed report is believed to have referenced GC's scalp swelling and suspected skull fracture and occipital bleeding.

423. Around the time Harper received the original faxed report identifying medical facts that would have led her to conclude that GC's brain injury was caused by a fall and/or preexisting medical conditions, Harper also accessed and reviewed the HH EHR for GC which among other things stated that GC had fallen at home; that GC had a genetic clotting disorder; and that GC had critically high ICP.

424. Upon information and belief, Harper would have also had access to information suggesting that GC had hydrocephaly/macrocephaly or some related disorder in light of his extraordinarily large head circumference and that large head size had long been associated with symptoms mimicking SBS/AHT.

425.    Upon reviewing this information, Harper objectively knew, as a medical specialist, that GC's medical condition and brain injury was not caused by the conduct of GC's daycare provider, Sylwia.

426.    Rather than honestly and objectively interpreting the data she reviewed, and in following the policies, procedures and customs outlined above, Harper knowingly and intentionally falsified, modified and erased exculpatory information in order to promote the SBS/AHT enterprise and thus promote her own personal, academic, reputational and financial needs over those of GC, Sylwia and the child welfare system.

427.    The fact that Harper intentionally and knowingly modified and edited Lucken's report to remove exculpatory evidence is demonstrated by the timing of the police department's request for Lucken's original report and by the two different fax timestamps contained on the report.

428.    Upon information and belief, on the afternoon of July 13, Lucken told investigating detective Pat Myslajek that she had faxed her original report to Harper that morning.

429.    Myslajek had scheduled a forensic interview of GC's sister at Corner House at 1:00 pm on July 14. When Lucken told him that she faxed her report to Harper at Corner House, Myslajek told Lucken he would obtain a copy of the fax from Harper and enter that report into evidence.

430.    When Harper learned that Myslajek planned to obtain a copy of Lucken's fax, Harper edited, modified and falsified the document by removing Lucken's original report and inserting a replacement report attributed to Lucken that Harper herself modified and co-wrote.

431.    Upon information and belief, this was accomplished by using digital editing software which allowed Harper to insert the replacement report while retaining the fax timestamp

across the top of each page.

432. The final version of Lucken's report given to Myslajek contained a fax timestamp of "07/13/2017 Thu 8:25" along the top left of each page. On the bottom of each page is a separate but different printer timestamp of "7/14/17."

433. This further demonstrates that Lucken's original report was faxed to Harper on 7/13 but was modified and edited on 7/14; and then later resent to Lucken for her to sign and file in EPIC.

434. Lucken's final report as falsified, modified and edited by Harper, did not contain the exculpatory medical evidence referring to GC's to scalp swelling, skull fracture and occipital bleeding from the fall or falls he suffered at home.

435. The final Lucken report as falsified, edited and modified by Harper also omitted references to GC's genetic clotting disorder and his abnormally large head size, both of which were additional medical facts that Harper knew would exculpate GC's daycare provider, Sylwia, from criminal liability.

436. On the morning of July 13, at or around 9:00 am, GC was examined by Defendant Silbert, an ophthalmologist.

437. Silbert's involvement was not for the purpose of GC's clinical condition or health. Rather, Silbert was brought in as a forensic child abuse expert to bolster the evidence needed to prosecute Sylwia for child abuse. Despite this fact, Silbert was held out as a clinician.

438. Upon information and belief, Silbert's forensic assessment was fictitiously billed to a third party insurance provider as clinical care and not a forensic examination.

439. On July 15, 2017, Silbert wrote his forensic evaluation of GC. Silbert wrote, consistent with the precise needs and wording of the Helfer Playbook and the policies, procedures

and customs outlined above, "Damage this severe does not occur as the result of a fall, intracranial hemorrhage, or cardiopulmonary resuscitation. Rather it is most consistent with abusive head trauma where blood vessels and tissues are torn in the context of recurrent, rapid, and severe acceleration-decelerations, with or without impact. Severe shaking is known to produce shearing forces such as this."

440. At the time Silbert made the statement, he was aware of, consciously omitted, consciously suppressed, consciously falsified and/or consciously mispresented:

     a.     GC's pre-admission fall history;

     b.     Wolfe's PCR;

     c.     Bachour's HPI indicating two distinct falls;

     d.     erroneous prehospital history reported by RN Randine Peterson, cut and pasted from Lucken's report;

     e.     scalp swelling and contusions over the posterior vertex;

     f.     the fact that GC tested positive for Factor V Leiden mutation that made him more susceptible to developing CVST from illness and fall related head injuries;

     g.     the abrupt increase in ICP after a second round of CT studies revealed the EVD catheter had migrated out of the ventricular system;

     h.     the fact that Heparin, an anticoagulant used to treat CVST, was withheld from GC because of concerns for Heparin-induced Thrombocytopenia (HIT);

     i.     the administration of tranexamic acid to GC in the face of clots and a possible stroke;

j.      the unexplained and undocumented medical emergency that GC suffered at around 4:00 pm on July 12;

k.      head circumference measurements above the 97th percentile in the setting of macrocephaly making GC more susceptible to fall-related injuries;

l.      CVST evidenced by CT imaging demonstrative of thrombosis in the superior saggital sinus, torcula, right transverse sinus and right sigmoid sinus;

m.      medical evidence of a sudden, rapid, and severe elevation of ICP to 85 mmHg;

n.      and influence of CVST and rapid, severe elevation of ICP upon ocular findings.

441.    Silbert's intentional omissions, fabrications and manipulations were accomplished in order to follow the unlawful and fraudulent policies, procedures and customs outlined above.

442.    Apart from following the fraudulent policies, procedures and customs, Silbert knew that disclosure of any or all of these issues in his report would have made it difficult or impossible to support a diagnosis of SBS/AHT and thus would not support the SBS/AHT enterprise or his financial/reputational/professional goals, Silbert's report was made recklessly and in bad faith and in order to promote the SBS/AHT enterprise.

443.    On the afternoon of July 13, 2017, a pediatric death confirmatory examination was performed by neurologist Dr. Armantina Espinoza. At the conclusion of her exam, Dr. Espinoza determined that GC met the clinical criteria to certify death.

444.    At 4:05 pm, July 13, 2017, GC was declared dead. He was one day short of his

first birthday.

445. GC was transferred out of patient care at HH into the care of LifeSource, an organ donation organization. GC's patient HH account number was 2720482253.

446. On the evening of July 13, Lucken and/or Harper began a replacement report under the HH vendor/3rd party account number assigned to Lifesource: 2720496811.

447. Upon information and belief, Lucken and/or Harper chose to create the replacement report under the new account number to prevent discovery of Lucken's original report under account number 2720482253.

448. At 10:31 pm, the first draft of the replacement report was complete.

449. At 10:40 pm, Lucken and/or Harper fixed a typo in the first paragraph under History of Present Illness. Third sentence, "The note from Randine Petersen, RN, appear[SL.1]s[SL.2]…"

450. On July 14, 2017, at 8:07 am, Lucken and/or Harper made a few more edits to the replacement report, adding greater emphasis to GC's fall that occurred July 6 and greater but knowingly false emphasis to GC "acting completely normal" in the days following this fall, leading up to his collapse on July 12.

451. On July 14, 2017, at 8:17 am, only forty-eight hours after GC's admission, Lucken filed her replacement consultative report through EPIC and transmitted it through interstate wires. Lucken later re-opened the report for editing purposes and then filed it as an addendum at 1:39 pm.

452. Lucken identified SBS/AHT as the primary diagnostic consideration, emphasizing, "Indeed, these findings are virtually definitive for abusive head trauma from shaking."

453.    At the time Lucken made that statement, she was aware of, consciously omitted, consciously suppressed, consciously falsified and/or consciously mispresented:

a.    GC's pre-admission fall history;

b.    Wolfe's PCR;

c.    Bachour's HPI indicating two distinct falls;

d.    erroneous prehospital history reported by RN Randine Peterson, cut and pasted from Lucken's report;

e.    scalp swelling and contusions over the posterior vertex;

f.    the fact that GC tested positive for Factor V Leiden mutation that made him more susceptible to developing CVST from illness and fall related head injuries;

g.    the abrupt increase in ICP after a second round of CT studies revealed the EVD catheter had migrated out of the ventricular system;

h.    the fact that Heparin, an anticoagulant used to treat CVST, was withheld from GC because of concerns for HIT;

i.    the administration of tranexamic acid to GC in the face of clots and a possible stroke;

j.    the unexplained and undocumented medical emergency that GC suffered at around 4:00 pm on July 12;

k.    head circumference measurements above the 97th percentile in the setting of macrocephaly making GC more susceptible to fall-related injuries;

l.    CVST evidenced by CT imaging demonstrative of thrombosis in the

superior saggital sinus, torcula, right transverse sinus and right sigmoid sinus;

    m.    medical evidence of a sudden, rapid, and severe elevation of ICP to 85 mmHg;

    n.    and influence of CVST and rapid, severe elevation of ICP upon ocular findings.

454. Because Lucken knew that disclosure any or all of these issues in her report would have made it difficult or impossible to support a diagnosis of SBS/AHT and thus would not support the SBS/AHT enterprise or her financial/reputational/professional goals, Lucken's report was made falsely, recklessly and in bad faith and in order to promote the SBS/AHT enterprise.

455. Moreover, all of the entries Lucken made into GC's EHR were addenda or modifications of different original reports that have now been erased or destroyed. None of Lucken's original documentation regarding her assessments or evaluations of GC are contained in GC's official medical record.

456. On July 15, 2017, assistant Hennepin County Medical Examiner Owen Middleton, MD ("Middleton") began the autopsy on GC.

457. Upon information and belief, at the time Middleton began GC's autopsy, he did not have a complete set of GC's records as required to have been provided to him by Minn. Stat. § 626.556, subd. 11(a). Of particular importance, Middleton was not provided:

    a.    Bachour's report of GC's fall earlier in the week;

    b.    BWC video of MPD officer Dante Dean;

    c.    discharge summary of attending physician, Defendant Jouhari;

    d.    CT imaging demonstrative of scalp swelling over the posterior vertex;

e.   a second CT study of GC that demonstrated that the EVD catheter had migrated out of his ventricular system and thus was not relieving his increasing ICP;

f.   GC's ICP measurements that showed an abrupt increase in ICP recorded at 5:00 pm on July 12;

g.   the fact that Heparin, an anticoagulant used to treat CVST, was withheld from GC because of concerns for HIT;

h.   the fact that GC was given tranexamic acid, which is contraindicated in a patient with GC's type of blood clotting disorder; or

i.   the report of LCSW Rosemary Froehle demonstrating that Lucken was aware of the preliminary findings that GC had scalp swelling and contusions over the posterior vertex and was suspected to have a skull fracture.

458.   On July 17, 2017, at 7:11 am, Harper, in her capacity as Medical Director of the Center and as the contracted supervisor of HH's CMPCT, filed a review of the child maltreatment consultation previously performed by Lucken.

459.   Harper stated, "Symptoms of a significant brain injury would be expected shortly after the trauma occurred . . . These injuries occurred as the result of acceleration-deceleration injury with a rotational component, with or without impact."

460.   At the time Harper made this report, she was aware of, consciously omitted, consciously suppressed, consciously falsified and/or consciously mispresented:

a.   GC's pre-admission fall history;

b.   Wolfe's PCR;

c.    Bachour's HPI indicating two distinct falls;

d.    erroneous prehospital history reported by RN Randine Peterson, cut and pasted from Lucken's report;

e.    scalp swelling and contusions over the posterior vertex;

f.    the fact that GC tested positive for Factor V Leiden mutation that made him more susceptible to developing CVST from illness and fall related head injuries;

g.    the abrupt increase in ICP after a second round of CT studies revealed the EVD catheter had migrated out of the ventricular system;

h.    the fact that Heparin, an anticoagulant used to treat CVST, was withheld from GC because of concerns for HIT;

i.    the administration of tranexamic acid to GC in the face of clots and a possible stroke;

j.    the unexplained and undocumented medical emergency that GC suffered at around 4:00 pm on July 12;

k.    head circumference measurements above the 97th percentile in the setting of macrocephaly making GC more susceptible to fall-related injuries;

l.    CVST evidenced by CT imaging demonstrative of thrombosis in the superior saggital sinus, torcula, right transverse sinus and right sigmoid sinus;

m.    medical evidence of a sudden, rapid, and severe elevation of ICP to 85 mmHg;

n.      influence of CVST and rapid, severe elevation of ICP upon ocular findings;

o.      that there were no radiologic or admission reports to support the claim of significant cerebral edema present at admission; and

p.      GC's parents reporting changes in overnight sleep patterns and daycare reports of loss of appetite and inconsolability consistent with TBI.

461.    Because Harper knew that disclosure any or all of these issues in her report would have made it difficult or impossible to support a diagnosis of SBS/AHT and thus would not support the SBS/AHT enterprise or her financial/reputational/professional goals, Harper's report was made recklessly and in bad faith and in order to promote the SBS/AHT enterprise.

462.    In particular, and in following the policies, procedures and customs she developed and implemented at UMP, U of M and HH, her report excluded all other possible causes of the injury, including differential diagnoses consistent with any of the above history or medical information.

463.    Like Lucken and Silbert, Harper excluded the importance of the sudden, severe increase of ICP, which is a known to produce retinal findings consistent with those attributed to SBS/AHT.

464.    Harper in fact was well aware that sudden severe spikes in ICP could produce the retinal hemorrhage dispersion pattern seen in GC, as revealed in testimony she gave in *State of Minnesota v. Laurie Ann Gregor*.

465.    Harper's report of child abuse was thus made recklessly and/or in bad faith and for the purpose of advancing the SBS/AHT enterprise.

466.    At around noon on July 20, 2017, Myslajek traveled to HH's medical records department and requested GC's records as part of the ongoing criminal investigation.

467.    Among other things, Myslajek requested copies of the PCR, discharge summary, ER reports, x-ray/radiology reports, operative reports, consultation reports, and photographs.

468.    While Myslajek waited in the HH medical records department lobby, Defendant Jouhari accessed the EPIC system and edited GC's pediatric death note/discharge summary.

469.    In particular, Jouhari changed the previous phrase, "there was no reported trauma" to "there was no reported **_or visual_** trauma." [emphases supplied]

470.    Jouhari use of the emphasized phrase "or visual" is significant.

471.    It suggests to the reader that Jouhari had personally and physically assessed GC's skin and body and after doing so did not see or visualize any scalp swelling, bruises, contusions or other signs of trauma.

472.    Jouhari also purposely omitted from the discharge records a critical piece of prehospital history contained in the original HPI, which stated, "Of note parents state patient fell earlier this week."

473.    Jouhari also backdated his signature to make it appear that he wrote his report on July 13, 2017 instead of on July 20, 2017.

474.    Jouhari's fraudulent and intentional edits to GC's admission history and omission of the fall history – while the police detective was in the waiting room – was done in furtherance of his conspiracy with Lucken, Silbert and Harper to support a fraudulent and fictitious SBS/AHT diagnosis. Jouhari intended to falsely convey to the reader that he had personally examined GC's head and saw no bruising or swelling, and that there was no history of falls on prior days.

475.    Jouhari's fraudulent medical record entry and omission was also transmitted

through interstate wires.

476. Harper, Lucken, Silbert and Jouhari's conspiracy to fabricate medical evidence for the purpose of securing a criminal prosecution resulted in the HCAO pursuing civil and criminal child abuse proceedings against Sylwia.

477. The civil child abuse proceedings were investigated, brought and maintained by Defendant Nicholson who, as set forth above, knew or should have known that much of the evidence gathered in the child abuse proceedings against Sylwia were fabricated, false and generated as a result of the fraudulent, unlawful and unconstitutional policies, procedures, customs and practices outlined above.

478. As a result of Nicholson, the HCAO and Hennepin County's wrongful conduct, on July 24, 2017, AMR (then age 8) and WR (then age 6) were removed from summer school at Lake Harriet Elementary in South Minneapolis and taken into protective custody by the Hennepin County Department of Health and Human Services, "the Department."

479. From there, they were moved to St. Joseph's Home for Children.

480. Both children were stripped down to their underwear and physically examined. No evidence or history of child abuse was found with either of the children.

481. Both children were subsequently interrogated by Myslajek and CPS investigator Larson. Afterward, both children were placed in a foster home located at 3418 Upton Ave in North Minneapolis.

482. On July 26, 2017, Nicholson and/or the HCAO caused Sylwia to be served with a petition to terminate her parental rights (TPR) to AMR and WR.

483. Defendant Nicholson represented the HCAO during the TPR proceeding and directed all investigation surrounding that proceeding, which dovetailed with the criminal

proceeding brought by the HCAO.

484. The TPR petition was filed on July 24, 2017. The petition referenced the diagnostic conclusions of the CMPCT comprised of but not limited to Harper, Lucken and Silbert.

485. At the time of the filing, the CPS investigation was incomplete, Dr. Middleton's autopsy was incomplete, and no criminal charges had been filed against Sylwia.

486. Upon information and belief, Nicholson was aware of the concealed and private policies, procedures, customs and practices of the Hennepin County child protection system described above, including the requirement that all conflicting "medical evidence" was omitted or scrubbed from the medical records and that the medical evidence of child abuse presented to the HCAO by Harper's team, in particular, would not contain any contrary or conflicting medical opinions or notes from other physicians.

487. Upon information and belief, Nicholson and the HCAO all knew the policies, procedures, customs and practices described above rendered the medical evidence of child abuse that they received from Harper and her child abuse team biased, inaccurate, incomplete and essentially curated by Harper and her team to ensure quick, easy and unrebutted child abuse prosecutions.

488. Upon information and belief, Nicholson and the HCAO knew that if defense attorneys became aware of these policies, procedures, customs and practices described above, that the medical evidence of child abuse generated by Harper and her team would likely be excluded by courts and/or disregarded by juries.

489. As a result, upon information and belief, Nicholson and the HCAO conspired with and cooperated with the other defendants to conceal the policies, procedures, customs and practices described above from courts, juries, defendants and defense attorneys.

490.     Based on the false and bad faith opinions and recommendations of Harper, Lucken and Silbert, which were designed to promote the SBS/AHT enterprise and not for the purpose of providing accurate and truthful medical information, Judge Juan Hoyos entered an Order of Protective Supervision for the Reynolds children, which in turn forced Sylwia to move out of the home that she shared with William, AMR and WR.

491.     As of today's date, this conduct, and the continuing course of conduct alleged in this Complaint, has prevented Sylwia from returning home to her family.

492.     On October 25, 2017, the HCME certified the manner of GC's death as "Could not be Determined." The HCME further found, "Deceased sustained injury under unclear circumstances; cannot exclude injury from another person(s)."

493.     The HCME also identified both the date of injury and the place of injury as "Unknown."

494.     HCME autopsy report was completed and signed by Dr. Middleton and reviewing pathologist Dr. Mitchel Morey on November 20, 2017.

495.     Nicholson and/or the HCAO requested the HCME's records for GC on December 15, 2017.  Wolfe's PCR documenting GC's preexisting head injury was among those records.

496.     In January, 2018, Nicholson and/or the HCAO specifically requested and obtained from the Hennepin County Service Center – Ridgedale Location a "non-certified" copy of GC's death certificate that did not contain the cause and manner of his death information.

497.     Upon information and belief, Nicholson and/or the HCAO specifically requested a non-certified copy because she or they knew that the certified copy contained a death determination that was contrary to their TPR proceeding and thus would have likely resulted in a ruling favorable to Sylwia.

498.     When Nicholson and/or the HCAO furnished the death certificate to Sylwia's defense counsel, all evidence and materials in the TPR matter were under a protective order.

499.     Defense counsel was dependent on Nicholson and the HCAO for all disclosures including the death certificate.

500.     On February 2, 2018, the HCAO charged Sylwia with two counts of Murder – 2nd Degree – Without Intent, in connection with the death of GC.

501.     The probable cause portion of the complaint cited the knowingly false and fraudulent medical opinions of Harper, Lucken and Silbert.

502.     At the time the complaint was filed, Sylwia was visiting her ailing father in Poland and was nearly three months pregnant with her and William's third child, AR.

503.     During the course of discovery in the TPR matter, the HCAO by and through Nicholson provided Sylwia with incomplete and manipulated discovery, including an incomplete medical chart for GC that contained a manipulated PCR report from Donald Wolfe – the one in which GC is described as having fallen at home.

504.     Wolfe's PCR was intentionally manipulated to make it illegible and unfindable. Among other things, the PCR report was reduced to 55% scale, the resolution of the document was altered, and it was inserted into the Discharge Instructions portion of the chart, rather than the Emergency Department or HPI sections.

505.     In other words, perhaps the most important piece of evidence in the chart was intentionally mislabeled and rendered unintelligible in order to thwart Sylwia's defense.

506.     The HCAO did not disclose the full sized, full resolution copy of the PCR it received from the HCME.

507.     Nicholson and the HCAO then intentionally interfered with the TPR court's

process by preventing court-appointed officials from performing their statutory duties.

508.    As part of the TPR proceeding, attorney Catherine Stratton was appointed as AR and WR's guardian *ad litem* pursuant to Minn. Stat. § 518.165.

509.    That statute required Stratton to act independently and in the best interest of the children she was appointed to represent—and not in the best interests of Nicholson and the HCAO.

510.    Among other things, the statute required Stratton to:

(1) conduct an independent investigation to determine the facts relevant to the situation of the child and the family, which must include, unless specifically excluded by the court, reviewing relevant documents; meeting with and observing the child in the home setting and considering the child's wishes, as appropriate; and interviewing parents, caregivers, and others with knowledge relevant to the case;
(2) advocate for the child's best interests by participating in appropriate aspects of the case and advocating for appropriate community services when necessary;
(3) maintain the confidentiality of information related to a case, with the exception of sharing information as permitted by law to promote cooperative solutions that are in the best interests of the child;
(4) monitor the child's best interests throughout the judicial proceeding; and
(5) present written reports on the child's best interests that include conclusions and recommendations and the facts upon which they are based.

511.    Instead of permitting and allowing Stratton to operate as an independent court-appointed officer as required by the statute, the HCAO, acting by or through Nicholson or others, either advised or instructed Stratton not to independently investigate the facts relevant to the situation of the children and their mother and advised Stratton to forbear from independently investigating the facts underlying the TPR.

512.    Stratton admitted to this interference in a recorded interview she had with William on February 27, 2018.

513.    Stratton felt that she had no choice but to follow the unlawful directives of Nicholson and/or the HCAO.

514.     As part of the TPR, licensed child protection social worker Gabriella Stumpf was assigned to interview the Reynolds family, evaluate safety and child protection issues, and make reports of her findings and observations to the court.

515.     Like Stratton, Stumpf was statutorily required to act in an independent role and for the best interests of the Reynolds children.  Her job was not to act as an extension of the HCAO, which was involved in breaking up the Reynolds family and prosecuting Sylwia for murder.

516.     Much like what happened with Stratton, Stumpf told William, during a phone call and in a recorded interview, that Nicholson and/or her office had intercepted Stumpf's child welfare reports before they were submitted to the court.

517.     Stumpf admitted that among other things, Nicholson redacted the portions of the report that were favorable to Sylwia and removed attachments that were favorable to Sylwia, leaving the report unfairly biased in favor of the HCAO's prosecutorial efforts on behalf of the Department.

518.     Meanwhile, the criminal indictment against Sylwia forced her to remain in Poland in order to avoid the false murder prosecution initiated and furthered by Defendants.

519.     On August 6, 2018, Sylwia and William's third child AR, was born in a hospital in Poznan, Poland.

520.     Because the Reynolds family was under intense financial duress on account of loss of income, loss of employment opportunities, and staggering legal fees that caused the family to exhaust all its savings, William was not able to be at Sylwia's bedside for the delivery of AR as he had been for the birth of their older two children.

521.     Since his birth, AR has seen his father three times and his siblings twice.

522. On May 1, 2019, Judge Juan Hoyos issued an order granting the Department's request to proceed to termination of Sylwia's parenting rights by default. A default hearing was scheduled for June 27, 2019. Notwithstanding Sylwia's appearance by way of counsel at every hearing, and notwithstanding William's presence at every hearing in support of her innocence, Judge Hoyos issued this order loosely based on Minn. R. Juv. Prot. P. 18.01. In his order, Judge Hoyos stipulated defense counsel for Sylwia, William, and their children would be denied their Constitutional rights to present evidence, cross-examine witnesses for the Department, or to object to any part of the default proceeding.

523. On July 3, 2019, Sylwia was surrounded by local police in Poland and driven to Bydgoszcz.

524. Once in Bydgoszcz, Sylwia was questioned in relation to a pending extradition matter brought by United States Department of Justice ("DOJ") on behalf of the HCAO. Sylwia was subsequently released on the condition she report once a week to the local authorities pending the outcome of the extradition matter

525. On August 13, 2019, The Minnesota Court of Appeals ("COA") granted defense counsel's Petition for Writ of Prohibition. The COA ordered Judge Hoyos to allow William and his children to assert their Constitutional rights to due process. When the default hearing resumed on August 16, 2019, the family's defense counsel would be allowed to object to testimony, cross-examine witnesses, and bring evidence in support of Sylwia's innocence.

526. On August 16, 2019, the motion to proceed with termination of parental rights by default was withdrawn by the Department.

527. In September, 2019, Sylwia's defense counsel in the TPR finally obtained – for the first time – a legible copy of Wolfe's PCR document. The document was obtained not from

the HCAO – which had been under a duty to provide the document – but rather from the HCME as part of a court order mandating the disclosure of all work product and materials received by that department in the course of performing GC's autopsy.

528.    Since the HCME provided records to both the HCAO and to Sylwia, it is apparent that the HCAO chose to intentionally withhold the PCR when it was received in December of 2017.

529.    Prior to receiving and reviewing the PCR in September, 2019, Plaintiff and his family were unaware of GC's complete fall history as well as the fact that Defendants knew about GC's complete fall history.

530.    After Wolfe's legible PCR document was received, the HCAO and the Department had little choice but to dismiss the TPR against Sylwia, because the PCR document conclusively proved that GC had sustained an accidental TBI two days before his collapse and prior to his first day in Sylwia's care.

531.    Despite the fact that the HCAO knew that there was no basis to continue with its murder prosecution against Sylwia – and that it had been caught concealing exculpatory evidence – it nonetheless persisted in the prosecution due to pressure from Harper.

532.    Because of the very structure of Hennepin County's MDT, the HCAO worked closely with its team leader, Harper, throughout Sylwia's TPR and criminal prosecution.

533.    Harper knew that Sylwia became aware of the concealed exculpatory documents and information.

534.    Harper knew that the concealed information made her diagnosis of SBS/AHT unsupportable, and thus prosecution would be futile.

535.    Upon information and belief, Harper knew that the financial incentives and

bonuses the U of M and the Center received from Bremer in 2017 for her diagnosis of SBS/AHT in GC's case might be clawed back if it was revealed the diagnosis was made falsely and fraudulently.

536.    Upon information and belief, Harper knew that similar performance renumerations from Bremer may be subject to claw back pursuant to her false and fraudulent diagnosis in the case of GC.

537.    Harper's interests in supporting and maintaining her SBS/AHT enterprise in the Twin Cities metro area and within the State of Minnesota was so compelling that she was unwilling to permit the HCAO – over whom she exerted *de facto* control over child abuse cases – to dismiss the criminal charges against Sylwia.

538.    HCAO knew that without Harper, its effectiveness would be greatly diminished, resulting in political fallout as well as the potential loss of office operating capital from federal and state funding sources.

539.    As a result, the SBS/AHT enterprise, at the behest of Harper, effectively required the HCAO to continue its futile quest to have Sylwia extradited from Poland to Minnesota, even though it knew that there was no evidentiary basis to prosecute and that Sylwia's prosecution would not serve justice.

540.    On November 5, 2019, HCAO assistant attorney Erin Lutz filed a sworn affidavit in the Hennepin County District Court, entitled "Affidavit in Support of Extradition Request."

541.    In that affidavit, Lutz made the following statements under oath in her Summary of Facts:

26. **Victim was also examined by Dr. Nancy Harper**, medical director and board certified child abuse pediatrician at the Otto Bremer Trust Center for Safe and Healthy

Children. **In addition to her examination of Victim**, Dr. Harper also reviewed medical records dating back to Victim's birth. Dr. Harper noted that the most common cause of subdural hemorrhages in infants is trauma where the blood vessels surrounding the brain are torn and sheared. Dr. Harper opined that Victim's injuries were not the product of a genetic condition, a bleeding disorder, or prolonged resuscitative efforts."

28. Dr. Sarah Lucken, a second child abuse pediatrician also reviewed the medical evidence in this case and concurred with Dr. Nancy Harper's opinion. Both doctors prepared expert reports with these findings, which were obtained as part of this investigation."

29. Victim's autopsy confirmed that Victim died of cardiac arrest due to severe brain swelling. The medical examiner identified traumatic injury to Victim's brain, neck, and eyes that is consistent with an acceleration-deceleration injury, with or without impact. The medical examiner could not identify any natural or accidental cause of Victim's injuries. The toxicology results also revealed that Victim had diphenhydramine, and antihistamine found in over-the-county medications such as Benadryl, in his blood. The medical examiner's report and photographs from the autopsy were obtained as part of the investigation.

32. Victim's parents were also interviewed as part of the investigation. **Victim's parents confirmed that Victim had not suffered any significant accidental trauma in the days leading up to Victim's death. Victim slept and ate normally the morning of July 12, 2017.** [emphases supplied]

542.    Lutz's affidavit was transmitted through interstate wires.

543.    Lutz's affidavit contained several false statements made under oath.

544.    First, Lutz knew that Harper did not see or examine GC.

545.    Lutz thus knew that Harper's involvement was strictly limited to a forensic review.

546.    Upon information and belief, Lutz falsified the extent of Harper's involvement because she wanted the Polish officials to believe that GC had been seen by and diagnosed by a well-credentialed child abuse pediatrician and not just Lucken, who was not a sub-certified child abuse pediatrician.

547.    Second, Lutz knew that GC had fallen and hit the back of his head two days before the hospital admission and again four days prior to that.  Upon information and belief, Lutz omitted and/or downplayed these important facts because she knew that these facts were exculpatory.

548.    Third, Lutz's statement omitted the fact that Harper's review of GC's medical history showed that his head was abnormally large compared to the rest of his body, indicating an underlying injury or disease process which is another exculpatory medical fact; and the fact that GC had a genetic blood clotting disorder.

549.    Lutz's false statements were made in an attempt to defraud the Polish officials into extraditing Sylwia from Poland.

550.    As part of the Polish extradition proceedings, Sylwia's defense counsel retained Polish Neurosurgeon Marcin Rut.

551.    Dr. Rut was included on a list of physicians provided by the Polish Court from which medical experts could be selected and admitted into evidence and testimony by the Court.

552.    Dr. Rut determined GC did not die from SBS/AHT. Rut cited the injury to the back of GC's head and the development/progression of CVST as contributing factors to GC's

death. As pertained to the expert reports of Harper and Lucken, Rut noted: "The lack of in-depth analysis in the context of differential diagnosis in the reports regarding the cause of death of [GC] issued by medical doctors, Lucken and Harper makes these reports unreliable."

553.    On November 19, 2020, the District Court in Bydgoszcz, Poland denied the DOJ extradition request. In its denial order, the Polish Court cited medical evidence which pointed to accidental and natural causation, and the omission of this evidence by the HCAO in the complaint against Sylwia.

554.    On December 28, 2020, the civil wrongful death lawsuit brought by GC's family against Sylwia was dismissed with prejudice after the contents of Wolfe's PCR and the CT studies were discussed with counsel for the plaintiffs, Robins Kaplan, LLP.

555.    After appeal of the November 19 order by the Polish prosecutor, The District Court in Bydgoszcz, Poland requested and obtained a second expert opinion from the Department of Forensic Medicine (DFM) at N. Copernicus University in Torun, Poland.  The DFM observed:

It should be noted at this point that the morphological features of subdural bleeding, preretinal and intraretinal hemorrhages, as well as cerebral sinus thrombosis, found in the victim, indicated different time points of their occurrence, from several hours to several weeks before [GC]'s death. In addition, the autopsy revealed an area on the dura mater saturated with hemosiderin, the nature of which may indicate the consequences of absorbed subdural bleeding from several months earlier…Considering the above, it is impossible for the changes in the central nervous system and eyeballs to occur as a result of a single event.

556.    The DFM concluded,

According to the literature, the clinical symptoms of intracranial venous thrombosis in most cases develop gradually over several days or weeks, and most often they are non-specific, including headache, nausea, vomiting, impaired consciousness, and optic disc swelling. In addition, there may be neurological deficits such as sensory, visual, and speech impairments.

The notes made by Sylwia Pawlak-Reynolds show that [GC] was very tearful, fussy, apathetic, which could have been the result of headaches and nausea experienced by the boy at that time. In addition, the parents in their testimonies informed that the victim had

been sleeping poorly during the previous two nights, waking up, which may also indicate severe pain.

In the analysis of the causes leading to the victim's death, the disproportional growth of the head circumference in relation to the rest of the body should also be taken into account. The increasing size of the skull may be the result of increased intracranial pressure due to hydrocephalus or intracranial hemorrhages, or it is a sign of many different metabolic and genetic diseases.

Considering the above, and in particular the results of the autopsy and microscopic examination, it should be assumed that the cause of [GC's] death was the disseminated, long-term subdural bleeding, leading to massive cerebral swelling and, consequently, brain death.

Although, as stated above, the occurrence of subdural bleeding, and also intraocular hemorrhages, could have occurred as a result of acceleration-deceleration injury, from the forensic-medical point of view, it should be assumed that more likely, they were the result of cerebral sinus thrombosis, which occurred as a result of predisposition related to coagulation disorders caused by factor V Leiden mutation, and protein C and S deficiency.

In this case, it cannot be ruled out that with such a strong prothrombotic bias as in [GC], even minor, insignificant injuries or infections, which in a healthy child would not cause any consequences, initiated a cascade of coagulation within the vessels of the central nervous system.

557.    On February 4, 2022, the District Court in Bydgoszcz, Poland upheld the previous orders denying the DOJ request for extradition. In so doing, the Court noted a "disturbing" effort to conceal exculpatory evidence – including the PCR – from defense counsel.

558.    The Polish court determined key assertions in the HCAO's probable cause statement were unsubstantiated insofar as they relied on the omissions of select pieces of medical evidence rather than their inclusion. It concluded that evidence was not just omitted, but that some of it was "…concealed from the defense, including the key report from the ambulance service, and then after the fact was made public, it did not affect the actions of the American authorities in any way."

559.    On March 30, 2022, the Court of Appeals in Gdansk, Poland upheld all previous

orders denying extradition issued by the District Court in Bydgoszcz.

560. The Court largely based its ruling on the appearance prosecutors and physicians in Hennepin County possessed yet "ignored" the PCR and the information in GC's medical records regarding the presence of CVST:

> Although the culpability of the defendant is not the subject of the court hearing deciding whether or not an extradition should be allowed, and the evidentiary proceedings are primarily intended to assess whether or not an extradition should take place, it is obvious that in the course of court proceedings regarding a request for extradition, the principles of establishing evidentiary basis for adjudicating and evaluating evidence set out in the Code of Criminal Procedure, still apply. In this context, the ambulance report is of particular importance, which quotes the mother of the victim, that her son fell two days before the incident, hitting the back of his head (exhibit 8 – attachment to the case file III Kop 2/21). Although this report was obtained by American defense attorneys of the defendant only in the course of the proceedings for removing a child from Sylwia Pawlak Reynolds' custody, it was known to doctors from the Hannepin [sic] County Medical Center who issued opinions on the probable causes of the minor's death, and yet it was not taken into account by them. After all, doctors from the violence against children team, Dr. Nancy Harper and Dr. Sarah Lucken, omitted this circumstance in their reports, stating that [GC's] injuries occurred as a result of an acceleration-deceleration injury with an element of rotation, which corresponds to shaking with or without impact, and this mechanism is characteristic of the so-called shaken baby syndrome. What is more, these doctors completely omitted the fact that the victim was carrier of the mutated factor V Leiden gene, which – in the light of the forensic experts' opinion drawn up at the request of the District Court – is a variant of the coagulation factor that results from a genetic mutation. The mutated protein is properly activated in the coagulation process, but it is much more slowly inactivated by activated protein C, which in combination with protein S acts as a regulator – inhibitor, inhibiting the coagulation process; the resistance to its action causes prolonged and excessive activity of factor V. The consequence of this condition is an increased risk of thromboembolic diseases. This, in connection with the child's head hitting the ground at least twice in the period preceding not only the event, but the placement of [GC] in the care of the defendant, initiated a coagulation cascade within the blood vessels of the central nervous system.

561. In closing, the Court in Gdansk shamed the various Hennepin County agencies involved in Sylwia's prosecution, including the HCAO and the Center for their improper response to exculpatory medical evidence, and determined that Sylwia likely would not receive a fair trial if extradited:

> In view of the fact that the American side ignored the above-mentioned ambulance report

95

and the information included in the victim's medical records regarding the presence of mutated factor V Leiden gene, asking the competent authorities of the United States of America to take a position on this evidence would go beyond the powers under Article 97 of the Civil Code criminal proceedings. Guided by the above arguments, we rule as above.

562.    On March 24, 2023, the decision(s) to deny the extradition of Sylwia Pawlak-Reynolds were upheld and made final by and through the Polish Minister of Justice.

563.    On November 14, 2023, the HCAO issued a letter agreeing to dismiss both criminal charges against Ms. Pawlak-Reynolds without prejudice.

564.    The basis for the HCAO's agreement to dismiss was its lack of evidence that Sylwia shook or otherwise injured GC.

565.    Several weeks later, the HCAO retracted its agreement to dismiss the charges against Sylwia.

566.    The basis for its retraction was not that it had discovered new evidence; that it had a way of proving that Sylwia murdered GC; or that justice would be served by the prosecution. Rather, upon information and belief, the HCAO retracted its agreement to dismiss the charges due to continuing pressure from Harper, who, as set forth above, has been illegally delegated the final *de facto* prosecutorial discretion in Hennepin County child abuse cases and who, upon information and belief, was and is unwilling to allow the subservient HCAO to walk away from an unwinnable case.

567.    On information and belief, Harper, in a communication with the HCAO, now claimed knowledge of the scalp swelling on the back of GC's head, and alleged that the injury occurred on July 12, 2017, notwithstanding the contents of the PCR, the omission of this information from her original report, and her previous statement to CPS investigator Andrew Larson that the timing of GC's injuries could not be determined.

568. Moreover, Harper, in a report published in 2021, acknowledged that 50% of children younger than 24 months of age who sustained accidental falls and were subject to her study, manifest scalp swelling 48 or more hours after they were injured.

569. On March 20, 2024, William filed a complaint against Harper with the Minnesota Board of Medical Practice. That complaint alleged some of the same basic facts outlined in this Complaint.

570. Dr. Pamela Gigi Chawla, MD ("Chawla") is vice president and chair of the Minnesota Board of Medical Practice Complaint Review Committee.

571. Chawla, a pediatrician and hospitalist, is the senior medical director for the primary care division at Children's Minnesota – St. Paul.

572. Midwest Children's Resource Center (MCRC), a child advocacy center, is housed with Children's Minnesota – St. Paul.

573. Harper is listed among staff clinicians practicing at MCRC.

574. Harper and Chawla are colleagues at Children's Minnesota – St. Paul.

575. Upon information and belief, MCRC has implemented and follows some or all of the unlawful, fraudulent and unconstitutional policies, procedures, customs and practices outlined above in their member hospitals, rendering Chawla part and parcel of the wrongful conduct set forth in this lawsuit.

576. Upon information and belief, Chawla did not recuse herself of oversight or review responsibilities with the Minnesota Board of Medical Practice, Complaint Review Committee as pertains to the complaint by the Plaintiffs against her colleague Harper, even though Chawla knew or should have known that the complaint against Harper ultimately rested on the wrongfulness of the child abuse customs in use in the metropolitan Twin Cities.

577.    The Minnesota Board of Medical Practice later dismissed William's complaint.

578.    Shortly after William filed his complaint, Harper filed a complaint against the attorney license of Plaintiff's employer, Brockton Hunter, Esq., in retaliation for Plaintiff's medical board complaint and in a bold attempt to extort William into withdrawing his medical board complaint by threating the license of William's employer.

579.    Harper's complaint against Mr. Hunter was later dismissed as unfounded.

580.    As of the date of this complaint, the fraudulent scheme committed and organized by Defendants has cost Sylwia, William and their family over $1,000,000.00 in legal fees, expert fees, filing fees, bank fees, credit card interest, loan interest, childcare, travel to and from Poland, lost wages, lost earnings, and lost employment opportunities, including the permanent closure of the family daycare business.

581.    The Reynolds family is nearing its eighth year of separation. AMR had just completed second grade when her mother moved out from their home. In 2025, she will begin her junior year at Washburn High School.

582.    WR has lived over half of his life without his mother at his side.

583.    AR turned 6 years old in August of 2024. He has lived the entirety of his life without his father, sister and brother.

584.    Sylwia spends her days in abject depression. She limits her activities outside of the house because she knows that the people in her small town have labeled her as a baby killer because of Defendant's wrongful and intentional conduct. She is forced to raise AR on her own, without the help and guidance of her husband and her other two children.

585.    William is forced to raise the two older children without their mother.  He has lived the past seven years without his wife's society and companionship. He has been forced to

work multiple jobs to pay legal bills and support his children, without the assistance of Sylwia and her daycare income.

586.　The family remains committed to reunification and the necessary healing that will come once they are back together in their home in South Minneapolis.

## FIRST CLAIM FOR RELIEF: VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS TO FAMILY INTEGRITY PURSUANT TO 42 U.S.C. § 1983

### Against Defendants Harper and Nicoholson

587.　Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

588.　42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

589.　Plaintiff and his children are citizens of the United States and Defendants Harper and Nicholson are persons acting under color of state law for the purposes of 42 U.S.C.§ 1983.

590.　As citizens of the United States, Plaintiff and his children have constitutional due process rights to liberty and to family integrity as guaranteed by the Fourteenth Amendment.

591.　Defendants Harper and Nicholson are not entitled to qualified immunity.

592.　Nicholson, in particular, violated § 1983 in her role as an investigator and civil attorney and not as a criminal prosecutor.

593.　Investigating child abuse; causing the prosecution of, and participating in the investigation and prosecution of alleged criminals is a governmental function that is traditionally the exclusive prerogative of the state.

594.    By and through a series of private agreements and legislation, Hennepin County delegated its constitutional obligation to identify, investigate, charge and prosecute child abuse to the U of M, UMP, HH and ultimately Harper.

595.    Thus, for these reasons, and those discussed at length above, Defendant Harper was at all times relevant hereto acting under color of state law for purposes of 42 U.S.C. § 1983.

596.    Defendant Harper knew of and disregarded medical facts and evidence of GC's falls, fall injuries and preexisting medical conditions in order to wrongfully and intentionally arrive a knowingly false conclusion that Sylwia murdered GC. In so doing, Harper intentionally caused Sylwia's false prosecution.

597.    Even after Harper had been provided with conclusive and irrebuttable evidence exonerating Sylwia from the crime, and even after Harper became aware of the fact that Sylwia was forced to flee from her husband and children in order to avoid the false prosecution, Harper continued to pressure the HCAO to falsely prosecute Harper in order to punish Sylwia and her family for questioning Harper and her motives.

598.    Harper thus knowingly and specifically intended to cause the continued interference of Plaintiff's family integrity in violation of their constitutional rights.

599.    All of Harper's intentional and/or deliberately indifferent acts or omissions were conducted within the scope of her official duties and employment.

600.    Harper's constitutional violations were clearly established at the time of the violations.

601.    Harper's intentional and/or deliberately indifferent acts or omissions intentionally deprived Plaintiff and his family of due process and of their rights, privileges and liberties secured by the Constitution of the United States of America, causing them to suffer damages.

602. Nicholson violated Plaintiff and the childrens' clearly established constitutional rights by engaging in the deliberatively indifferent acts described above and by intentionally instructing independent, court appointed personnel to fabricate their investigations; and by engaging in the manipulation and fabrication of investigations directly and intentionally.

603. In so doing, Nicholson intentionally and deliberately caused the continued interference of Plaintiff's family integrity in violation of their constitutional rights.

604. As a proximate result of this unlawful conduct, Plaintiff and his family have suffered injuries and losses, entitling them to recover compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, upset, emotional distress, loss of society, loss of companionship, and other special damages all in amounts to be proven at trial.

605. Plaintiff further claims attorneys' fees and costs pursuant to 42 U.S.C. §1988, as well as pre-judgment interest and costs as allowable by federal law.

606. In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages against Defendants Harper and Nicholson, in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff and his family.

## SECOND CLAIM FOR RELIEF: VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS TO FAMILY INTEGRITY PURSUANT TO 42 U.S.C. § 1983: MONELL CLAIM

### Against Defendants Hennepin County; HH; U of M; and UMP.

607. Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

608. Hennepin County; U of M; HH; UMP; with deliberate indifference to the rights of Sylwia and other similarly situated caregivers of babies and young children, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that

were the moving force behind Sylwia's false civil and criminal prosecutions, examples of which are set forth above.

609. Before and at the time GC was admitted to HH – Hennepin County, UMP, the U of M; and HH, with deliberate indifference to the rights of caregivers of babies and young children, initiated, tolerated, permitted, failed to correct, promoted, ratified a custom, pattern and practice of failing to monitor, coordinate the care for, and address the obvious and serious situations arising from the policies and procedures put into place by Harper. Among other things, the policies, practices, procedures and customs put in place by Harper and adopted by these defendants included:

      a.   A policy or custom that requires that suspected victims of child abuse to be admitted (or transferred) to the hospital's trauma/surgery service instead of the hospitalist service so that care will be initially directed by child abuse pediatricians and not specialized hospitalists;

      b.   A policy or custom of deliberately denying a sick baby access to specialized clinical care if the baby is identified as a potential victim of child abuse;

      c.   A policy or custom that forbids UMP hospitalists from making entries in the medical record that conflict with a child abuse related diagnosis such as SBS/AHT;

      d.   A policy that forbids UMP hospitalists that are not part of the child abuse service from communicating with police or child protection workers; and

      e.   A policy that requires UMP hospitalists to develop a cohesive approach to diagnosing a child that is a suspected victim of child abuse, e.g, that the

physician must not use his independent professional medical judgment to arrive at a medical conclusion different from physicians on the child abuse service.

 f. Permitting Harper to edit, modify and alter medical records of other medical providers in order to permit fabrication of medical evidence these Defendants knew and intended would be used in child abuse prosecutions;

 g. Permitting Harper to use her status and position to pressure, cajole, extort and coerce other medical providers and case workers under the U of M, UMP and HH umbrella into falsifying or shading their medical records, or permitting Harper to do so on their behalf, for the purpose of fabricating medical evidence these Defendants knew and intended would be used in child abuse prosecutions;

 h. Permitting Harper to alter, modify and edit notes and reports of other physicians without requiring use of the EPIC system, so as to avoid a data trail in subsequent litigation;

 i. Permitting and tolerating Harper's use of what amounts to the Helfer Playbook in securing child abuse prosecutions and convictions;

 j. As to UMP, permitting Harper to claim that her expert witness fees are paid to UMP to make it appear to juries as if Harper is not benefiting from her expert testimony.

610. The above conduct constitutes formally promulgated policies, well-settled custom and practice, and final decisions by county policy makers.

611. While these policies are formally promulgated in unconstitutional form that

103

caused the violation of Plaintiff's 14th Amendment right to family integrity, they also constitute custom and practice, and the purposeful decision of the county policy makers to promulgate only these policies regarding the charging and civil and criminal prosecution of alleged perpetrators of child abuse.

612.    The existence of a widespread custom of deliberate indifference to the constitutional rights of caregivers and parents of children seeking emergency medical care at HH and other Hennepin County medical institutions is another basis for this claim and lawsuit. Plaintiff invokes this Court's jurisdiction under § 1983 to enter injunctions and any similar orders to prevent this systemic deprivation of civil rights to continue unabated in the future.

613.    As a result of this unlawful and unconstitutional conduct, Plaintiff and his family have suffered injuries and losses, entitling them to recover compensatory and special damages, including for loss of constitutional rights, loss of enjoyment of life, upset, emotional distress, loss of society, loss of companionship, and other special damages all in amounts to be proven at trial.

614.    Plaintiff further claims attorneys' fees and costs pursuant to 42 U.S.C. §1988, as well as pre-judgment interest and costs as allowable by federal law.

615.    In addition to compensatory, economic, consequential and special damages, Plaintiffs are entitled to punitive damages, in that the actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff and his family.

## THIRD CLAIM FOR RELIEF: VIOLATION OF THE RACKETEER INFLUENCED and CORRUPT ORGANIZATIONS ACT, "RICO," 18 U.S.C. § 1961 et seq.

### Against Defendant Harper

616.    Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

617.    For the purposes of this Complaint, the SBS/AHT enterprise was and is a RICO

enterprise as that term is defined under 18 U.S.C. § 1961(4), as the enterprise includes a group of individuals associated in fact as described in greater detail above.

618.    At times relevant to this Complaint, Defendant Harper received income from a pattern of racketeering activity in which she participated in, in violation of 18 U.S.C. § 1962(a).

619.    At times relevant to this Complaint, Defendant Harper maintained an interest in and control over the SBS/AHT enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

620.    At times relevant to this Complaint, Defendant Harper maintained an interest in and control over the SBS/AHT enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

621.    At times relevant to this Complaint, Defendant Harper was employed by and/or associated with the SBS/AHT enterprise and conducted the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

622.    Defendant Harper's conduct, and the SBS/AHT enterprise itself, affect interstate commerce.

623.    The pattern of racketeering activity alleged herein includes, but is not limited to:

a.    Multiple acts of wire fraud as defined under 18 U.S.C. § 1343 and 18 U.S.C. § 1961(1), including multiple uses of interstate wires for the purpose of perpetuating the fraudulent schemes in which Harper and her employers bilked governmental entities and taxpayers out of money and property; and

b.    Multiple acts of extortion or coercion as defined under 18 U.S.C. § 1961(1), including acts of extortion directed toward coworkers

and caseworkers as well as the act of extortion directed toward Plaintiff and his employer.

624. Defendant Harper's pattern of racketeering activity has been continuous for at least the past 10 years.

625. Defendant Harper's pattern of racketeering has caused Plaintiff and his family to suffer injuries to their business and property in amounts to be determined by the jury at trial. Plaintiff further claims treble damages and attorneys fees as provided by 18 U.S.C. § 1964(c).

626. In addition, Plaintiff seeks all equitable remedies available under 18 U.S.C. § 1964(a), including appropriate Court orders imposing reasonable restrictions on the SBS/AHT enterprise; Ordering Harper's divestiture from the enterprise, including her position within Hennepin County's child abuse prosecution structure; An order prohibiting Harper from continued involvement in child abuse prosecution; and any similar orders as justice requires.

## FOURTH CLAIM FOR RELIEF: CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED and CORRUPT ORGANIZATIONS ACT, "RICO," 18 U.S.C. § 1962(d)

### Against Defendants Hennepin County; U of M; HH; Otto Bremer Trust; UMP; Nicholson; Lucken; Silbert; and Jouhari

627. Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

628. As set forth above, Defendant Harper engaged in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1961 *et seq.*

629. The above-named defendants, and each of them, conspired and agreed with Harper and with one another to adopt the goal of furthering the SBS/AHT enterprise by engaging in conduct that furthered the enterprise.

630. As described above, each of the Defendants has conspired with Harper to aid,

assist, abet and further her pattern of racketeering activity.

631. Nicholson, Lucken, Silbert and Jouhari conspired with Harper to engage in RICO violations by fabricating and falsifying medical evidence used to falsely prosecute Sylwia civilly and criminally and by assisting Harper in doing so.

632. Defendants Hennepin County, U of M, UMP and HH conspired with Harper to engage in RICO violations by engaging in the acts and omissions described above and by providing Harper with the power, office and title to prosecute Sylwia and others similarly situated; by empowering Harper to cause the fabrication and alteration of medical evidence used in child abuse civil and criminal prosecutions, including Sylwia's; and by implementing and enforcing the unlawful policies, procedures, practices and customs created by Harper.

633. Defendants Bremer and U of M Foundation conspired with Harper to engage in RICO violations by engaging in the acts and omissions described above and by creating the financial incentives to the other Defendants to find child abuse where it does not exist and to incentivize and monetize the false prosecution of alleged child abusers, including Sylwia.

634. Defendants' conspiracy to violate RICO has caused Plaintiff and his family to suffer injuries to their business and property in amounts to be determined by the jury at trial. Plaintiff further claims treble damages and attorneys fees as provided by 18 U.S.C. § 1964(c) individually and in his role as next friend.

635. In addition, Plaintiff seeks all equitable remedies available under 18 U.S.C. § 1964(a), including appropriate Court orders imposing reasonable restrictions on the SBS/AHT enterprise; Ordering Defendants' divestiture from the enterprise, including Harper's position within Hennepin County's child abuse prosecution structure; An order prohibiting Harper from continued involvement in child abuse prosecution; and any similar orders as justice requires.

## FIFTH CLAIM FOR RELIEF: ABUSE OF PROCESS

### Against Defendants Harper and Lucken

636.   Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

637.   Harper and Lucken conspired with one another and acted individually to cause the wrongful child abuse report and subsequent civil and criminal prosecutions of Sylwia by and through the fabrication of medical evidence, the destruction and alteration of records, and by making knowingly false statements of fact and opinion to police and prosecutors.

638.   Harper and Lucken caused the employment of a legal process against Sylwia not for the purpose of punishing Sylwia for a crime or civil wrong, but for the improper purpose of promoting their own financial, academic and reputational goals.

639.   Harper and Lucken's wrongful conduct and abuse of process has caused Plaintiff and his family to suffer the injuries, damages and losses set forth above.  Plaintiff further seeks punitive damages for Defendants' willful, wanton and fraudulent conduct individually and in his role as next friend.

## SIXTH CLAIM FOR RELIEF: VIOLATION OF MINN. STAT. § 260E.08

### Against Defendants Harper, Lucken, Silbert and Jouhari

640.   Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

641.   Minn. Stat. § 260E.08 imposes civil penalties against any person who knowingly or recklessly makes a false report of child abuse.

642.   The statute also provides for punitive damages and attorneys fees.

643.   Defendants Harper, Lucken, Silbert and Jouhari, both individually and in

conspiracy with one another, made knowingly false reports accusing Sylwia of abusing and murdering GC. These reports were made in bad faith, thus depriving Defendants of any immunity.

644.    Plaintiff claims actual damages, attorneys fees and punitive damages resulting from these false reports pursuant to Minn. Stat. § 260E.08(d) for himself and for his family in his role as next friend.

## SEVENTH CLAIM FOR RELIEF: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendants Harper, Lucken, UMP and Nicholson)

645.    Plaintiff hereby incorporates all previous averments as if set forth herein.

646.    Defendants Harper, Lucken, UMP and Nicholson's conduct, as described in detail above, was extreme and outrageous.

647.    Defendants, and each of them, intended to cause Plaintiff and members of his family severe emotional distress or otherwise acted recklessly in causing Plaintiff and his family to suffer extreme emotional distress.

648.    Plaintiff and all members of his family suffered severe emotional distress caused by Defendants' extreme and outrageous conduct in amounts to be determined by the jury at trial.

## EIGHTH CLAIM FOR RELIEF: CIVIL CONSPIRACY
### Against ALL Defendants

649.    Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

650.    As set forth in detail above, Defendants agreed with one another to commit a series of unlawful acts in furtherance of a lawful goal and/or an unlawful goal by and through a series of lawful acts.

651.    In particular, Hennepin County, U of M, UMP, U of M Foundation, Bremer and

HH agreed with one another and with Defendants Harper, Silbert, Lucken and Jouhari to obtain increased funding, resources and grants from Bremer and government agencies by and through finding and increasing the number of child abuse prosecutions and convictions.

652. Nicholson agreed to assist in Defendants' wrongful goal by engaging in the acts and omissions described above and by maintaining a false civil proceeding against Sylwia and the children.

653. These defendants agreed with one another that the goal of obtaining increased funding, resources and grants from Bremer and government agencies through finding and increasing the number of child abuse prosecutions and convictions could only be accomplished through illegal and fraudulent means, including through the indictment and prosecution of innocent persons and by bringing baseless family court actions in support of the criminal prosecutions.

654. These defendants agreed with one another that the best method for accomplishing the goal of increased funding and resources through the indictment and prosecution of child abuse would be to adopt the policies, procedures, practices and customs developed by Harper and her collaborators at the Helfer Society, and as outlined in detail above.

655. Defendants knew and intended that the policies, procedures, practices and customs developed by Harper and her collaborators at the Helfer Society, and as outlined in detail above were wrongful, illegal and unethical because they required the participating physicians and child abuse case workers and their attorneys to alter and fabricate medical evidence; that the alteration and fabrication of the medical evidence would take place outside of the EPIC EHR system so as to avoid a metadata trail; and that the practices implemented by Harper would necessarily result in false prosecutions and convictions.

656.    Despite their knowledge and intent that their conduct and agreement was unlawful and injurious to innocent parents and caregivers, Defendants agreed to engage in the conduct described herein in order to benefit Defendants financially, politically, academically, reputationally and personally.

657.    In addition, Defendants Harper, Nicholson, Lucken, Silbert and Jouhari agreed and conspired with one another to fabricate, alter, omit and edit medical evidence in order to cause, continue and perpetuate Sylwia's false civil and criminal prosecutions.

658.    Defendants' civil conspiracy has caused Plaintiff and his family to suffer damages, injuries and losses in amounts to be determined by the jury.  Plaintiff further claims punitive damages stemming from Defendants' intentional and willful civil conspiracy.

### NINTH CLAIM FOR RELIEF: REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

#### Against ALL Defendants

659.    Plaintiff hereby incorporates each and every averment set forth herein as if each and every averment were set forth verbatim herein.

660.    28 U.S.C. § 2201 and Fed. R. Civ. P. 57 empower the Court to declare the rights and obligations of the parties, including the Defendants.

661.    Plaintiff requests an order declaring that:

a.    Defendants' policies, procedures and protocols outlined above are unlawful and unconstitutional;

b.    Bremer's act of paying bonuses and/or additional monies to Defendants based upon "production" numbers for child abuse prosecutions is unlawful and unconstitutional;

c.    The intertwined organizational structure implemented by Hennepin

County, which makes Defendants a part of the criminal prosecution team and which makes Harper the *de facto* decision maker in criminal prosecutions is unlawful and unconstitutional; and

d.    Hennepin County's current child abuse protection and prosecution structure unduly, unfairly and unconstitutionally targets low income parents and caregivers.

662.    Plaintiff further requests injunctive relief pursuant to Fed. R. Civ. P. 65 in the form of an injunction prohibiting the conduct and organizational structure identified above; prohibiting the implementation of the wrongful policies, procedures, customs and practices outlined above; and effectively unwinding the current child abuse protection and prosecution structure currently in place in Hennepin County.

## **CONCLUSION**

663.    For the reasons set forth herein, Plaintiff prays that his honorable Court grant judgment in his favor and in favor of his family members and following trial to a jury, award the following damages in excess of $20 million and other remedies available by law, including:

a.    Pecuniary loss, including all available economic and noneconomic loss as set forth herein;

b.    Punitive damages;

c.    Attorney's fees;

d.    Pre and post judgement interest;

e.    Treble damages;

f.    RICO remedies, including injunctive relief;

g.      Declaratory relief;

**PLAINTIFF REQUESTS TRIAL TO A JURY.**

DATED March 31, 2025,

LAW OFFICES OF J.M. REINAN

/s/ Jerome M. Reinan
_____
#24322X
Attorney for Plaintiff
1437 High Street
Denver, CO 80218
jreinan@reinanlaw.com
303.894.0383