UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| William Reynolds, individually; as Spouse of Sylwia Pawlak Reynolds; and as Next Friend of their minor children, AMR, WR, and AR<br><br>Plaintiff<br><br>vs. | Case No. 25-CV-754-LMP-SGE |
| | **PLAINTIFF'S RESPONSE TO NANCY SANDERS HARPER, MD, AND UNIVERSITY OF MINNESOTA PHYSICIANS' MOTION TO DISMISS [Doc. 64-65]** |
| Nancy Sanders Harper, MD; Hennepin County; Fairview Health Services; The Board of Regents of the University of Minnesota; Hennepin Healthcare System, Inc., d/b/a Hennepin County Medical Center; The University of Minnesota Physicians d/b/a U of M Physicians; Britta Nicholson; Sarah Elizabeth Lucken, MD; Seth Cheng Silbert, MD; Mohamed Tahsin A. Jouhari, MD,<br><br>                          Defendants. | |

THE PLAINTIFF, William Reynolds, by and through counsel, the Law Offices of J.M. Reinan, P.C., hereby submits his Response to Nancy Sanders Harper, MD and University of Minnesota Physicians' Motion to Dismiss [Doc. 64-65] as follows:

## I. <u>INTRODUCTION</u>

**[A] claim of shaken baby syndrome is more an article of faith than a proposition of science.**

*Del Prete v. Thompson*, 10 F.Supp.3d 907, 958 (N.D.Ill., 2014), fn. 10

***

Eight years ago, the defendant doctors, led by Defendant Nancy Sanders Harper, MD, "Harper," falsely reported 11-month-old "GC" as the victim of Shaken Baby Syndrome, "SBS."

Harper and her co-defendant doctors knew their reports were fictitious. They knew that SBS was not a scientifically valid diagnosis, and even if it was, GC's prior history of falls at home as well as his genetic blood clotting disorder made such a diagnosis medically unsustainable. To circumvent this problem, Harper and other members of her team intentionally excluded exculpatory facts from their reports and manipulated medical evidence to support the diagnosis, which they knew and intended would be used to prosecute GC's daycare provider, who, as is usually the case, was the last adult present when GC lapsed into unconsciousness. That daycare provider was Sylwia Reynolds, "Sylwia," Plaintiff William Reynolds's wife and the mother of the three minor plaintiffs, AMR, WR and AR.

The Defendants' nearly identical fictitious reports of child abuse were not a mistake or a coincidence. The fictitious reports were created in order to further Harper and the other defendants' support of the SBS enterprise, which faces increasing court and medical scrutiny due to the complete absence of scientific support.

The diagnosis of and prosecution of child abuse has become an important and lucrative enterprise throughout the country and particularly in Hennepin County. Much like a parallel for-profit business, the money generated by the child abuse detection and prevention programs is

dependent in large part on results. To justify significant funding for universities, healthcare, and law enforcement, it is necessary to identify and prosecute significant numbers of suspected child abusers.

Harper, in particular, has been very effective at producing results. Within two years of assuming her leadership role and implementing changes to the way child abuse is diagnosed and prosecuted in Hennepin County, the number of child abuse prosecutions skyrocketed. Prior to Harper's arrival, a yearly average of 1,739 cases of child abuse were diagnosed in Hennepin County. Within two years of Harper's arrival, that number jumped to 5,709. By that time, a child in Hennepin County was 2.6 times more likely to be determined a victim of abuse than a child living in any of the other eight metro counties.

This precipitous increase in child abuse identification and prosecution resulted in significant funding increases – to the point where the Hennepin County Attorney's Office ended up spending more money on child abuse matters than all other criminal matters combined.

The problem with these impressive numbers is that they occurred during a time when the SBS enterprise in particular was amidst an existential threat from courts and medical science. Beginning in the early 2000s, a number of scientific and biomechanical studies generally debunked the hypothesis that a child can suffer the so-called triad of a brain bleed, retinal bleed and brain swelling from merely being shaken. These studies also effectively collapsed other traditionally held SBS hypotheses, including one that held brain bleeds or brain swelling could not be caused by blows to the head caused by short falls; another that a child could not experience periods of lucidity after a blow to the head; and that retinal bleeds were never spontaneous.

Once provided with peer reviewed studies scientifically debunking traditional SBS beliefs, courts around the country slowly began to exclude SBS diagnoses based on shaking alone-- where

no blunt trauma had occurred and where the diagnoses was premised on presence of the SBS triad – subdural hemorrhages, retinal hemorrhages and encephalopathy (brain swelling.) By 2009, the combination of medical studies and adverse court rulings basically forced the American Academy of Pediatrics to issue a position paper stating that an SBS diagnosis based on shaking alone was only appropriate where all possible accidental or medical causes had been properly considered and excluded.

Because SBS is a bread-and-butter diagnosis for child abuse pediatricians, "CAPs" like Harper, any diminution in the ability to diagnose and prosecute SBS cases threatens to have a profound effect on the financial, reputational and teaching aspects of the CAP enterprise and the system designed around it.

Like many industries, CAPs have what amounts to a lobbying organization. Theirs is the Ray Helfer Society. Recognizing the real threat to the SBS enterprise caused by scientific developments that limit a CAP's ability to legitimately diagnose SBS cases, members of the Helfer Society created a playbook designed to ensure that SBS numbers could be maintained or even increased despite continuing erosion of the medical bases underlying the SBS hypothesis.

The Helfer playbook generally consists of a set of policies, practices or customs that its members implement or lobby to implement at their teaching institutions and hospitals as well as tactics its members can use when faced with pushback over the implementation of those policies, practices or customs. The goal behind the Helfer playbook is to implement policies at hospitals and teaching institutions that put the CAP solely in charge of all children admitted to a hospital with non-specific symptoms that might be seen as signs of potential abuse, such as brain bleeds, broken bones or suspicious bruising. This gives the CAP authority to direct testing, diagnosis and care direction – including ordering forensic tests that have no medical benefit to the child. The

Helfer policy goal is to also implement policies and practices that give the attending CAPs authority to monitor and edit reports, opinions and documentation from consulting clinicians in order to cleanse the reports of medical evidence that conflicts with the CAP's child abuse opinion or determination.

The Helfer playbook also has the goal of training clinicians to avoid documenting, whenever possible, medical or accident histories that might dilute or conflict with the CAP's abuse determination, and which might be used to defend against the child abuse allegation. This would include such things as falls the child suffered at home; genetic bleeding and clotting disorders; and head growth abnormalities, such as macrocephaly.

Many Helfer playbook policies, practices, and customs contradict fundamental scientific and medical principles. Child abuse pediatrics is at best a hybrid of forensic and clinical medicine and at worst forensic medicine with very few clinical aspects. The basic job of the CAP is not to medically treat an abused child so much as it is to forensically determine whether the child was abused so that the abuser can be found, punished and deterred from future abuse. Assigning a forensic non-clinician to lead a medical team treating an infant with serious health issues prioritizes the SBS enterprise and diagnosis over the child's wellbeing.

Perhaps even more nettlesome is the policy forbidding consulting clinicians from expressing their true opinions and conclusions in the medical record. This restriction conflicts with established principles of medical practice and does not align with the team-based approach to clinical care promoted at contemporary hospitals and medical schools. Allowing the CAP to veto and edit consulting clinicians' opinions and documentation is well beyond the pale of accepted medical practice. Yet that is the policy that has emerged to combat the increasing scrutiny over the SBS diagnosis.

The Helfer Society also established alternative paths to get SBS-based opinions over Rule 702 hurdles. This was accomplished through a combination of solidifying CAP community opinions that the SBS triad was diagnostic of SBS regardless of the existence of supporting studies and the use of so-called "confession studies" in which data from plea bargains is used to support the opinion that SBS is valid because many accused abusers admitted to causing the SBS triad from shaking alone.

The creators of the Helfer playbook have also developed policies, practices, customs that are frankly fraudulent, illegal and bordering on criminal. These policies, practices or customs include bullying clinicians who question a CAP's methods.

The institutional defendants in this case have embraced Harper and the Helfer playbook that she put into place even though those policies, practices or customs are facially unconstitutional. The Helfer playbook policies implemented at the defendant institutions and followed by the individually-named defendants resulted in constitutional deprivations and injuries to the legally-protected interests of Sylwia, William and their children. In following these unconstitutional policies, defendants conspired with one another to knowingly and falsely accuse Sylwia of murdering GC, resulting in the continued destruction of the Reynolds family. It has forced Sylwia to remain in Poland, away from her husband and children.

This set of facts pled in the amended complaint also pose a number of serious legal, constitutional, moral, and ethical problems that, to this point, have been generally left unaddressed here and throughout the country. Child abuse pediatric students at major universities, like the University of Minnesota, are being taught how to promote SBS as a valid medical diagnosis not because it is scientifically valid, but because the system under its current structure needs CAPs to sustain SBS convictions so their other legitimate child abuse ventures remain funded.

While the standard justification for this tradeoff is that society needs to protect children from child abuse, the government-sanctioned use of fraudulent, unconstitutional and non-scientific methods to accomplish that goal does nothing more than create abuse where none exist existed. Protecting an entire system of criminal prosecution based on false premises because it satisfies some other greater good is not only wasteful, but also unlawful and unconstitutional.

Plaintiff urges the Court to use its powers to put a stop to this illegal enterprise and permit a jury to determine whether Plaintiff and his family are entitled to compensation for the many continued abuses they have suffered at the hands of these Defendants.

## II.    FACTUAL BACKGROUND

### The evolution of SBS and the forensic discipline of Child Abuse Pediatrics

SBS is not and never has been a scientifically tested and proven medical diagnosis. Amd. Cpt. ¶44[1] *See also, State v. Nieves,* 302 A.3d 595, 620, (N.J. App. 2023)("the evidence amply demonstrates that there is no general acceptance from the biomechanical community, and biomechanical testing has never proven the premise of SBS/AHT, despite the hypothesis being grounded in biomechanical principles.").  See also, *Illinois v. Valdez*, 18-CF-370 (Cir. Ct. Ill., August 26, 2025), attached as **Exhibit 1**:

> Biomechanical studies have failed to verify the theory that shaking an infant/child alone can cause traumatic brain injury and its symptoms of subdural hematoma and retinal hemorrhage. In fact, existing biomechanical studies seem to refute the premise behind the diagnosis of SBS/ AHT. A majority of those in the medical field generally accept that violent shaking alone can cause SBS/AHT without scientific validation. It has not been proven by the State that the diagnosis of SBS/ AHT (shaking alone) is generally accepted in the field of biomechanical science, the critical scientific field that forms the basis for the diagnosis.

The idea that a baby could suffer severe brain injury from shaking alone – and in the absence of external trauma -- was an idea postulated from the work of British researchers

---

[1] All references are to paragraphs of the Amended Complaint unless otherwise noted.

Guthkelch and Ommaya from the late 1960s and early 1970s. ¶45; *Nieves, supra.* Ommaya studied whiplash injuries in infants involved in 30 mph automobile accidents. *Id.* at 607. Guthkelch postulated that brain injuries could be attributed to non-impact events. *Id.* Despite their later protests that their research did not create or support what is now known as the SBS diagnosis, Ommaya and Guthkelch's misinterpreted research managed to birth an entire forensic pediatric subspecialty focused on the diagnosis of pediatric trauma. *Id.*; *Cameron, supra*; ¶¶46-54

Through extensive publicity and lobbying, this forensic pediatric subspecialty, child abuse pediatrics, created massive appropriations of state, federal, and private funding devoted to child abuse diagnosis and prosecution. ¶¶56-57, 71

### Funding of the SBS enterprise

This substantial public and private money created what are now known as multidisciplinary teams consisting of child abuse pediatricians, "CAPs," law enforcement, prosecutors, child advocacy centers, medical providers and medical school departments devoted to the training of future CAPs and their support teams. ¶¶121-122 These state, federal and private funds pay for the forensic workup, investigations, and prosecutions of child abuse as well as the training necessary to provide CAPs to counties, localities and hospital systems across the country. ¶¶71-72 The funding of CAPs teams and related prosecutorial and law enforcement arms is directly related to the number of child abuse cases identified and generated by CAPs.

For example, prior to Harper's arrival in Hennepin County, an average of 1,739 Hennepin County children per year were identified as victims of abuse. ¶133 In 2016 – after Harper's arrival and her system of policies, practices and customs she brought with her -- 5,709 Hennepin County were reported as alleged victims of physical abuse. That's an increase of 228% over the previous eight-year average. ¶134

By contrast, the other eight Twin Cities metropolitan counties combined reported only 3,804 cases of child abuse in 2016. ¶ 135. By population, non-Hennepin metro counties reported 8 victims of child abuse per 1000 children in 2016. Hennepin County – under Harper's leadership– reported 21 victims per 1000 children, which is a rate 2.6 times higher than the other counties combined. ¶136

Harper's arrival also resulted in the creation of a University chair and a sizable grant to Harper and the Otto Bremer Trust Center for Safe & Healthy Children, "the Center," underwritten by the Otto Bremer Trust. ¶27

By 2016, Bremer and the State of Minnesota created funding incentives tied in part to production numbers, e.g., the number of children that could be identified as victims of abuse. ¶137 Bremer's incentives were tied in part to the number of child fatalities resulting from abuse. *Id.* This funding extended to the HCAO, which fortified its child abuse prosecution team after the 2016 explosion in child abuse cases. ¶139.

The HCAO's overall budget increased shortly after Harper's arrival and the increase in child abuse identifications. In 2014, that budget was $45,107,676, of which $20,804,203 was earmarked for child abuse matters. ¶140 By 2018, the overall budget increased to $57,166,723, of which slightly over half was earmarked for child abuse. ¶141

By 2018, more funding was allocated for child protection related matters than for criminal prosecutions in Hennepin County. ¶¶ 141-142.

Nationally, the similarly well-funded child abuse system produced its intended results for many years in large part because CAPs provided the prosecution with a rare magic bullet.  The CAP expert called to testify on behalf of the prosecution is often well-credentialed and backed by the medical school of a large university.  ¶¶72, 81 The CAP is often called to establish not only

the manner or injury of death, but also by default the identity of the perpetrator and intent. ¶¶65-70 For many years, those accused of child abuse were unable to mount a reasonable defense to the well-prepared and credentialed CAP prosecution team. ¶73 Although there are and were no peer-reviewed scientific studies supporting SBS as a medical diagnosis, a well-polished CAP and an alleged child victim were more than enough to send an innocent caregiver to prison, mostly because the SBS enterprise juggernaut created the massive funding of CAPs, CAP training and CAPs teams. ¶¶64, 81

Despite the lack of scientific studies supporting the SBS diagnosis, CAPs often managed to avoid Rule 702 exclusion by convincing courts that the SBS diagnosis was widely accepted in the medical community, particularly by the CAP subspecialty, and therefore the diagnosis was legitimate because doctors said it was, even if there was not a scientific basis for that opinion. *See Nieves, generally, supra.*

CAPs were also often successful in overcoming Rule 702 challenges on the science of SBS by arguing that the diagnosis was proven by studies based on perpetrator confessions. *Nieves* at 637-638. CAPs, in effect, figured out a way to overcome Rule 702 challenges by aggressively compiling and manipulating data points from cases where an adult had "confessed" to shaking the baby, asserting that these many confessions – often in the form of pleas to a lesser offense --proves that children can suffer severe brain injury from being shaken alone. *Id;* ¶¶9, 118, 145; 209-211.

### SBS starts to receive pushback from the medical research community

By the early 2000's, medical science began to threaten the well-funded SBS enterprise upon which many CAPs, medical school pediatric departments, prosecutors and child abuse investigators relied for their reputations and livelihoods. ¶¶82-88 The evolution of the medical community's negative response to SBS as a scientific diagnosis is pled with particularity in ¶¶83-

104.

In addition, many recent court decisions have discussed and analyzed the evolution of SBS

from an accepted medical diagnosis to what some courts now imply is a junk science. *See, e.g.,*

*Cavazos v. Smith*, 132 S.Ct. 2, 10, 565 U.S. 1, 13 (U.S.,2011)(Ginsburg, J. dissenting)

> By the end of 1998, it had become apparent that "there was inadequate scientific evidence to come to a firm conclusion on most aspects of causation, diagnosis, treatment, or any other matters pertaining to SBS," and that "the commonly held opinion that the finding of [subdural hemorrhage] and [retinal hemorrhage] in an infant was strong evidence of SBS was unsustainable."

***

> [T]here is now significant doubt in the medical community over the validity of "Shaken Baby Syndrome," or SBS, an expert diagnosis that formed the basis for convicting caregivers of murder when babies died suddenly under their care. See, *e.g.*, *Cavazos v. Smith*, 565 U.S. 1, 13, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (Ginsburg, J., dissenting) (collecting studies questioning the validity of SBS in one such case). The National Registry of Exonerations includes over 30 cases where people convicted of murder, manslaughter, or child abuse based partially on evidence of SBS were later exonerated. See,https://www.law.umich.edu/special/exoneration/Pages/detaillist.aspx.

*McCrory v. Alabama*, 144 S.Ct. 2483, 2484 (2024)(Statement of Sotomayor, J. regarding the

denial of certiorari)

***

> [A] claim of shaken baby syndrome is more an article of faith than a proposition of science.

*Del Prete v. Thompson*, 10 F.Supp.3d 907, 958 (N.D.Ill., 2014), fn. 10

***

> The AAP's 2009 policy statement stated that "there is no single or simple test to determine the accuracy of the diagnosis," omitted the "presumption of child abuse" that appeared in its prior reports, and said "[p]ediatricians also have a responsibility to consider alternative hypotheses when presented with a patient with findings suggestive of AHT [Abusive Head Trauma]."[29] *Id*. at 1410. This paper acknowledged that the mechanism of injury is unclear and that abuse can no longer be presumed from the presence of the triad…The current research shows that (i) subdural hematoma, (ii) retinal hemorrhage, and (iii) cerebral edema are attributable to a wide variety of both natural and

11

accidental causes.

*Jones v. State*, 2021 WL 346552, at *12, *20 (Md.App., 2021)

***

We find it persuasive that as early as 2004, the Journal of Neurosurgery published an article stating the terminology of "shaking" should be avoided. In 2015, the journal for the British Academy for Forensic Sciences included writings that showed no study has demonstrated that shaking alone, without an associated impact, could create a subdural hematoma. Research ranging from mechanical dolls to animal abuse has yet to bridge the gap between theory and reproduceable results which the scientific method demands. Essentially, science has evolved to a degree that has removed "Shaken" from "Shaken Baby Syndrome." This is evident from the need to vague the terms to "Impact Syndrome" and then to "Abusive HeadTrauma."

*Ex parte Roark*, 707 S.W.3d 157, 185 (Tex.Crim.App., 2024)

In a nutshell, researchers and, subsequently, courts, began to focus on the fact that the type of acceleration/deceleration trauma at issue in many cases brought under an SBS theory actually involved biomechanics, not traditional or pediatric medicine. *Nieves, supra.* Courts determined that there exist no SBS-based biomechanical studies that actually support what was being claimed by the CAPs subspecialty, namely, that "shaking alone can create acceleration and deceleration forces sufficient to cause intracranial trauma." *Nieves* at 620-21. As a result, courts across the country began rejecting SBS expert testimony under Rule 702. Appellate courts began reversing child abuse convictions based on flawed SBS expert testimony. *Id.*

These scientific studies, and the principles underlying them, resulted in several prominent medical organizations withdrawing support for the underlying foundations of SBS. The National Association of Medical Examiners withdrew its endorsement of the SBS hypothesis, calling the SBS triad "not scientifically valid" and "mythical." ¶¶89-90 The same conclusion was reached by the American Academy of Forensic Sciences. ¶91 In 2017, a large Swedish study concluded that there is insufficient medical evidence supporting the presumption that SBS is causative of the triad

of brain injuries used to diagnose and prosecute SBS cases.  ¶95

Dr. Guthkelch later expressed remorse for creating what he considered to be a runaway industry premised on his Shaken Baby Syndrome theory. ¶94 Dr. Ommaya similarly criticized the SBS enterprise for extrapolating the findings of his 30 mph car crash studies as supportive of the SBS diagnosis. *Nieves,* supra at 607.

### **CAPs respond to the existential threat to their profession and enterprise by creating a playbook to fraudulently tilt medical evidence in favor of the SBS diagnosis**

Public and private funding for the massive enterprise centered around the SBS diagnosis requires steady if not increasing numbers of diagnosed victims of SBS and resulting prosecutions. ¶81 Thus, if SBS diagnosis and prosecution numbers decrease because SBS is harder to prove in court, literally millions of dollars and hundreds of jobs would be at stake, not to mention the teaching, law enforcement and prosecutorial structures created by the diagnosis. ¶¶137-143 Most importantly, if SBS is proven to be junk science at best, medical fraud at worst, this calls into serious question the entire subspecialty of child abuse pediatrics as a forensic discipline and leads to a profound, existential concern: are children and families more likely to be protected or harmed by child abuse pediatricians?

Some of the more aggressive members of the CAP community responded to the existential threat posed to the SBS enterprise by creating what amounts to a playbook designed to overcome medical research and courts disapproving of SBS science.  Much of this work was carried out by and through members of the Helfer Society, which is the primary professional organization for child abuse pediatricians.  ¶¶106-109

Defendant Harper was until recently the President of the Helfer Society. ¶110. Other prominent Helfer Society members include Barbara Knox, MD and Debra Esernio-Jenssen, MD. ¶¶110-111

What the plaintiff alleges in the amended complaint as the "Helfer playbook" is a collection of evidence manipulating tactics that these CAPs and the Helfer Society have created in an attempt to counter the recent medical research and court challenges.  These Helfer playbook tactics include such things as:

- Facilitating the implementation of institutional policies requiring that CAPs are reassigned as a child's primary attending and treating physician in all cases in which a brain bleed, retinal bleed, broken bones or similar injuries are found in the emergency department, so that CAPs can control forensic testing and medical documentation on the child;

- Facilitating the implementation of institutional policies, practices or customs that prevent other physicians from documenting diagnoses, opinions or beliefs that conflict with the CAP's diagnosis;

- Training or pressuring physicians to omit from documentation medical conditions that conflict with an SBS diagnosis, such as macrocephaly or genetic blood clotting disorders;

- Training or pressuring physicians to omit from documentation certain forms of accidental head trauma, including falls;

- Pressuring prosecutors to obtain admissions or confessions, as part of the plea process, that can be used to bolster SBS studies based on "confession data;" and

- Causing the institutional implementation of policies, procedures, customs or practices that permit the CAP to edit other physician's documentation in order to ensure consistent medical evidence; ¶¶113-115

The Helfer playbook morphed into a set of policies, procedures, customs or practices that

members of the Helfer Society pushed to implement in the institutions they served. Because these policies, procedures, customs or practices are by design antithetical to the medical and scientific process, implementation of the Helfer playbook often resulted in considerable pushback from the medical communities in which it was implemented.  ¶¶146-147, 119

### Two of Harper's close colleagues have been repeatedly forced out of high-level CAP positions for implementing Helfer playbook tactics

Institutional or individual physician pushback over the Helfer playbook has resulted in CAPs like Harper and her close associates resorting to heavy-handed tactics, threats and political pressure to ensure other medical providers and CAPs teams support these SBS-supportive policies, procedures, customs or practices.

Dr. Debra Esernio-Jenssen, a Helfer Society member and close colleague of Harper, has been ousted from several different institutions for implementing a version of the Helfer playbook that includes bullying or pressuring coworkers into supporting false or unsupported child abuse determinations. ¶¶ 268, 273-277, 280-293.

Esernio-Jenssen's use of the Helfer playbook has also resulted in a number of negative court rulings against her. One family court remarked, "the Court gained the impression that Dr. Jenssen had formed an intuitive judgment, and that she would make almost any argument to back it up." ¶257. That same court found, "Dr. Jenssen's emphasis on ethnic and religious issues is often distasteful". ¶255.  Another court found that Esernio-Jenssen failed "to identify and adequately rule out the various potential causes of bilateral subdural hematomas in this child, and her misdiagnosis of the child as suffering from subarachnoid bleeding, caused her to jump to many conclusions including the conclusion that the child's injuries were caused by violent shaking." ¶263. A third family court judge found that Esernio-Jenssen's testimony entirely unreliable as a result of her overreaching. ¶265

15

After being forced out of her positions in New York, Esernio-Jenssen became the Medical Director of the Gainesville Service Center of the Florida Department of Children and Families where she was the subject of numerous complaints ¶¶268-269. The Office of the Inspector General ultimately removed Esernio-Jenssen from her CAP role due to her false reports of child abuse. ¶¶268-277. Esernio-Jenssen then left Florida and relocated to Lehigh Valley in Pennsylvania to take a position as the director of the John Van Brakle Child Advocacy Center. She was again accused of creating a toxic work environment and of bullying coworkers into supporting her false reports of child abuse. ¶¶278-293. Despite all of this, Esernio-Jenssen is still an active member of the Ray Helfer Society and continues her work as an expert witness. ¶294

Another one of Harper's Helfer Society colleagues is Barbara Knox, MD. Similar to Esernio-Jenssen, Knox was forced out of positions in Wisconsin and Alaska due to her implementation of the Helfer playbook, including engaging in fraudulent and extortive conduct in order to support and maintain the SBS/AHT hypothesis and resulting prosecutions.

During her time in Wisconsin, Knox caused the false prosecution of a daycare provider for allegedly killing an infant in her care. Knox was able to cause the prosecution by pressuring a colleague, Dr. Michael Stier, to falsely opine that the child suffered a skull fracture due to abuse. ¶¶298-304 Stier later admitted, in a post-conviction motions hearing, that he was pressured by Knox to lie about the skull fracture in order to support her SBS opinion. ¶¶ 302-304.

In a second incident, Knox pressured the false prosecution of the parent of infant Henry, who had a genetic blood clotting disorder. ¶¶305-308. In another incident, Knox attempted to cause a false abuse prosecution of the Siebold family by fraudulently representing herself as a "blood specialist" to Leo's parents in order to take additional forensic evidence she planned to use to falsely accuse Leo's mother, a third-grade teacher, of abuse. The police intervened on the parents'

behalf, derailing Knox's plan. ¶¶313-318. In a fourth incident, Knox attempted to cause a false child abuse prosecution of a Lake Mills childcare provider who fell down the stairs while holding a 4-month-old, causing them both injuries. The court dismissed the charges during trial, finding Knox's theory of abusive head trauma unsustainable. ¶¶326-328.

Knox was forced out of her position at the University of Wisconsin in 2019. ¶¶332-333. She then moved to Alaska, where she took on the role as Alaska's lead CAP. She also brought with her the Helfer playbook, which helped her increase the number of abuse prosecutions by upwards of 220% in the first year. ¶¶335-336. However, because those increased numbers were largely the result of Knox bullying and pressuring her coworkers into going along with Knox's false or unsupported abuse determinations, most of the workers and professionals in the Alaska CARES child abuse program resigned their positions in response. Knox was then forced out of her Alaska position. ¶¶338-339. Esernio-Jenssen helped Knox obtain a new position at the University of Florida, where she is today. ¶340.

### Harper's adoption of the Helfer playbook

Although Harper has not faced the same degree of public scrutiny as her Helfer Society colleagues for behind the scenes bullying, manipulation and fraud, Harper employs the same Helfer playbook policies and tactics in her lead role over the child abuse prevention program in Hennepin County ¶¶ 217-248.

In one case, Harper fabricated a narrative that a baby was abused by his mother because he became fussy when he saw her following his summary removal from the family home. ¶¶221-224. When the state appointed visit supervisor informed the parents' attorney that Harper's statements to the court were false – that the baby was actually happy to see his mother – Harper had her original opinion narratives destroyed in order to avoid getting caught manipulating facts and

opinions used in the prosecution. ¶227.

In other cases, Harper has falsely testified that she has provided opinions favorable to a child abuse defendant, when in fact she has not. ¶¶ 228-35. Harper has also testified that short falls cannot cause brain injury when in fact she knows the opposite to be true. ¶¶237-241.

Another Helfer-based tactic Harper regularly uses (and teaches to her medical students) is the omission of a baby's head circumference if the baby suffers from macrocephaly, like GC did. ¶¶243; 246-7. Harper knows that macrocephaly is diagnostic of conditions that would exclude the SBS diagnosis. *Id.*

A Wisconsin court recently found that Harper's SBS opinions are not based on medical science. *Wisconsin v. Ford,* 22 CF 48, Iowa County Circuit Court, attached as **Exhibit 2**. Instead, it found that Harper relies on a combination of what she describes as physician consensus and, notably, her own belief that her SBS findings are always validated by the court system, even when the accused is exonerated:

> When asked how she gets feedback about the correctness of her diagnosis, Dr. Harper testified that she feels it is a correct diagnosis when she gets the agreement of other specialists and colleagues regarding a specific case. She also pointed to validation of a diagnosis when there is a legal finding, in the context of a legal proceeding, that confirms or adopts the finding of abuse in a particular case. Interestingly, and despite her reliance on legal findings when those findings are consistent with her opinion, Dr. Harper does not endorse a belief that a not guilty verdict, or a failure to find abuse in a legal case, demonstrates that her diagnosis is incorrect.

*Id.* at p. 15

As discussed below, Harper does not actually follow a physician consensus model. She makes the SBS diagnosis and then forces those around her to adopt it. That means the "scientific basis" for Harper's SBS diagnosis is limited to confirmation of baby shaking through guilty pleas and convictions by underfunded, overwhelmed parents and caregivers, since Harper apparently does not accept jury exonerations as valid.

**Harper sets official policy for the institutional defendants**

Harper sets and directs policies for child abuse and neglect throughout the Fairview and HHC systems. ¶¶ 126-131; 143-148. As a result, Defendants HHC, Fairview and UMP, which employ physicians associated with the University of Minnesota, have adopted the Helfer playbook for its physicians and thus the hospitals where its physicians practice. *Id.* If a child is admitted with indicia of SBS to a UMP- staffed hospital like Fairview, where the Otto Bremer Center for Safe and Healthy Children is housed, or HHC, that child's care is assigned to a CAP like Harper, even though forensic-based CAPs are not adept at clinical care. ¶¶113, 196. Moreover, if the CAP determines that the injured child was a victim of abuse, the policies and/or customs put into place by UMP and the Defendant institutions prevent members of the baby's clinical team from suggesting or documenting a diagnosis that conflicts with the CAP's child abuse diagnosis. This in effect prevents the baby from receiving a proper medical workup and proper treatment despite being admitted to what are supposed to be Minnesota's foremost child-focused healthcare institutions.  ¶¶144-147

Because these child abuse policies and/or customs are in derogation of good care and medical ethics, these policies or customs are unwritten but are still enforced by the defendant institutions. ¶151. In the event staff claims a lack of awareness about these policies, practices or customs, swift training, discipline and enforcement is carried out by Harper and other high-ranking members of UMP and the institutions it serves.  ¶¶150; 155-205.

One particular episode of Harper, UMP and Fairview's discipline, training and enforcement of these Helfer Society policies, practices or customs involved Dr. Bazak Sharon, a well-respected UMP pediatric immunologist. *Id.* Sharon was forced to resign positions with UMP and the University of Minnesota after he refused to follow Harper's directive to avoid documenting

diagnosis inconsistent with child abuse in two different patient charts.  ¶¶203-205

Sharon's trouble began when he violated the Helfer Society policy, practice or custom implemented by UMP and Fairview prohibiting the documentation of clinical notes conflicting with a CAP's determination that a baby was the victim of abuse.  In the first case, a baby had been diagnosed with an older brain bleed.  Sharon and a UMP neurologist, Dr. Zinn, concluded that the brain bleed was spontaneous as opposed to traumatic—a finding well established in the medical literature. *See, e.g., Nieves, Jones, supra*.  Sharon documented that conclusion in Fairview's electronic health record, which triggered a disciplinary proceeding against him, because his conclusion conflicted with the CAP's determination that the baby had been abused. ¶¶162-187

The disciplinary proceeding was conducted via Zoom, and Sharon recorded the meeting with his phone. The disciplinary proceeding was headed by Harper, even though she was not in Sharon's supervisory chain. ¶205. Also in attendance were UMP's attorney, as well as Fairview and UMP's highest ranking clinical executives. During the course of the disciplinary proceeding, Sharon was told that he violated UMP/Fairview's policy against documenting opinions that conflicted with the CAP's abuse determination.  He was told that his contrary opinions posed a problem for law enforcement, who were described as "confused" and in "moral distress," e.g., conflicted about prosecuting a parent who may not have caused the injury. Sharon was told that the CAP had to spend time with law enforcement undoing the harm caused by Sharon's documentation of his and Dr. Zinn's opinion. Sharon was also disciplined for giving his truthful and medically-based opinion to the child's parents, who he was told were also "confused" by that opinion even though they knew they hadn't abused their son. ¶¶181-197

Approximately one year later, Sharon attended another baby who had presented with an older brain bleed. Sharon was fired from his positions at UMP and the University of Minnesota at

the direction of Harper after he again truthfully documented his opinion that the baby's brain bleed was not the result of abuse. ¶¶198-205.

**Facts concerning GC**

The same Helfer Society-based policies, practices or customs that resulted in Sharon's termination were in place at HHC when baby GC was rushed to that hospital after collapsing at Sylwia Pawlak Reynolds's daycare on July 12, 2017.

GC was eleven months old. He had just started at Sylwia's daycare two days earlier, on July 10.  ¶385 Sylwia had taken care of GC's sister, KC, for the previous two years, and so she knew the family well. ¶¶348-351.

On the first day GC was brought to Sylwia's daycare, Sylwia noticed an abrasion on GC's forehead.  GC's father told Sylwia that GC had fallen off a bed. ¶¶360 He did not specify when this event occurred. Uknown to Sylwia, GC had also fallen at home that same morning, and sustained a significant injury on back of his head as well.  ¶¶356-357

GC presented to his primary care clinic, France Avenue Family Physicians, with head circumference measurements diagnostic of macrocephaly. At the time of his birth, his head measured in the eighty-fifth percentile.  By the time GC came to Sylwia's daycare, his head measured two standard deviations above the ninety-seventh percentile. Macrocephaly is associated with underlying illness and /or injury, and increased risk for subdural hemorrhages from minimal trauma. ¶¶353-355

When present in a severe or fatal AHT/SBS case, macrocephaly undermines the immediacy of severe presenting symptoms. For this reason, CAPs most often omit or conceal head circumference measurements that are diagnostic of macrocephaly to protect their SBS diagnoses. ¶¶243-246

GC collapsed at GC's at Sylwia's daycare shortly after being dropped off on the morning

on July 12.  Sylwia immediately called 9-1-1 and began performing CPR. ¶¶365-367 One of the first responders spoke with GC's mother, who reported that GC had fallen and hit the back of his head at home two days earlier.  This fact was documented in the paramedics' patient care report (PCR) and handed to the emergency room staff at HHS upon GC's arrival. The PCR was later scanned into HHS's EPIC system and made available to all providers involved in GC's diagnosis, care and treatment.  ¶¶370-376

Upon arrival to HHS, GC was subsequently examined by pediatric intensive care unit (PICU) by Dr. Bachour who noted two falls in GC's admission history of present illness (HPI). Bachour cited "mother and EMS report from day care provider" as her sources of pre-hospital history. This information was also entered into EPIC.  ¶¶377-378

CT studies taken of GC's head less than an hour after admission demonstrated the presence of scalp swelling over GC's posterior vertex. Subdural bleeding and a blood clot in the superior sagittal sinus were also demonstrated in the region of the posterior vertex where the swelling and bruising was located. There were blood clots in the other regions of GC's cerebral venous system, most notably in the right sigmoid and transverse sinuses and the torcula where the major venous sinuses of the brain (superior sagittal, straight sinus, and occipital sinus) meet and drain into the transverse sinuses.  ¶¶380-382

The blood clots were produced by a condition known as cerebral venous sinus thrombosis or CVST. CVST is a clotting disorder that produces clots (thromboses) in cerebral veins and  dural sinuses that drain blood from the brain back to the heart to be re-oxygenated. When a clot obstructs a vein or dural sinus, this causes blood to back up, which raises intracranial pressure (ICP.) This can lead to a venous infarction (a type of ischemic event) or a hemorrhagic stroke if a blood vessel ruptures from the pressure. ¶¶383-384

HHS emergency department physicians immediately elevated the head of GC's bed to 30 degrees and began administering IVs of hypertonic saline. They were deeply concerned about GC's ICP. Their concern intensified when the CT imaging report identified a clot in the right sigmoid sinus. Immediate medical intervention was required to measure and reduce ICP. At 1:30 pm, an undocumented surgical procedure known as a ventriculostomy was completed. During this procedure, an extra ventricular drain (EVD) catheter was surgically inserted into GC's brain to measure ICP and relieve pressure by extracting cerebral spinal fluid. ¶¶385-388

At 1:57 pm, Bachour ordered an ophthalmology consult to determine whether GC had any ocular symptoms that could confirm the medical team's suspicion of CVST. Approximately ten minutes later, she ordered two magnetic resonance venograms (MRV) to better visualize the cerebral venous sinus system and to determine the extent of clotting. Around this same time, Dr. Lehman ordered a Factor V Leiden DNA test. The results of this test confirmed that GC possessed a heterozygous mutation that made him eight times more likely to develop CVST than a person without his type of mutation. Lehman also ordered Protein C and S activity screens. ¶¶389-392 Protein C and S are essentially brakes on coagulation. They work together to prevent excessive blood clotting. ¶560

At 2:08 pm, a CT venogram was performed. The results of the venogram showed that GC's brain catheter had migrated out of the ventricular system and was no longer measuring or mitigating ICP. The placement of the EVD catheter needed to be surgically corrected. ¶396

Defendant Lucken, a staff pediatrician and rotational member of the Child Maltreatment Physician Consult Team (CMPCT) on-call list, was contacted by licensed independent social worker, Rosemary Froehle to assess and consult with the medical team on GC's condition at or around 2:30 pm. The CMPCT on-call list was comprised of HCMC medical providers, and CAPs

representing the Otto Bremer Center for Safe and Healthy Children ("the Center"). Defendant Harper, Medical Director of the Center, was a rotational member of the on-call list as was Lucken. Lucken contacted Harper shortly after she was paged by Froehle. ¶393

After she physically examined GC and reviewed imaging, Lucken concluded that GC's brain injury was caused by an impact resulting in a skull fracture and occipital hematoma. Lucken completed her initial abuse consultation at or around 4:00 pm, at which time she gave her report to Ms. Froehle. Neither she nor Ms. Froehle entered this report into EPIC. Froehle promptly called CPS at 4:13 pm and reported maltreatment, citing the medical opinions of Lucken, that GC had a skull fracture and occipital hematoma. ¶¶403-404

A massive blood and fresh frozen plasma transfusion was initiated at 3:59 pm. ¶398 Dr. Lehman ordered two infusions of tranexamic acid—an agent that increases blood clotting and which is contraindicated in the presence of CVST and clotting disorders. Patients with a history of CVST or active clot formation should not be given tranexamic acid. The medication could potentially make existing clots larger or contribute to new clot formation. ¶397

At 5:00 pm, RN Johnson noted GC's ICP had elevated to 85 mmHg. ¶406 The average ICP for a one-year-old boy is in the range of 5 – 10  mmHg. ¶388 On the morning of July 13, 2017, at 8:25 am, Lucken faxed her report to Harper. Lucken's original report was destroyed and was never entered into EPIC. Instead, Harper re-wrote Lucken's report. Harper removed all statements and opinions suggesting that GC had a prominent and visible injury on the back of his head that had been caused by a fall at home, as was documented by EMS. Harper removed all traces of this history. Harper also excluded other important medical information that conflicted with her AHT/SBS diagnosis including evidence of the blood clotting disorder, head circumference measurements diagnostic of macrocephaly, the massive blood and plasma transfusion, the ICP

spike to 85 mmHg, the migrated EVD catheter, and the order for tranexamic acid in the setting of suspected CVST. ¶429-435

After intentionally removing all exonerating information and significant events, Harper wrote, for Lucken's signature, that the intracranial findings were the product of child abuse, and "virtually definitive for abusive head trauma from shaking." ¶¶434, 435, 452

GC was declared dead on July 13, 2017 at 4:05 pm. ¶444 Dr. Middleton began an autopsy on GC on July 15, 2017. ¶456 On July 20, the lead Minneapolis police detective traveled to HHS's medical records department and requested GC's records as part of his ongoing criminal investigation. While the detective waited in the medical records lobby, Defendant Jouhari accessed GC's Epic record and edited it. Among other things, Dr. Jouhari changed the phrase "there was no reported trauma" to "there was no reported or **visual** trauma." That change was made to suggest that GC's head was examined by Jouhari and that no bruise, swelling or contusion was observed, which of course was not true and was done so that Jouhari's report would be consistent with Harper's report. Dr. Jouhari also back dated his note to July 13 even though the change was made on July 20. The printed chart provided to the detective did not evidence Dr. Jouhari's edits or back dating of this note. ¶¶466-474

Harper's report resulted in the Hennepin County Attorney's Office (HCAO) opening a civil termination of parental rights proceeding against Sylwia, who then had two children with Plaintiff. On July 24, 2017, Hennepin County removed the Reynolds's two children, AMR and WR from summer school while they were at Lake Harriet Elementary. From there, they were moved to St. Joseph's home for children, where they were stripped of their clothes, physically examined and then interrogated by MPD and CPS. Later that day, they were placed in a foster home. ¶¶476-481

On October 25, 2017, Dr. Middleton certified the manner of GC's death as "could not be

determined."   Middleton determined "deceased sustained injury under unclear circumstances; cannot exclude injury from another person(s)."  He also identified the date and the place the injury occurred as unknown.  The autopsy report was completed and signed by Dr. Middleton and Dr. Mitchel Morey on November 20, 2017. ¶¶492-494

The HCAO assigned Defendant Nicholson to the TPR matter. The HCAO obtained GC's records from the HCME on December 15, 2017.  Among those records were the PCR documenting GC's fall on July 10, 2017 and the preexisting head injury.  On January 2, 2018, Nicholson specifically requested and obtained a copy of GC's death certificate from the Hennepin County Service Center – Ridgedale location that omitted the HCME's medical certification that GC's manner of death could not be determined. During the course of the TPR proceeding, Nicholson, the HCAO and HHS manipulated GC's medical records in order to make evidence of GC's prior falls and head injuries difficult or impossible for Sylwia to discover. Among other things, the PCR's print size and resolution were manipulated to make it unreadable, and the report itself was placed in the back of the medical record under the masthead, "Discharge Instructions Provided to Patient," instead of at the front, preceding the admission records, where it belonged. ¶¶495-506

Nicholson and/or agents of the HCAO also interfered with the TPR court's independently-appointed guardian *ad litem* and child protection worker in order to facilitate Sylwia's permanent separation from her children. Among other things,  Nicholson and/or the HCAO instructed the GAL to refrain from independently investigating the facts that gave rise to the TPR proceeding. ¶511. The GAL admitted as such during a recorded interview she had with the Plaintiff.  ¶512. Nicholson and/or the HCAO also intercepted independent child welfare reports before they were submitted to the TPR court. ¶516. The child protection worker admitted that Nicholson redacted portions of the reports and removed attachments that were favorable to Sylwia, leaving the reports

unfairly biased in favor of the HCAO's prosecutorial efforts on behalf of the county. ¶¶516-517

During the pendency of the TPR proceeding, Sylwia returned to her native Poland to help take care of her father, who had been ill. ¶502 During the time she was in Poland, Sylwia gave birth to the Reynolds's third child, AR. Because the pending TPR proceeding would have separated Sylwia from AR—as she had been from her other children—Sylwia was compelled to remain in Poland in order to prevent a separation from AR caused by Defendants' continuing unconstitutional conduct. ¶¶519-521

In September, 2019, Sylwia finally obtained a legible copy of the paramedic report describing GC's fall history. That document was obtained by court order from the medical examiner – not from the HCAO or Nicholson, who continued to conceal that information.  ¶527 Prior to that time, Plaintiff was unaware of GC's complete fall history. ¶ 529. Defendants, however, had always had that information. *Id.* Nicholson and the HCAO's production of the complete fall history forced them to dismiss the TPR proceeding because the fall history showed that GC had sustained an accidental traumatic brain injury at home, two days before his collapse at Sylwia's daycare center. ¶530.

Although the HCAO conceded that it could no longer meet its burden of proving neglect in the TPR proceeding, it nonetheless continued to prosecute Sylwia for murder, even though that charge carried a higher burden of proof. ¶¶530-31. The HCAO's continued its pursuit of a murder conviction not because it believed that Sylwia had committed the crime, but because it was under immense political pressure from Harper. ¶¶530-539

Bowing to Harper's pressure, the HCAO began extradition proceedings against Sylwia in November 2019.  In support of the extradition request, HCAO assistant attorney Erin Lutz filed a sworn affidavit in which she attested that GC had been personally examined by Harper.  The

HCAO made this statement not because it was true, but because it wanted to bolster its position by attesting that GC was examined in person by a well-credentialed CAP. ¶¶540-546.

Harper, however, never examined GC. ¶544.

Lutz also attested that GC's parents were interviewed and asserted GC had not suffered any injuries at home and that he had slept and eaten normally prior to July 12. ¶541  That attestation was also false. GC's parents told multiple sources – including Lucken -- that GC had fallen and sustained bruising. ¶¶357, 363, 411, 472, 560. GC also had trouble sleeping and a loss of appetite between July 10 and July 12. ¶460(p), 556. This is important because fussiness, an inability to sleep, and an inability to eat are all hallmarks of traumatic brain injury in infants. Thus, if GC suffered trauma-related symptoms prior to July 12, those facts would tend to exonerate Sylwia. ¶¶363; 555-556

The Polish trial court rejected the HCAO's extradition request. ¶557 It found, among other things, a "disturbing" effort to conceal exculpatory evidence from Sylwia. *Id.* It also expressed a concern that the exculpatory evidence did not result in dismissal of the charges. ¶558.

The HCAO appealed to the Polish Court of Appeals. That court affirmed the decision of the district court. The Court of Appeals held that Harper and Lucken knew that GC hit his head twice at home before collapsing at Sylwia's daycare, yet omitted that exculpatory evidence from their reports – which in turn were used as the basis for the probable cause supporting Sylwia's murder prosecution. ¶560

The Court of Appeals also held that Lucken and Harper both knew that GC suffered from a type of clotting disorder that made him more susceptible to brain injury after each fall, yet failed to reasonably consider this medical issue in their reports. *Id.* The court determined that the American authorities continued to ignore this exculpatory evidence and as a result, extraditing

Sylwia back to the United States would result in a human rights violation under the terms of the Hague Convention. ¶¶560-61.

After it lost the extradition proceeding, the HCAO issued a November, 2023 letter agreeing to dismiss the criminal charges against Sylwia due to a lack of evidence that Sylwia shook or otherwise injured GC. ¶¶562-63 After that letter was issued, Harper pressured the HCAO to retract the dismissal agreement, which it did. ¶565-67.  The HCAO was forced to comply with Harper's demands to continue the criminal prosecution because the HCAO is unable to operate its child abuse prosecution unit without Harper's full support. ¶¶537-8.

Harper pressured the HCAO to maintain the prosecution against Sylwia not because there was evidence that Sylwia murdered GC, but because Harper didn't wish to concede that she was wrong about Sylwia shaking GC.  *Id.* Harper was particularly concerned about conceding that issue because her perceived infallibility –her claims of a nearly 100% batting average  in diagnosing child abuse -- is an important part of her trial testimony, particularly in light of recent attacks on the reliability of the SBS diagnosis. ¶¶ 209-211. For Harper, it was much better to press with the prosecution with the hope that Sylwia would later plea to a lesser offense, which would still allow Harper to claim that Sylwia admitted to shaking GC.

On March 20, 2024, Plaintiff filed a complaint against Harper with the Minnesota Board of Medical Practice. ¶569.  Plaintiff's complaint tracked many of the basic facts alleged in the complaint here.  *Id.* In retaliation for Plaintiff's complaint, Harper filed a complaint against the attorney license of Plaintiff's employer, Brockton Hunter, Esq. ¶578.  Harper's complaint was summarily dismissed as unfounded. ¶579.

To this day, Plaintiff and Sylwia remain separated as the direct result of the conduct alleged in this case. ¶¶580-86.  Sylwia is unable to travel to the United States because she will face a

murder charge brought by prosecutors and expert physicians who have engaged in many levels of evidence manipulation and Brady violations. Defendants' conduct is thus ongoing because Defendants have long known that Sylwia did not murder GC, yet they continue to pursue a criminal prosecution not for the sake of justice but to preserve the SBS racketeering enterprise.

## III.    <u>LEGAL ARGUMENT</u>

### A.  <u>Defendants Acted in Bad Faith and Thus Cannot Claim Statutory Immunity</u>

The federal and state statutes cited by Defendants immunize only those who act in good faith. 34 U.S.C. § 20342(1), Minn. Stat. § 260E.34 (a)(1).  Plaintiff alleges throughout the amended complaint that Defendants acted in bad faith, thus depriving them of statutory immunity. Among other things:

- Harper intentionally fabricated and manipulated medical evidence to support what she knew was an otherwise unsustainable child abuse report;

- Harper intentionally destroyed medical evidence and/or concealed exculpatory evidence in order to cause Sylwia's wrongful prosecution

- Harper caused the fabrication and manipulation of other physicians' reports that were used to wrongfully prosecute Sylwia.

- Harper wrongfully and maliciously pressured the HCAO to retract its dismissal of Sylwia

- UMP implemented a policy, practice or custom that forbad its physicians from entering notes, opinions or consultations into the EPIC system that conflicted with child abuse opinions rendered by a UMP CAP, including Harper.

- UMP had a policy, practice or custom of empowering Harper to edit, modify or delete the notes, opinions or consultations of other physicians in order to ensure

consistency with Harper's child abuse opinions.

- Plaintiff specifically alleges that Harper and UMP acted in bad faith. ¶¶ 454, 461, 490, 643.

### B. Harper and UMP were State Actors for the Purposes of §1983

Private parties can become state actors for the purposes of §1983 when they willfully participate in joint activity with the state or its agents. The Supreme Court has held that a number of facts, factors or circumstances should be considered in determining whether private actor is a state actor for purposes of §1983 liability:

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," *Blum*, 457 U.S., at 1004, 102 S.Ct. 2777, when the State provides "significant encouragement, either overt or covert," *ibid*., or when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar, supra*, at 941, 102 S.Ct. 2744 (internal quotation marks omitted). We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 231, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957) (*per curiam*), when it has been delegated a public function by the State, *cf., e.g., West v. Atkins, supra*, at 56, 108 S.Ct. 2250; *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627–628, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), when it is "entwined with governmental policies," or when government is "entwined in [its] management or control," *Evans v. Newton*, 382 U.S. 296, 299, 301, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296 (2001). The Supreme Court has also found state action where a defendant acts upon "powers traditionally exclusively reserved to the State." *Manhattan Community Access Corporation v. Halleck*, 587 U.S. 802, 802 (2019). "A private party who conspires with a state actor, e.g., a prosecutor, may act under color of state law." *Myers, supra* at 1467. These factors should be applied to the totality of the circumstances presented in the case. *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007).

Federal courts have held that CAPs like Harper can be state actors for the purposes of

§1983 liability because they perform a role traditionally reserved to the state and because their conduct is often intertwined with that of prosecutors and law enforcement.  One such reported case involved Esernio-Jenssen, Harper's close colleague. In *Estiverne v. Esernio-Jenssen*, 581 F.Supp.2d 335, 345 (E.D.N.Y. 2008), the court noted that Esernio-Jenssen was alleged to be a "zealot" who often diagnosed child abuse where none existed and who was known to disregard exculpatory medical evidence in reaching her conclusions. *Id* at 339-40. The court found that Esernio-Jenssen's conduct crossed the line from medical provider to criminal investigator. *Id* at 344-45.  In so doing, she also crossed the line into state action. *Id.*

In *Mohil v. Glick*, 842 F.Supp.2d 1072, 1077 (N.D.Ill.,2012), the court found that medical professionals involved in diagnosing child abuse are often state actors because that is a traditional state role and those involved in it are by necessity closely intertwined with law enforcement and prosecutors:

> [I]t cannot be disputed that the governmental task in the field of child abuse could not function responsibly without the invaluable input provided by medical professionals. And when those professionals are not themselves governmental employees, it is equally beyond dispute that the interrelationship between those professionals and the purely governmental people involved in the decisionmaking process is truly a close entwinement (the word repeatedly used in *Brentwood Academy* as meeting the state-actor test)

The amended complaint alleges Harper and UMP were functioning as *de facto* state agents through their participation in a coordinated system designed to support state prosecution. Under the principles established in *Brentwood Academy* and *Halleck, supra*, private actors whose functions are deeply intertwined with governmental policy can be treated as state actors, particularly when they perform functions traditionally reserved to the state, such as gathering evidence for criminal prosecutions.

Harper and UMP were state actors for the purposes of § 1983 because they were basically

the sole state investigators in Sylwia's case. Harper, in particular, certainly crossed the line from objective medical provider to state actor when she – like Esernio-Jenssen – left her physician role in favor of creating an evidentiary package to help sustain a criminal prosecution that would otherwise fail for lack of probable cause.

Harper was also a state actor under the intertwining doctrine. Her conduct is and was so deeply intertwined with governmental policy and action as to be virtually indistinguishable from it.

### C. Harper and UMP are Not Entitled to Qualified Immunity.

A private party amenable to suit under §1983 is generally not entitled to immunity. *Davis v. Buchanan Cnty., Missouri*, 11 F.4th 604, 617 (8th Cir. 2021); *Domina v. Van Pelt*, 235 F.3d 1091, 1096 (8th Cir. 2000). The exception to that rule is if that defense has been traditionally available to the private actor or if immunity is available as a matter of public policy. *Davis, supra,* applying *Richardson v. McKnight*, 521 U.S. 399 (1997).

The Eighth Circuit recently held that neither exception applies to non-government physicians providing traditionally governmental services. *Davis, supra.* Courts in other circuits, applying the same framework, have reached similar conclusions. In *Gokor v. Schlievert*, 474 F.Supp.3d 929, 933 (N.D.Ohio, 2020), the court held that although a privately employed child abuse pediatrician is a state actor for the purposes of §1983, the CAP's role is not one that traditionally affords qualified immunity. In *McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012) the Sixth Circuit held that a private psychiatrist providing services to prison inmates could not claim immunity because it was not traditionally available and because there is no public policy compelling immunity.

Harper and UMP are not entitled to qualified immunity because their roles have not been

traditionally afforded immunity. *Gokor, supra.* Moreover, there is no public policy reason to extend immunity to CAP physicians, particularly in light of the allegations that the CAP enterprise has become increasingly reliant on medical evidence manipulation to sustain the SBS/AHT diagnosis.

Assuming, *arguendo*, that qualified immunity is available to Harper and UMP, it still is not available here. The concept of qualified immunity does not protect conduct that violates clearly established rights that a reasonable person would have known about. *Harlow v. Fitzgerald,* 457 U.S. 800 (1982).

The right to be free of a state proceeding tainted by concealed exculpatory evidence has been clearly established for over 60 years. *Brady v. Maryland*, 373 U.S. 83 (1963); *White v. Smith*, 696 F.3d 740, 759 (8th Cir. 2012). The right to be free of a state proceeding premised on manufactured evidence has been established since at least 1935. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), *cited in White, supra.* See also, *Napue v. Illinois,* 360 U.S. 264, 269 (1959).

The right to be free of a state proceeding marked by a reckless or intentional failure to consider alternative theories of death has been clearly established in the Eighth Circuit since at least 2001. *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 956 (8th Cir. 2001). The right to be free of a probable cause showing based on false or manufactured evidence has also been clearly established for many years. *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999). For the purposes of this standard, a falsified report of a forensic physician is the same as a falsified report of a police officer. *Moldowan v. City of Warren*, 578 F.3d 351, 397 (6th Cir. 2009).

It was also well established, prior to 2017, that the falsification or manufacture of evidence later used in a prosecution is a conscience-shocking violation of constitutional rights to due process. *Livers v. Schenck*, 700 F.3d 340, 351 (8th Cir. 2012); *White v. Smith*, 808 F.Supp.2d 1174,

34

1233 (D.Neb., 2011), *aff'd* 696 F.3d 740; *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012).

Thus, it is clearly established – and has been for some years now – that a state actor who manufactures or manipulates evidence for use in a prosecution engages in conduct that may shock the conscience and is not entitled to qualified immunity. *Id.* This specifically includes child abuse pediatricians who manufacture evidence in order to support a child abuse prosecution. *Estiverne v. Esernio-Jenssen*, 581 F.Supp.2d 335, 348 (E.D.N.Y.,2008).

Harper's conduct shocks the conscience. Not only did she fabricate, manipulate, conceal and destroy evidence, but she pressured the HCAO to continue prosecuting Sylwia for murder after it had determined that it lacked sufficient evidence to move forward.

Harper and UMP's conduct violated Sylwia's constitutional due process rights and her right to free access to the courts. *Brady, supra; White, supra.* Their conduct also violated William and the children's right to family integrity and the right to be free from fabricated evidence. Those rights were clearly established nationally and in the Eighth Circuit at the time of the alleged conduct. *See, e.g., Lehr v. Robertson,* ; *In re Scott Cnty. Master Docket*, *supra; Myers, supra.*

Harper's conduct was not undertaken in isolation. She, Esernio-Jenssen, Knox and other Ray Helfer Society CAPs created a playbook they use and impose on their respective institutions to ensure a flow of child abuse prosecutions sufficient to sustain funding for their departments, law enforcement and prosecutors.

UMP adopted, ratified and implemented this playbook at the hospitals staffed by UMP physicians, including HHS and Fairview. This fact is borne out by not only by what happened in Sylwia's case, but also by the Zoom video recorded by Sharon in which UMP's attorney and highest ranking clinical administrators informed him that UMP's official policy, custom or practice was to stifle opinions and medical notes that conflicted with a CAP finding of child abuse. Sharon

was told that this policy was so paramount to UMP's mission that the child's presenting medical illnesses would have to take a back seat to the CAP's forensic workup of the child.

The combination of the Helfer playbook, UMP's adoption of that playbook and UMP's sanctioning of Harper's methods gave Harper the unfettered ability to manufacture medical evidence against Sylwia.

### D. Harper Was Personally Involved in Constitutional Violations

Harper's role extended beyond merely providing medical opinions - her specialized position as a child abuse pediatrician created a direct causal link between her medical determinations and the subsequent state actions that caused the constitutional deprivations that separated the family.

Plaintiff alleges that Harper's diagnoses were not just opinions – they were presented as conclusive medical findings that she knew and intended would trigger specific state interventions.

### E. Plaintiff's Claims Are Not Barred by Statutes of Limitations

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the statute of limitations argument made in his Response to the HHS Defendants' Motion to Dismiss, contemporaneously filed.

In addition to those arguments, Plaintiff argues that Harper's malicious pressuring of the HCAO to retract its offer to dismiss the prosecution in November, 2023 restarts the statute of limitations clock because it constitutes new wrongful conduct. *Hope v. Klabal, supra.* Thus, even to the extent that some of Plaintiff's may have been arguably time barred up to that point, Harper's new and wrongful conduct separately gives rise to new claims, including for §1983, abuse of process, intentional infliction of emotional distress, RICO and conspiracy. This suit

36

was timely filed as to those claims, as it was filed well within the two years since Harper's new wrongful conduct.

### F. Plaintiff has Standing to Bring these Claims

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the standing argument made in his Response to the HHS Defendants' Motion to Dismiss, contemporaneously filed.

### G.  Monell Claim

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the *Monell* argument made in his Response to the HHS Defendants' Motion to Dismiss, contemporaneously filed.

### H. Civil Conspiracy Claim

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the civil conspiracy argument made in his Response to the HHS Defendants' Motion to Dismiss, contemporaneously filed.

### I. *Younger* Abstention Does Not  Apply

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the *Younger* abstention argument made in his Response to the HHS Defendants' Motion to Dismiss, contemporaneously filed.

### J.   Plaintiff has Plausibly Pled a RICO Claim

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the RICO argument made in his Response to the HHS Defendants' Motion to Dismiss,

contemporaneously filed.

WHEREFORE, for the reasons set forth herein Plaintiff prays that this Honorable Court DENY Defendants' Motion to Dismiss.

Submitted this 22nd day of September, 2025.

LAW OFFICES OF J.M. REINAN, PC

/s/ Jerome M. Reinan

_____

Jerome M. Reinan, #24322X
1437 High St.
Denver, CO 80218
jreinan@reinanlaw.com
(303)894.0383

**CERTIFICATION OF COMPLIANCE**

Undersigned hereby affirms, pursuant to LR 7.1(f) that the foregoing proportional font type memorandum of law contains 11,330 words as counted by Microsoft Word for Mac, Ver. 16.01.

/s/ Jerome M. Reinan
Jerome M. Reinan

**CERTIFICATION OF SERVICE**

Undersigned hereby affirms that the foregoing was served on all counsel of record this 22nd day of September, 2025 by and through the ECF electronic filing system approved by the Court.

/s/ Jerome M. Reinan
Jerome M. Reinan