UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| William Reynolds, individually; as Spouse of Sylwia Pawlak Reynolds; and as Next Friend of their minor children, AMR, WR, and AR | Case No. 25-CV-754-LMP-SGE |
| Plaintiff | |
| vs. | |
| | **PLAINTIFF'S RESPONSE TO HHS DEFENDANTS' MOTION TO DISMISS [Doc. 60-61]** |
| Nancy Sanders Harper, MD; Hennepin County; Fairview Health Services; The Board of Regents of the University of Minnesota; Hennepin Healthcare System, Inc., d/b/a Hennepin County Medical Center; The University of Minnesota Physicians d/b/a U of M Physicians; Britta Nicholson; Sarah Elizabeth Lucken, MD; Seth Cheng Silbert, MD; Mohamed Tahsin A. Jouhari, MD, | |
| Defendants. | |

THE PLAINTIFF, William Reynolds, by and through counsel, the Law Offices of J.M. Reinan, P.C., hereby submits his Response to the HHS Defendants' Motion to Dismiss [Doc. 60-61] as follows:

1

# I. INTRODUCTION

**[A] claim of shaken baby syndrome is more an article of faith than a proposition of science.**

*Del Prete v. Thompson*, 10 F. Supp. 3d 907, 958 (N.D. Ill. 2014), fn. 10

\*\*\*

Eight years ago, the defendant doctors, led by Defendant Nancy Sanders Harper, MD, "Harper," falsely reported 11-month-old "GC" as the victim of Shaken Baby Syndrome, "SBS."

Harper and her co-defendant doctors knew their reports were fictitious. They knew that SBS was not a scientifically valid diagnosis, and even if it was, GC's prior history of falls at home as well as his genetic blood clotting disorder made such a diagnosis medically unsustainable. To circumvent this problem, Harper and other members of her team intentionally excluded exculpatory facts from their reports and manipulated medical evidence to support the diagnosis, which they knew and intended would be used to prosecute GC's daycare provider, who, as is usually the case, was the last adult present when GC lapsed into unconsciousness. That daycare provider was Sylwia Reynolds, "Sylwia," Plaintiff William Reynolds's wife and the mother of the three minor plaintiffs, AMR, WR and AR.

The Defendants' nearly identical fictitious reports of child abuse were not a mistake or a coincidence. The fictitious reports were created in order to further Harper and the other defendants' support of the SBS enterprise, which faces increasing court and medical scrutiny due to the complete absence of scientific support.

The diagnosis of and prosecution of child abuse has become an important and lucrative enterprise throughout the country and particularly in Hennepin County. Much like a parallel for-profit business, the money generated by the child abuse detection and prevention programs is

dependent in large part on results. To justify significant funding for universities, healthcare, and law enforcement, it is necessary to identify and prosecute significant numbers of suspected child abusers.

Harper, in particular, has been very effective at producing results. Within two years of assuming her leadership role and implementing changes to the way child abuse is diagnosed and prosecuted in Hennepin County, the number of child abuse prosecutions skyrocketed. Prior to Harper's arrival, a yearly average of 1,739 cases of child abuse were diagnosed in Hennepin County. Within two years of Harper's arrival, that number jumped to 5,709. By that time, a child in Hennepin County was 2.6 times more likely to be determined a victim of abuse than a child living in any of the other eight metro counties.

This precipitous increase in child abuse identification and prosecution resulted in significant funding increases – to the point where the Hennepin County Attorney's Office ended up spending more money on child abuse matters than all other criminal matters combined.

The problem with these impressive numbers is that they occurred during a time when the SBS enterprise in particular was amidst an existential threat from courts and medical science. Beginning in the early 2000s, a number of scientific and biomechanical studies generally debunked the hypothesis that a child can suffer the so-called triad of a brain bleed, retinal bleed and brain swelling from merely being shaken. These studies also effectively collapsed other traditionally held SBS hypotheses, including one that held brain bleeds or brain swelling could not be caused by blows to the head caused by short falls; another that a child could not experience periods of lucidity after a blow to the head; and that retinal bleeds were never spontaneous.

Once provided with peer reviewed studies scientifically debunking traditional SBS beliefs, courts around the country slowly began to exclude SBS diagnoses based on shaking alone-- where

no blunt trauma had occurred and where the diagnoses was premised on presence of the SBS triad – subdural  hemorrhages, retinal hemorrhages and encephalopathy (brain swelling.) By 2009, the combination of medical studies and adverse court rulings basically forced the American Academy of Pediatrics to issue a position paper stating that an SBS diagnosis based on shaking alone was only appropriate where all possible accidental or medical causes had been properly considered and excluded.

Because SBS is a bread-and-butter diagnosis for child abuse pediatricians, "CAPs" like Harper, any diminution in the ability to diagnose and prosecute SBS cases threatens to have a profound effect on the financial, reputational and teaching aspects of the CAP enterprise and the system designed around it.

Like many industries, CAPs have what amounts to a lobbying organization. Theirs is the Ray Helfer Society. Recognizing the real threat to the SBS enterprise caused by scientific developments that limit a CAP's ability to legitimately diagnose SBS cases, members of the Helfer Society created a playbook designed to ensure that SBS numbers could be maintained or even increased despite continuing erosion of the medical bases underlying the SBS hypothesis.

The Helfer playbook generally consists of a set of policies, practices or customs that its members implement or lobby to implement at their teaching institutions and hospitals as well as tactics its members can use when faced with pushback over the implementation of those policies, practices or customs. The goal behind the Helfer playbook is to implement policies at hospitals and teaching institutions that put the CAP solely in charge of all children admitted to a hospital with non-specific symptoms that might be seen as signs of potential abuse, such as brain bleeds, broken bones or suspicious bruising. This gives the CAP authority to direct testing, diagnosis and care direction – including ordering forensic tests that have no medical benefit to the child. The

Helfer policy goal is to also implement policies and practices that give the attending CAPs authority to monitor and edit reports, opinions and documentation from consulting clinicians in order to cleanse the reports of medical evidence that conflicts with the CAP's child abuse opinion or determination.

The Helfer playbook also has the goal of training clinicians to avoid documenting, whenever possible, medical or accident histories that might dilute or conflict with the CAP's abuse determination, and which might be used to defend against the child abuse allegation. This would include such things as falls the child suffered at home; genetic bleeding and clotting disorders; and head growth abnormalities, such as macrocephaly.

Many Helfer playbook policies, practices, and customs contradict fundamental scientific and medical principles. Child abuse pediatrics is at best a hybrid of forensic and clinical medicine and at worst forensic medicine with very few clinical aspects. The basic job of the CAP is not to medically treat an abused child so much as it is to forensically determine whether the child was abused so that the abuser can be found, punished and deterred from future abuse. Assigning a forensic non-clinician to lead a medical team treating an infant with serious health issues prioritizes the SBS enterprise and diagnosis over the child's wellbeing.

Perhaps even more nettlesome is the policy forbidding consulting clinicians from expressing their true opinions and conclusions in the medical record. This restriction conflicts with established principles of medical practice and does not align with the team-based approach to clinical care promoted at contemporary hospitals and medical schools. Allowing the CAP to veto and edit consulting clinicians' opinions and documentation is well beyond the pale of accepted medical practice. Yet that is the policy that has emerged to combat the increasing scrutiny over the SBS diagnosis.

The Helfer Society also established alternative paths to get SBS-based opinions over Rule 702 hurdles. This was accomplished through a combination of solidifying CAP community opinions that the SBS triad was diagnostic of SBS regardless of the existence of supporting studies and the use of so-called "confession studies" in which data from plea bargains is used to support the opinion that SBS is valid because many accused abusers admitted to causing the SBS triad from shaking alone.

The creators of the Helfer playbook have also developed policies, practices, customs that are frankly fraudulent, illegal and bordering on criminal. These policies, practices or customs include bullying clinicians who question a CAP's methods.

The institutional defendants in this case have embraced Harper and the Helfer playbook that she put into place even though those policies, practices or customs are facially unconstitutional. The Helfer playbook policies implemented at the defendant institutions and followed by the individually-named defendants resulted in constitutional deprivations and injuries to the legally-protected interests of Sylwia, William and their children. In following these unconstitutional policies, defendants conspired with one another to knowingly and falsely accuse Sylwia of murdering GC, resulting in the continued destruction of the Reynolds family. It has forced Sylwia to remain in Poland, away from her husband and children.

This set of facts pled in the amended complaint also pose a number of serious legal, constitutional, moral, and ethical problems that, to this point, have been generally left unaddressed here and throughout the country. Child abuse pediatric students at major universities, like the University of Minnesota, are being taught how to promote SBS as a valid medical diagnosis not because it is scientifically valid, but because the system under its current structure needs CAPs to sustain SBS convictions so their other legitimate child abuse ventures remain funded.

While the standard justification for this tradeoff is that society needs to protect children from child abuse, the government-sanctioned use of fraudulent, unconstitutional and non-scientific methods to accomplish that goal does nothing more than create abuse where none exist existed. Protecting an entire system of criminal prosecution based on false premises because it satisfies some other greater good is not only wasteful, but also unlawful and unconstitutional.

Plaintiff urges the Court to use its powers to put a stop to this illegal enterprise and permit a jury to determine whether Plaintiff and his family are entitled to compensation for the many continued abuses they have suffered at the hands of these Defendants.

## II.    FACTUAL BACKGROUND

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the Factual Background set forth in his Response to Defendants Harper and UMP's Motion to Dismiss, contemporaneously filed.

## III.    LEGAL ARGUMENT

### A. The Amended Complaint is Not Excessive or Prolix

Courts routinely permit lengthy complaints in complex cases, particularly where civil rights or RICO violations are alleged. *See, e.g., Stephenson v. Deutsche Bank AG,* 282 F. Supp. 2d 1032, 1075 (D. Minn. 2003) *Campoli v. Anywhere Real Est. Inc.,* No. 24-CV-04481 (JMB/SGE), 2025 WL 2410428, at *3 (D. Minn. July 3, 2025)(discussing the need to plead RICO and similar claims with particularity).  This is because although Rule 8 requires a "short and plain" statement of the claim, Rule 9(b) and Rules of pleading RICO, civil rights and conspiracy claims necessarily require more particularity, especially in complex cases involving multiple claims and parties.  These two Rules must be read in harmony with one another. *Stephenson, supra.*

Plaintiff is also required to plead enough facts to make his claims plausible. *Bell Atl. Corp.*

*v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Although that might be accomplished with a short and plain statement in a fairly simple case, this is not a simple case, either factually or legally. At the crux of this case this the allegation that Minnesota's foremost child abuse pediatrician has used her position to create what amounts to an unchecked fiefdom involving the manufacture of corrupt medical evidence used to prosecute innocent parents and caregivers of child abuse in order to prop up a financial and political enterprise that is under attack from both the medical and legal communities.

Plaintiff had no choice but to plead the lengthy and complex nature of the development of the SBS enterprise and the enterprise's existential response to the medical and legal community's recent attempts to pare back the enterprise.  Had Plaintiff pled his claims as simply as Defendant suggests, it would have left an opening for Defendants to argue that it is simply implausible to suggest that well-regarded doctors, the University and the Twin Cities' largest hospitals conspired, in a vacuum, to frame Sylwia.

### B. Plaintiff's Claims Are Not Barred by Statutes of Limitations

### 1. The Children's Claims are Tolled Due to their Minority

William brings claims on behalf of his three children, AMR, WR and AR, as their next friend pursuant to Fed. R. Civ. P. 17(c)(2).  All three children were minors at the time this action was commenced and are still minors today. AMR is 17, WR is 14 and AR is 7.

Federal courts apply the tolling laws of the forum state. *DeVries v. Driesen*, 766 F.3d 922, 923 (8th Cir. 2014); *Wallace v. Kato*, 549 U.S. 384, 394 (2007). This includes claims brought under 42 U.S.C. § 1983. DeVries, 766 F.3d 922 *See also, Sacks v. University of Minnesota,* 600 F.Supp.3d 915, 941 (D.Minn. 2022).

Minnesota tolls the statute of limitations on claims brought by minors. In Minnesota, a

minor "must commence the action either within one year of reaching the age of majority or within the six-year period of limitation, whichever is later." *D.M.S. v. Barber*, 645 N.W.2d 383, 387 (Minn. 2002) (interpreting Minn. Stat. § 541.15(a)(1)). Because none of the children have yet reached the age of majority, statutes of limitations on their claims continue to be tolled. Minn. Stat. Ann. § 541.15(a)(1). Their claims are not time-barred.

### 2. The Statutes of Limitations are Tolled by the Continuing Violation Doctrine

Statutes of limitations may be tolled under the continuing violation doctrine. *Hope v. Klabal*, 457 F.3d 784, 793 (8th Cir. 2006); "A statute of limitations may not begin to run on a continuing wrong till the wrong is over and done with." *Mille Lacs Band of Chippewa Indians v. State of Minn.*, 853 F. Supp. 1118, 1126 (D. Minn. 1994), aff'd, 124 F.3d 904 (8th Cir. 1997), *aff'd sub nom. Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 119 S. Ct. 1187, 143 L. Ed. 2d 270 (1999), *citing Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983). *See also, Fletcher v. Union Pac. R. Co.*, 621 F.2d 902, 908 (8th Cir. 1980). "The continuing violation doctrine is an equitable doctrine that can toll the statute of limitations where a pattern of conduct "constitute[s] a sufficiently integrated pattern to form," in effect, a single act." " *Ringsred v. City of Duluth*, 995 N.W.2d 146, 152 (Minn., 2023); See also, *Hubbard v. United Press Intern., Inc.*, 330 N.W.2d 428, 440 (Minn., 1983), fn. 11.

As compared to most reported cases, Plaintiff's damages are not confined to a single wrongful act that occurred eight years ago. Rather, Plaintiff, Sylwia and the children continue to suffer new and additional damages each that that Defendants continue engaging in wrongful conduct. The continued wrongful conduct forces Sylwia to remain in Poland, causing all the entire family to suffer ongoing, new and continuous harm.

As set forth above, the continuing destruction of the Reynolds family unit has been directly

caused by pressure Harper exerted on the HCAO. In November, 2023, following the repeated and resounding extradition losses in the Polish courts, the HCAO issued a letter notifying Sylwia of its intent to dismiss the criminal charges against her based on a lack of evidence.  Before that dismissal took place, Harper maliciously and outrageously pressured the HCAO to reverse its decision not because Harper believed that Sylwia murdered GC, but because Harper could not afford to lose one of the few powerful tools left in her SBS arsenal.

As found by the court in *Wisconsin v. Ford,* 22 CF 48, Iowa County Circuit Court, attached to the Response to Harper and UMP's Motion to Dismiss [Doc. 64-65] as **Exhibit 2,** medical science has put Harper and other CAPs in a box. There are no scientific studies that validate SBS. Worse yet, there are scientific studies that disprove it. Simply relying – as she once did – on the theory that the SBS diagnosis is validated because CAPs say it is does not meet Rule 702 standards. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

As a result, Harper and other CAPs have begun to heavily if not almost exclusively rely on what have been described as "confession studies." These are nothing more than a compilation of data points comparing the number of times persons accused of SBS by Harper (or other CAPs) have actually or tacitly confessed to shaking the baby by and through a plea or other form of confession. These studies, however are also not scientifically valid as a general proposition because a person may confess or plea to shaking the baby even though he did not actually do it. *Nieves, supra.* The Wisconsin court found that Harper's confession study was invalid because her data did not include cases in which a jury exonerated defendants that Harper had accused of injuring a baby through shaking.

Thus, Harper's successful campaign to continue Sylwia's criminal prosecution was not based on medical evidence or probable cause that Sylwia shook GC to death, but rather an attempt

to defend Harper's confession study statistics by forcing what she apparently hopes to be a plea with a tacit admission that GC was shaken.

Regardless of whether Harper's November, 2023 conduct is considered continuing conduct or a new, discrete wrongful act, the fact remains that Sylwia remains in the county's unconstitutional crosshairs while the Reynolds family unit continues to be unlawfully and unconstitutionally separated because of a conduct that is continuing. The statutes of limitations cannot bar these claims.

### 3. The Statutes of Limitations are Tolled due to Defendants' Fraudulent Concealment

The "discovery rule" provides that the statute of limitations does not begin to run until the facts of the claim are discovered through reasonable diligence. *Hope v. Klabal, supra*. The statute of limitations is similarly tolled if a defendant fraudulently conceals facts necessary to bring a claim. *In re Pork Antitrust Litigation*, 781 F.Supp.3d 758, 863 (D.Minn. 2025). Tolling based on fraudulent concealment is available if 1) a defendant concealed a plaintiff's cause of action, (2) a plaintiff failed to discover the existence of his cause of action, and (3) the plaintiff diligently sought to discover his claim. *In re Milk Products Antitrust Litigation*, 84 F.Supp.2d 1016, 1022 (D.Minn.1997).

The fact of the concealment of the exculpatory ambulance trip report – which identified GC's fall and occipital brain injury – was litigated to conclusion in the Polish courts. Defendants are thus precluded from relitigating the findings and conclusions of the Polish courts if they were (1) provided a full and fair trial of the issues in a court of competent jurisdiction; (2) the Polish courts ensured the impartial administration of justice; and (3) the Polish courts ensured the trial was without prejudice or fraud. *Shen v. Leo A. Daly Co.,* 222 F.3d 472, 476 (8th Cir. 2000); *Black Clawson Co., Inc. v. Kroenert Corp.*, 245 F.3d 759, 763 (8th Cir. 2001)

Those factors are met here. Hennepin County filed for extradition through the Polish court system. ¶¶539-62. The courts took evidence from experts, considered the arguments and filings of Hennepin County and Sylwia, and impartially determined that material exculpatory evidence, including evidence of the occipital head injury, was concealed from Sylwia and thus by extension, from Plaintiff. Hennepin County exercised its right of appeal, and the Polish Court of Appeals rendered a final decision on the merits.

Thus, for the purposes of this case, it should be deemed established that the fact of the occipital head injury was concealed from Plaintiff until September, 2019; and that Harper and Lucken's omission of the occipital head injury and genetic clotting disorder from their reports constituted concealment of exculpatory medical facts and evidence.

Silbert and Jouhari also engaged in acts of concealment. Like Lucken, Silbert also knew about GC's occipital fall but did not include that fact in his report. Jouhari concealed the fact of the occipital injury by altering medical records to make it appear as if he had examined GC's head and found no evidence of a fall or injury. Nicholson and Hennepin County concealed the fact of GC's fall history by manipulating GC's medical record in such a way to make the ambulance trip report illegible, in violation of a court order.

Discovery of these facts was critical to Plaintiff's understanding of Defendants' fraudulent conduct and thus his claims. Although Plaintiff was aware of GC's fall resulting in a forehead abrasion, it was the occipital injury that resulted in GC's brain bleed and subsequent death. The fact of the fall-related occipital injury first gave notice that Defendant's conduct was wrongful and intentional. This is obviated by the fact that once the HCAO produced the ambulance trip report documenting the occipital injury in September, 2019, it was forced to dismiss the TPR proceeding because of it.

RICO has a slightly different application. It does not have a "pattern discovery" rule. Instead, it allows equitable tolling of any statute of limitations if there has been concealment or "where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it." *Rotella v. Wood*, 528 U.S. 549, 561 (2000). At its base, the RICO claim involves a complicated racketeering enterprise that notably includes unwritten yet formal policies, practices or customs imposed on UMP and HHS physicians to tailor reports and medical evidence in a way that supports an SBS diagnosis. Given the levels of secrecy that already exist in a hospital setting – let alone HIPAA and other privacy laws – Plaintiff was unable to discover the true nature and extent of Defendants' fraudulent scheme even with exceptional diligence. In fact, it wasn't until a March 24, 2025 meeting with Dr. Sharon that Plaintiff first learned that the Helfer-based policies were actual, formal policies of UMP, Fairview and HHS. ¶158. His and Sylwia's RICO claims should thus be equitably tolled until that date.

### C. <u>Plaintiff has Standing</u>

### 1. William has third party standing to assert Sylwia's claims

As the HHS defendants note, a person can have third-party standing to bring claims on behalf of another if that there is a close relationship between the person and the party representing her; and if can be demonstrated that the person does not have reasonable access to the courts or if that person can identify some significant hindrance that prevents her from bringing the claims in her own name. *Singleton v. Wulff,* 428 U.S. 106, 114-15 (1976). The obstacles faced by the person need not be "insurmountable." *Id.*

In *League of Women Voters of Minnesota Education Fund v. Si*mon, 2021 WL 1175234, at *10 (D.Minn., 2021), cited by HHS, cases discussing such hindrances were identified. In one of those cases, *Mayor and City Council of Baltimore v. Trump*, 416 F.Supp.3d 452, 490 (D.Md.,

2019) the court held that a third party had standing to bring claims on behalf of non-citizens who had a genuine fear of retaliation from the government for bringing those claims. Similarly, in *Exodus Refugee Immigration, Inc. v. Pence*, 165 F.Supp.3d 718, 732 (S.D.Ind., 2016), the court conferred prudential standing on a third party based on concerns that forcing the refugees to bring claims in their own name would make them adverse to the person from whom assistance was sought.

Both of the prudential standing criteria are met here. William is Sylwia's husband and the father of their children.  There is no person more closely aligned to Sylwia's interests.

Sylwia faces nearly insurmountable impediments in joining this case as a party. She has a reasonable fear that if she returns to Minnesota, she jailed without bail and her son will be taken from her. The Polish courts have determined that Sylwia's fears are not speculative.  It called Hennepin County's due process violations disturbing and a human rights violation.

If Sylwia were to join this case as a party but remain in Poland, the likelihood is that Defendants will seek to force Sylwia to either appear in person for her deposition or trial. If she were to appear in person, there is little doubt that she would be arrested and AR would be taken from her. If she refuses to appear in person, Defendants would likely seek sanctions that may result in the dismissal or devaluation of her claims.

William also has standing to assert Sylwia's claims because Defendants' conduct has eroded her access to the courts. *See, e.g., Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983) A state actor's willful destruction of exonerating evidence violates that constitutional right. *Id.*

### 2. William and the children also have standing

William and his children have standing to bring these claims based on their own direct injuries, including loss of consortium, companionship, and loss of the intact family unit they

enjoyed or would have enjoyed absent defendants' wrongful conduct.

The Supreme Court has recognized family integrity as a fundamental liberty interest protected by the Constitution. *E.g., Lehr v. Robertson,* 463 U.S. 248, 258 (1983)*; Santosky v. Kramer,* 455 U.S. 745, 753 (1982); *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987). As a division of this Court held some 40 years ago,

> "The privacy and autonomy of familial relationships … are unarguably among the protectible interests which due process protects. We can conceive of no more important relationship, no more basic bond in American society, than the tie between parent and child." *Bohn v. County of Dakota,* 772 F.2d 1433, 1435 (8th Cir.1985). Plaintiffs claim that the false accusations defendants created caused the separation of children from parents. Defendants do not dispute that plaintiffs have a protected liberty interest in their family relationships. . . The other major constitutional violation plaintiffs assert is based on the separation of the parents from their children. Undoubtedly, plaintiffs have a protected liberty interest under the fourteenth amendment in keeping their family unit together. *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir.1977).

*In re Scott Cnty. Master Docket*, 618 F.Supp. 1534, 1546 (D.Minn., 1985), *aff'd in part, rev'd in part on other grounds, Myers, supra.*

Defendants' wrongful conduct directly resulted in AMR and WR being removed from the family home and placed in a foster home. Defendants' wrongful and unconstitutional conduct also directly resulted in the separation of the Reynolds family.  Sylwia has been forced to remain in Poland rather than face criminal and renewed civil TPR proceedings riddled with due process violations, evidence fabrication, evidence concealment and various conspiracies.

In response, HHS argues that Sylwia made the "choice" to stay in Poland and away from her family. That heartbreaking decision was far from a choice.

As found by the Polish courts, Defendants' due process violations are so profound and so intertwined with her right to a fair trial that returning to Minnesota to face prosecution would actually constitute a human rights violation in derogation of the Hague Convention. Defendants

should be bound by these findings under the doctrine of collateral estoppel. *Shen, supra.*

Had Harper left well enough alone and permitted the HCAO to dismiss the criminal prosecution as was promised in November, 2023, all of this may have been a moot point. Sylwia would have returned to Minnesota and would have been reunited with her family. Yet Harper was more concerned about maintaining her personal statistics and the statistics of the SBS enterprise than she was about medicine, justice and the rights and feelings of the family she destroyed. She needlessly and intentionally caused the continued destruction of the Reynolds family.

As a result, Sylwia and William have suffered through the last eight years without the company and companionship of one another. The two older Reynolds children have been forced to grow up without a mother and their younger brother. Young AR has been forced to grow up without a father and older siblings. The Reynolds family are now strangers to one another. These are compelling, concrete and redressable injuries.

### D. Plaintiff has Pled Plausible RICO and Civil Rights Injunction Claims and is Entitled To Injunctive and Equitable Relief

None of the Defendants, including HHS, challenge any aspect of Plaintiff's RICO claim apart from the sufficiency of his RICO enterprise allegations[1]. Thus, if Plaintiff can cross the threshold of pleading the plausible existence of a RICO enterprise, there is no basis to dismiss the RICO claim.

A RICO enterprise has three elements:

> (1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering.

---

[1] The University also argues that Plaintiff has implausibly alleged that Harper was clothed with the authority of the University when she engaged in the predicate acts of wire fraud. Doc. 54, p. 8.  However, that argument does not constitute an additional substantive attack on the elements of Plaintiff's RICO claim.

*U.S. v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004)

An enterprise may consist of any variety of corporations, business entities and individuals who are associated in fact. *U.S. v. Philip Morris USA Inc*., 566 F.3d 1095 (D.C. Cir. 2009). The Supreme Court has held that this can be a loose structure:

> Such a group need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Boyle v. U.S.,* 556. U.S. 938, 948 (2009).

The enterprise (or enterprises) need not have formal names or formal designations. *United States v. Gershman*, 31 F.4th 80, 97 (2nd Cir. 2022). Moreover, it is appropriate, particularly at the early stages of the proceeding, to plead the existence of different, multiple or alternative enterprises. "Equivocation about the constitution of the enterprise, however, does not undermine the plausibility of the pleadings." *Jackson v. Segwick Claims Management Services*, Inc., 699 F.3d 466, 480 (6th Cir. 2012), *overruled on other grounds.*

The amended complaint plausibly alleges the three required elements of a RICO enterprise. First, regardless of what he calls it – the SBS enterprise, the Helfer enterprise, the SBS diagnosis enterprise – Plaintiff identifies a common purpose among participants to promote, encourage and/or profit from the SBS diagnosis. Not every participant in the enterprise must reap an economic benefit from the enterprise, although each of them allegedly do here. *Handeen v. Lemaire*, 112

F.3d 1339, 1351 (8th Cir. 1997).

Second, Plaintiff plausibly pleads an ongoing organizational structure where medical professionals, hospitals, the University and Hennepin County each have a sustained role in promoting, encouraging and profiting from use of the SBS diagnosis, which the members of the organization all know is a medically-debunked hypothesis whose application results in constitutional violations.

Harper is the head of the enterprise. She manages the day to day operations, sets policy and enforces policy. HHS and Fairview provide hospital facilities that funnel potential SBS patients to Harper and other CAPs for SBS diagnostic workups. HHS and Fairview also impose policies, practices or customs on clinicians that ensure that an SBS diagnosis made by Harper or one of her colleagues is not challenged internally.

Hennepin County provides the law enforcement and prosecutorial support necessary to transform the SBS diagnosis into a criminal charge that itself results in a data point that not only results in a financial or reputational benefit to the members of the enterprise, but sustains the enterprise by creating a conviction or plea bargain that is used to attempt to legitimize the diagnosis in future prosecutions.

UMP supplies physicians that support the enterprise by following the policies, practices and customs put into place by Harper, HHS and Fairview that result in manipulated or fabricated medical evidence used to support the SBS diagnosis. The University supplies medical students who are trained by Harper in the policies, practices and customs put into place by Harper so that the enterprise will continue to spread and flourish in the future and so additional data supportive of SBS can be created outside the boundaries of the Twin Cities.

Third, Plaintiff plausibly alleges that outside of the enterprise set up to wrongfully

prosecute innocent persons through the use of the fictitious SBS diagnosis, the above structure operates in a legitimate fashion, providing medical, teaching and county services as intended. Given that the lack of an enterprise is the only challenged element of the RICO and RICO conspiracy claims, Plaintiff's plausible description of the RICO enterprise entitles him to move forward with the RICO claims. That gives him standing to seek all available RICO remedies, including equitable and injunctive relief. 18 U.S.C. § 1964(a). *See, e.g., Josephs v. Alberto Jose Marzan and Press Media Group, Inc.*, 2022 WL 45041, at *10 (D.Minn., 2022)(private plaintiffs have standing to seek equitable and injunctive relief under RICO).

Thus, contrary to Defendants' assertions, Plaintiff has standing to seek orders from this Court appropriate to dismantle Defendants' racketeering enterprise.

Plaintiff has also pled a claim for injunctive relief under §1983. To the extent this claim is not clear because §1985 was not specifically used, Plaintiff seeks leave to amend the complaint to rectify any error.

As set forth above, Defendants' civil rights deprivations are continuing. The HCAO is continuing to pursue a bad faith, tainted prosecution devoid of probable cause simply because Harper, who holds the purse strings for the HCAO's substantial child protection unit, has demanded it. The request for injunctive relief is thus related to a continuing and actual threat, not the sort of speculative one argued by Defendants.

### E.  Monell Claim

A plaintiff may establish municipal liability under 42 U.S.C. § 1983 "if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise."

*Kiefer v. Isanti Cnty., Minnesota*, 71 F.4th 1149, 1152–53 (8th Cir. 2023), *citing Corwin v. City of Indep., Mo.*, 829 F.3d 695, 699–700 (8th Cir. 2016); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The manufacturing of false evidence used in a prosecution is a clear violation of constitutional due process rights. *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012), and has been clearly recognized as such for many years. When a municipal actor like HHS creates and enforces an official policy that permits or even requires its agents to manufacture evidence used in prosecutions, that policy or custom is facially unconstitutional. *See, e.g., Graham v. Barnette*, 5 F.4th 872, 890 (8th Cir. 2021). When an official municipal policy is facially unconstitutional, all a plaintiff needs to do to plead a Monell claim is plead the unconstitutional policy and its exercise. *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 390 (8th Cir. 2007)

Plaintiff has pled throughout the amended complaint that HHS adopted official policies originally created by the Helfer Society and implemented at HHS by Harper, who was clothed with final policymaking authority in regard to child abuse diagnosis policies. The policies were designed to overcome a significant erosion in the ability to prosecute SBS cases due to advancements in medical science and adverse court rulings, not to improve patient care.

The policies effectively allowed CAPs like Harper to purify medical evidence used in child abuse prosecutions by giving CAPs the lead care role over children suspected of being abused. In this role, the CAPs were able to order forensic tests not related to the child's medical issues. The CAPs were given the authority to edit the opinions of other physicians. Other physicians were prohibited from documenting opinions or beliefs inconsonant with the CAP's opinions, and were required to use analog methods of communication in order to avoid creating non-erasable metadata.

These policies, practices and customs are facially unconstitutional. The purpose of the policies is to manipulate and manufacture medical evidence used in prosecutions. The policy

itself requires what courts have held to be conduct that shocks the conscience. *White, supra.*

No hospital interested in the health and welfare of an injured child has a policy assigning a forensic, non clinician doctor to lead the child's care team. No hospital interested in the fairness and accuracy of its medical charts permits one doctor to dictate what other doctors put in their documentation, let alone a doctor whose main job is supporting a criminal prosecution. No hospital interested in the health and welfare of an injured child stifles the independent judgment of its clinical team.

HHS's facially unconstitutional policies, practices and customs were the moving force of the injuries alleged by Plaintiff. These unconstitutional policies, practices and customs not only permitted Harper, Lucken, Silbert and Jouhari to fabricate and manipulate medical evidence, but actually mandated the manipulation of the evidence as an official policy of HHS. Each of those physicians was encouraged, by policy, to create child abuse reports free of exculpatory medical facts, histories and evidence, such as GC's previous falls; GC's head bruises and contusions; his genetic blood clotting disorder; his macrocephaly; and the medical misadventures he suffered while under HHS's care.

### F. Defendants engaged in a Civil Conspiracy

"To prevail on a civil conspiracy claim, a plaintiff must establish that defendants "agreed to accomplish an unlawful purpose, and took concerted actions to achieve that purpose."" *Damon v. Groteboer*, 937 F.Supp.2d 1048, 1078 (D.Minn., 2013), *citing Marty H. Segelbaum, Inc. v. MW Capital, LLC*, 673 F.Supp.2d 875, 880 (D.Minn.2009) and *Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 41 N.W.2d 818, 824 (Minn. 1950).

Contrary to HHS's assertions, Plaintiff's civil conspiracy case is not focused entirely on Defendants' conspiracy to increase funding through unlawful and unconstitutional policies

that intentionally result in fictitious accusations of child abuse.

As noted above, each of the named defendants has or has had a role in causing Plaintiff's injuries. Harper is the head of the conspiracy. She manages the day to day operations, sets policy and enforces policy. HHS and Fairview provide hospital facilities that funnel potential SBS patients to Harper and other CAPs for SBS diagnostic workups. HHS and Fairview also impose policies, practices or customs on clinicians that ensure that an SBS diagnosis made by Harper or one of her colleagues is not challenged internally.

Hennepin County provides the law enforcement and prosecutorial support necessary to transform the SBS diagnosis into a criminal charge that itself results in a data point that not only results in a financial or reputational benefit to the members of the enterprise, but sustains the enterprise by creating a conviction or plea bargain that is used to attempt to legitimize the diagnosis in future prosecutions.

UMP supplies physicians that support the enterprise by following the policies, practices and customs put into place by Harper, HHS and Fairview that result in manipulated or fabricated medical evidence used to support the SBS diagnosis. The University supplies medical students who are trained by Harper in the policies, practices and customs put into place by Harper so that the enterprise will continue to spread and flourish in the future and so additional data supportive of SBS can be created outside the boundaries of the Twin Cities.

Plaintiff has also adequately pled the existence of a conspiracy by and between Harper, Lucken, Silbert and Jouhari. ¶¶657-8. Plaintiff alleges that those individuals agreed and conspired with one another to fabricate, alter, omit and edit medical evidence in order to cause, continue and perpetuate Sylwia's false civil and criminal prosecutions, which in turn resulted in the destruction of the family unit. *Id.* These are not conclusory allegations.

As described above, this conspiracy was predicated on those Defendants' agreement to create false and fictitious reports of GC's abuse at the hands of his daycare provider when those Defendants all knew that there existed clearly exonerating facts including:

- a history of multiple falls at home;

-  clear evidence of a previous blow to GC's occipital region;

- Severe macrocephaly;

- A genetic clotting disorder;

- Severely increased ICP as a result of a brain clot; and

- Multiple episodes of medical misadventures in the hospital, including:

  - Administration of a contraindicated medication that caused additional clotting and increased ICP;

  - Migration of the brain catheter, resulting in increased ICP; and

  - Some sort of undocumented medical emergency that resulted in the emergent infusion of blood products

Conspiracies can be proved by circumstantial evidence. In fact, "[a] conspiracy is rarely susceptible of proof by direct evidence. .. *U.S. v. Powell*, 564 F.2d 256, 258 (8th Cir. 1977). An agreement to accomplish an unlawful purpose can thus be proved by such things as the uncanny consistency between Harper, Lucken, Silbert and Jouhari's reports – all of which uniformly omitted exonerating facts. The agreement is also proved by Defendants' adherence to the unconstitutional and unlawful policies, practices and customs put in place by Harper and adopted and enforced by HHS.

The conspiracy by Harper and Lucken is proved by Lucken's agreement to permit Harper to modify or destroy Lucken's original report, which contained some of the exonerating facts

Harper wished to remove from the record. The conspiracy is also proved by the fact that Lucken and Harper agreed to use an analog fax to communicate so that their communications would not appear in EPIC metadata or in an audit trail. Jouhari's agreement is proved by his alteration of his emergency department report – while the investigating police officer waited. That record alteration was designed to make it appear as if Jouhari had visually examined GC on admission to the E.D. and had not seen any occipital bruising, which was untrue and which was designed to promote the other Defendants' false prosecution of GC's daycare provider, Sylwia.

### G.  HHS Engaged in Bad Faith and Thus Cannot Claim Immunity

The federal and state statutes cited by Defendants only immunize those who act in good faith. 34 U.S.C. § 20342(1), Minn. Stat. § 260E.34 (a)(1).  William alleges throughout the amended complaint that Defendants acted in bad faith, thus depriving them of statutory immunity. Among other things:

- HHS had a formal policy, practice or custom that forbade its physicians from entering notes, opinions or consultations into the EPIC system that conflicted with child abuse opinions rendered by a CAP, including Harper. ¶¶146-152; 155-205.

- HHS had a policy or practice of using a fax machine instead of the EPIC electronic records system to exchange consultations between physicians and the CAPs. The use of an analog fax ensured that any provider consultations or reports were not entered into the permanent electronic medical record until they were edited and approved by Harper. ¶¶ 414-415;

- HHS had a policy, practice or custom of empowering Harper to edit, modify or delete the notes, opinions or consultations of other physicians in order to ensure consistency with Harper's child abuse opinions.

- Lucken faxed Harper a consultative report in which she identified GC's previous fall at home as well as his scalp swelling, suspected skull fracture and occipital bleeding that were a result of the fall and impact. ¶¶395; 419-422;

- Pursuant to Defendants' policy, practice or custom, Harper destroyed Lucken's report because it would have prevented an SBS/AHT prosecution. ¶426

- Harper rewrote Lucken's report to intentionally exclude all of the above exculpatory medical evidence in order to make it appear that GC's injuries were the result of being shaken by the daycare provider, which Harper and Lucken both knew was not the case. ¶¶425-435.

- William specifically alleges that the reports accusing Sylwia of abuse were made in bad faith. ¶¶ 454, 461, 490, 643, .

### H. The *Younger* Abstention Doctrine Does not Apply Here

There are a number of reasons why the *Younger* abstention doctrine does not apply to this case. First, *Younger* abstention does not apply in the face of allegations that the state criminal prosecution is the product of bad faith. *Steffel v. Thompson*, 415 U.S. 452, 454 (1974). Plaintiff plausibly alleges, throughout the amended complaint, that Sylwia's prosecution is the product of bad faith.

Second, *Younger* abstention does not apply when there is no active criminal proceeding since the doctrine itself is based on the idea that a pending criminal proceeding will allow the plaintiff the ability to fully vindicate herself. *Id.* at 462. Although Hennepin County has not dismissed the criminal complaint against Sylwia, the proceedings are at what amounts to an interminable standstill. Plaintiff alleges, and the Polish courts have found, that if Sylwia returns to Minnesota, she will face proceedings so rigged that they would constitute a human rights violation.

Abstaining from hearing this matter pending the conclusion of the criminal matter will deny Plaintiff and Sylwia from their right to access the courts.

Third, abstention is inappropriate when the pending criminal case – if fairly tried – does not offer the full slate of remedies claimed in the federal lawsuit. *Hunt v. Roth*, 648 F.2d 1148, 1154 (8th Cir. 1981). This case presents extraordinary circumstances where the alleged constitutional violations cannot be effectively addressed in the state proceedings. The complaint alleges a systematic conspiracy to fabricate evidence and perpetuate false medical theories across multiple institutions, which goes beyond what can be remedied in the criminal case alone. Additionally, the interests of the minor children and William individually cannot be adequately protected in a criminal proceeding against only Sylwia.  The criminal proceeding also provides no avenue for compensation, injunctive relief, equitable relief, treble damages or attorneys fees. For these reasons, the Court should decline to abstain from hearing this matter pending the resolution of the stalled criminal matter.

WHEREFORE, for the reasons set forth herein, Plaintiff prays that this honorable Court DENY the HHS Defendants' Motion to Dismiss.

Submitted this 22nd day of September, 2025.

LAW OFFICES OF J.M. REINAN

/s/ Jerome M. Reinan

_____

Jerome M. Reinan, #24322X
1437 High St.
Denver, CO 80218
jreinan@reinanlaw.com
(303)894.0383

26

**CERTIFICATION OF COMPLIANCE**

Undersigned hereby affirms, pursuant to LR 7.1(f) that the foregoing proportional font type memorandum of law contains 7850 words as counted by Microsoft Word for Mac, Ver. 16.01.

/s/ Jerome M. Reinan

Jerome M. Reinan

**CERTIFICATION OF SERVICE**

Undersigned hereby affirms that the foregoing was served on all counsel of record this 22nd day of September, 2025 by and through the ECF electronic filing system approved by the Court.

/s/ Jerome M. Reinan

Jerome M. Reinan