UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

William Reynolds, individually; as
Spouse of Sylwia Pawlak Reynolds; and as
Next Friend of their minor children, AMR, WR,
and AR

Plaintiff

vs.

Nancy Sanders Harper, MD; Hennepin County;
Fairview Health Services; The Board of
Regents of the University of Minnesota;
Hennepin Healthcare System, Inc., d/b/a
Hennepin County Medical Center; The
University of Minnesota Physicians d/b/a U of
M Physicians; Britta Nicholson; Sarah
Elizabeth Lucken, MD; Seth Cheng Silbert,
MD; Mohamed Tahsin A. Jouhari, MD,

Defendants.

Case No. 25-CV-754-
LMP-SGE

**PLAINTIFF'S RESPONSE TO
COUNTY DEFENDANTS'
MOTION TO DISMISS
[Doc. 56-57]**

THE PLAINTIFF, William Reynolds, by and through counsel, the Law Offices of J.M. Reinan, P.C., hereby submits his Response to the County Defendants' Motion to Dismiss [Doc. 56-57] as follows:

# I. INTRODUCTION

**[A] claim of shaken baby syndrome is more an article of faith than a proposition of science.**

*Del Prete v. Thompson*, 10 F. Supp. 3d 907, 958 (N.D. Ill. 2014), fn. 10

\*\*\*

Eight years ago, the defendant doctors, led by Defendant Nancy Sanders Harper, MD, "Harper," falsely reported 11-month-old "GC" as the victim of Shaken Baby Syndrome, "SBS."

Harper and her co-defendant doctors knew their reports were fictitious. They knew that SBS was not a scientifically valid diagnosis, and even if it was, GC's prior history of falls at home as well as his genetic blood clotting disorder made such a diagnosis medically unsustainable. To circumvent this problem, Harper and other members of her team intentionally excluded exculpatory facts from their reports and manipulated medical evidence to support the diagnosis, which they knew and intended would be used to prosecute GC's daycare provider, who, as is usually the case, was the last adult present when GC lapsed into unconsciousness. That daycare provider was Sylwia Reynolds, "Sylwia," Plaintiff William Reynolds's wife and the mother of the three minor plaintiffs, AMR, WR and AR.

The Defendants' nearly identical fictitious reports of child abuse were not a mistake or a coincidence. The fictitious reports were created in order to further Harper and the other defendants' support of the SBS enterprise, which faces increasing court and medical scrutiny due to the complete absence of scientific support.

The diagnosis of and prosecution of child abuse has become an important and lucrative enterprise throughout the country and particularly in Hennepin County. Much like a parallel for-profit business, the money generated by the child abuse detection and prevention programs is dependent in large part on results. To justify significant funding for universities, healthcare, and

2

law enforcement, it is necessary to identify and prosecute significant numbers of suspected child abusers.

Harper, in particular, has been very effective at producing results. Within two years of assuming her leadership role and implementing changes to the way child abuse is diagnosed and prosecuted in Hennepin County, the number of child abuse prosecutions skyrocketed. Prior to Harper's arrival, a yearly average of 1,739 cases of child abuse were diagnosed in Hennepin County. Within two years of Harper's arrival, that number jumped to 5,709. By that time, a child in Hennepin County was 2.6 times more likely to be determined a victim of abuse than a child living in any of the other eight metro counties.

This precipitous increase in child abuse identification and prosecution resulted in significant funding increases – to the point where the Hennepin County Attorney's Office ended up spending more money on child abuse matters than all other criminal matters combined.

The problem with these impressive numbers is that they occurred during a time when the SBS enterprise in particular was amidst an existential threat from courts and medical science. Beginning in the early 2000s, a number of scientific and biomechanical studies generally debunked the hypothesis that a child can suffer the so-called triad of a brain bleed, retinal bleed and brain swelling from merely being shaken. These studies also effectively collapsed other traditionally held SBS hypotheses, including one that held brain bleeds or brain swelling could not be caused by blows to the head caused by short falls; another that a child could not experience periods of lucidity after a blow to the head; and that retinal bleeds were never spontaneous.

Once provided with peer reviewed studies scientifically debunking traditional SBS beliefs, courts around the country slowly began to exclude SBS diagnoses based on shaking alone-- where no blunt trauma had occurred and where the diagnoses was premised on presence of the SBS triad

– subdural  hemorrhages, retinal hemorrhages and encephalopathy (brain swelling.) By 2009, the combination of medical studies and adverse court rulings basically forced the American Academy of Pediatrics to issue a position paper stating that an SBS diagnosis based on shaking alone was only appropriate where all possible accidental or medical causes had been properly considered and excluded.

Because SBS is a bread-and-butter diagnosis for child abuse pediatricians, "CAPs" like Harper, any diminution in the ability to diagnose and prosecute SBS cases threatens to have a profound effect on the financial, reputational and teaching aspects of the CAP enterprise and the system designed around it.

Like many industries, CAPs have what amounts to a lobbying organization. Theirs is the Ray Helfer Society. Recognizing the real threat to the SBS enterprise caused by scientific developments that limit a CAP's ability to legitimately diagnose SBS cases, members of the Helfer Society created a playbook designed to ensure that SBS numbers could be maintained or even increased despite continuing erosion of the medical bases underlying the SBS hypothesis.

The Helfer playbook generally consists of a set of policies, practices or customs that its members implement or lobby to implement at their teaching institutions and hospitals as well as tactics its members can use when faced with pushback over the implementation of those policies, practices or customs. The goal behind the Helfer playbook is to implement policies at hospitals and teaching institutions that put the CAP solely in charge of all children admitted to a hospital with non-specific symptoms that might be seen as signs of potential abuse, such as brain bleeds, broken bones or suspicious bruising. This gives the CAP authority to direct testing, diagnosis and care direction – including ordering forensic tests that have no medical benefit to the child. The Helfer policy goal is to also implement policies and practices that give the attending CAPs

authority to monitor and edit reports, opinions and documentation from consulting clinicians in order to cleanse the reports of medical evidence that conflicts with the CAP's child abuse opinion or determination.

The Helfer playbook also has the goal of training clinicians to avoid documenting, whenever possible, medical or accident histories that might dilute or conflict with the CAP's abuse determination, and which might be used to defend against the child abuse allegation. This would include such things as falls the child suffered at home; genetic bleeding and clotting disorders; and head growth abnormalities, such as macrocephaly.

Many Helfer playbook policies, practices, and customs contradict fundamental scientific and medical principles. Child abuse pediatrics is at best a hybrid of forensic and clinical medicine and at worst forensic medicine with very few clinical aspects. The basic job of the CAP is not to medically treat an abused child so much as it is to forensically determine whether the child was abused so that the abuser can be found, punished and deterred from future abuse. Assigning a forensic non-clinician to lead a medical team treating an infant with serious health issues prioritizes the SBS enterprise and diagnosis over the child's wellbeing.

Perhaps even more nettlesome is the policy forbidding consulting clinicians from expressing their true opinions and conclusions in the medical record. This restriction conflicts with established principles of medical practice and does not align with the team-based approach to clinical care promoted at contemporary hospitals and medical schools. Allowing the CAP to veto and edit consulting clinicians' opinions and documentation is well beyond the pale of accepted medical practice. Yet that is the policy that has emerged to combat the increasing scrutiny over the SBS diagnosis.

The Helfer Society also established alternative paths to get SBS-based opinions over Rule

5

702 hurdles. This was accomplished through a combination of solidifying CAP community opinions that the SBS triad was diagnostic of SBS regardless of the existence of supporting studies and the use of so-called "confession studies" in which data from plea bargains is used to support the opinion that SBS is valid because many accused abusers admitted to causing the SBS triad from shaking alone.

The creators of the Helfer playbook have also developed policies, practices, customs that are frankly fraudulent, illegal and bordering on criminal. These policies, practices or customs include bullying clinicians who question a CAP's methods.

The institutional defendants in this case have embraced Harper and the Helfer playbook that she put into place even though those policies, practices or customs are facially unconstitutional. The Helfer playbook policies implemented at the defendant institutions and followed by the individually-named defendants resulted in constitutional deprivations and injuries to the legally-protected interests of Sylwia, William and their children. In following these unconstitutional policies, defendants conspired with one another to knowingly and falsely accuse Sylwia of murdering GC, resulting in the continued destruction of the Reynolds family. It has forced Sylwia to remain in Poland, away from her husband and children.

This set of facts pled in the amended complaint also pose a number of serious legal, constitutional, moral, and ethical problems that, to this point, have been generally left unaddressed here and throughout the country. Child abuse pediatric students at major universities, like the University of Minnesota, are being taught how to promote SBS as a valid medical diagnosis not because it is scientifically valid, but because the system under its current structure needs CAPs to sustain SBS convictions so their other legitimate child abuse ventures remain funded.

While the standard justification for this tradeoff is that society needs to protect children

from child abuse, the government-sanctioned use of fraudulent, unconstitutional and non-scientific methods to accomplish that goal does nothing more than create abuse where none exist existed. Protecting an entire system of criminal prosecution based on false premises because it satisfies some other greater good is not only wasteful, but also unlawful and unconstitutional.

Plaintiff urges the Court to use its powers to put a stop to this illegal enterprise and permit a jury to determine whether Plaintiff and his family are entitled to compensation for the many continued abuses they have suffered at the hands of these Defendants.

## II.    FACTUAL BACKGROUND

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the Factual Background set forth in his Response to Defendants Harper and UMP's Motion to Dismiss, contemporaneously filed.

## III.    LEGAL ARGUMENT

### A.  Plaintiff has Standing

### 1. William has third party standing to assert Sylwia's claims

As the HHS defendants note, a person can have third-party standing to bring claims on behalf of another if that there is a close relationship between the person and the party representing her; and if can be demonstrated that the person does not have reasonable access to the courts or if that person can identify some significant hindrance that prevents her from bringing the claims in her own name. *Singleton v. Wulff,* 428 U.S. 106, 114-15 (1976).  The obstacles faced by the person need not be "insurmountable." *Id.*

In *League of Women Voters of Minnesota Education Fund v. Si*mon, 2021 WL 1175234, at \*10 (D.Minn., 2021), cited by HHS, cases discussing such hindrances were identified. In one of those cases, *Mayor and City Council of Baltimore v. Trump*, 416 F.Supp.3d 452, 490 (D.Md.,

2019) the court held that a third party had standing to bring claims on behalf of non-citizens who had a genuine fear of retaliation from the government for bringing those claims. Similarly, in *Exodus Refugee Immigration, Inc. v. Pence*, 165 F.Supp.3d 718, 732 (S.D.Ind., 2016), the court conferred prudential standing on a third party based on concerns that forcing the refugees to bring claims in their own name would make them adverse to the person from whom assistance was sought.

Both of the prudential standing criteria are met here. William is Sylwia's husband and the father of their children. There is no person more closely aligned to Sylwia's interests.

Sylwia faces nearly insurmountable impediments in joining this case as a party. She has a reasonable fear that if she returns to Minnesota, she jailed without bail and her son will be taken from her. The Polish courts have determined that Sylwia's fears are not speculative. It called Hennepin County's due process violations disturbing and a human rights violation.

If Sylwia were to join this case as a party but remain in Poland, the likelihood is that Defendants will seek to force Sylwia to either appear in person for her deposition or trial. If she were to appear in person, there is little doubt that she would be arrested and AR would be taken from her. If she refuses to appear in person, Defendants would likely seek sanctions that may result in the dismissal or devaluation of her claims.

William also has standing to assert Sylwia's claims because Defendants' conduct has eroded her access to the courts. *See, e.g., Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983) A state actor's willful destruction of exonerating evidence violates that constitutional right. *Id.*

### 2. William and the children also have standing

William and his children have standing to bring these claims based on their own direct injuries, including loss of consortium, companionship, and loss of the intact family unit they

enjoyed or would have enjoyed absent defendants' wrongful conduct.

The Supreme Court has recognized family integrity as a fundamental liberty interest protected by the Constitution. *E.g., Lehr v. Robertson,* 463 U.S. 248, 258 (1983)*; Santosky v. Kramer,* 455 U.S. 745, 753 (1982); *Stanley v. Illinois,* 405 U.S. 645, 651 (1972); *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir. 1987). As a division of this Court held some 40 years ago,

> "The privacy and autonomy of familial relationships … are unarguably among the protectible interests which due process protects. We can conceive of no more important relationship, no more basic bond in American society, than the tie between parent and child." *Bohn v. County of Dakota,* 772 F.2d 1433, 1435 (8th Cir.1985). Plaintiffs claim that the false accusations defendants created caused the separation of children from parents. Defendants do not dispute that plaintiffs have a protected liberty interest in their family relationships. . . The other major constitutional violation plaintiffs assert is based on the separation of the parents from their children. Undoubtedly, plaintiffs have a protected liberty interest under the fourteenth amendment in keeping their family unit together. *Duchesne      v.      Sugarman*,      566      F.2d      817,      825      (2d      Cir.1977).

*In re Scott Cnty. Master Docket*, 618 F.Supp. 1534, 1546 (D.Minn., 1985), *aff'd in part, rev'd in part on other grounds, Myers, supra.*

Defendants' wrongful conduct directly resulted in AMR and WR being removed from the family home and placed in a foster home. Defendants' wrongful and unconstitutional conduct also directly resulted in the separation of the Reynolds family.  Sylwia has been forced to remain in Poland rather than face criminal and renewed civil TPR proceedings riddled with due process violations, evidence fabrication, evidence concealment and various conspiracies.

In response, HHS argues that Sylwia made the "choice" to stay in Poland and away from her family. That heartbreaking decision was far from a choice.

As found by the Polish courts, Defendants' due process violations are so profound and so intertwined with her right to a fair trial that returning to Minnesota to face prosecution would actually constitute a human rights violation in derogation of the Hague Convention. Defendants

should be bound by these findings under the doctrine of collateral estoppel. *Shen, supra.*

Had Harper left well enough alone and permitted the HCAO to dismiss the criminal prosecution as was promised in November, 2023, all of this may have been a moot point. Sylwia would have returned to Minnesota and would have been reunited with her family. Yet Harper was more concerned about maintaining her personal statistics and the statistics of the SBS enterprise than she was about medicine, justice and the rights and feelings of the family she destroyed. She needlessly and intentionally caused the continued destruction of the Reynolds family.

As a result, Sylwia and William have suffered through the last eight years without the company and companionship of one another. The two older Reynolds children have been forced to grow up without a mother and their younger brother. Young AR has been forced to grow up without a father and older siblings. The Reynolds family are now strangers to one another. These are compelling, concrete and redressable injuries.

**B. <u>Plaintiff has Pled Plausible RICO and Civil Rights Claims and is Entitled To Injunctive and Equitable Relief</u>**

None of the Defendants, including HHS, challenge any aspect of Plaintiff's RICO claim apart from the sufficiency of his RICO enterprise allegations[1]. Thus, if Plaintiff can cross the threshold of pleading the plausible existence of a RICO enterprise, there is no basis to dismiss the RICO claim.

A RICO enterprise has three elements:

> (1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering.

---

[1] The University also argues that Plaintiff has implausibly alleged that Harper was clothed with the authority of the University when she engaged in the predicate acts of wire fraud. Doc. 54, p. 8. However, that argument does not constitute an additional substantive attack on the elements of Plaintiff's RICO claim.

*U.S. v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004)

An enterprise may consist of any variety of corporations, business entities and individuals who are associated in fact. *U.S. v. Philip Morris USA Inc*., 566 F.3d 1095 (D.C. Cir. 2009). The Supreme Court has held that this can be a loose structure:

> Such a group need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Boyle v. U.S.,* 556. U.S. 938, 948 (2009).

The enterprise (or enterprises) need not have formal names or formal designations. *United States v. Gershman*, 31 F.4th 80, 97 (2nd Cir. 2022). Moreover, it is appropriate, particularly at the early stages of the proceeding, to plead the existence of different, multiple or alternative enterprises. "Equivocation about the constitution of the enterprise, however, does not undermine the plausibility of the pleadings." *Jackson v. Segwick Claims Management Services*, Inc., 699 F.3d 466, 480 (6th Cir. 2012), *overruled on other grounds.*

The amended complaint plausibly alleges the three required elements of a RICO enterprise. First, regardless of what he calls it – the SBS enterprise, the Helfer enterprise, the SBS diagnosis enterprise – Plaintiff identifies a common purpose among participants to promote, encourage and/or profit from the SBS diagnosis. Not every participant in the enterprise must reap an economic benefit from the enterprise, although each of them allegedly do here. *Handeen v. Lemaire*, 112

11

F.3d 1339, 1351 (8th Cir. 1997).

Second, Plaintiff plausibly pleads an ongoing organizational structure where medical professionals, hospitals, the University and Hennepin County each have a sustained role in promoting, encouraging and profiting from use of the SBS diagnosis, which the members of the organization all know is a medically-debunked hypothesis whose application results in constitutional violations.

Harper is the head of the enterprise. She manages the day to day operations, sets policy and enforces policy. HHS and Fairview provide hospital facilities that funnel potential SBS patients to Harper and other CAPs for SBS diagnostic workups. HHS and Fairview also impose policies, practices or customs on clinicians that ensure that an SBS diagnosis made by Harper or one of her colleagues is not challenged internally.

Hennepin County provides the law enforcement and prosecutorial support necessary to transform the SBS diagnosis into a criminal charge that itself results in a data point that not only results in a financial or reputational benefit to the members of the enterprise, but sustains the enterprise by creating a conviction or plea bargain that is used to attempt to legitimize the diagnosis in future prosecutions.

UMP supplies physicians that support the enterprise by following the policies, practices and customs put into place by Harper, HHS and Fairview that result in manipulated or fabricated medical evidence used to support the SBS diagnosis. The University supplies medical students who are trained by Harper in the policies, practices and customs put into place by Harper so that the enterprise will continue to spread and flourish in the future and so additional data supportive of SBS can be created outside the boundaries of the Twin Cities.

Third, Plaintiff plausibly alleges that outside of the enterprise set up to wrongfully

12

prosecute innocent persons through the use of the fictitious SBS diagnosis, the above structure operates in a legitimate fashion, providing medical, teaching and county services as intended. Given that the lack of an enterprise is the only challenged element of the RICO and RICO conspiracy claims, Plaintiff's plausible description of the RICO enterprise entitles him to move forward with the RICO claims. That gives him standing to seek all available RICO remedies, including equitable and injunctive relief. 18 U.S.C. § 1964(a). *See, e.g., Josephs v. Alberto Jose Marzan and Press Media Group, Inc*., 2022 WL 45041, at *10 (D.Minn., 2022)(private plaintiffs have standing to seek equitable and injunctive relief under RICO).

Thus, contrary to Defendants' assertions, Plaintiff has standing to seek orders from this Court appropriate to dismantle Defendants' racketeering enterprise.

Plaintiff has also pled a claim for injunctive relief under §1983. To the extent this claim is not clear because §1985 was not specifically used, Plaintiff seeks leave to amend the complaint to rectify any error.

As set forth above, Defendants' civil rights deprivations are continuing. The HCAO is continuing to pursue a bad faith, tainted prosecution devoid of probable cause simply because Harper, who holds the purse strings for the HCAO's substantial child protection unit, has demanded it. The request for injunctive relief is thus related to a continuing and actual threat, not the sort of speculative one argued by Defendants.

### C. Nicholson Is Not Entitled to Absolute Immunity

Prosecutors are entitled to absolute immunity for prosecutorial functions. However, absolute immunity does not extend to investigatory functions. *Mille Lacs Band of Ojibwe v. County of Mille Lacs, Minnesota*., 508 F.Supp.3d 486 (D. Minn. 2020). Courts apply a functional test to determine whether the prosecutor's role is investigatory or prosecutorial rather than looking to the

13

actor's title. *Anderson v. Larson*, 327 F.3d 762 (8th Cir. 2003).

Courts have held that giving advice to investigators is not part of the prosecutorial role. *Burns v. Reed*, 500 U.S. 478, 495 (1991). Prosecutors engaging in administrative roles are entitled only to qualified immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Performing social services functions or filing social services reports does not confer absolute immunity. *J.T.H. v. Missouri Department of Social Services Children's Division*, 39 F.4th 489, 492 (8th Cir. 2022).

Nicholson's alleged actions fall outside the scope of prosecutorial immunity. Plaintiff alleges, at ¶510-13 that Nicholson gave fictitious, fraudulent and wrongful legal advice to the guardian *ad litem* assigned by the family court to represent the interests of the Reynolds children. This advice involved, inter alia, instructing the GAL to forbear from conducting an independent investigation into the facts leading to the TPR proceeding. That in turn resulted in continued family separation. When Nicholson stepped into the role of advising an investigator, she left her prosecutorial role and thereby forfeited the ability to claim absolute immunity. *Burns, Buckley, supra.*

Nicholson also stepped into an administrative and/or investigatory role and thus out of the realm of absolute immunity when she edited the social worker's reports to the family court. ¶¶ 514-517. *J.T.H.*, *supra.* Doing the investigatory work of a social worker – or supervising that work – is not a prosecutorial role.

Nicholson is also not entitled to qualified immunity. The concept of qualified immunity does not protect conduct that violates clearly established rights that a reasonable person would have known about. *Harlow v. Fitzgerald,* 457 U.S. 800 (1982).

The right to be free of a state proceeding tainted by concealed exculpatory evidence has been clearly established for over 60 years. *Brady v. Maryland*, 373 U.S. 83 (1963); *White v. Smith*,

14

696 F.3d 740, 759 (8th Cir. 2012). The right to be free of a state proceeding premised on manufactured evidence has been established since at least 1935. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), *cited in White, supra.* See also, *Napue v. Illinois,* 360 U.S. 264, 269 (1959).

It was also well established, prior to 2017, that the falsification or manufacture of evidence used in a prosecution is a conscience-shocking violation of constitutional rights to due process. *Livers v. Schenck*, 700 F.3d 340, 351 (8th Cir. 2012); *White v. Smith*, 808 F.Supp.2d 1174, 1233 (D.Neb., 2011), *aff'd* 696 F.3d 740; *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012).

Thus, it is clearly established – and has been for some years now – that a state actor who manufactures or manipulates evidence for use in a prosecution is not entitled to qualified immunity. *Id.*

### D. *Monell* Claim

A plaintiff may establish municipal liability under 42 U.S.C. § 1983 "if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise."

*Kiefer v. Isanti Cnty., Minnesota*, 71 F.4th 1149, 1152–53 (8th Cir. 2023), *citing Corwin v. City of Indep., Mo.*, 829 F.3d 695, 699–700 (8th Cir. 2016); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The manufacturing of false evidence used in a prosecution is a clear violation of constitutional due process rights. *White v. Smith*, 696 F.3d 740, 754 (8th Cir. 2012), and has been clearly recognized as such for many years. When a municipal actor like Hennepin County creates and enforces an official policy that permits or even requires its agents to manufacture evidence used in prosecutions, that policy or custom is facially unconstitutional. *See, e.g., Graham v. Barnette*, 5 F.4th 872, 890 (8th Cir. 2021). When an official municipal policy is facially unconstitutional, all a plaintiff needs to do to plead a Monell claim is plead the unconstitutional

15

policy and its exercise. *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 390 (8th Cir. 2007)

Plaintiff has pled throughout the amended complaint that Hennepin County adopted official policies originally created by the Helfer Society and implemented by Harper, who was clothed with final policymaking authority in regard to child abuse diagnosis policies, which made her the *de facto* decisionmaker on which cases to prosecute, even though she is not a prosecutor. The policies were designed to overcome a significant erosion in the ability to prosecute SBS cases due to advancements in medical science and adverse court rulings, not to improve patient care.

The policies effectively allowed CAPs like Harper to purify medical evidence used in child abuse prosecutions by giving CAPs the lead care role over children suspected of being abused. In this role, the CAPs were able to order forensic tests not related to the child's medical issues. The CAPs were given the authority to edit the opinions of other physicians. Other physicians were prohibited from documenting opinions or beliefs inconsonant with the CAP's opinions, and were required to use analog methods of communication in order to avoid creating non-erasable metadata.

These policies, practices and customs are facially unconstitutional. The purpose of the policies is to manipulate and manufacture medical evidence used in prosecutions. The policy itself requires what courts have held to be conduct that shocks the conscience. *White, supra.*

Hennepin County's facially unconstitutional policies, practices and customs were the moving force of the injuries alleged by Plaintiff. These unconstitutional policies, practices and customs permitted and encouraged the use of manipulated medical evidence, as an official policy of Hennepin County. Each of those physicians was encouraged, by policy, to create child abuse reports free of exculpatory medical facts, histories and evidence, such as GC's previous falls; GC's

head bruises and contusions; his genetic blood clotting disorder; his macrocephaly; and the medical misadventures he suffered while under HHS's care.  These policies, practices and customs give rise to *Monell* liability.

WHEREFORE, for the reasons set forth herein, Plaintiff prays that this honorable Court DENY the Hennepin County Defendants' Motion to Dismiss.

Submitted this 22nd day of September, 2025.

LAW OFFICES OF J.M. REINAN

/s/ Jerome M. Reinan

_____

Jerome M. Reinan, #24322X
1437 High St.
Denver, CO 80218
jreinan@reinanlaw.com
(303)894.0383

## CERTIFICATION OF COMPLIANCE

Undersigned hereby affirms, pursuant to LR 7.1(f) that the foregoing proportional font type memorandum of law contains 4985 words as counted by Microsoft Word for Mac, Ver. 16.01.

/s/ Jerome M. Reinan

## CERTIFICATION OF SERVICE

Undersigned hereby affirms that the foregoing was served on all counsel of record this 22nd day of September, 2025 by and through the ECF electronic filing system approved by the Court.

/s/ Jerome M. Reinan
Jerome M. Reinan