UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

|  |  |
|---|---|
| William Reynolds, individually; as Spouse of Sylwia Pawlak Reynolds; and as Next Friend of their minor children, AMR, WR, and AR<br><br>Plaintiff<br><br>vs. | Case No. 25-CV-754-LMP-SGE |
|  | **PLAINTIFF'S RESPONSE TO DEFENDANT REGENTS OF UNIVERSITY OF MINNESOTA'S MOTION TO DISMISS [DOC. 52, 54]** |
| Nancy Sanders Harper, MD; Hennepin County; Fairview Health Services; The Board of Regents of the University of Minnesota; Hennepin Healthcare System, Inc., d/b/a Hennepin County Medical Center; The University of Minnesota Physicians d/b/a U of M Physicians; Britta Nicholson; Sarah Elizabeth Lucken, MD; Seth Cheng Silbert, MD; Mohamed Tahsin A. Jouhari, MD,<br><br>Defendants. |  |

THE PLAINTIFF, William Reynolds, by and through counsel, the Law Offices of J.M. Reinan, P.C., hereby submits his Response to Defendant Regents of University of Minnesota's Motion to Dismiss [Doc 52, 54]  as follows:

## I. INTRODUCTION

**[A] claim of shaken baby syndrome is more an article of faith than a proposition of science.**

*Del Prete v. Thompson*, 10 F. Supp. 3d 907, 958 (N.D. Ill. 2014), fn. 10

\*\*\*

Eight years ago, the defendant doctors, led by Defendant Nancy Sanders Harper, MD, "Harper," falsely reported 11-month-old "GC" as the victim of Shaken Baby Syndrome, "SBS."

Harper and her co-defendant doctors knew their reports were fictitious. They knew that SBS was not a scientifically valid diagnosis, and even if it was, GC's prior history of falls at home as well as his genetic blood clotting disorder made such a diagnosis medically unsustainable. To circumvent this problem, Harper and other members of her team intentionally excluded exculpatory facts from their reports and manipulated medical evidence to support the diagnosis, which they knew and intended would be used to prosecute GC's daycare provider, who, as is usually the case, was the last adult present when GC lapsed into unconsciousness. That daycare provider was Sylwia Reynolds, "Sylwia," Plaintiff William Reynolds's wife and the mother of the three minor plaintiffs, AMR, WR and AR.

The Defendants' nearly identical fictitious reports of child abuse were not a mistake or a coincidence. The fictitious reports were created in order to further Harper and the other defendants' support of the SBS enterprise, which faces increasing court and medical scrutiny due to the complete absence of scientific support.

The diagnosis of and prosecution of child abuse has become an important and lucrative enterprise throughout the country and particularly in Hennepin County. Much like a parallel for-profit business, the money generated by the child abuse detection and prevention programs is dependent in large part on results. To justify significant funding for universities, healthcare, and

2

law enforcement, it is necessary to identify and prosecute significant numbers of suspected child abusers.

Harper, in particular, has been very effective at producing results. Within two years of assuming her leadership role and implementing changes to the way child abuse is diagnosed and prosecuted in Hennepin County, the number of child abuse prosecutions skyrocketed. Prior to Harper's arrival, a yearly average of 1,739 cases of child abuse were diagnosed in Hennepin County. Within two years of Harper's arrival, that number jumped to 5,709. By that time, a child in Hennepin County was 2.6 times more likely to be determined a victim of abuse than a child living in any of the other eight metro counties.

This precipitous increase in child abuse identification and prosecution resulted in significant funding increases – to the point where the Hennepin County Attorney's Office ended up spending more money on child abuse matters than all other criminal matters combined.

The problem with these impressive numbers is that they occurred during a time when the SBS enterprise in particular was amidst an existential threat from courts and medical science. Beginning in the early 2000s, a number of scientific and biomechanical studies generally debunked the hypothesis that a child can suffer the so-called triad of a brain bleed, retinal bleed and brain swelling from merely being shaken. These studies also effectively collapsed other traditionally held SBS hypotheses, including one that held brain bleeds or brain swelling could not be caused by blows to the head caused by short falls; another that a child could not experience periods of lucidity after a blow to the head; and that retinal bleeds were never spontaneous.

Once provided with peer reviewed studies scientifically debunking traditional SBS beliefs, courts around the country slowly began to exclude SBS diagnoses based on shaking alone-- where no blunt trauma had occurred and where the diagnoses was premised on presence of the SBS triad

3

– subdural  hemorrhages, retinal hemorrhages and encephalopathy (brain swelling.) By 2009, the combination of medical studies and adverse court rulings basically forced the American Academy of Pediatrics to issue a position paper stating that an SBS diagnosis based on shaking alone was only appropriate where all possible accidental or medical causes had been properly considered and excluded.

Because SBS is a bread-and-butter diagnosis for child abuse pediatricians, "CAPs" like Harper, any diminution in the ability to diagnose and prosecute SBS cases threatens to have a profound effect on the financial, reputational and teaching aspects of the CAP enterprise and the system designed around it.

Like many industries, CAPs have what amounts to a lobbying organization. Theirs is the Ray Helfer Society. Recognizing the real threat to the SBS enterprise caused by scientific developments that limit a CAP's ability to legitimately diagnose SBS cases, members of the Helfer Society created a playbook designed to ensure that SBS numbers could be maintained or even increased despite continuing erosion of the medical bases underlying the SBS hypothesis.

The Helfer playbook generally consists of a set of policies, practices or customs that its members implement or lobby to implement at their teaching institutions and hospitals as well as tactics its members can use when faced with pushback over the implementation of those policies, practices or customs. The goal behind the Helfer playbook is to implement policies at hospitals and teaching institutions that put the CAP solely in charge of all children admitted to a hospital with non-specific symptoms that might be seen as signs of potential abuse, such as brain bleeds, broken bones or suspicious bruising. This gives the CAP authority to direct testing, diagnosis and care direction – including ordering forensic tests that have no medical benefit to the child. The Helfer policy goal is to also implement policies and practices that give the attending CAPs

4

authority to monitor and edit reports, opinions and documentation from consulting clinicians in order to cleanse the reports of medical evidence that conflicts with the CAP's child abuse opinion or determination.

The Helfer playbook also has the goal of training clinicians to avoid documenting, whenever possible, medical or accident histories that might dilute or conflict with the CAP's abuse determination, and which might be used to defend against the child abuse allegation. This would include such things as falls the child suffered at home; genetic bleeding and clotting disorders; and head growth abnormalities, such as macrocephaly.

Many Helfer playbook policies, practices, and customs contradict fundamental scientific and medical principles.  Child abuse pediatrics is at best a hybrid of forensic and clinical medicine and at worst forensic medicine with very few clinical aspects.  The basic job of the CAP is not to medically treat an abused child so much as it is to forensically determine whether the child was abused so that the abuser can be found, punished and deterred from future abuse. Assigning a forensic non-clinician to lead a medical team treating an infant with serious health issues prioritizes the SBS enterprise and diagnosis over the child's wellbeing.

Perhaps even more nettlesome is the policy forbidding consulting clinicians from expressing their true opinions and conclusions in the medical record. This restriction conflicts with established principles of medical practice and does not align with the team-based approach to clinical care promoted at contemporary hospitals and medical schools.  Allowing the CAP to veto and edit consulting clinicians' opinions and documentation is well beyond the pale of accepted medical practice. Yet that is the policy that has emerged to combat the increasing scrutiny over the SBS diagnosis.

The Helfer Society also established alternative paths to get SBS-based opinions over Rule

702 hurdles. This was accomplished through a combination of solidifying CAP community opinions that the SBS triad was diagnostic of SBS regardless of the existence of supporting studies and the use of so-called "confession studies" in which data from plea bargains is used to support the opinion that SBS is valid because many accused abusers admitted to causing the SBS triad from shaking alone.

The creators of the Helfer playbook have also developed policies, practices, customs that are frankly fraudulent, illegal and bordering on criminal. These policies, practices or customs include bullying clinicians who question a CAP's methods.

The institutional defendants in this case have embraced Harper and the Helfer playbook that she put into place even though those policies, practices or customs are facially unconstitutional. The Helfer playbook policies implemented at the defendant institutions and followed by the individually-named defendants resulted in constitutional deprivations and injuries to the legally-protected interests of Sylwia, William and their children. In following these unconstitutional policies, defendants conspired with one another to knowingly and falsely accuse Sylwia of murdering GC, resulting in the continued destruction of the Reynolds family. It has forced Sylwia to remain in Poland, away from her husband and children.

This set of facts pled in the amended complaint also pose a number of serious legal, constitutional, moral, and ethical problems that, to this point, have been generally left unaddressed here and throughout the country. Child abuse pediatric students at major universities, like the University of Minnesota, are being taught how to promote SBS as a valid medical diagnosis not because it is scientifically valid, but because the system under its current structure needs CAPs to sustain SBS convictions so their other legitimate child abuse ventures remain funded.

While the standard justification for this tradeoff is that society needs to protect children

from child abuse, the government-sanctioned use of fraudulent, unconstitutional and non-scientific methods to accomplish that goal does nothing more than create abuse where none exist existed. Protecting an entire system of criminal prosecution based on false premises because it satisfies some other greater good is not only wasteful, but also unlawful and unconstitutional.

Plaintiff urges the Court to use its powers to put a stop to this illegal enterprise and permit a jury to determine whether Plaintiff and his family are entitled to compensation for the many continued abuses they have suffered at the hands of these Defendants.

## II.    FACTUAL BACKGROUND

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the Factual Background set forth in his Response to Defendants Harper and UMP's Motion to Dismiss, contemporaneously filed.

## III.    LEGAL ARGUMENT

### A.  The Eleventh Amendment does Not Bar the Claim For Injunctive Relief Against Harper in Her Official Capacity

It is well established that the Eleventh Amendment does not bar actions for injunctive relief against state officials acting in their official capacities. *Ex Parte Young*, 209 U.S. 123, 155-56 (1908); *Fond du Lac Band of Chippewa Indians v. Car*lson, 68 F.3d 253, 255 (8th Cir.1995). This is because "state officials are "persons" under § 1983 when sued for injunctive relief because such actions "are not treated as actions against the State."" *Treleven v. University of Minnesota*, 73 F.3d 816, 819 (8th Cir. 1996).

Plaintiff sued Harper both individually in the various official roles she holds with several of the defendants. Particular to this Defendant, Harper is sued in her official role as the Child Abuse Pediatrics Fellowship Program Director at the University of Minnesota. ¶24. Plaintiff also

alleges that this role results in liability under *Ex Parte Young*.¶25. To the extent this is unclear, Plaintiff requests leave to file an amended complaint setting forth an official capacity claim against Harper in her official role as the Child Abuse Pediatrics Fellowship Program Director at the University of Minnesota.

Plaintiff has specifically requested injunctive relief as afforded under the civil rights claim to prevent systemic civil rights violations in the future. ¶612.  To the extent this is not clear because Plaintiff refers to § 1983 instead of § 1985 in the amended complaint, Plaintiff seeks leave to correct that issue in an amended complaint.

Courts have regularly interpreted *Ex Parte Young* as providing a legal avenue for injunctive relief against state actors in their official capacities. *See, e.g., Randolph v. Rodgers*, 253 F.3d 342, 345 (8th Cir. 2001) Plaintiff has therefore pled a proper claim against Harper in her official role that does not violate the Eleventh Amendment bar.

### B.  Plaintiff has Standing

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the Standing argument set forth in his Response to the HHS Defendants' Motion to Dismiss, contemporaneously filed.

### C.  Statute of Limitations

For the sake of brevity and to avoid redundancy, Plaintiff adopts and incorporates the Statute of Limitations argument set forth in his Response to the HHS Defendants' Motion to Dismiss, contemporaneously filed.

WHEREFORE, for the reasons set forth herein, Plaintiff prays that this honorable Court DENY the Hennepin County Defendants' Motion to Dismiss.

Submitted this 22nd day of September, 2025.

LAW OFFICES OF J.M. REINAN

/s/ Jerome M. Reinan

_____

Jerome M. Reinan, #24322X
1437 High St.
Denver, CO 80218
jreinan@reinanlaw.com
(303)894.0383

## CERTIFICATION OF COMPLIANCE

Undersigned hereby affirms, pursuant to LR 7.1(f) that the foregoing proportional font type memorandum of law contains 2248 words as counted by Microsoft Word for Mac, Ver. 16.01.

/s/ Jerome M. Reinan

## CERTIFICATION OF SERVICE

Undersigned hereby affirms that the foregoing was served on all counsel of record this 22nd day of September, 2025 by and through the ECF electronic filing system approved by the Court.

/s/ Jerome M. Reinan
Jerome M. Reinan

9