# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| WILLIAM REYNOLDS, *individually; as Spouse of Sylwia Pawlak Reynolds; and as parent of their minor children, A.M.R., W.R., and A.R.*, | Case No. 25-cv-754 (LMP/SGE) |
| Plaintiff, | |
| v. | **ORDER ON DEFENDANTS' MOTIONS TO DISMISS** |
| NANCY SANDERS HARPER, MD; HENNEPIN COUNTY; THE BOARD OF REGENTS OF THE UNIVERSITY OF MINNESOTA; HENNEPIN HEALTHCARE SYSTEM, INC., *d/b/a Hennepin County Medical Center*; THE UNIVERSITY OF MINNESOTA PHYSICIANS, *d/b/a U of M Physicians*; BRITTA NICHOLSON; SARAH ELIZABETH LUCKEN, MD; SETH CHENG SILBERT, MD; and MOHAMED TAHSIN A. JOUHARI, MD, | |
| Defendants. | |

Jerome Reinan and Jordana Gingrass, **Law Offices of J.M. Reinan, P.C., Denver, CO**, for Plaintiff.

Mark R. Whitmore and Nicolas Louis Hanson, **Bassford Remele, Minneapolis, MN**, for Defendants Nancy Sanders Harper and University of Minnesota Physicians.

Chase Webber and Marissa K. Linden, **Hennepin County Attorney's Office, Minneapolis, MN**, for Defendants Hennepin Healthcare System, Inc., Sarah Elizabeth Lucken, Seth Cheng Silbert, and Mohamed Tahsin A. Jouhari.

Kelly K. Pierce, **Hennepin County Attorney's Office, Minneapolis, MN**, for Defendant Britta Nicholson.

Timothy Joseph Pramas, **Office of the General Counsel, University of Minnesota, Minneapolis, MN**, for Defendant Board of Regents of the University of Minnesota.

Plaintiff William Reynolds[1] brought this lawsuit against a variety of doctors, medical systems, governmental entities, and a child protection attorney, alleging that they engaged in a conspiracy to falsely report incidents of child abuse and secure false child abuse prosecutions and convictions to earn political influence and secure governmental funding. William alleges that his family fell victim to this conspiracy, as these individuals and institutions were involved in reporting William's wife, Sylwia, for alleged child abuse when a child in Sylwia's care tragically died in July 2017. William alleges that the report of child abuse against Sylwia was false but nevertheless led Hennepin County to seek termination of Sylwia's parental rights and to prosecute Sylwia for the child's death. Although the proceedings to terminate Sylwia's parental rights were later dismissed, the criminal charges remain pending against Sylwia, who remains in Poland to avoid criminal prosecution.

William brought this suit on his own behalf, on behalf of Sylwia, and on behalf of his and Sylwia's three minor children, alleging that the purported conspiracy among these individuals and institutions has injured each of them. Defendants move to dismiss William's 113-page amended complaint on various grounds.[2] *See* ECF Nos. 52, 56, 60,

---

[1]    Because this Order references several members of the Reynolds family, the Court will use the first names of members of the Reynolds family. No disrespect is intended in doing so.

[2]    In the operative amended complaint, William also named the Otto Bremer Trust, the University of Minnesota Foundation, and Fairview Health Services as Defendants. *See*

64. The Court concludes that most of William's claims must be dismissed, but that a Section 1983 claim for damages against Defendant Nancy Sanders Harper may proceed on behalf of William's children, A.M.R. and W.R.

## BACKGROUND

### I.    Background of Alleged Conspiracy

William's amended complaint begins by recounting the historical development of the condition known as "shaken baby syndrome" or "abusive head trauma" (referred to in this Order collectively as "SBS/AHT"). ECF No. 7 ¶¶ 44–105. William alleges that although SBS/AHT has been "widely discredited by medical science," child abuse pediatricians, prosecutors, and social workers have constructed "a financial, political and medical machine built on identifying and prosecuting SBS/AHT." *Id.* ¶¶ 7, 70–75. William alleges that identifying SBS/AHT creates "an easy route for securing child abuse convictions," is politically popular, and rewards medical and legal professionals with "significant public funding" to research, investigate, and prosecute incidents of SBS/AHT. *Id.* ¶¶ 64–75.

William alleges that Dr. Harper is a leader of this financial, political, and medical machine. Dr. Harper is the Child Abuse Pediatrics Fellowship Program Director and a Professor of Pediatric Emergency Medicine at the University of Minnesota. *Id.* ¶ 24. She is also the Medical Director of the Otto Bremer Trust Center for Safe & Healthy Children at the University of Minnesota and is employed by the University of Minnesota Physicians

---

ECF No. 7. William later voluntarily dismissed all claims against those Defendants. *See* ECF Nos. 44, 74, 81.

("UMP"). *Id.* ¶¶ 27, 30. William alleges that Dr. Harper believes in the validity of SBS/AHT as a medical diagnosis and has attempted to "counteract" new medical evidence that casts doubt on the validity of SBS/AHT. *Id.* ¶ 106. According to William, Dr. Harper developed a series of policies, protocols, and customs with other child abuse pediatricians that incentivizes medical professionals to find evidence of child abuse and to ignore and fail to document other explanations for a child's injuries. *Id.* ¶¶ 106–20.

William alleges that these protocols were implemented by Dr. Harper in Hennepin County. *Id.* ¶¶ 127–34. Specifically, William alleges that Dr. Harper has implemented policies at Hennepin County hospitals that require child abuse pediatricians, not hospitalists, to examine a potential child abuse victim; forbid hospitalists from making entries in a child's medical records that conflict with a child abuse-related diagnosis; forbid hospitalists from communicating with families of potential child abuse victims, as well as police or child protection workers; and require physicians to allow Dr. Harper to edit their reports of suspected child abuse. *See id.* ¶¶ 147, 414–15.

To support his assertion that these policies have led to an increase in false accusations of child abuse, William alleges that after Dr. Harper arrived in Hennepin County in 2014, the number of reported child abuse cases in Hennepin County increased 228% over the previous eight-year average, which disproportionately exceeded the rates of reported child abuse in the other eight counties in the Twin Cities metropolitan area. *Id.* ¶¶ 133–36. William also details several cases of falsely reported child abuse from 2022 and 2023 that he alleges resulted from the policies and practices implemented by Dr. Harper. *Id.* ¶¶ 159–96, 198–205, 219–27. William also alleges that at least one of Dr.

Harper's former colleagues at UMP and the University of Minnesota—Dr. Bazak Sharon, a "well-respected and well-qualified pediatrician"—raised concerns in 2022 and 2023 about Dr. Harper's child-abuse diagnostic practices, including her alleged practice of ignoring, omitting, and concealing "important medical opinions and findings" inconsistent with findings of child abuse. *See id.* ¶¶ 156–205. William alleges that Dr. Sharon was eventually terminated by UMP and the University of Minnesota for criticizing and failing to follow Dr. Harper's practices in diagnosing cases of child abuse. *See id.* ¶¶ 203–04.

## II.    Reynolds Family Experience

William alleges that his family became entangled in these policies and practices in 2017. William's wife, Sylwia, ran a daycare out of the Reynolds family home. *Id.* ¶¶ 349–52. One of the children Sylwia looked after was G.C., an 11-month-old child. *Id.* ¶ 358.

G.C. allegedly fell and hit his head at his home on two occasions: once on July 6, 2017, and again on July 10, 2017. *Id.* ¶¶ 356–57. When G.C.'s father dropped off G.C. at daycare on July 10, 2017, G.C.'s father told Sylwia that G.C. had fallen and hit his head. *Id.* ¶ 360. G.C. allegedly was "fussy and inconsolable" during his stays at daycare on July 10 and 11, and refused to eat, drink, or nap. *Id.* ¶ 362. Then, on July 12, 2017, G.C. collapsed while at daycare. *Id.* ¶ 365. Sylwia called 911, and emergency responders took G.C. to a hospital owned by Hennepin Healthcare System, Inc. ("Hennepin Healthcare"). *Id.* ¶¶ 367–68, 373. Despite treatment by Hennepin Healthcare physicians, G.C. died on July 13, 2017. *Id.* ¶ 444.

Although William's specific allegations are lengthy, at base, William alleges that Dr. Harper and other physicians who treated G.C.—including Defendants Sarah Elizabeth

Lucken, Seth Cheng Silbert, and Mohamed Tahsin A. Jouhari—wrongfully concluded that G.C.'s death was the result of child abuse by Sylwia.  William alleges that in addition to Dr. Harper, Dr. Lucken, Dr. Silbert, and Dr. Jouhari all came to this conclusion by applying the policies and protocols developed by Dr. Harper, which incentivized them to find evidence of child abuse and ignore other explanations for G.C.'s death.  *See, e.g., id.* ¶¶ 370–95, 414–15, 426–31, 436–44, 446–55, 458–65, 468–76, 490.  William alleges that, in accordance with the protocols developed by Dr. Harper, she, Dr. Lucken, Dr. Silbert, and Dr. Jouhari ignored other explanations for G.C.'s death (for example, his diagnosed macrocephaly, genetic clotting disorder, and falls on July 6 and 10, 2017), failed to document those other explanations, and altered documentation in G.C.'s medical records to align with their conclusion that G.C. suffered SBS/AHT.  *See, e.g., id.* ¶¶ 393–95, 414–15, 426–31, 436–44, 446–55, 458–65, 468–76, 490.  Dr. Harper and Dr. Lucken eventually reported their findings of suspected child abuse to child protection officials at Hennepin County.  *Id.* ¶¶ 400–04, 458–60.

As a result of the child abuse allegations against Sylwia, on July 24, 2017, the Hennepin County Attorney's Office ("HCAO") filed a petition to terminate Sylwia's parental rights to her minor children, A.M.R. and W.R. (the "TPR proceedings").  *Id.* ¶¶ 482, 484.  The TPR petition included the conclusions of Dr. Harper, Dr. Lucken, and Dr. Silbert.  *Id.* ¶ 484.  After the TPR proceedings were initiated, A.M.R. and W.R. were removed from the Reynolds family home on July 24, 2017.  *Id.* ¶ 478.  A.M.R. and W.R. were taken into protective custody by Hennepin County officials, stripped down to their underwear, and physically examined for evidence of child abuse.  *Id.* ¶ 480.  A.M.R. and

W.R. were then placed in a foster home. *Id.* ¶ 481. A state court judge later issued an Order of Protective Supervision, which required Sylwia to move out of the Reynolds home. *Id.* ¶ 490. Eventually, A.M.R. and W.R. were returned to William's custody, although the date on which they were returned is unclear. *See, e.g.*, *id.* ¶¶ 530, 585.

Britta Nicholson was the Assistant Hennepin County Attorney assigned to prosecute the TPR proceedings against Sylwia. *Id.* ¶ 483. William alleges that by prosecuting the TPR proceedings despite the false accusations of child abuse against Sylwia, Nicholson was also part of a conspiracy to wrongfully accuse Sylwia of child abuse. *See id.* ¶ 486. William specifically challenges several actions taken by Nicholson. First, he alleges that Nicholson contacted Catherine Stratton—the guardian ad litem assigned by the family court to represent the interests of A.M.R. and W.R.—and pressured her not to independently investigate the facts underlying the TPR proceedings. *Id.* ¶¶ 508–13. Second, William alleges that Nicholson edited the reports of a social worker assigned to interview A.M.R. and W.R. and redacted evidence and information that was favorable to Sylwia before the reports were submitted to family court. *Id.* ¶¶ 514–17. Third, William alleges that Nicholson requested a "non-certified" copy of G.C.'s death certificate because the certified copy contained a death determination that was not favorable to the TPR proceedings. *Id.* ¶ 497. William alleges that Nicholson took these actions to perpetuate and conceal Dr. Harper's practices that encouraged findings of child abuse. *Id.* ¶¶ 486–89.

On February 2, 2018, the HCAO brought second-degree murder charges against Sylwia in connection with G.C.'s death. *Id.* ¶ 500. At that time, Sylwia was visiting her father in Poland and was nearly three months pregnant with her and William's third child,

A.R.  *Id.* ¶ 502.  Because Sylwia felt that the case against her was "fabricated," Sylwia chose not to return to the United States and has remained in Poland with A.R. since February 2018.  *Id.* ¶¶ 12, 584.

In mid- to late 2019, the HCAO sought to extradite Sylwia from Poland to face trial on the murder charges.  *Id.* ¶¶ 523–24, 540.  The extradition request cited the conclusions of Dr. Harper and Dr. Lucken that G.C.'s death resulted from child abuse.  *Id.* ¶ 541.  Polish authorities eventually denied the HCAO's extradition request, asserting that G.C.'s evaluating physicians and the HCAO demonstrated an "improper response to exculpatory medical evidence."  *Id.* ¶¶ 553, 555–62.  According to the amended complaint, Polish authorities concluded that Sylwia would not receive a fair trial in the United States.  *Id.* ¶ 561.  The HCAO thereafter issued a letter agreeing to dismiss the criminal charges against Sylwia without prejudice, *id.* ¶ 563, but retracted the letter after Dr. Harper allegedly intervened and pressured the HCAO to maintain the criminal charges against Sylwia, *id.* ¶ 565–66.  Accordingly, Sylwia's criminal charges remain pending, although it does not appear that any progress is occurring with respect to those charges.  *Id.*; *see Minnesota v. Pawlak-Reynolds*, No. 27-CR-18-3122 (Minn. Dist. Ct.) (showing no action on Sylwia's criminal case since October 2024).

As for the TPR proceedings, William alleges that in September 2019, Sylwia's attorneys received a copy of an "ambulance trip report" written by a paramedic who responded to Sylwia's daycare when G.C. collapsed.  *Id.* ¶ 371–75, 527.  The ambulance trip report, which was shared with G.C.'s treating physicians, stated that G.C.'s mother reported that G.C. had fallen and struck the back of his head days before collapsing in

Sylwia's care. *Id.* ¶¶ 371–75. William alleges that prior to receiving a legible copy of the ambulance trip report, he and his family "were unaware of GC's complete fall history as well as the fact that Defendants knew about GC's complete fall history." *Id.* ¶ 529. William alleges that the TPR proceedings were later dismissed against Sylwia because the ambulance trip report "conclusively proved that GC had sustained an accidental [head injury] two days before his collapse." *Id.* ¶ 530.

William continues to raise A.M.R. and W.R. in Minneapolis, while Sylwia raises A.R. in Poland. *Id.* ¶¶ 581–86. William alleges that his family is unconstitutionally separated and that he has accrued "staggering legal fees" due to Defendants' conduct. *Id.* ¶¶ 520, 581, 585. To remedy what he sees as the "unconstitutional, unlawful, fraudulent and secret policies, procedures, customs and practices of persons involved in the Hennepin County child protection system," *id.* ¶ 1, William brought suit on February 27, 2025, ECF No. 1, and he later filed an amended complaint on March 31, 2025, ECF No. 7. William brings eight substantive claims on his own behalf, on Sylwia's behalf, and on behalf of their three minor children:

(1)    Section 1983 claims against Dr. Harper and Nicholson;

(2)    *Monell* claims against Hennepin County, Hennepin Healthcare, the Board of Regents of the University of Minnesota ("Board of Regents"), and UMP;

(3)    A claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Dr. Harper;

(4)    RICO conspiracy claims against Hennepin County, Hennepin Healthcare, the Board of Regents, UMP, Nicholson, Dr. Lucken, Dr. Silbert, and Dr. Jouhari;

(5)    Common-law abuse of process claims against Dr. Harper and Dr. Lucken;

9

(6)     Claims for false reporting of child abuse under Minn. Stat. § 260E.08 against Dr. Harper, Dr. Lucken, Dr. Silbert, and Dr. Jouhari;

(7)     Common-law intentional infliction of emotional distress ("IIED") claims against Dr. Harper, Dr. Lucken, UMP, and Nicholson; and

(8)     Civil conspiracy claims against all Defendants.

*See id.* ¶¶ 587–658.  William seeks monetary damages, a declaration that the "policies, procedures and protocols" of Defendants are "unlawful and unconstitutional," and an injunction "prohibiting the implementation of the wrongful policies, procedures, customs and practices" and "unwinding the current child abuse protection and prosecution structure currently in place in Hennepin County."  *Id.* ¶¶ 661–63.

All Defendants move to dismiss.  ECF Nos. 52, 56, 60, 64.

## ANALYSIS

In reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court must accept as true all the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).  The complaint must "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I.     Challenges to Justiciability

Defendants raise various challenges to the justiciability of William's claims, including whether certain Defendants are immune from suit and whether the Court has or

10

should exercise subject-matter jurisdiction over the claims. The Court will consider these arguments first because "[s]ubject matter jurisdiction is a threshold matter that [courts] are obligated to address at the outset" of a case. *Sianis v. Jensen*, 294 F.3d 994, 997 (8th Cir. 2002).

### a.    Sovereign Immunity (Board of Regents)

The Board of Regents argues that all the claims against it—specifically, the *Monell*, RICO conspiracy, and civil conspiracy claims—are barred by sovereign immunity. ECF No. 54 at 4–5.

The Eleventh Amendment bars private parties, such as William, from suing a state in federal court. U.S. Const. amend. XI. That's true regardless of whether the plaintiff seeks monetary damages or equitable relief. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996). Sovereign immunity also extends to instrumentalities of a state, like the Board of Regents. *E.g.*, *Treleven v. Univ. of Minn.*, 73 F.3d 816, 818 (8th Cir. 1996); *Cardoso v. Bd. of Regents of Univ. of Minn.*, 205 F. Supp. 3d 1046, 1049 (D. Minn. 2016). The Eleventh Amendment therefore bars William's claims against the Board of Regents unless he demonstrates that one of two exceptions apply: (1) that Congress "authorize[d] such a suit"; or (2) that the Board of Regents has "waive[d] its sovereign immunity by consenting to suit." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999).

William's sole response is that sovereign immunity does not bar his claim for injunctive relief against Dr. Harper. ECF No. 80 at 7–8. That argument is puzzling: Dr. Harper is *not* the Board of Regents. Because William has failed to respond to the Board of

11

Regents's sovereign-immunity argument, he has forfeited his claims against the Board of Regents. *See Dorosh v. Minn. Dep't of Hum. Servs.*, No. 23-cv-1144 (ECT/LIB), 2023 WL 6279374, at *9 (D. Minn. Sept. 26, 2023) ("A plaintiff waives its claims by failing to respond to a defendant's arguments on a motion to dismiss.").

The result would be no different on the merits because neither of the exceptions to sovereign immunity apply. Congress has not authorized private persons to bring *Monell* or civil RICO claims against a state. *See Harris v. Mo. Ct. of Appeals, W. Dist.*, 787 F.2d 427, 429 (8th Cir. 1986) (*Monell*); *McMaster v. Minnesota*, 819 F. Supp. 1429, 1434 (D. Minn. 1993) (RICO), *aff'd*, 30 F.3d 976 (8th Cir. 1994). Nor is there any indication the Board of Regents waived its sovereign immunity for *Monell* and RICO claims. *See Capers v. Ramsey Cnty. Pub. Def.*, No. 13-cv-1041 (PJS/JJG), 2014 WL 1048517, at *4 (D. Minn. Mar. 18, 2014) (citation omitted) ("[I]t is widely recognized that Minnesota has not waived its Eleventh Amendment immunity from suit in federal court for federal constitutional claims." (internal quotation marks omitted)); *cf. McMaster*, 819 F. Supp. at 1434. Accordingly, the *Monell* and RICO conspiracy claims against the Board of Regents are barred by sovereign immunity. And because sovereign immunity "applies with equal force to pendent state law claims," *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968 (8th Cir. 2000), William's civil conspiracy claim against the Board of Regents is also barred by sovereign immunity. All claims against the Board of Regents are therefore dismissed.

### b. Article III Standing

The remaining Defendants argue that William lacks Article III standing to bring claims on behalf of himself, Sylwia, and his minor children. ECF No. 57 at 7–10; ECF

No. 61 at 16–22; ECF No. 65 at 13–16. Federal court jurisdiction "is restricted to cases and controversies." *Missouri v. Yellen*, 39 F.4th 1063, 1067 (8th Cir. 2022) (citation omitted) (internal quotation marks omitted). Standing to sue "is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To meet the "irreducible constitutional minimum" required to establish standing, a plaintiff has the burden to show three elements: "(1) the plaintiff suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (quoting *Spokeo*, 578 U.S. at 338). The standing inquiry is not "an assessment of the merits of a plaintiff's claim," and, in assessing standing, the Court assumes that "on the merits the plaintiffs would be successful." *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016). But if the plaintiff lacks standing, "a federal court has no subject-matter jurisdiction over the claim." *Schumacher v. SC Data Ctr., Inc.*, 912 F.3d 1104, 1105 (8th Cir. 2019) (citation omitted).

### i.     William's Claims

Defendants argue that William fails to allege concrete injuries to himself that are traceable to their conduct. To satisfy Article III standing, William must show that he suffered an injury in fact that is "concrete, particularized, and actual or imminent." *Arc of Iowa*, 94 F.4th at 710. The injury-in-fact requirement ensures that a plaintiff has a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

13

Defendants contend that the only injury William asserts is his seven-year separation from Sylwia after she decided to remain in Poland.  ECF No. 61 at 20; ECF No. 65 at 14.  But the Court discerns three distinct injuries asserted by William: (1) his separation from A.M.R. and W.R. when they were removed from the Reynolds family home and placed in foster care in July 2017; (2) his separation from Sylwia after she stayed in Poland; and (3) "staggering legal fees."  *See, e.g.*, ECF No. 7 ¶¶ 481, 518–20, 580–86.  Injuries to each of these interests are legally cognizable.  *See Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 897 (8th Cir. 2020) ("Parents have a recognized liberty interest in the care, custody, and management of their children.  Children and parents also share a liberty interest in their mutual care and companionship." (internal citation omitted)); *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) ("The right to marry, establish a home and bring up children is a central part of the liberty protected by the Due Process Clause." (citation modified)); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (explaining that monetary harms "readily qualify as concrete injuries under Article III").  These injuries are also "concrete" because they "actually exist," *Spokeo*, 578 U.S. at 340, and are "particularized" because they affect William "in a personal and individual way," *id.* at 339 (citation omitted).

The next question is whether these three injuries are traceable to Defendants' conduct.  "An injury is fairly traceable if the plaintiff shows a causal connection between the injury and the conduct complained of that is not the result of the independent action of some third party not before the court." *Muff v. Wells Fargo Bank NA*, 71 F.4th 1094, 1100 (8th Cir. 2023) (citation modified).  Stated differently, traceability "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the

14

identified harm," a connection that "cannot be overly attenuated." *Agred Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021) (citation omitted).

At the core of each of William's claims is the allegation that Defendants investigated and reported Sylwia for abusing G.C., attempted to terminate Sylwia's rights to her own children, and prosecuted Sylwia for G.C.'s death, despite knowing that Sylwia did not abuse G.C. or cause his death. *See, e.g.*, ECF No. 7 ¶¶ 393–95, 414–15, 426–31, 436–44, 446–55, 458–65, 468–76, 482–90, 500–17. Assuming those claims are meritorious (as the Court must in evaluating standing, *see Am. Farm Bureau Fed'n*, 836 F.3d at 968), it is plausible (if not likely) that the reports of child abuse by Dr. Harper and Dr. Lucken caused Nicholson and Hennepin County to initiate TPR proceedings against Sylwia, which in turn caused A.M.R.'s and W.R.'s removal from the Reynolds family home and placement in foster care. *See, e.g.*, *id.* ¶¶ 400–04, 458–60, 476–79. And it is also plausible that initiation of the TPR and criminal proceedings against Sylwia by Nicholson and Hennepin County caused William to incur "staggering legal fees" to defend his wife. *See, e.g.*, *id.* ¶ 520. There is accordingly a "sufficiently direct causal connection" between the "challenged action" (here, falsely accusing Sylwia of G.C.'s death) and William's "identified harms" (specifically, his legal fees and temporary separation from A.M.R. and W.R). *Agred Found.*, 3 F.4th at 1073. William therefore has standing to bring claims against Defendants based on these theories of injury.

William, however, does not have standing to bring claims against Defendants based on his separation from Sylwia after she made the choice to stay in Poland. Defendants' investigation and prosecution of Sylwia did not cause her to remain in Poland after she was

charged; rather, Sylwia made that decision "independently of any action or inaction" by Defendants. *Id.* Defendants have not inflicted Sylwia's exile in Poland on William, and indeed, through Hennepin County's attempt to extradite Sylwia, *see* ECF No. 7 ¶ 524, it appears that Defendants would prefer that Sylwia return to the United States. And although William protests that Sylwia was "forced to flee" the United States because of Defendants' conduct, *id.* ¶ 597, William points to no "determinative or coercive effect" applied by Defendants that directly caused Sylwia to remain in Poland, *see Bennett v. Spear*, 520 U.S. 154, 169 (1997). In fact, William's briefing highlights that Sylwia's decision to remain in Poland was based on her own independent assessment of the fairness and merits of the criminal charges against her. *See* ECF No. 78 at 9 (explaining that Sylwia refuses to return to the United States to face proceedings "riddled with due process violations, evidence fabrication, evidence concealment and various conspiracies").

Simply put, William cannot manufacture standing against Defendants by pointing to Sylwia's self-imposed exile, a decision in which Defendants played no part. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415–18 (2013); *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976). Because any injury from William's separation from Sylwia is "the result of the independent action of [a] third party not before the court" (namely, Sylwia's own independent decision to remain in Poland), William lacks standing to press claims based on that injury. *Muff*, 71 F.4th at 1100.

### ii.    Sylwia's Claims

Defendants next assert that William does not have standing to assert claims on behalf of Sylwia. ECF No. 61 at 17–19; ECF No. 65 at 16. Generally, a plaintiff may not

16

assert the legal rights and injuries of others.  *See Warth v. Seldin*, 422 U.S. 490, 499 (1975).

However, a plaintiff who satisfies Article III standing may also assert claims on behalf of

a third party if (1) the plaintiff has a "close" relationship with the third party; and (2) there

is a hindrance to the third party's ability to bring suit.  *See Kowalski v. Tesmer*, 543 U.S.

125, 130–31 (2004).

Assuming that William has a close relationship with Sylwia, the Court disagrees

with William that there is a hindrance to Sylwia's ability to assert her own rights.  William

claims that Sylwia faces "insurmountable impediments in joining this case as a party."  ECF

No. 78 at 14.  That is because she remains in Poland, and if she is named as a plaintiff,

Defendants would likely force her to return to the United States for a deposition or trial,

which would subject Sylwia to arrest.  *Id.*  That argument is flawed for several reasons.

First, regardless of whether Sylwia is a named plaintiff, it is plausible (if not

probable) that Defendants will seek to depose Sylwia and call her as a trial witness.

William's argument that Sylwia's status as a formal plaintiff would put her at higher risk

for being called back to the United States rests on speculation, which is insufficient to

confer third-party standing.  *See League of Women Voters of Minn. Educ. Fund v. Simon*,

No. 20-cv-1205 (ECT/TNL), 2021 WL 1175234, at *11 (D. Minn. Mar. 29, 2021) (citing

*Powers v. Ohio*, 499 U.S. 400, 414 (1991)) (holding that "general allegation" of hindrance

did not suffice to confer third-party standing); *see also Pharm. Buying Ass'n, Inc. v.*

*Sebelius*, 906 F. Supp. 2d 604, 616 (W.D. Tex. 2012) (citing *Miller v. Albright*, 523 U.S.

420, 448 (1998)) ("Something more than a hypothetical hindrance is required.").

Second, it is not even clear that Sylwia would be required to return to the United States during this litigation if she were a named plaintiff.  It is hardly unusual for a plaintiff in a foreign country to file suit in an American court and conduct the litigation from abroad.  Indeed, videoconferencing technology has shrunk the practical world in which depositions and discovery occur and can mitigate burdens in cross-border litigation.  *See SEC v. Aly*, 320 F.R.D. 116, 119 (S.D.N.Y. 2017) (explaining that holding depositions by videoconference is "frequently a preferred solution to mitigate the burden of a deposition location inconvenient to one or both sides").  Trial testimony, too, may be conducted virtually "[f]or good cause in compelling circumstances and with appropriate safeguards." Fed. R. Civ. P. 43(a).  Although Defendants may eventually seek Sylwia's in-person attendance at a deposition or trial, the opportunities open to Sylwia to remain in Poland during the pendency of this case only further highlight the speculative and hypothetical nature of William's claimed hindrance.

Third, on a more fundamental level, the hindrance that William asserts is entirely self-imposed.  As discussed above, nothing that Defendants have done has forced Sylwia to remain in Poland; rather, Sylwia's decision to remain in Poland is the result of her own voluntary, independent choice to avoid a prosecution that she deems unfair.  Any hindrance Sylwia may have in bringing her own civil action is of her own making, which does not make it a "genuine obstacle" to asserting her rights.  *Singleton v. Wulff*, 428 U.S. 106, 116 (1976); *see also Miller*, 523 U.S. at 448 (O'Connor, J., concurring) (explaining that third-party standing does not exist when the hindrance claimed is "ultimately self imposed").

William cites two cases in which third parties brought constitutional claims against governmental officials on behalf of immigrants who credibly feared that, if they personally brought suit, the government would retaliate against them. *See Mayor of Balt. v. Trump*, 416 F. Supp. 3d 452, 490 (D. Md. 2019) (explaining that immigrants had "credible fear that suing the federal government would torpedo the visa application of a family member whom they are sponsoring or seek to sponsor"); *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016) (explaining that Syrian refugees would be "reticent to bring this litigation against the Governor" given the Governor's decision to suspend Syrian refugee resettlement and "the attention Syrian refugees generally are receiving from government officials and the media"). But in neither case was the barrier to suit—potential governmental retaliation—attributable to any independent action by the immigrants who sought to assert their rights. Here, Sylwia's alleged barrier to suit—a purported inability to return to the United States—is entirely the result of her own independent decision to flee the United States. In no sense is that a "genuine obstacle" to bringing suit, *Singleton*, 428 U.S. at 116, so William lacks third-party standing to assert claims on behalf of Sylwia.

### iii. Minor Children's Claims

Defendants do not dispute, as a theoretical matter, that William has third-party standing to bring claims on behalf of his children. *See, e.g.*, ECF No. 61 at 19 ("[G]enerally, Reynolds may sue on behalf of his children based on the children's rights and injuries."). However, they argue that the children have not suffered any injury traceable to Defendants' conduct. *See id.* at 19–20; ECF No. 65 at 14–15. That argument largely mirrors the argument Defendants made regarding William's standing, so the

19

outcome is largely the same: A.M.R. and W.R. have standing to sue for injuries allegedly derived from their removal from the Reynolds family home and placement in foster care in July 2017.[3] *See* ECF No. 7 ¶ 481. However, the children do not have standing to assert claims based on injuries derived from Sylwia's voluntary decision to flee the United States for the same reasons William lacks standing to assert those claims. So, because A.R. was not born until after Sylwia decided to leave the United States, *id.* ¶¶ 519–21, William lacks standing to bring claims on behalf of A.R. against Defendants.

### iv.  Injunctive and Declaratory Relief

Defendants finally argue that William lacks standing to seek injunctive and declaratory relief. ECF No. 57 at 7–10; ECF No. 61 at 22. "An injunction is inherently prospective and cannot redress past injuries." *Frost v. Sioux City*, 920 F.3d 1158, 1161 (8th Cir. 2019). Declaratory relief, too, must be "prospective," for the purpose of a declaratory judgment is "to define the legal rights and obligations of the parties in anticipation of *some future conduct*, not simply to proclaim liability for a past act." *Just. Network Inc. v. Craighead County*, 931 F.3d 753, 764 (8th Cir. 2019) (citation omitted). Accordingly, when a plaintiff seeks declaratory and injunctive relief, "past injuries alone are insufficient to establish standing. Rather, [the plaintiff] must show he is suffering an ongoing injury or faces an immediate threat of injury." *Frost*, 920 F.3d at 1162 (citation omitted) (alteration in original); *see also Harmon v. City of Kansas City*, 197 F.3d 321, 327

---

[3]  It is not clear from the amended complaint whether the children paid any of the legal fees, and the Court finds it implausible that they did so. Accordingly, the Court does not construe the children's claims to raise a theory of injury based on the expenditure of legal fees.

(8th Cir. 1999) ("The mere fact that injurious activity took place in the past does nothing to convey standing to seek injunctive relief against future constitutional violations.").

William essentially seeks relief declaring that the "policies, procedures and protocols" of Defendants are "unlawful and unconstitutional," and an injunction "prohibiting the implementation of the wrongful policies, procedures, customs and practices" and "unwinding the current child abuse protection and prosecution structure currently in place in Hennepin County." ECF No. 7 ¶¶ 661–62. But William has standing to seek that injunctive and declaratory relief only if those alleged policies, procedures, and protocols cause him to "suffer[] an ongoing injury or face[] an immediate threat of injury." *Frost*, 920 F.3d at 1162 (citation omitted).

Recall the injuries for which William has standing to sue: (1) his separation from A.M.R. and W.R. in July 2017; (2) legal fees that he has paid; and (3) claims on behalf of A.M.R. and W.R. for their separation from their parents in July 2017. However, William does not allege that any of these injuries are ongoing or that there is an immediate threat that they will recur. The amended complaint indicates that A.M.R. and W.R. have been returned to William's custody, although the date on which they were returned is unclear. *See, e.g.*, ECF No. 7 ¶ 585 (alleging that William currently "raise[s]" A.M.R. and W.R.), *id.* ¶ 530 (alleging that the proceedings to terminate Sylwia's parental rights to A.M.R. and W.R. were dismissed). Nor does the amended complaint illuminate whether William continues to accrue legal fees. *See id.* ¶ 520 (alleging in 2018 that William had expended "staggering legal fees that caused the family to exhaust all of its savings"). Indeed, it is unclear what legal fees would be presently accruing, given that the TPR proceeding against

21

Sylwia was terminated years ago, *id.* ¶ 530, and the criminal proceedings against Sylwia are largely paused, given Sylwia's self-imposed exile in Poland, *id.* ¶¶ 562, 584. And to the extent that William claims injury from legal fees expended to maintain *this* lawsuit, that injury cannot support Article III standing.[4] *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) ("[An] interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim.").

William hardly disputes any of this. Instead, he alleges that because he has plausibly alleged a RICO claim, he has standing to seek injunctive relief for that claim. ECF No. 78 at 19. That's not how standing works, for standing "is distinct from the merits of a claim," *Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 950 (8th Cir. 2019), and it "is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive," *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). Because William has failed to demonstrate an "ongoing injury" to himself, A.M.R., and W.R. from that RICO claim that is traceable to Defendants' conduct, he lacks standing to seek injunctive and declaratory relief. *Frost*, 920 F.3d at 1162.

William also asserts that Hennepin County "is continuing to pursue a bad faith, tainted prosecution devoid of probable cause simply because Harper, who holds the purse strings for the HCAO's substantial child protection unit, has demanded it." ECF No. 78

---

[4]    At the end of the day, whether William has plausibly alleged an ongoing injury is largely a moot point because, as explained below, William's claims to recover for his injuries are barred by the applicable statutes of limitation.

22

at 19. William hits on one potential ongoing injury: the pending criminal charges hanging over Sylwia. But as an initial matter, the amended complaint never actually seeks injunctive or declaratory relief to remedy that injury. Rather, William seeks generally to enjoin and declare unlawful "Defendants' policies, procedures and protocols," the "intertwined organizational structure implemented by Hennepin County," and "Hennepin County's current child abuse protection and prosecution structure." ECF No. 7 ¶¶ 661–62. William does not explicitly request that the Court enjoin Sylwia's criminal prosecution or declare it unlawful. And William's counsel confirmed at oral argument that the complaint does not request injunctive and declaratory relief to terminate the criminal charges against Sylwia. The Court therefore concludes that William does not adequately allege a request for injunctive and declaratory relief to remedy the pending criminal charges against Sylwia.[5]

### c.   *Younger* Abstention

Defendants assert that the Court should abstain from exercising jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971). Federal courts have a "virtually unflagging obligation" to "exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). There are exceptions to this rule, however. *See Minn. Living Assistance, Inc. v. Peterson*, 899 F.3d 548, 551 (8th Cir. 2018). In *Younger* and its progeny, the Supreme Court has explained that federal courts should abstain from

---

[5]   In passing, William sought leave to amend his complaint to add an official-capacity *Ex parte Young* claim for injunctive relief against Dr. Harper and to plead more clearly a claim for injunctive relief under Section 1983. ECF No. 77 at 8; ECF No. 78 at 19. But because William lacks standing to seek injunctive relief, those requests are denied.

exercising jurisdiction when (1) there is an ongoing state proceeding; (2) which is judicial in nature, implicates important state interests, and provides an adequate opportunity to raise any relevant federal questions in the state proceeding; and (3) no exceptions to *Younger* abstention apply. *Wassef v. Tibben*, 68 F.4th 1083, 1087 (8th Cir. 2023).

Defendants assert that this lawsuit is parallel to Sylwia's ongoing state criminal proceedings, which means the Court must abstain from exercising jurisdiction. ECF No. 57 at 10; ECF No. 61 at 22; ECF No. 65 at 30–31. That may well be true if *Sylwia* were bringing claims in federal court on her own behalf. But as the Court has concluded, the only claims that remain are William's claims on his own behalf and on A.M.R.'s and W.R.'s behalf. That's a problem for Defendants' *Younger* argument, because "*Younger* does not typically apply where the federal-court plaintiff is not itself a party to the state-court proceedings." *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 41 (1st Cir. 2012); *see Herrera v. City of Palmdale*, 918 F.3d 1037, 1046 (9th Cir. 2019); *see also Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1251 (8th Cir. 2012) (discussing the "limitations on the application of *Younger* abstention to federal plaintiffs who were not state-court parties"). William and the Reynolds children are indisputably not parties to Sylwia's state criminal proceedings, so as a default rule, *Younger* abstention does not apply to their claims.

It is true that *Younger* abstention may still apply when the interests of the parties seeking relief in federal court are "sufficiently intertwined" with those of the party in the pending state proceedings. *Tony Alamo*, 664 F.3d at 1251; *see Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 881–82 (8th Cir. 2002). But no party makes that argument,

24

and it is not the Court's job "to research the law to support a[] [party's] argument." *Viking Supply v. Nat'l Cart Co.*, 310 F.3d 1092, 1099 (8th Cir. 2002) (citation omitted). Based on the arguments presented to the Court, *Younger* abstention is not appropriate.

## II.    Rule 8 Violation

Dr. Lucken, Dr. Silbert, Dr. Jouhari, and Hennepin Healthcare next argue that the amended complaint should be dismissed for the simple reason that it is too long. ECF No. 61 at 9–10. Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 was "not promulgated to provide helpful advice; it has the force of law, and it must be followed." *Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1152 (D. Minn. 2011); *see also Mangan v. Weinberger*, 848 F.2d 909, 911 (8th Cir. 1988) (affirming dismissal of pleading that was "unreasonably verbose, confusing, and conclusory"); *Michaelis v. Neb. State Bar Ass'n*, 717 F.2d 437, 438–39 (8th Cir. 1983) (affirming dismissal of complaint that was "needlessly long, repetitious and confused").

The invitation to dismiss the amended complaint on Rule 8 grounds is tempting. William's 113-page, 663-paragraph amended complaint blows past the length of other complaints that courts have dismissed on Rule 8 grounds. *See Gurman*, 842 F. Supp. 2d at 1151 (dismissing 60-page, 250-paragraph complaint, which was "neither concise nor clear" for failing to comply with Rule 8); *Quinlan v. Washington County*, No. 24-cv-2782 (PAM/ECW), 2024 WL 4287670, at *5 (D. Minn. Sept. 25, 2024) (dismissing 457-paragraph complaint for violating Rule 8). That strongly suggests that William's amended complaint violates the pleading requirements of Rule 8(a)(2).

William protests that "RICO, civil rights and conspiracy claims necessarily require more particularity, especially in complex cases involving multiple claims and parties," and that he "had no choice but to plead the lengthy and complex nature of the development of the SBS enterprise and the enterprise's existential response to the medical and legal community's recent attempts to pare back the enterprise." ECF No. 78 at 7–8. That's fair—to a point. But as William's own cited case law demonstrates, "[v]iable RICO claims—some asserting wrongful conduct spanning many years of alleged misconduct— are regularly brought in this District via pleadings that are at least half of the length of the Amended Complaint." *Campoli v. Anywhere Real Est. Inc.*, No. 24-cv-4481 (JMB/SGE), 2025 WL 2410428, at *3 (D. Minn. July 3, 2025) (describing RICO complaints spanning 8 pages, 36 pages, and 51 pages).

William's argument is also belied by the Court's review of the amended complaint. For one, the amended complaint is laden with unnecessary, granular detail. As just one example, the amended complaint spends 76 paragraphs discussing unrelated case law, scholarly articles, and case studies to make a point that the Court can summarize in one sentence: SBS/AHT is a discredited medical diagnosis that some medical professionals prop up to incentivize wrongful child abuse prosecutions. *See* ECF No. 7 ¶¶ 44–120. The complaint then spends 223 paragraphs describing the work of some of these physicians— none of which is relevant to the injuries that William and his family suffered. *Id.* ¶¶ 121– 344. In fact, not until paragraph 345 is the reader introduced to the Reynolds family. And the Court would be remiss if it did not note the "frequent editorializing" and "lengthy and repetitious commentary" that aggravate the length of the complaint. *Quinlan v. Puls*,

26

No. 24-cv-3990 (ADM/DLM), 2025 WL 1616471, at *5 (D. Minn. Apr. 7, 2025); *see, e.g.,* ECF No. 7 ¶ 71 ("Over the years, lobbying and publicity efforts by SBS/AHT proponents— including child abuse pediatricians, prosecutors and child welfare caseworkers—has resulted in significant public funding and what amounts to a financial, political and medical machine built on identifying and prosecuting SBS/AHT."); *id.* ¶ 105 ("Crumbling medical and legal support for the SBS/AHT hypothesis in recent years has threatened the lucrative and prestigious enterprise created and funded based on the SBS/AHT hypothesis."); *id.* ¶ 208 ("By wielding this unchecked medical and legal power, Harper is able to ensure that if she decides that someone abused a baby, that person will lose custody of the baby and any other children in his or her household."); *id.* ¶ 505 ("In other words, perhaps the most important piece of evidence in the chart was intentionally mislabeled and rendered unintelligible in order to thwart Sylwia's defense."); *id.* ¶ 538 ("HCAO knew that without Harper, its effectiveness would be greatly diminished, resulting in political fallout as well as the potential loss of office operating capital from federal and state funding sources."). That leaves the Court with the distinct impression that William is using his amended complaint as a brief or as a press release—neither of which is permitted. *Naca*, 2016 WL 5842771, at *1.

Nevertheless, all parties have expended significant resources briefing William's claims on the merits, and it would be inefficient for the Court to dismiss the amended complaint, have William file a second amended complaint, and then invariably have the parties bring a second round of Rule 12 motions that mirror the arguments they have already spent time making now. So, although the Court finds that the amended complaint

27

violates Rule 8, it will not dismiss the amended complaint as a remedy. Rather, the Court will order a different remedy. As discussed below, the Court is allowing a Section 1983 claim for damages to proceed against Dr. Harper brought by William on behalf of A.M.R. and W.R. for their alleged injury of being separated from their parents in July 2017 when they were removed from the Reynolds family home and placed in foster care. No later than 14 days after the issuance of this Order, William is ordered to file a second amended complaint that details the allegations relevant to the single Section 1983 claim that the Court is allowing to proceed. The second amended complaint must not exceed 25 pages, double spaced. If William fails to file a second amended complaint in compliance with these requirements, the Court will dismiss the amended complaint.

## III.   Challenges to Timeliness

Defendants next argue that William's and the children's claims are untimely under the statutes of limitations applicable to those claims. ECF No. 57 at 2; ECF No. 61 at 10–16; ECF No. 65 at 5–13. William does not dispute that the claims he brings on his own behalf are barred by the applicable statutes of limitations, ECF No. 77 at 36–37; ECF No. 78 at 8–13, which the Court construes as a concession that his claims are time-barred, *Zimmerscheid v. JP Morgan Chase Bank, N.A.*, 49 F. Supp. 3d 583, 590–91 (D. Minn. 2014) (failure to respond to opposing party's argument in a motion to dismiss constitutes an "abandonment" of a claim). Rather, William argues that his claims are timely because the statutes of limitations have been tolled by either (1) the continuing-violation doctrine or (2) the fraudulent-concealment doctrine, and that A.M.R. and W.R.'s claims are tolled by Minnesota's minority-tolling statute. ECF No. 77 at 36–37; ECF No. 78 at 8–13. The

Court agrees with the latter argument but not the former, meaning that although William may bring some claims on behalf of A.M.R. and W.R., he is out of time to bring claims on his own behalf.

### a.    William's Claims

As an initial matter, William does not explain whether the Court should apply state or federal tolling rules for his continuing-violation and fraudulent-concealment claims. That distinction matters, because when the Court exercises federal question and supplemental jurisdiction (as it does here), it applies state tolling rules to pendent state claims, *see Larsen v. Mayo Med. Ctr.*, 218 F.3d 863, 866 (8th Cir. 2000); state tolling rules to some federal claims that borrow state statutes of limitations (such as Section 1983 claims), *Wallace v. Kato*, 549 U.S. 384, 394 (2007); and federal tolling rules to some federal claims (like a civil RICO claim), *see Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016). The parties rely indiscriminately on both federal and Minnesota state case law, and because the Court does not discern that the tolling rules at play here lead to a different outcome for William's claims under either federal or Minnesota law,[6] the Court will likewise rely on both federal and Minnesota case law.

### i.    Continuing-Violation Doctrine

The continuing-violation doctrine "allows a plaintiff to toll the expiration of the statute of limitations where a continuing pattern forms due to [wrongful] acts occurring over a period of time, 'as long as at least one incident of [wrongful conduct] occurred

---

[6]    As explained below, the difference in state and federal tolling rules does make a difference for A.M.R.'s and W.R.'s claims.

within the limitations period.'" *Radcliffe v. Securian Fin. Grp., Inc.*, 906 F. Supp. 2d 874, 885 (D. Minn. 2012) (quoting *Taxi Connection v. Dakota, Minn. & E. R.R. Corp.*, 513 F.3d 823, 825 (8th Cir. 2008)).  Discrete acts that fall within the statutory time period, however, "do not make timely acts that fall outside the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002).  Moreover, a plaintiff who is merely "feeling the present effects" of a past wrongful act may not seek refuge in the continuing-violation doctrine. *Hope v. Klabal*, 457 F.3d 784, 793 (8th Cir. 2006) (citation omitted); *see also Treanor v. MCI Telecomms. Corp.*, 200 F.3d 570, 574 (8th Cir. 2000) (explaining that a plaintiff must experience "more than the mere consequences of past [misconduct]" to invoke the continuing-violation doctrine).

William alleges that the statute of limitations on his claims should be tolled because Defendants' "continued wrongful conduct forces Sylwia to remain in Poland, causing all the entire family to suffer ongoing, new and continuous harm."  ECF No. 78 at 9.  The Court, again, disagrees with the premise that Defendants' alleged conduct "forces" Sylwia to remain in Poland.  But even assuming the plausibility of that assertion, that injury is a quintessential example of a plaintiff who is merely "feeling the present effects" of a past wrongful act.  *Hope*, 457 F.3d at 793.  Indeed, according to the amended complaint, the whole reason that Sylwia left the United States and was separated from her family was because of Defendants' alleged crusade against Sylwia for the death of G.C., which culminated in Hennepin County initiating TPR and criminal proceedings against Sylwia. *See* ECF No. 7 ¶¶ 267–408.

30

These proceedings began, at latest, on February 2, 2018—more than seven years before William brought this lawsuit. *See* ECF No. 7 ¶ 9, (alleging that "Sylwia's fabricated prosecution . . . has forced her to remain in her native home Poland"); *id.* ¶ 422 (alleging that the "criminal indictment against Sylwia forced her to remain in Poland in order to avoid the false murder prosecution initiated and furthered by Defendants"). Seven years is longer than any of the statutes of limitations applicable to William's claims. *See Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 617–18 (8th Cir. 1995) (six-year statute of limitations for Section 1983 claim); *Doe v. Anoka County*, 776 F. Supp. 3d 756, 773 (D. Minn. 2025) (same for *Monell* claim); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (four-year statute of limitations for civil RICO claims); *Olson v. City of Cambridge*, No. A24-0723, 2024 WL 4344828, at *3 (Minn. Ct. App. Sept. 30, 2024) (two-year statute of limitations for abuse-of-process claim); Minn. Stat. § 541.05, subd. 1(2) (six-year statute of limitations for making a false report of child abuse under Minn. Stat. § 260E.08(d)); *Wenigar v. Johnson*, 712 N.W.2d 190, 208–09 (Minn. Ct. App. 2006) (two-year statute of limitations for IIED claim).[7] Although William and his children may continue to suffer harm from their separation from Sylwia, that harm represents the "mere

---

[7]   It is unclear if the continuing-violation doctrine even applies to some of William's claims as a matter of law. *See Wenigar*, 712 N.W.2d at 209 (noting that "the continuing violation doctrine is most commonly applied in discrimination cases" and that there is "no record of the continuing tort or violation doctrine being applied to a claim of [IIED]" in Minnesota); *Goff v. Nationwide Mut. Ins. Co.*, No. 2:18-cv-340, 2019 WL 7604826, at *8–9 (S.D. Ohio Sept. 30, 2019) (casting doubt on whether the continuing-violation doctrine applies to civil RICO claims and collecting cases so holding). The Court need not resolve those issues because even if the continuing-violation doctrine could apply to all of William's claims, William fails to demonstrate that it should be applied here.

consequences" of past wrongful conduct outside of the limitations period. *Treanor*, 200 F.3d at 574.

William attempts to bring the earlier alleged misconduct into the limitations period by highlighting his allegation that Dr. Harper allegedly pressured Hennepin County to maintain the criminal charges against Sylwia in November 2023. ECF No. 78 at 10. But to invoke the continuing-violation doctrine, a plaintiff must demonstrate that the defendants' acts are part of an "ongoing pattern or practice," not "isolated" incidents. *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1303 (8th Cir. 1997) (emphasis omitted). Consequently, a significant temporal gap between events occurring outside the limitations period and events occurring inside the limitations period are "fatal" to a continuing-violation argument. *Benjamin v. Brookhaven Sci. Assocs., LLC*, 387 F. Supp. 2d 146, 154 (E.D.N.Y. 2005) (citation omitted) (six-year gap between incidents did not plausibly allege continuing violations); *see Smith v. PayPal, Inc.*, No. 8:12CV226., 2013 WL 2444032, at *9 n.6 (D. Neb. June 4, 2013) (14-month gap "precludes a finding of a continuing violation"); *Bakker v. Mokena Fire Prot. Dist.*, No. 19 C 5586, 2020 WL 1139262, at *3 (N.D. Ill. Mar. 9, 2020) (two-and-a-half year gap did not plausibly allege continuing violations). Here, assuming Dr. Harper pressured prosecutors to maintain the criminal charges against Sylwia in November 2023, that discrete act—which occurred more than five years after Sylwia was criminally charged—cannot fairly be characterized as part of an "ongoing pattern or practice," particularly when William does not allege any injurious conduct on Dr. Harper's part in the intervening five years. *Jenson*, 130 F.3d at 1303. More to the point, the discrete act of Dr. Harper allegedly pressuring prosecutors in November

2023 does not revive the untimely claims from years before.[8] *Morgan*, 536 U.S. at 112. William therefore cannot rely on the continuing-violation doctrine to save his untimely claims.

### ii.        Fraudulent-Concealment Doctrine

William alternatively asserts that the fraudulent-concealment doctrine saves his untimely claims. ECF No. 78 at 11–13. To establish fraudulent concealment, William must plead that there was an "affirmative act or statement by a defendant which concealed a potential cause of action, that the statement was known to be false or made in reckless disregard of its truth or falsity, and that concealment could not have been discovered by [his] reasonable diligence." *Sacks v. Univ. of Minn.*, 600 F. Supp. 3d 915, 941 (D. Minn. 2022) (citing *Anunka v. City of Burnsville*, 534 F. App'x 575, 576 (8th Cir. 2013) (per curiam)). The fraud perpetrated must "conceal[] the very existence of the facts giving rise to the cause of action, such that the plaintiff was unaware the cause of action existed at all." *Marvin Lumber & Cedar Co. v. Sapa Extrusions, Inc.*, 964 F. Supp. 2d 993, 1008 (D. Minn. 2013); *see also Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918 (Minn. 1990) (explaining that to defeat an assertion of fraudulent concealment, "[a] party need not know

---

[8]       To the extent that the alleged November 2023 incident creates a standalone claim, William lacks standing to pursue it. That is because the only injury William seems to assert arising from Dr. Harper's pressure to maintain the criminal charges is William's continued separation from his wife. *See* ECF No. 78 at 9 (arguing that the "continued wrongful conduct forces Sylwia to remain in Poland, causing all the entire family to suffer ongoing, new and continuous harm"); *id.* at 11 ("[T]he Reynolds family unit continues to be unlawfully and unconstitutionally separated because of a conduct that is continuing."). As explained in the Court's standing analysis, however, William's, A.M.R.'s, and W.R.'s separation from Sylwia after her departure to Poland in 2017 or 2018 is not traceable to Defendants' conduct.

the details of the evidence establishing the cause of action, only that the cause of action exists"). Any activities which would "create notice" of the cause of action and "excite attention" as to that claim will require inquiry on the part of a plaintiff. *See In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1024 (D. Minn. 1997) (citation omitted). If the plaintiff fails to so inquire, then "it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claim." *Wild v. Rarig*, 234 N.W.2d 775, 795 (Minn. 1975) (citation omitted).

William contends that the exculpatory ambulance trip report identifying G.C.'s fall and occipital brain injury was concealed from him and Sylwia until September 2019. ECF No. 78 at 12. Because the report revealed the allegedly undisclosed fact of G.C.'s fall and head injury, William asserts that the statutes of limitations should be tolled until September 2019. *See id.*

That assertion is flatly contradicted by the amended complaint, which alleges that on July 10, 2017, G.C.'s father told Sylwia that G.C. had fallen and hit his head at home. *See* ECF No. 7 ¶ 360. Sylwia and William were therefore on notice by July 2017 that G.C.'s death could have been caused by an accidental fall, rather than Sylwia's purported abuse. *See Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d at 1024. It makes no difference that Sylwia did not know the "details of the evidence" in the ambulance trip report that further supported her claim that G.C.'s death was due to a fall, not abuse. *Hydra-Mac*, 450 N.W.2d at 918. What matters is that the statement to Sylwia by G.C.'s father plainly "excite[d] attention" to a potential claim that G.C.'s death was the result of an accidental fall. *See Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d at 1024. At that point, William could no longer

34

plausibly assert that he was "unaware" of such a claim. *Marvin Lumber & Cedar*, 964 F. Supp. 2d at 1008. By failing to bring his claims for another nearly eight years, William failed to "avail himself of those means which the law provides for prosecuting or preserving his claim." *Wild*, 234 N.W.2d at 795. William therefore cannot rely on the fraudulent-concealment doctrine to save his untimely claims. *Sacks*, 600 F. Supp. 3d at 941 (requiring "reasonable diligence" to assert the doctrine).

William offers one last argument: that equitable tolling operates to save his untimely RICO claim. ECF No. 78 at 13; *see Rotella v. Wood*, 528 U.S. 549, 561 (2000) (explaining that equitable tolling can apply to RICO's statute of limitation). William offers no reasoned analysis of the equitable-tolling doctrine (indeed, he does not even identify the elements of equitable tolling, let alone discuss their applicability to this case). The Court is "not obliged to consider this perfunctorily raised, undeveloped argument." *In re Vera T. Welte Testamentary Tr.*, 96 F.4th 1034, 1039 (8th Cir. 2024). And because William provides no other basis on which to toll his untimely claims, all of William's remaining claims brought on his own behalf are dismissed with prejudice. *See Johnson v. Mott*, 376 F. App'x 641, 641 (8th Cir. 2010) (per curiam) (affirming dismissal with prejudice because complaint showed statute of limitations had run).

### b.    A.M.R.'s and W.R.'s Claims[9]

Having concluded that the continuing-violation and fraudulent-concealment doctrines cannot save William's untimely claims, those doctrines similarly cannot save

---

[9]    When this Order references "A.M.R.'s and W.R.'s" claims, the Court recognizes that, technically, these are William's claims brought on behalf of A.M.R. and W.R.

A.M.R.'s and W.R.'s untimely claims. However, William argues that A.M.R.'s and W.R.'s untimely claims are tolled by Minnesota's minority-tolling statute. ECF No. 78 at 8–9. The Court agrees that Minnesota's minority-tolling statute tolls all of A.M.R.'s and W.R.'s untimely claims except for the RICO claim.

### i.   Minority Tolling

Minnesota's minority-tolling statute provides that when a cause of action accrues during a plaintiff's "infancy" (that is, being less than 18 years of age), the plaintiff must commence the action either within one year of reaching the age of maturity or within the statute of limitations, whichever is later. Minn. Stat. § 541.15(a)(1); *see D.M.S. v. Barber*, 645 N.W.2d 383, 386–87 (Minn. 2002). A.M.R. and W.R. remain under the age of 18, ECF No. 7 ¶ 19, which means the statutes of limitations on their claims have not yet run, Minn. Stat. § 541.15(a)(1). Accordingly, A.M.R.'s and W.R.'s claims remain timely—except for the RICO claim, as discussed more fully below.

To defeat that conclusion, Dr. Lucken, Dr. Silbert, Dr. Jouhari, and Hennepin Healthcare assert that a federal court may decline to apply a state tolling rule when application of the rule would "frustrate the policy embodied in the federal law on which the claim is based." *Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 957 (8th Cir. 2000); *see* ECF No. 87 at 1–2. As an initial matter, that argument would not apply to A.M.R.'s and W.R.'s state-law claims, given that there is no "federal law" or policy that would be frustrated by application of Minnesota's minority-tolling statute to those claims. *Strawn*, 210 F.3d at 957. As for A.M.R.'s and W.R.'s Section 1983 and *Monell* claims, those claims borrow Minnesota's tolling rules (including its minority-tolling statute), *Wallace*, 549 U.S.

36

at 394, and the Court does not believe that the statute would "frustrate" the federal policy underlying Section 1983. Indeed, the Supreme Court has held that a state statute tolling claims during a period of "legal disabilit[y]"—which includes infancy—was consistent with Section 1983's "remedial purpose." *Hardin v. Straub*, 490 U.S. 536, 540, 544 (1989). Other lower courts have routinely applied state minority-tolling statutes to Section 1983 claims, concluding that those statutes do not frustrate Section 1983's purpose. *See, e.g.*, *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1214 (10th Cir. 2014); *Bishop v. Children's Ctr. for Developmental Enrichment*, 618 F.3d 533, 537–38 (6th Cir. 2010); *Vinluan v. Ardsley Union Free Sch. Dist.*, No. 19-cv-10674 (NSR), 2021 WL 1063482, at *8 (S.D.N.Y. Mar. 18, 2021).

Dr. Lucken, Dr. Silbert, Dr. Jouhari, and Hennepin Healthcare also observe that the minority-tolling statute "does not automatically apply to every cause of action." ECF No. 87 at 2. But they cite cases involving the Minnesota Civil Damages Act, product liability claims, and federal administrative claims. *Id.* (first citing *Whittener ex rel. Miller v. Dahl*, 625 N.W.2d 827, 832 (Minn. 2001); then citing *Budler v. Gen. Motors Corp.*, 400 F.3d 618, 621–22 (8th Cir. 2005); and then citing *Smith v. United States*, 588 F.2d 1209, 1211 (8th Cir. 1978)). None of the cases cited by Dr. Lucken, Dr. Silbert, Dr. Jouhari, and Hennepin Healthcare establishes that Minnesota's minority-tolling statute does not apply to the claims that are actually raised in this case.

Dr. Lucken, Dr. Silbert, Dr. Jouhari, and Hennepin Healthcare finally object that applying the minority-tolling statute to A.M.R.'s and W.R.'s claims would extend the statutes of limitations on their claims for many years after the incidents giving rise to this

37

lawsuit. ECF No. 78 at 2–3. But that's a feature, not a bug, of the minority-tolling statute. In enacting the minority-tolling statute, the Minnesota Legislature evidently determined that the unfairness in extending a defendant's exposure to suit is outweighed by the unfairness of requiring a minor to pursue their claim before reaching maturity. *See Ostrander ex rel. Ostrander v. Cone Mills, Inc.*, 445 N.W.2d 240, 241–42 (Minn. 1989). It is not for this Court to elevate Defendants' policy arguments over the actual policy bargain struck by the Legislature. *See id.*; *In re Estate of Karger*, 93 N.W.2d 137, 142 (Minn. 1958) ("What the law ought to be is for the legislature; what the law is, rests with the courts."). Minnesota's minority-tolling statute therefore tolls the statutes of limitations for A.M.R.'s and W.R.'s claims.

Except one. Recall that RICO claims do not borrow state tolling rules; rather, federal tolling rules apply to RICO claims because RICO's statute of limitations derives from federal law. *See Goel*, 820 F.3d at 558; *Enrich v. Touche Ross & Co.*, 846 F.2d 1190, 1199 (9th Cir. 1988). So, if A.M.R.'s and W.R.'s RICO claims are to be tolled because of their infancy, that tolling rule must derive from federal law. But here, William points to no federal law or doctrine that would allow for tolling of A.M.R.'s and W.R.'s RICO claims; instead, he relies exclusively on Minnesota's minority-tolling statute. He has therefore forfeited any claim that A.M.R.'s and W.R.'s RICO claims are tolled due to their minority under federal law.

Even if William made such an argument, it would be without merit. As the Supreme Court long ago explained, "exemptions from the operation of statutes of limitations, usually accorded to infants . . . do not rest upon any general doctrine of the law . . . but in every

instance upon express language in those statutes giving them time, after majority . . . , to assert their rights." *Vance v. Vance*, 108 U.S. 514, 521 (1883). Accordingly, "federal courts have consistently rejected requests to create tolling exceptions for minors, reasoning that in the absence of an express legislative directive to the contrary, parents and guardians are assumed to be adequate surrogates." *United States v. Alvarez*, 710 F.3d 565, 567 n.10 (5th Cir. 2013) (collecting cases); *see Wilson ex rel. Wilson v. Gunn*, 403 F.3d 524, 526–27 (8th Cir. 2005) (declining to create minority exception to two-year statute of limitations in the Federal Tort Claims Act). Federal courts therefore apply minority tolling for federal statutes of limitations "only if the statute setting out the limitations period so specifies." *Booth v. United States*, 914 F.3d 1199, 1205 (9th Cir. 2019). Here, RICO contains no specific minority-tolling provision, so that claim cannot be tolled because of A.M.R.'s and W.R.'s minority. Accordingly, their RICO claims must be dismissed with prejudice as time-barred.[10]

## IV.    Merits of A.M.R.'s and W.R.'s Claims

Having resolved the threshold issues of standing and timeliness, the Court considers the merits of A.M.R.'s and W.R.'s six remaining claims: Section 1983, *Monell*, abuse of process, false report of child abuse, IIED, and civil conspiracy.

---

[10]    Because the substantive RICO claim is time-barred, so too is the RICO conspiracy claim. *See Jaworski v. Rollupspacovers*, No. 11-cv-1816 (DSD/JSM), 2012 WL 1130684, at *3 (D. Minn. Apr. 3, 2012) (holding that dismissal of a substantive RICO claim requires dismissal of a RICO conspiracy claim).

### a.       False Report of Child Abuse

The Court can easily dispatch with A.M.R.'s and W.R.'s false report of child abuse claim under Minn. Stat. § 260E.08.   That statute provides that "[a]ny person who knowingly or recklessly makes a false report [of child abuse] shall be liable in a civil suit *for any actual damages suffered by the person or persons so reported* and for any punitive damages set by the court or jury, plus costs and reasonable attorney fees."   Minn. Stat. § 260E.08(d) (emphasis added).   But as the italicized portion makes clear, a person may only recover under the statute for actual damages suffered by the person reported—here, Sylwia.   ECF No. 7 ¶¶ 426–34.   A.M.R. and W.R. are not seeking damages incurred by Sylwia (nor could they, as explained in rejecting William's attempt to establish third-party standing to raise Sylwia's claims).   A.M.R. and W.R. therefore cannot recover actual damages under Minn. Stat. § 260E.08, and they consequently cannot recover punitive damages.   *See Potter v. LaSalle Court Sports & Health Club*, 384 N.W.2d 873, 876 (Minn. 1986) (explaining the "general rule that punitive damages are not recoverable in the absence of actual damages").   A.M.R.'s and W.R.'s claims under Minn. Stat. § 260E.08 are therefore dismissed.[11]

---

[11]      One could also characterize this argument as one of statutory standing.   When a plaintiff alleges injury to rights conferred by statute, "two separate standing-related inquiries are implicated: whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives that plaintiff authority to sue (statutory standing)." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012).   Unlike constitutional standing (which is a jurisdictional prerequisite), statutory standing goes to the merits of a claim. *Id.*   Statutory standing therefore asks whether the state "has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Id.* (citation omitted).   Here, Minn. Stat. § 260E.08(d) plainly does not accord A.M.R. and W.R. the

40

**b.**   *Monell* **Claims**

A.M.R. and W.R. next bring *Monell* claims against UMP, Hennepin Healthcare, and Hennepin County, alleging that their policies and customs resulted in the unconstitutional deprivation of A.M.R.'s and W.R.'s right to family integrity.  ECF No. 7 ¶¶ 607–15.  A municipality cannot be held liable for a constitutional violation under Section 1983 solely because it employs a tortfeasor.  *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978).  Rather, under *Monell*, "[l]iability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016).

**i.**   *Monell* **Claim Against UMP**

The *Monell* claim against UMP fails as a matter of law because William fails to allege that UMP is a municipality subject to suit under *Monell*.  "[D]epartments or subdivisions" of a municipal government are not legal entities subject to suit under *Monell*. *Ketchum v. City of West Memphis*, 974 F.2d 81, 82 (8th Cir. 1992).  That includes a division of a municipal government in Minnesota.  *See Shimer v. Shingobee Island Water & Sewer Comm'n*, No. 02-cv-953 (JRT/FLN), 2003 WL 1610788, at *3–4 (D. Minn. Mar. 18, 2003); *Seelye v. Fisher*, No. 06-cv-2848 (RHK/RLE), 2007 WL 951604, at *6 (D. Minn. Mar. 29,

---

right to redress their own injuries; rather, the plain language of the statute accords "person or persons so reported" a mechanism to recover for a false report of child abuse. A.M.R. and W.R. are not among that class of potential plaintiffs.

41

2007).  Rather, the appropriate defendant for a *Monell* claim is the municipality itself.  *See*

*Shimer*, 2003 WL 1610788, at *4.

Here, William does not allege what relationship, if any, UMP has with a municipal

government.[12]  The amended complaint suggests that UMP is related to the University of

Minnesota.  ECF No. 7 ¶ 26.  But if that's true, then UMP would be an instrumentality of

the state, and the *Monell* claim against it would be barred by sovereign immunity.  *See*

*Treleven*, 73 F.3d at 818.  And if UMP is a division of a municipal government, then it is

not a legal entity subject to suit under *Monell*.  *See Ketchum*, 974 F.2d at 82.  Either way,

the result is the same: the *Monell* claim against UMP must be dismissed.

### ii.    *Monell* Claims Against Hennepin County and Hennepin Healthcare

A.M.R. and W.R. may assert *Monell* claims against Hennepin County, a municipal

government.  *See Buckley v. Hennepin County*, 9 F.4th 757, 765 (8th Cir. 2021).  And

although Hennepin Healthcare is technically a division of a municipal government,

Minnesota law explicitly designates Hennepin Healthcare as a "municipality" subject to

suit.  *See* Minn. Stat. §§ 383B.901; 383B.907, subd. 1(13); 383B.919.  Courts have

consequently held that a *Monell* claim may properly be asserted against Hennepin

Healthcare itself.  *See Doe v. Hennepin County*, No. 24-cv-1392 (NEB/DTS), 2025 WL

2524604, at *7–8, 8 n.16 (D. Minn. Aug. 21, 2025); *VanHauer v. Minneapolis Police Dep't*,

---

12    UMP describes itself as a "private group of medical providers," which raises the
question whether UMP is an arm of any government at all.  ECF No. 65 at 30.  Although
the amended complaint does not explicitly allege whether UMP is a public or private entity,
William's briefing does not dispute UMP's characterization of itself as a private entity.

No. 23-cv-1208 (ECT/LIB), 2024 WL 3540799, at *6 (D. Minn. July 25, 2024).  The Court

therefore considers whether A.M.R. and W.R. have plausibly alleged *Monell* claims against

Hennepin County and Hennepin Healthcare.

As noted above, municipal liability may attach under *Monell* for constitutional

violations if the violations resulted from: (1) an official municipal policy; (2) an unofficial

custom; or (3) a deliberately indifferent failure to train or supervise an official or employee.

*Bolderson*, 840 F.3d at 985.  The amended complaint invokes the first two theories of

*Monell* liability.  ECF No. 7 ¶¶ 607–615.

### 1.     Official Municipal Policy

An official policy is "a deliberate choice to follow a course of action" by an "official

who is determined by state law to have the final authority to establish governmental

policy."  *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998) (citation modified).

An official-policy *Monell* claim therefore requires that the challenged policy be made by

someone with "final policymaking authority" for the municipality.  *Atkinson v. City of

Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013).  Whether an individual exercised

"final policymaking authority" is a question of law decided by the Court; only after the

Court determines that the challenged policy was implemented by someone with final

policymaking authority can the Court consider whether that policy resulted in a

constitutional violation.  *See id.* at 1215 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S.

701, 737 (1989)).  The Court consults two "key sources" to determine whether an

individual is a final policymaker: (1) "state and local positive law" and (2) state and local

"custom or usage having the force of law." *Id.* (internal quotation marks omitted) (quoting *Jett*, 491 U.S. at 737).

Here, William alleges that the challenged policies leading to A.M.R.'s and W.R.'s injuries were created and implemented by Dr. Harper. *See, e.g.*, ECF No. 7 ¶¶ 131, 169, 201, 414, 609 (asserting that the "policies, practices, procedures and customs" were "put in place by Harper and adopted by these defendants"). The Court must therefore determine whether Dr. Harper possessed "final policymaking authority" over Hennepin County or Hennepin Healthcare.

Looking first to "state and local positive law," *Atkinson*, 709 F.3d at 1215, Dr. Harper clearly holds no final policymaking authority for either Hennepin County or Hennepin Healthcare. State law vests the Hennepin County Board of Commissioners with final policymaking authority over Hennepin County. *See* Minn. Stat. § 373.02 ("The powers of the county as a body politic and corporate shall only be exercised by the county board or in pursuance of a resolution adopted by the county board."); *see also generally* Minn. Stat. § 375.18. And state law vests the Hennepin Healthcare Board of Directors with final policymaking authority over Hennepin Healthcare. *See* Minn. Stat. § 383B.903, subd. 1. The amended complaint does not allege that Dr. Harper is a member of either board.

William also fails to raise any non-conclusory allegations that Dr. Harper has final policymaking authority over Hennepin County or Hennepin Healthcare by virtue of a "custom or usage having the force of law." *Atkinson*, 709 F.3d at 1215. A "custom or usage" may arise when an entity delegates final policymaking power to an individual. *See*

44

*id.* at 1215–16; *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946–47 (8th Cir. 2017). A subordinate official possesses delegated final policymaking authority when the official acts "(1) free of review and (2) without any constraints imposed as a matter of policy by the original policymaker." *Soltesz*, 847 F.3d at 946 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). The delegation must be of "legal power," so if "the board retains the authority to review, even though it may not exercise such review or investigate the basis of the decision, delegation of final authority does not occur." *Id.* at 946–47 (citation omitted) (emphasis omitted). "Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Praprotnik*, 485 U.S. at 130.

To be sure, William alleges repeatedly that Dr. Harper is the de facto policymaker for Hennepin County's and Hennepin Healthcare's child-abuse response policies. *See, e.g.*, ECF No. 7 ¶ 131 (alleging that Dr. Harper "caused those child abuse policies" to be implemented by Hennepin County and Hennepin Healthcare); *id.* ¶ 136 (describing "Hennepin County under Harper's leadership"); *id.* ¶ 145 (alleging Dr. Harper's "dictatorial role over Hennepin County's child protection system"); *id.* ¶ 146 (similar); *id.* ¶ 207 (similar); *id.* ¶ 414 (similar); *id.* ¶ 609 (similar); *see also* ECF No. 78 at 20 ("Harper . . . was clothed with final policymaking authority in regard to child abuse diagnosis policies."). These allegations are, however, exactly the type of "naked assertions devoid of further factual enhancement" that do not withstand a Rule 12(b)(6) motion. *Iqbal*, 556 U.S. at 678. Never does the amended complaint actually allege *how* the Hennepin County Board of Commissioners or the Hennepin Healthcare Board of Directors

45

delegates to Dr. Harper the power to "implement" or "put in place" her preferred policies. In fact, neither the Hennepin County Board of Commissioners nor the Hennepin Healthcare Board of Directors are ever mentioned in the amended complaint, so it is hard to see how the amended complaint plausibly alleges that those entities with final policymaking authority delegated "legal power" to Dr. Harper "without any constraints." *Soltesz*, 847 F.3d at 946–47.

It may be true that Dr. Harper, by virtue of her experience, holds significant influence over medical professionals, prosecutors, and others involved with the child-protection system in Hennepin County. But any "personal sway" that Dr. Harper possesses over the child-protection system does not translate into final policymaking authority. *Adv. Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 168 (5th Cir. 2016); *see Praprotnik*, 485 U.S. at 131 (rejecting the application of the "vague concept of 'de facto final policymaking authority'" (emphasis omitted)). That's particularly true given the "high bar for establishing municipal liability," as the final-policymaking-authority inquiry "demands careful analysis from district courts[] to avoid any risk that liability could be imposed under a theory of respondeat superior." *Soltesz*, 847 F.3d at 947. Because state law does not vest Dr. Harper with final policymaking authority, and because the amended complaint does not plausibly allege that the Hennepin County Board of Commissioners or the Hennepin Healthcare Board of Directors delegated to Dr. Harper the legal power to implement child-abuse policies, A.M.R. and W.R. cannot pursue an official policy *Monell* claim against Hennepin County and Hennepin Healthcare.

## 2.    Unofficial Custom

"A municipal custom is a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law." *Russell v. Hennepin County*, 420 F.3d 841, 849 (8th Cir. 2005) (citation modified).  That custom must encompass "a widespread and persistent pattern of unconstitutional misconduct . . . policymakers were either deliberately indifferent to or tacitly authorized." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023) (citation omitted).  "Notice is the touchstone of deliberate indifference" for a *Monell* claim.  *Atkinson*, 709 F.3d at 1216.  Accordingly, a plaintiff must allege a "persistent, widespread pattern of unconstitutional conduct *of which officials have notice* and subsequently react with deliberate indifference or tacit authorization." *Sorcan v. Rock Ridge Sch. Dist.*, 131 F.4th 646, 651 (8th Cir. 2025) (emphasis added) (citation omitted).

Even if the amended complaint plausibly alleged a "persistent, widespread pattern of unconstitutional conduct," W.M.R. and A.R. cannot bring an unofficial custom claim against Hennepin County and Hennepin Healthcare because there is no allegation that at the time of their injuries, Hennepin County and Hennepin Healthcare had notice of that pattern of unconstitutional conduct.  The amended complaint describes several instances of Dr. Harper allegedly participating in a pattern to wrongfully accuse caregivers in Hennepin County of child abuse from 2022 to 2023.  *See* ECF No. 7 ¶¶ 159–96 (describing Dr. Harper's involvement with a child-abuse case in Hennepin County in 2022); *id.* ¶¶ 198–205 (describing Dr. Harper's involvement with a child-abuse case in Hennepin County in 2023); *id.* ¶¶ 219–27 (describing Dr. Harper's involvement with a child-abuse case in

Hennepin County in 2023). But remember that W.M.R. and A.R. suffered their alleged injuries in July 2017. *See id.* ¶ 481. At that point, then, Hennepin County and Hennepin Healthcare could not have been on "notice of prior incidents" involving Dr. Harper, given that all of the instances described in the amended complaint of the alleged custom of wrongfully accusing caregivers of child abuse had yet to occur. *See Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987). Because Hennepin County and Hennepin Healthcare would not have had notice of these incidents in July 2017—and because the amended complaint describes no other incidents of the alleged custom of wrongfully accusing caregivers in Hennepin County of child abuse—A.M.R. and W.R. are unable as a matter of law to show that either entity acted with "deliberate indifference or tacit authorization." *Sorcan*, 131 F.4th at 651. A.M.R.'s and W.R.'s unofficial-custom *Monell* claim therefore fails, and their *Monell* claims must therefore be dismissed.

### c.   Section 1983 Claims

A.M.R. and W.R. next bring Section 1983 claims against Dr. Harper and Nicholson for depriving them of their right to family integrity. ECF No. 7 ¶¶ 587–606. The claim against Nicholson is barred by absolute prosecutorial immunity, but the claim against Dr. Harper may proceed.

### i.   Section 1983 Claim Against Nicholson

Nicholson asserts that absolute prosecutorial immunity bars the Section 1983 claim against her. ECF No. 57 at 10–13. Prosecutors are "absolutely immune from liability under § 1983 for their conduct in initiating a prosecution and in presenting the State's case insofar as that conduct is intimately associated with the judicial phase of the criminal process."

48

*Woodworth v. Hulshof*, 891 F.3d 1083, 1089 (8th Cir. 2018) (internal quotation marks omitted) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)).  This immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom" but not to "administrative duties and those investigatory functions that do not relate to . . . the initiation of a prosecution or for judicial proceedings."  *Id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273–74 (1993)).  A court must take a "functional approach" to the immunity inquiry, looking to "the nature of the function performed, not the identity of the actor who performed it."  *Buckley*, 509 U.S. at 269 (citations omitted).  Absolute immunity for prosecutors also extends to government attorneys initiating and prosecuting child protection proceedings on behalf of the state.  *P.G. v. Ramsey County*, 141 F. Supp. 2d 1220, 1231 (D. Minn. 2001); *Lindquist v. Taylor*, No. 24-cv-0552 (NEB/JFD), 2024 WL 1831993, at *3–4 (D. Minn. Apr. 16, 2024).

William does not dispute this legal framework but argues that some of Nicholson's conduct was investigatory or administrative, and therefore outside of the scope of absolute immunity.  ECF No. 78 at 13–15.  The Court disagrees.

William first asserts that Nicholson acted as an investigator when she allegedly "gave fictitious, fraudulent and wrongful legal advice to the guardian ad litem assigned by the family court to represent the interests of the Reynolds children."  *Id.* at 14; *see* ECF No. 7 ¶¶ 507–14.  But investigatory functions are not categorically exempt from absolute immunity; rather, absolute immunity is lost only when those investigatory functions "do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings."  *Buckley*, 509 U.S. at 273.  The amended complaint alleges that after the

49

TPR proceedings were initiated, Nicholson contacted Stratton—the court-appointed guardian ad litem—and advised her not to investigate the facts underlying the TPR proceedings. ECF No. 7 ¶¶ 507–14. But as those allegations make plain, Nicholson consulted with Stratton—a potential witness in the TPR proceedings—only after the TPR proceedings were underway, and the contact with Stratton related directly to those judicial proceedings. A prosecutor's consultation with a potential witness in a pending child protection proceeding falls well within the scope of prosecutorial immunity. *See Imbler v. Pachtman*, 424 U.S. 409, 430 n.32 (1976) (holding out-of-court "effort to control the presentation of witness testimony" was entitled to absolute immunity because it was "fairly within [the prosecutor's] function as an advocate"); *Corrigan v. City of Savage*, No. 18-cv-2257 (ADM/BRT), 2019 WL 2030002, at *2, 10 (D. Minn. Jan. 14, 2019) (holding claim that prosecutor met with and "coached" witness prior to trial was not "investigatory," but rather was subject to prosecutorial immunity), *report and recommendation adopted*, 2019 WL 1487897 (D. Minn. Apr. 4, 2019), *aff'd*, 786 F. App'x 614 (8th Cir. 2019); *see also Reasonover v. St. Louis County*, 447 F.3d 569, 580 (8th Cir. 2006) ("For a lawyer to properly try a case, [she] must confer with witnesses, and conduct some of [her] own factual investigation."). That conclusion is confirmed when considering that Nicholson's alleged misconduct occurred only after the TPR proceedings were initiated.[13] *See Winslow v. Smith*, 696 F.3d 716, 739 (8th Cir. 2012) (holding that the

---

[13] The same conclusion applies to the allegations that Nicholson provided "incomplete and manipulated discovery" during the TPR proceedings and wrongfully requested a non-certified copy of G.C.'s death certificate in January 2018—six months after the TPR

prosecutor was entitled to absolute immunity, and noting that "there is no evidence that any action taken by [the prosecutor] prior to the filing of criminal complaints against Plaintiffs was unconstitutional" and that "once the charging documents were filed, [the prosecutor] was protected by absolute immunity"); *Myers v. Morris*, 810 F.2d 1437, 1450 (8th Cir. 1987) (holding that prosecutor's interviewing of potential sex crime victims was not investigatory as criminal charges were already initiated by the time the interviews took place).

William's cited cases do not convince the Court otherwise. In the first case—*Burns*—police officers investigating a shooting sought advice from a prosecutor about whether they could use hypnosis on a potential suspect. 500 U.S. at 481–82. After the prosecutor advised the officers that they could proceed, the suspect underwent hypnosis, during which she made incriminating statements. *Id.* at 482. The suspect was later arrested and charged with the shooting. *Id.* The suspect then brought a Section 1983 claim against the prosecutor, and the Supreme Court held that the prosecutor was not entitled to absolute immunity for giving legal advice to police. *Id.* at 496. Unlike in this case, however, judicial proceedings had not yet been initiated against the suspect in *Burns*, meaning that the prosecutor's act of giving legal advice could not fairly be construed as "connected with the prosecutor's role in judicial proceedings." *Id.* at 494; *see Buckley*, 509 U.S. at 275 (noting

---

proceedings were initiated. ECF No. 7 ¶¶ 503, 497; *see Armendariz v. Rovney*, No. 20-cv-0464 (PJS/HB), 2020 WL 2513739, at *2 (D. Minn. Apr. 9, 2020) (observing that "conduct during discovery" in a pending prosecution "fall[s] within the ambit" of absolute immunity), *report and recommendation adopted*, 2020 WL 2512842 (D. Minn. May 18, 2020).

that *Burns* was about "offering legal advice to police about an *unarrested* suspect" (emphasis added)). Here, the TPR proceedings were already underway when Nicholson consulted with Stratton about those pending proceedings, so Nicholson's conduct was clearly "connected with [her] role in judicial proceedings." *Burns*, 500 U.S. at 494; *see Winslow*, 696 F.3d at 739.

The second case cited by William—*Buckley*—is also materially distinguishable. In *Buckley*, prosecutors allegedly fabricated false evidence "during the early stages of the investigation, which was being conducted under the joint supervision and direction of the sheriff" and the prosecutor. 509 U.S. at 262. The Supreme Court held that the creation of the fabricated evidence was "investigatory" because at that time, prosecutors did not have "probable cause to arrest [the plaintiff] or to initiate judicial proceedings," and their mission was "entirely investigative in character." *Id.* at 274. Here, again, Nicholson's contact with Stratton occurred once the TPR proceedings were well underway, so that contact cannot be deemed "entirely investigative in nature."

The third case cited by William—*J.T.H. v. Missouri Department of Social Services Children's Division*—involved a county child-welfare investigator who filed an "investigation report," which was designed to make a "preliminary finding on the issue in front of her." 39 F.4th 489, 492 (8th Cir. 2022) (citation omitted) (internal quotation marks omitted). Here, however, the contact between Nicholson and Stratton was anything but "preliminary." Rather, it occurred in the context of an ongoing judicial proceeding.

William also argues that Nicholson acted in an administrative or investigatory role when she allegedly redacted and edited portions of child welfare reports before they were

submitted to the family court. ECF No. 78 at 14; *see* ECF No. 7 ¶ 517. But Nicholson's decision to edit documents presented to the family court in a pending TPR proceeding is squarely a prosecutorial function subject to absolute immunity. *See Myers*, 810 F.2d at 1466 (explaining that absolute immunity for guardians and attorneys in child-protection proceedings "extends beyond oral testimony to providing their reports and recommendations to the family court").

William points to no other conduct by Nicholson that purportedly demonstrates that she acted in an investigatory or administrative role. Accordingly, Nicholson's conduct, as alleged in the amended complaint, is protected by absolute immunity as a matter of law. The Section 1983 claim against her is therefore dismissed.[14]

### ii.    Section 1983 Claim Against Dr. Harper

Dr. Harper offers various reasons why the Section 1983 claim against her should be dismissed, including lack of state action, statutory immunity, qualified immunity, and failure to state a claim. ECF No. 65 at 16–28. At this stage, none of those arguments are sufficient to warrant dismissal.

### 1.    State Action

Dr. Harper argues that the complaint fails to plausibly allege that she is a state actor. *Id.* at 23–27. Generally, only a state actor can face Section 1983 liability. *Doe v. N. Homes,*

---

[14]    Absolute immunity also applies to the IIED claim, which is based on Nicholson's conduct during the TPR proceedings. ECF No. 7 ¶¶ 645–48. And without any other primary claims remaining against Nicholson, the derivative civil-conspiracy claim must also be dismissed. *D.A.B. v. Brown*, 570 N.W.2d 168, 172 (Minn. Ct. App. 1997) (explaining that a civil-conspiracy claim must be "supported by an underlying tort"). Accordingly, all claims against Nicholson are dismissed.

*Inc.*, 11 F.4th 633, 637 (8th Cir. 2021).  That's because "the text and structure of the Constitution . . . enforc[e] [a] constitutional boundary between the governmental and the private."  *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).  "State employment is generally sufficient to render the defendant a state actor."  *West v. Atkins*, 487 U.S. 42, 49 (1988) (citation modified).  Generally, then,  "a public employee acts under color of state law while acting in [her] official capacity or while exercising [her] responsibilities pursuant to state law."  *Id.* at 50; *see Briscoe v. Bock*, 540 F.2d 392, 394–95 (8th Cir. 1976) ("[I]f the authorities of a public hospital, acting under color of law, deprive a person of a federally protected right, he may seek redress under [Section] 1983.").

The state-action inquiry here is complicated by the fact that Dr. Harper wears several hats.  Dr. Harper is the Director of the Child Abuse Pediatrics Fellowship Program and a Professor of Pediatric Emergency Medicine at the University of Minnesota—a public entity.  ECF No. 7 ¶ 24.  She is also the Medical Director of the Otto Bremer Trust Center for Safe and Healthy Children, which is alleged to be a department of the University of Minnesota—again, a public entity.  *Id.* ¶ 27.  She is also employed by UMP, *id.* ¶ 30, which describes itself as a "private group of medical providers," ECF No. 65 at 30, a characterization that William does not dispute.  Accordingly, whether Dr. Harper is a state actor depends on which hat she was wearing when she engaged in the conduct William challenges in this lawsuit.

The conduct challenged here is Dr. Harper's evaluation of C.G.'s case and conclusion that G.C.'s death was caused by child abuse.  ECF No. 7 ¶¶ 414–35, 446–52, 458–65.  Although not entirely clear, the amended complaint alleges that Dr. Harper

54

evaluated C.G.'s case and reported her conclusions "in her capacity as Medical Director" of the Otto Bremer Trust Center for Safe and Healthy Children. *Id.* ¶ 458. That allegation is reinforced by the affidavit submitted by the HCAO in support of Sylwia's extradition, which explains that G.C. "was also examined by Dr. Nancy Harper, medical director and board certified child abuse pediatrician at the Otto Bremer Trust Center for Safe and Healthy Children." *Id.* ¶ 541. Notably, Dr. Harper was not identified as acting in her capacity as an employee for UMP, a private entity. Rather, she was identified as acting in her capacity as an employee of a public entity— the Otto Bremer Trust Center for Safe and Healthy Children, which is a part of the University of Minnesota. *Id.* ¶ 27. Accordingly, the Court understands the amended complaint to allege that Dr. Harper acted in her capacity as Medical Director of the Otto Bremer Trust Center for Safe and Healthy Children when she evaluated G.C.'s case. Because Dr. Harper would have been acting in her official capacity as a public employee at that time, the Court concludes that the amended complaint plausibly alleges state action on Dr. Harper's part. *See West*, 487 U.S. at 49–50.

### 2.    Statutory Immunity

Dr. Harper next argues that she is entitled to statutory immunity under federal and state law. ECF No. 65 at 16–21. Section 20342 of the federal Child Abuse Prevention and Treatment Act provides:

> [A]ny individual making a good faith report to appropriate authorities of a suspected or known instance of child abuse or neglect, or who otherwise, in good faith, provides information or assistance, including medical evaluations or consultations, in connection with a report, investigation, or legal intervention pursuant to a good faith report of child abuse or neglect shall not be subject to civil liability or criminal prosecution, under any Federal law, rising from making such report or providing such information or assistance.

34 U.S.C. § 20342(1).  Section 20342 also provides that "there shall be a presumption that the person acted in good faith" when a federal civil action is "brought against a person based on the person's reporting a suspected or known instance of child abuse or neglect, or providing information or assistance with respect to such a report."  *Id.* § 20342(2).

Minnesota law provides similar immunity.[15]  The Minnesota Reporting of Maltreatment of Minors Act provides that "a person making a voluntary or mandated report" of child abuse is "immune from any civil or criminal liability that otherwise might result from the person's actions if the person is . . . acting in good faith."  Minn. Stat. § 260E.34(a)(1), (b).  Because both the federal and state immunity statutes require "good faith" on the part of the reporter, the Court considers the federal and state statutory immunity questions together.[16]

---

[15]     Minnesota's statutory immunity does not apply to the Section 1983 claim because "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law" without trampling upon the United States Constitution's Supremacy Clause.  *Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) (citation omitted).  However, because the state statutory immunity question is relevant to the state-law claims, the Court considers the immunity question here.

[16]     It is not clear whether Section 20342 even applies to A.M.R.'s and W.R.'s claims. As Dr. Harper recognizes, Section 20342 was not enacted until 2018.  ECF No. 65 at 17. But Dr. Harper's report of child abuse was made in July 2017—before Section 20342 was enacted.  ECF No. 7 ¶ 458.  At least one federal district court has determined that Section 20342 does not immunize conduct that occurred before Section 20342's enactment.  *See Grae-El v. City of Seattle*, No. C21-1678JLR, 2022 WL 1001465, at *2–4 (W.D. Wash. Apr. 4, 2022).  The Court need not resolve that question now because the amended complaint plausibly alleges that Dr. Harper did not act in good faith when she reported G.C.'s death as child abuse.

56

"Generally speaking, good faith is a matter of subjective intent." *J.E.B. v. Danks*, 785 N.W.2d 741, 749 (Minn. 2010). Reporting child abuse in good faith means that the report was "made without an ulterior motive, made without malice and made for a proper purpose." *Id.* at 750; *see Robinson v. Advocate Health & Hosps. Corp.*, No. 22 C 2058, 2023 WL 12077972, at *5 (N.D. Ill. Mar. 31, 2023) (applying state-law definition of "good faith" to Section 20342). "A reporter acting in good faith will be immune even if she is negligent or exercises bad judgment." *J.E.B.*, 785 N.W.2d at 749 (citation omitted).

Dr. Harper asserts that she "carried out her role in good faith pursuant to both medical ethics and statutory obligations to ensure child safety." ECF No. 65 at 19. That may well be so, but the amended complaint provides sufficient allegations, taken as true, to raise a factual issue as to Dr. Harper's good-faith reporting. *Gorog*, 760 F.3d at 792.

First, the amended complaint alleges that Dr. Harper knew of G.C.'s prior falls at home, macrocephaly, and genetic clotting disorder, all of which could allegedly explain why G.C. collapsed and died. ECF No. 7 ¶¶ 423–25. However, the amended complaint alleges that Dr. Harper omitted from her report the "exculpatory medical evidence referring to GC's [] scalp swelling, skull fracture and occipital bleeding" resulting from his falls at home, and that she "also omitted references to GC's genetic clotting disorder and his abnormally large head size, both of which were additional medical facts that Harper knew would exculpate" Sylwia. *Id.* ¶¶ 434–35. The amended complaint also alleges that Dr. Harper falsely represented that G.C. was "acting completely normal" in the days following his falls, and that her final report omitted multiple medical details inconsistent with a

57

finding of child abuse.[17]  *Id.* ¶¶ 458–64.  If Dr. Harper knowingly omitted a host of evidence from G.C.'s child-abuse report that would tend to exonerate Sylwia—as the amended complaint alleges—it raises the question of whether Dr. Harper's report of child abuse was made "for a proper purpose."  *J.E.B.*, 785 N.W.2d at 750.

Bolstering this conclusion are the allegations regarding Dr. Sharon and the extradition process.  According to the amended complaint, Dr. Sharon, a "well-respected and well-qualified" former colleague of Dr. Harper, raised concerns about Dr. Harper's child-abuse diagnostic practices, including her alleged practice of ignoring, omitting, and concealing "important medical opinions and findings" inconsistent with a finding of child abuse.  *See* ECF No. 7 ¶¶ 156–205.  Although Dr. Sharon's concerns with Dr. Harper came to light several years after G.C.'s death, those concerns tend to corroborate William's allegations that Dr. Harper wrongfully accused Sylwia of misconduct.  Dr. Harper's reputation among her colleagues may therefore properly inform whether she acted in good faith when reporting G.C.'s death as child abuse, at least at the pleading stage.  *See Estiverne v. Esernio-Jenssen*, 581 F. Supp. 2d 335, 347 (E.D.N.Y. 2008).  Moreover, the conclusion of Polish authorities that G.C.'s evaluating physicians demonstrated an "improper response to exculpatory medical evidence" further supports the claim that Dr. Harper did not act in good faith when she reported G.C.'s death as child abuse.  ECF No. 7 ¶¶ 553, 555–62.

---

[17]    As Dr. Harper correctly points out, the sole fact that Dr. Harper edited reports of her colleagues does nothing to demonstrate Dr. Harper's bad faith.  ECF No. 86 at 8.  But the amended complaint alleges more: that Dr. Harper knowingly excluded exculpatory evidence when reporting G.C.'s purported child abuse.  ECF No. 7 ¶¶ 434–35, 458–64.

Finally, the Court observes the amended complaint's allegations that Dr. Harper is financially and politically incentivized to identify cases of child abuse at any cost. ECF No. 7 ¶ 65 (describing political importance of identifying cases of child abuse "given the overwhelming public distaste over child abuse injuries and deaths"); *id.* ¶¶ 121–26 (describing state resources appropriated to counties based on number of child abuse reports and open child protection cases); *id.* ¶ 132. The amended complaint supports this allegation by observing that after Dr. Harper arrived in Hennepin County in 2014 (and Minnesota began appropriating child abuse funding based on the number of child abuse reports and open child protection cases), the number of reported child abuse cases in Hennepin County increased 228% over the previous eight-year average, which disproportionately exceeded the rates of reported child abuse in the other eight Twin Cities metropolitan-area counties. *Id.* ¶¶ 133–36. Reporting G.C.'s death as child abuse for financial or political purposes no doubt constitutes an "ulterior motive" for reporting child abuse. *J.E.B.*, 785 N.W.2d at 750; *See Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 318 (4th Cir. 2009) (holding that bad faith in reporting child abuse under a similar immunity statute exists when the report is made "out of self-interest").

This is not to say that Dr. Harper acted in bad faith as a matter of law. Of course, there could be perfectly innocent explanations for the conduct that William challenges, and discovery may ultimately prove William's allegations of bad faith wrong. But the Court is cognizant that a "[d]etermination of what constitutes good faith necessarily involves factual findings." *Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 728 (Minn. 1985). And at the pleading stage, the Court must accept William's plausible factual allegations as true.

*Gorog*, 760 F.3d at 792.  The Court must therefore accept as true William's allegations that Dr. Harper's child-abuse report knowingly omitted exculpatory information and was made to increase Dr. Harper's influence.  That plausibly alleges bad faith reporting, so the question of statutory immunity cannot be resolved at this time.

### 3.    Qualified Immunity

For similar reasons, the Court cannot resolve the Section 1983 claim in Dr. Harper's favor on qualified-immunity grounds at this juncture.  "Under the doctrine of qualified immunity, a court must dismiss a complaint against a government official in [her] individual capacity that fails to state a claim for violation of 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity analysis requires a two-step inquiry: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Nord v. Walsh County*, 757 F.3d 734, 738 (8th Cir. 2014) (citation omitted) (internal quotation marks omitted).  Unless both questions are answered affirmatively, qualified immunity applies.  *Id.*

In his response brief, William identifies several constitutional rights that Dr. Harper allegedly violated.  ECF No. 77 at 33–35.  But the amended complaint identifies only one constitutional right at issue: the due process right to familial integrity.  ECF No. 7 ¶¶ 587–606.  Because William may not amend his complaint "by the briefs in opposition to a

60

motion to dismiss," *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989), the Court focuses only on the due process right identified in the amended complaint.

"Parents have a liberty interest in the care, custody, and management of their children," but this interest is "limited by the state's compelling interest in protecting a child." *Swipies v. Kofka*, 348 F.3d 701, 703 (8th Cir. 2003). Accordingly, it has been clearly established for at least several decades that "when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse." *Manzano v. S.D. Dep't of Soc. Servs.*, 60 F.3d 505, 510–11 (8th Cir. 1995). The question, then, is whether Dr. Harper's report was founded upon a reasonable suspicion of child abuse.

The amended complaint plausibly alleges that Dr. Harper did not have that reasonable suspicion. Rather, the amended complaint alleges that despite being aware of substantial evidence that G.C.'s death was not the result of child abuse, Dr. Harper nevertheless went forward with accusing Sylwia of child abuse by knowingly omitting key exculpatory evidence from her report. ECF No. 7 ¶¶ 419–27, 434–35, 458–64. Under the "reasonable suspicion" standard, "an official is not free to disregard plainly exculpatory evidence when it undermines substantial inculpatory evidence that reasonable suspicion exists." *Stanley v. Finnegan*, 899 F.3d 623, 628 (8th Cir. 2018). Indeed, in *Stanley*, the Eighth Circuit held that a child-abuse investigator was not entitled to qualified immunity at the motion-to-dismiss stage when she decided to remove children from their parents' custody because of a report of child abuse. *Id.* The Eighth Circuit highlighted that the

complaint in that case "raise[d] a fair inference that [the investigator] was aware of the substantial exculpatory evidence developed during the five-hour investigation before [the investigator] made the decision to remove" the children. *Id.* So, too, is the case here: according to the amended complaint, Dr. Harper was made aware of numerous indications that G.C.'s death was not the result of abuse, yet omitted those details from her report, effectively misrepresenting the strength of the accusations against Sylwia. ECF No. 7 ¶¶ 371–75, 377–79, 419–27, 434–35, 458–64. Those allegations raise a fair inference that Dr. Harper lacked reasonable suspicion that G.C.'s death was caused by Sylwia's abuse. *Stanley*, 899 F.3d at 628; *see Dennis v. DeJong*, 867 F. Supp. 2d 588, 631–32 (E.D. Pa. 2011) (holding that social worker was not entitled to qualified immunity on a motion-to-dismiss when complaint alleged that she made misrepresentations to a judge to obtain removal of a child from their parents).

The amended complaint also raises the inference that Dr. Harper was motivated by professional influence or financial gain to determine that G.C. died from child abuse. ECF No. 7 ¶¶ 65, 121–26, 132. "Though perhaps unlikely, this theory is not implausible." *Stanley*, 899 F.3d at 328 (holding that complaint plausibly alleged that removal of children from parents' home was motivated by an improper purpose—specifically, disagreement with the parents' decision to homeschool); *see Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."). A.M.R.'s and W.R.'s Section 1983 claim against Dr. Harper therefore survives a motion to dismiss based on qualified immunity.

#### 4.      Personal Involvement

Dr. Harper finally argues that she was not personally involved in the deprivation of A.M.R.'s and W.R.'s due process right to familial integrity.   ECF No. 65 at 27–28. "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability . . . [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) (internal citation omitted) (internal quotation marks omitted).  This principle often arises in cases where a plaintiff seeks to impose Section 1983 liability on a tortfeasor's supervisor. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996).  Because supervisors are not liable for the misdeeds of their agents under a theory of respondeat superior, a supervisor may be held liable for a Section 1983 claim only when the supervisor is "personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation."   *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) (citation omitted).

Dr. Harper argues that she provided "medical consultation and opinions, which were then independently evaluated and acted upon by law enforcement, child protection authorities, and the courts."  ECF No. 65 at 27.  Dr. Harper therefore asserts that she did not "decide[] to indict [Sylwia] on murder charges."  *Id.* at 27–28.  Dr. Harper construes the personal involvement requirement of Section 1983 too narrowly, however.  The injury allegedly suffered by A.M.R. and W.R. was their July 2017 removal from the Reynolds family home and placement into foster care.  ECF No. 7 ¶¶ 478–81.  The amended

complaint does not allege that Dr. Harper was a mere supervisor of those responsible for that injury. Rather, the amended complaint plausibly alleges that Dr. Harper's own report of child abuse by Sylwia catalyzed the TPR proceedings, which in turn caused A.M.R.'s and W.R.'s separation from their parents. *See id.* ¶¶ 426–35 (alleging that Dr. Harper's and Dr. Lucken's report of child abuse was provided to law enforcement); *id.* ¶¶ 458–63 (describing Dr. Harper's reporting of G.C.'s death as child abuse); *id.* ¶¶ 466–67 (alleging that law enforcement accessed G.C.'s medical records); *id.* ¶ 484 (alleging that the TPR petition included the diagnostic conclusions of Dr. Harper). Put another way, the amended complaint alleges that Dr. Harper's report of child abuse was a "but-for" cause of A.M.R.'s and W.R.'s removal from the Reynolds family home.

Those allegations plausibly allege a "causal link" between Dr. Harper's actions and A.M.R.'s and W.R.'s alleged constitutional injuries. *Mayorga*, 442 F.3d at 1132 (citation omitted). Indeed, Dr. Harper's alleged role in this case is akin to a social worker who reports suspected child abuse—and in such cases, there is no dispute that the social worker's report of child abuse is a causal link in the removal of the child from their parents. *See Manzano*, 60 F.3d at 507–10; *Dornheim v. Sholes*, 430 F.3d 919, 921–22, 925–26 (8th Cir. 2005). The amended complaint therefore plausibly alleges Dr. Harper's personal involvement in a violation of A.M.R.'s and W.R.'s due process right to family integrity. Accordingly, that Section 1983 claim against Dr. Harper may proceed.

d.    **Abuse-of-Process Claims**[18]

Turning next to the abuse-of-process claims against Dr. Harper and Dr. Lucken, ECF No. 7 ¶¶ 636–39, under Minnesota law, that claim requires proof of two elements: (1) "the existence of an ulterior purpose"; and (2) "the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued, whether such result might otherwise be lawfully obtained or not." *Hoppe v. Kapperich*, 28 N.W.2d 780, 786 (Minn. 1947). The "gist of the action is the misuse or misapplication of the process, [a]fter it has once been issued, for an end other than that which it was designed to accomplish." *Id.* Although the Minnesota Supreme Court has never said as much, "process" for the purposes of this tort must mean judicial process: "[p]rocess is so denominated because it proceeds or issues forth in order to bring the defendant into court, to answer the charge preferred against him, and signifies the writs or judicial means by which he is brought to answer." *Eclipse Architectural Grp., Inc. v. Lam*, 814 N.W.2d 692, 697 (Minn. 2012) (emphasis omitted) (quoting *Process*, Black's Law Dictionary (9th ed. 2009)). Treatises on the law of torts agree. *See* Restatement (Third) of Torts: Liability for Economic Harm § 26 (Sept. 2025 update) (defining "process" in "abuse of process" as "the instruments by

---

[18]    As the Court transitions to A.M.R.'s and W.R.'s state-law claims, a brief interlude on subject-matter jurisdiction is warranted. The Court may consider the merits of those state-law claims under the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. The federal and state-law claims arise out of a "common nucleus of operative fact" (namely G.C.'s death and Defendants' conduct in reporting Sylwia for child abuse), which unlocks the door to the Court's supplemental jurisdiction. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). And no party argues that the Court, in its discretion, should decline to exercise jurisdiction over the state-law claims. *See Hunter v. Page County*, 102 F.4th 853, 869 (8th Cir. 2024). Accordingly, the Court exercises supplemental jurisdiction over A.M.R.'s and W.R.'s state-law claims.

which courts assert their jurisdiction and command others to appear, act, or desist"); Dobbs'

Law of Torts § 594 (Apr. 2025 update) (defining "process" in "abuse of process" as

"judicial procedures of various kinds," including "summons, subpoenas, attachments,

garnishments, replevin or claim and delivery writs, arrest under a warrant, injunctive

orders, and other orders directly affecting obligations of persons or rights in property");

Prosser & Keeton on Torts § 121 (5th ed. 1984) (explaining that for an abuse of process

claim to lie, "it is clear that the judicial process must in some manner be involved").

Accordingly, to plausibly state a claim for abuse of process, William must allege that after

the initiation or issuance of some judicial process, Dr. Harper and Dr. Lucken "misuse[d]"

that process for an "ulterior purpose." *Hoppe*, 28 N.W.2d at 786.

William does not allege as much.[19]  He asserts that Dr. Harper and Dr. Lucken

abused legal process by falsely reporting G.C.'s death as child abuse to law enforcement.

*See* ECF No. 7 ¶¶ 395, 410–14, 419–30, 446–55, 458–65, 637.  But when Dr. Harper and

Dr. Lucken reported G.C.'s death as child abuse, no judicial process had been instituted

against Sylwia; in fact, the initiation of judicial process would not come until more than a

week after Dr. Harper and Dr. Lucken made their reports.  *Compare id.* (describing Dr.

Harper's and Dr. Lucken's conduct from July 12, 2017, to July 17, 2017), *with id.* ¶ 484

(alleging that the TPR proceedings were initiated on July 24, 2017).  Because the amended

complaint does not allege that Dr. Harper or Dr. Lucken misused judicial process "[a]fter

---

[19]     The Court observes that William did not respond to Dr. Lucken's arguments for dismissal on the abuse-of-process claim, which itself forfeits the abuse-of-process claim. *See Dorosh*, 2023 WL 6279374, at *9.

it has once been issued," it fails to state an abuse-of-process claim against them. *Hoppe*, 28 N.W.2d at 786; *see Young v. Klass*, 776 F. Supp. 2d 916, 925 (D. Minn. 2011) (holding plaintiff failed to establish abuse of process claim against security guard when security guard's report to police about plaintiff preceded the initiation of judicial process, such as the plaintiff's arrest and criminal prosecution); *Brown v. City of Dermott*, 151 F.4th 985, 991–92 (8th Cir. 2025) (similar outcome on similar facts under similar state tort law).[20]

### e.    IIED Claims

The amended complaint next alleges an IIED claim against Dr. Harper, Dr. Lucken, and UMP.  ECF No. 7 ¶¶ 645–48.  An IIED claim under Minnesota law contains four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438–39 (Minn. 1983).  As to the third and fourth elements, a plaintiff must plausibly allege that the distress inflicted "is so severe that no reasonable [person] could be expected to endure it."  *Id.* at 439 (citation omitted).

The amended complaint fails to plausibly allege an IIED claim because, even assuming that Defendants' allegedly false report of child abuse constitutes "extreme and outrageous" conduct, there are no allegations as to the severity of A.M.R.'s and W.R.'s

---

[20]    A claim of abuse of process could exist with respect to William's allegation that Dr. Harper pressured the HCAO to maintain the pending criminal charges against Sylwia in 2023 out of Dr. Harper's own self-interest.  ECF No. 7 ¶ 566.  But at that point, the only injury resulting from that purported abuse of process would be Sylwia's continued self-exile in Poland.  As the Court has already explained, no plaintiff has standing to seek redress for that injury.

emotional distress resulting from their removal from the Reynolds family home in July 2017. Indeed, the amended complaint does not allege that they suffered emotional distress from this incident at all. *See* ECF No. 7 ¶¶ 478–81. Absent such allegations, the IIED claim fails as a matter of law. *See Mount v. Mount*, No. A19-1717, 2020 WL 3409818, at *3 (Minn. Ct. App. June 22, 2020) (affirming dismissal of IIED claim because plaintiff did not allege that he suffered severe emotional distress).

### f.    Civil Conspiracy Claims

The amended complaint finally alleges a civil conspiracy claim against all Defendants. ECF No. 7 ¶¶ 649–58. A civil conspiracy claim under Minnesota law requires (1) a combination of two or more people (2) to commit an unlawful act or a lawful act by unlawful means. *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950); *see Hong Chen v. Mar*, No. A10-1908, 2011 WL 2119406, at *5 (Minn. Ct. App. May 31, 2011). However, at this point, the only Defendant against whom A.M.R. and W.R. have pleaded a plausible claim for relief is Dr. Harper. Because the amended complaint does not plausibly allege that *two or more* people conspired to commit an underlying tort, the civil conspiracy claim fails as a matter of law.

*        *        *

What remains in this case, then, is a Section 1983 claim for damages against Dr. Harper in her individual capacity brought by A.M.R. and W.R. for their injury of being separated from their parents in July 2017 when they were removed from the Reynolds family home and placed in foster care.

68

## CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  The Board of Regents's Motion to Dismiss (ECF No. 52) is **GRANTED**;

2.  Hennepin County's and Nicholson's Motion to Dismiss (ECF No. 56) is **GRANTED**;

3.  Hennepin Healthcare's, Dr. Jouhari's, Dr. Lucken's, and Dr. Silbert's Motion to Dismiss (ECF No. 60) is **GRANTED**;

4.  Dr. Harper's and UMP's Motion to Dismiss (ECF No. 64) is **GRANTED in part and DENIED in part**;

5.  All claims brought by William on his own behalf are **DISMISSED WITH PREJUDICE**;

6.  All claims brought by William on Sylwia's and A.R.'s behalf are **DISMISSED WITHOUT PREJUDICE**;

7.  Claims brought by William on A.M.R.'s and W.R.'s behalf are **DISMISSED** as follows:

    a.  Count 1 of the amended complaint is **DISMISSED WITHOUT PREJUDICE** as against Nicholson;

    b.  Counts 2, 5, 6, 7, and 8 of the amended complaint are **DISMISSED WITHOUT PREJUDICE**; and

    c.  Counts 3 and 4 of the amended complaint are **DISMISSED WITH PREJUDICE**.

8.      No later than March 19, 2026, William is ordered to file a second amended complaint relevant to the single claim (Count 1) proceeding against a single defendant (Dr. Harper) in this action.  The second amended complaint must be no longer than 25 pages, double spaced.[21]

Dated: March 5, 2026                          *s/Laura M. Provinzino*
                                              Laura M. Provinzino
                                              United States District Judge

---

[21]    To be clear, William only has leave to amend the amended complaint to allege a Section 1983 claim for damages against Dr. Harper in her individual capacity brought by A.M.R. and W.R. for their injury of being separated from their parents in July 2017 when they were removed from the Reynolds family home and placed in foster care.  If William wishes to allege other claims or add other parties in a second amended complaint, he must seek leave to amend in accordance with Federal Rule of Civil Procedure 15(a)(2).

70