**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

William Reynolds, *as next friend of* A.M.R. and W.R., *minor children*,

*Plaintiff*,

v.

Nancy Sanders Harper, MD, *individually and in her capacity as Medical Director for the Otto Bremer Trust Center for Sage & Healthy Children at the University of Minnesota*,

*Defendant*.

Case No. 25-cv-754 (LMP/SGE)

**ORDER**

---

This matter is before the Court, United States Magistrate Judge Shannon G. Elkins, on Plaintiff William Reynolds' motion for leave to file a second amended complaint. (Dkt. 96.) Based on all the files, records, and proceedings herein, the motion will be granted-in-part and denied-in-part.

**BACKGROUND**

Plaintiff William Reynolds filed this action against various doctors, medical systems, governmental entities, and a child protection attorney, alleging that they conspired to falsely report incidents of child abuse and secure false child abuse prosecutions and convictions to earn political influence and secure governmental funding. The underlying facts are recited in the Honorable District Court Judge Laura Provinzino's March 5, 2026 Order (Dkt. 95), which this Court incorporates by reference. Briefly, Reynolds alleges that these individuals and institutions were involved in falsely reporting his wife Sylwia for

alleged child abuse after G.C., a child in her care, died in 2017. He alleges that the false report of child abuse led Hennepin County to try to terminate Sylwia's parental rights, forcibly remove their children A.M.R. and W.R. from the family's home, and criminally prosecute Sylwia for the child's death. The proceedings to terminate Sylwia's parental rights were later dismissed, but Sylwia remains in Poland in the face of pending criminal charges.

Judge Provinzino dismissed most of Reynolds' amended complaint, allowing only Reynolds' claim for damages under 42 U.S.C. § 1983 against Defendant Dr. Nancy Harper for A.M.R. and W.R.'s "injury of being separated from their parents in July 2017 when they were removed from the Reynolds family home and placed in foster care." (Dkt. 95 at 68.) In her order, Judge Provinzino granted Reynolds leave to amend his complaint "only" "to allege a Section 1983 claim for damages against Dr. Harper in her individual capacity brought by A.M.R. and W.R." for injury arising from their removal from the Reynolds family home and placement in foster care. (*Id.* at 70 n. 21.) If Reynolds wanted to allege any other claims or add other parties in a second amended complaint, "he must seek leave to amend" under the Federal Rules no later than March 19, 2026. (*Id.*) This motion followed.

In his Proposed Second Amended Complaint, Reynolds asserts claims for deprivation of rights under 42 U.S.C. § 1983 and intentional infliction of emotional distress against Dr. Harper, and a § 1983 *Monell* claim against Hennepin County and Hennepin Healthcare System, Inc. (Dkt. 96, Ex. 1 ("SAC").) Defendants oppose Reynolds' motion.

## ANALYSIS

### I. Legal Standard

The federal rules provide that courts should "feely give leave" to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). This forgiving standard does not, however, give parties an absolute right to amend their claims for any reason at any time. *See*, *e.g.*, *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 705 (8th Cir. 2008). Courts can deny a motion to amend for "compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Id.* (cleaned up).

An amendment is futile where the proposed claim "could not withstand a motion to dismiss under Rule 12(b)(6)." *Silva v. Metropolitan Life Ins. Co.*, 762 F.3d 711, 719 (8th Cir. 2014) (citation omitted). "To survive a motion to dismiss for failure to state a claim, the complaint must show the plaintiff 'is entitled to relief,' Fed. R. Civ. P. 8(a)(2), by alleging 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1063 (8th Cir. 2017) (en banc) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). On a motion to dismiss, the court must take all of the plaintiff's allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).

## II. Claims on Behalf of A.M.R. and W.R. under 42 U.S.C. § 1983

### A. Family Integrity

In her March 5, 2026 Order, Judge Provinzino determined that the Amended Complaint sufficiently alleged that Dr. Harper was a state actor and adequately pleaded factual issues as to Dr. Harper's good-faith reporting and qualified immunity, allowing A.M.R. and W.R.'s § 1983 claim alleging a violation of their due process right to family integrity to proceed. (Mar. 5, 2026 Ord. at 53-64.) Still, Judge Provinzino ordered Reynolds to file a second amended complaint relevant to this single claim not exceeding 25 pages. (*Id.* at 70.) Reynolds' SAC repleads the family-integrity claim, alleging that Dr. Harper's actions violated A.M.R. and W.R.'s due process right to family integrity.

Dr. Harper opposes Reynolds' repleaded § 1983 family integrity claim. She argues that since Judge Provinzino's order, "the parties have received documents which unambiguously clarify Dr. Harper's different roles for each organization, and plainly show she absolutely was not a state actor in connection with her clinical work at issue in this case." (Dkt. 104 at 7.) But courts do not consider matters outside the pleadings when determining whether a claim is stated. *E.g.*, *Enervations, Inc. v. Minn. Min. & Mfg., Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004). The SAC alleges that Dr. Harper acted in her capacity as Medical Director of the Otto Bremer Trust Center for Safe and Healthy Children when she evaluated G.C.'s case. (SAC ¶¶ 8, 19-21, 25, 82.) Because Dr. Harper would have been acting in her official capacity as a public employee at that time, the Court concludes that the SAC plausibly alleges state action on her part. Thus, the SAC advances the same

allegations that Judge Provinzino previously determined were sufficient to allege state action. (*See* Mar. 5, 2026 Ord. at 55.)

**B. Alternate § 1983 Theories**

Reynolds also attempts to add several theories of recovery under § 1983 beyond A.M.R. and W.R.'s familial integrity claim—fabrication and manufacture of evidence, concealment of exculpatory evidence, reckless failure to consider alternative causes of death, and unreasonable seizure and search. (SAC ¶¶ 86-104.) Dr. Harper argues that allowing amendment to include Reynolds' newly pleaded sub-claims would also be futile because (1) the new sub-claims are "merely an exercise in label-switching" and (2) the Eighth Circuit has not recognized stand-alone claims of the type described in the SAC.

As this Court sees it, Reynolds' first three sub-claims generally restate the § 1983 claim that Judge Provinzino ordered be repleaded. In her Order, she noted that the Amended Complaint "allege[d] that despite being aware of substantial evidence that G.C.'s death was not the result of child abuse, Dr. Harper nevertheless . . . omitt[ed] key exculpatory evidence from her report." (Mar. 5, 2026 Ord. at 61.) Judge Provinzino also conceded that, although perhaps unlikely, it was not implausible that Dr. Harper was motivated by professional influence or financial gain to reach her ultimate determination. (*Id.* at 62.) Reynolds' sub-claims asserting "fabrication and manufacture of evidence," "concealment of exculpatory evidence," and "reckless failure to consider alternative causes of death" are simply different names for the same thing. These "sub-claims" allege what Judge Provinzino granted Reynolds leave to replead in her Order: "a Section 1983 claim for damages against Dr. Harper in her individual capacity for their injury of being separated

from their parents in July 2017 when they were removed from the Reynolds family home and placed in foster care." (Ord. at 70 n.21.)

Reynolds' Fourth Amendment sub-claim is different. There, Reynolds alleges that the searches and seizures of A.M.R. and W.R. were based on Dr. Harper's report and caused them to suffer damages "including the trauma of removal from school by the authorities, the humiliation and lasting harm of strip searches, and all other damages described above . . . ." (SAC ¶¶ 101-04.) Reynolds relies on *Manuel v. City of Joliet*, 580 U.S. 357 (2017), to argue that a Fourth Amendment claim can rest on a seizure supported by fabricated evidence. (Dkt. 111 at 14.) In *Manuel*, however, the plaintiff brought a § 1983 suit against the City of Joliet and several police officers (i.e., the parties that effected his seizure) rather than the judge who allegedly falsified evidence justifying his detention. But Dr. Harper did not seize or search A.M.R. and W.R., nor did she did remove them from school. According to the SAC, Dr. Harper altered G.C.'s medical report and submitted it to the medical examiner and the Hennepin County Attorney's Office. (SAC ¶ 51-54, 58.) A few days later, Hennepin County officials filed a Termination of Parental Rights petition incorporating Dr. Harper's report and removed A.M.R. and W.R. from summer school. (SAC ¶ 63.) Although the Hennepin County officials relied on her report in the termination of parental rights, the SAC does not allege specific facts demonstrating that Dr. Harper had personal involvement in removing the children from school or preventing them from returning to the family home. *See Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006) ("To establish personal liability of the supervisory defendants, [a plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation

of his constitutional rights."). Accordingly, this Court will deny Reynolds' motion to add a theory of recovery against Dr. Harper arising from an alleged violation of A.M.R. and W.R.'s Fourth Amendment rights.

### III. Monell Claims

In addition to the § 1983 claim, the SAC attempts to revive *Monell* claims that did not survive Defendants' motion to dismiss. Judge Provinzino thoroughly examined and dismissed A.M.R. and W.R.'s *Monell* claims in her March 5 Order. (Mar. 5 Ord. at 40-48.) She determined that "[b]ecause state law did not vest Dr. Harper with final policymaking authority in Hennepin County, and because the Hennepin County Board of Commissioners or the Hennepin Healthcare Board of Directors delegated to Dr. Harper the legal power to implement child-abuse policies, A.M.R. and W.R. cannot pursue an official policy *Monell* claim against Hennepin County and Hennepin Healthcare." (Ord. at 46.) Judge Provinzino also determined that A.M.R. and W.R. "cannot bring an unofficial custom claim" because the Amended Complaint lacked any allegation that "at the time of their injuries, Hennepin County and Hennepin Health Care had notice of that pattern of unconstitutional conduct." (*Id.* at 47.)

Not to be dissuaded, Reynolds argues that the SAC cures these pleading deficiencies "by specifically alleging the formal contractual instruments that embedded [Dr.] Harper's authority into the governance structure of Hennepin County's child protection system, with no independent check on her conclusions at any level." (Dkt. 97 at 5.) Hennepin County and Hennepin Healthcare both argue that whether an individual exercises final policymaking authority remains a question of law, and the Second Amended Complaint

fails to allege that either law or custom vests Dr. Harper with policymaking authority. (Dkt. 106 at 16-19; Dkt. 107 at 24.)

To recover for a *Monell* claim, a plaintiff must demonstrate an injury that results from the "execution of a governmental policy of custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). The Supreme Court has "set a high bar for establishing municipal liability under § 1983, and demands careful analysis . . . to avoid any risk that liability could be imposed under a theory of respondeat superior" because a municipality "bears responsibility for its own torts, not the torts of its employees." *Soletsz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017). As such, *Monell* liability exists only where the constitutional violation alleged is the result of (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train of supervise an official or employee. *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016).

**A. Official Policy**

An official policy is "a deliberate choice to follow a course of action" by an "official who is determined by state law to have the final authority to establish governmental policy." *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998) (citation modified). An official-policy *Monell* claim therefore requires that the challenged policy be made by someone with "final policymaking authority" for the municipality. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013). Whether an individual exercised "final policymaking authority" is a question of law decided by the Court; only after the

Court determines that the challenged policy was implemented by someone with final policymaking authority can the Court consider whether that policy resulted in a constitutional violation. *See id.* at 1215 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). An individual official possesses delegated final policymaking authority when that official acts "(1) free of review and (2) without any constraints imposed as a matter of policy by the original policy maker." *Soletz v. Rushmore Plaza Civic Ctr.* 847 F.3d 941, 946 (8th Cir. 2017) (citing *City of St. Louis v. Praprotnik*, 485 U.S 112, 127 (1988)). Courts rely on two "key sources" to determine whether an individual is a final policymaker: (1) "state and local positive law"; and (2) state and local "custom or usage having the force of law." *Id.* (cleaned up).

Judge Provinzino carefully reviewed both "key sources" under *Soletz* and determined as a matter of law that "Dr. Harper clearly holds no final policymaking authority for either Hennepin County or Hennepin Healthcare." (Mar. 5, 2026 Ord. at 44-46.) Reynolds attempts to address the Amended Complaint's lack of factual enhancement by identifying various contracts between Hennepin County and University of Minnesota Physicians ("UMPhysicians"). (SAC ¶¶ 18-20.) Reynolds argues that one of these contracts—Personal Service Agreement A176983—"embedded [Dr.] Harper's authority into the governance structure of the child protection system, with no independent check on her conclusions at any level." (Dkt. 97 at 5-8.) But even if the Personal Services Contract operated to delegate some policymaking authority directly to Dr. Harper—which is far from certain and far from clearly pleaded—Reynolds admits that Hennepin County "retained the contractual right at all times to remove [Dr.] Harper from the agreement[.]"

(SAC ¶ 20.) A delegation of final authority "does not occur" where the "board retains the authority to review, even though it may not exercise such review or investigate the basis of the decision[.]" *Soletz*, 847 F.3d at 946-47. Regardless of whether Hennepin County exercised it, Hennepin County's right to remove Dr. Harper demonstrates that she was not delegated final policymaking authority via the Personal Services Agreement.

Reynolds also identifies a separate contract between UMP and Hennepin County—a Personal/Professional Service Agreement (Contract No. PR00003012) (the "3012 Contract"). (*See* Dkt. 97 at 7; Pierce Decl., Dkt. 109, Ex. 3.) But the 3012 Contract commenced on January 1, 2021—several years after the events alleged in the Second Amended Complaint. (*See* SAC ¶¶ 48-55.) Reynolds cannot base an official-policy *Monell* claim for conduct that occurred in 2017 on delegated authority arising from a contractual agreement that began in 2021. The 3012 Contract also provides that UMP "shall perform all services hereunder to the satisfaction of" Hennepin County and allows Hennepin County to terminate the contract with 30 days' written notice. Like the Personal Service Agreement above, Hennepin County's ability to terminate Dr. Harper clearly demonstrates that the 3012 Contract did not delegate final policymaking authority to Dr. Harper.

The third contract that Reynolds identifies is a "Master Cooperative Agreement" between Hennepin County and the Regents of the University of Minnesota. (SAC ¶ 18; Dkt. 97 at 7.) But Reynolds says nothing about this Master Cooperative Agreement other than that it exists. Nothing in the SAC alleges that provisions of this Master Cooperative Agreement evince an official policy of Hennepin County vesting Dr. Harper with the legal power to implement child-abuse policies.

Reynolds argues that his *Monell* claim should survive because the SAC adequately pleads facts alleging that Hennepin County ratified Dr. Harper's conduct without scrutiny. (Dkt. 114 at 4, citing SAC ¶¶ 34, 63, 107.) The SAC does not include any such connective allegations. It does not allege that Dr. Harper had any involvement in the 2015 Casey Family Programs assessment that identified significant deficiencies in Hennepin County's child-protection practices. (SAC ¶ 31.) It does not allege that Dr. Harper was at all involved in the deaths of children in Hennepin County's child-protection system, including Kendrea Johnson. (SAC ¶ 32.) It does not allege that deficiencies identified in a 2016 federal audit were caused by Dr. Harper. (*Id.*) Nor does it allege that Hennepin County "embed[ed] [Dr. Harper's] diagnostic conclusions into the formal governance structure" of the County's child-protection apparatus. (Dkt. 114 at 4.) The SAC's allegations that Hennepin County ratified Dr. Harper's conduct without scrutiny are exactly the "naked assertions devoid of further factual enhancement" that are insufficient to withstand a Rule 12(b)(6) motion. *Iqbal*, 556 U.S. at 678.

Because state law does not vest Dr. Harper with final policymaking authority, and because SAC does not plausibly allege that Hennepin County and Hennepin Healthcare delegated final policymaking authority to Dr. Harper, Reynolds' request to add an official policy *Monell* claim against Hennepin County and Hennepin Healthcare will be denied.

**B. Unofficial Custom**

Reynolds also seeks leave to add a *Monell* claim based on unofficial custom. "A municipal custom is a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law." *Russel v. Hennepin*

*County*, 420 F.3d 841, 849 (8th Cir. 2005) (citation modified). That custom must encompass "a widespread and persistent pattern of unconstitutional misconduct . . . policymakers were either deliberately indifferent to or tacitly authorized." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023) (citation omitted). "Notice is the touchstone of deliberate indifference" for a *Monell* claim. *Atkinson*, 709 F.3d at 1216. Accordingly, a plaintiff must allege a "persistent, widespread pattern of unconstitutional conduct *of which officials have notice* and subsequently react with deliberate indifference or tacit authorization." *Sorcan v. Rock Ridge Sch. Dist.*, 131 F.4th 646, 651 (8th Cir. 2025) (emphasis added) (citation omitted).

Judge Provinzino dismissed the previously-pleaded unofficial-custom claim because the Amended Complaint lacked any allegation that at the time of A.M.R. and W.R.'s injuries, Hennepin County and Hennepin Healthcare had notice of a persistent, widespread pattern of unconstitutional conduct. (Mar. 5, 2026 Ord. at 47-48.) The unofficial-custom claim in the SAC suffers from the same defect.

Like the Amended Complaint, the SAC fails to allege an unofficial custom that put Hennepin County and Hennepin Healthcare on notice of a pattern of unconstitutional conduct. Reynolds points to the 2015 report from the Casey Family Programs "identif[ying] significant deficiencies in Hennepin County's child protection practices," the death of Kendra Johnson "in foster care result[ing] in a $1.5 million settlement," and a "2016 federal audit further identif[ying] significant deficiencies in the county's child welfare practices." (SAC ¶¶ 32-33.) But the SAC does not allege that the underlying facts of the Casey report, Kendra Johnson's death, or the federal audit bear any factual similarity

to Dr. Harper's allegedly false reports. *See Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (plaintiff failed to show prior incidents bore factual similarity to facts underlying claims); *see also Hunziker at Tr. for ALJ v. Doherty*, Case no. 20-cv-2188 (NEB/TNL), 2021 WL 3146529 (D. Minn. July 26, 2021) (dismissing claim for failing to plead factual allegations describing specific policy, custom or practice); *Ratliff v. City of Columbia*, No. 99-1986, 1999 WL 1143752, at *1 (8th Cir. Nov. 24, 1999) (requiring plaintiff to demonstrate a "custom of failing to act on earlier similar complaints of unconstitutional conduct").

Reynolds also argues that the SAC's allegation that a surge in physical-abuse reports is sufficient to put Hennepin County and Hennepin Healthcare on notice of the alleged conduct that the SAC imputes to Dr. Harper. (*See* Dkt. 115 at 7-8.) Again, the SAC's reliance on the 2015 Casey Report, the death of Kendra Johnson in foster care, and the 2016 federal audit pleads no facts regarding or in any way related to Dr. Harper's conduct. Nothing in the SAC alleges that these events put Hennepin County or Hennepin Healthcare on notice of a persistent pattern of fabricated evidence or intentionally inaccurate diagnoses of the kind that underlie Reynolds' claims, whether by Dr. Harper or anyone else. *See, e.g., McGuire v. Cooper*, 952 F.3d 918, 922-23 (8th Cir. 2020) (requiring pattern of misconduct to be "very similar to the conduct giving rise to liability"). This lack of detail is fatal to an unofficial-custom claim. Accordingly, the Court determines that the SAC fails to state a *Monell* claim based on an unofficial custom.

### C. Failure to Train or Supervise

Reynolds also seeks leave to add a *Monell* claim for failure to train or supervise. In some limited circumstances, a municipality's "decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 562 U.S. 51, 61 (2011). To state such a failure-to-train claim, a plaintiff must allege: (1) the municipality's training practices were inadequate; (2) the municipality was deliberately indifferent to the rights of others in adopting those training practices such that the failure to train reflects a deliberate or conscious choice by the municipality; and (3) the inadequate training caused the plaintiff's constitutional deprivation. *Parrish v. Ball*, 591 F.3d 993, 997 (8th Cir. 2010) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996); *City of Canton*, 489 U.S. at 389).

Reynolds argues that the SAC alleges specific, identifiable supervision deficiencies and oversight mechanisms that Hennepin County and Hennepin Healthcare should have employed. (Dkt. 114 at 9-10; SAC ¶¶ 22-23.) Reynolds also alleges that the same pre-2017 facts that establish notice for the unofficial custom theory above establish notice for his failure-to-train claim. The Court disagrees. The SAC does not plead a pattern of constitutional violations by untrained or unsupervised staff similar to those it imputes to Dr. Harper. Nor does the SAC plead the existence of any prior instances of similar events that would have given Hennepin County or Hennepin Healthcare notice that its training and supervision of Dr. Harper (or someone fulfilling a similar role) "were inadequate and likely to result in constitutional violations." *Yang v. City of Minneapolis*, 607 F. Supp. 3d 880, 898 (D. Minn. 2022).

Reynolds' proposed amendment to include a *Monell* claim would be futile, and accordingly, this Court will deny the motion to amend to add them.

### C. Intentional Infliction of Emotional Distress

Finally, Reynolds seeks to revive an Intentional Infliction of Emotional Distress ("IIED") claim against Dr. Harper. Under Minnesota law, IIED contains four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress, and (4) the distress must be severe." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983). To satisfy the third and fourth elements, a plaintiff must plausibly allege that the distress inflicted was "so severe that no reasonable person could be expected to endure it." *Wenigar v. Johnson*, 712 N.W.2d 190, 208 (Minn. Ct. App. 2006) (quoting *Cafferty v. Garcia's of Scottsdale, Inc.*, 375 N.W.2d 850 853 (Minn. Ct. App. 1985)) (noting that courts "may look to the intensity and duration of the distress," and observing that the distress must exceed "the type that people commonly encounter and endure in their lives").

Dr. Harper argues that the alleged damages are not sufficient to support an IIED claim under Minnesota law and that it "strains plausibility" that A.M.R. and W.R.'s alleged severe emotional distress have any causal relationship to Dr. Harper. (Dkt. 104 at 21-22.) This Court disagrees. The Second Amended Complaint plausibly alleges an IIED claim against Dr. Harper. The alleged conduct of falsifying a child abuse report is extreme and outrageous, the SAC alleges that the conduct was intentional or reckless, and unlike the dismissed Amended Complaint, the SAC alleges that A.M.R. and W.R. suffered severe distress as a result of Dr. Harper's conduct, including nightmares, anxiety, depression, and

difficulty forming trusting relationship, as well as physical manifestations of extreme emotional distress. (SAC ¶ 78.) These particularized facts sufficiently plead severe emotional distress that no reasonable person could be expected to endure. *See Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 869 (Minn. 2003).

The SAC alleges that Dr. Harper fabricated a report of child abuse that led directly to the children being removed from the house, which removal resulted in severe emotional distress. (SAC ¶¶ 111-13.) To the extent Dr. Harper argues causation or the extent of damages, those are questions to be fleshed out in discovery and, if necessary, answered by the jury. Because the claim is sufficiently pleaded to state a claim for relief under Minnesota law, this Court grants Reynolds' motion for leave to amend to include an IIED claim.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT** Plaintiff William Reynolds' Motion for Leave to File Second Amended Complaint (Dkt. 96) be **GRANTED-IN-PART** and **DENIED-IN-PART** as set forth above; that the claims for violation of A.M.R. and W.R.'s due process right to Family Integrity claim under 42 U.S.C. § 1983 and for intentional infliction of emotion distress be allowed to proceed; and all other amendments be denied.

Dated: August 17, 2025

*s/Shannon G. Elkins*
SHANNON G. ELKINS
United States Magistrate Judge